**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| and TRUE THE VOTE, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 1:12-cv-800-WTL-TAB |
| v. | ) | |
| | ) | |
| J. BRADLEY KING, *et al.* | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

Judicial Watch, Inc., and True the Vote ("Plaintiffs") respectfully submit this

Memorandum in Opposition to the Motion to Dismiss and Memorandum in Support of

Defendants J. Bradley King, Trent Deckard, and Connie Lawson ("Defendants").

I.      **INTRODUCTION.**

Section 8 of the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg *et seq.*,

requires States to make reasonable efforts to remove the names of ineligible voters from their

official lists of eligible voters by reason of the death of the registrant or a change in the

registrant's residence.  Section 8 of the NVRA also mandates that any such voter list

maintenance programs or activities be uniform, nondiscriminatory, and in compliance with the

Voting Rights Act of 1965, among other important protections.

In 2006, the State of Indiana entered into a consent decree with the U.S. Department of

Justice that specifically required the State of Indiana to remedy its failure to comply with its

voter list maintenance obligations under Section 8 of the NVRA.  That consent decree expired in

2009.  According to data from the 2010 U.S. Decennial Census and data submitted by the State

1

of Indiana to the U.S. Election Assistance Committee ("EAC") regarding the 2010 general

election, however, *twelve* counties in the State of Indiana still had more registered voters on the

voter rolls than total voting age population in those counties as of 2010.  When Defendants were

asked for records about the efforts they undertook in 2010 and 2011 to satisfy their voter list

maintenance obligations, they failed to produce any records or make records available for

inspection.

Judicial Watch, Inc., which has many members who are registered to vote in the State of

Indiana, and True the Vote, which seeks to safeguard the integrity of elections by reviewing

voter rolls and filing citizen complaints, as well as through poll monitoring among other

activities, subsequently initiated this action to compel Defendants' compliance with Section 8 of

the NVRA.  Because Defendants received ample notice that they were in violation of Section 8

of the NVRA and both Judicial Watch, Inc. and True the Vote have standing to remedy

Defendants' Section 8 violations, Defendants' motion to dismiss should be denied.

## II.      STANDARD OF REVIEW.

The standard of review governing a Rule 12(b)(6) motion to dismiss is well established.

While a complaint need not contain detailed factual allegations, it must plead "enough facts to

state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570

(2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*citing Twombly,* 550 U.S. at 556).  The plausibility

standard "asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a

complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of

the line between possibility and plausibility of entitlement to relief.'" *Id.* (internal citations omitted) (*quoting Twombly*, 550 U.S. at 557).

In addition, when analyzing a complaint for failure to state a claim under Rule 12(b)(6), a court must "tak[e] all well-pled allegations of the complaint as true and view[] them in the light most favorable to the plaintiff." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (*quoting Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010)). "[A] plaintiff's claims should survive dismissal if relief could be granted under any set of facts that could be proved consistent with the allegations." *McMillan v. Collection Professionals, Inc*., 455 F.3d 754, 758 (7th Cir. 2006).

## III.   ARGUMENT.

### A.   The State of Indiana Received Ample Notice of The Violation.

On February 6, 2012, Judicial Watch, Inc. sent Defendants a detailed, four-page, single-spaced letter notifying them that the State of Indiana was in violation of Section 8 of the NVRA and advising them that a lawsuit may be brought against them to ensure compliance with the requirements of the law.  ECF No. 1 at ¶¶ 19, 21; ECF No. 21 at Exhibit 1; *see also* 42 U.S.C. § 1973gg-9(b)(1) and (2).  The letter explained that, under Section 8 of then NVRA, the State of Indiana was required to undertake a uniform, nondiscriminatory voter registration list maintenance program that complies with the Voting Rights Act.  ECF No. 21 at Exhibit 1.  It further explained that Section 8 required the State to make a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters due to (A) "the death of the registrant or (B) "a change in the residence of the registrant" to a place outside the jurisdiction in which he or she is registered.  *Id.*

The letter continued:

Based on our review of 2010 census data and publicly available eligible voter lists, it appears that Indiana is failing to comply with the voter registration list

maintenance requirements of Section 8 of the NVRA.  For example, it would appear that there are more people registered to vote in the Counties of Scott, Spencer, Crawford, Warrick, Tipton, Franklin, Warren, Union, Orange, Brown, Hancock, and Newton than there are adults over the age of 18 living in each county . . . .

The above information strongly suggests Indiana has not been maintaining its eligible voter lists and is therefore in violation of the NVRA.  Equally important, your apparent failure to maintain accurate, up-to-date voter registration lists creates a risk that elections in November 2012 and beyond may lack the integrity required by the NVRA and undermine public confidence in the electoral process. We are hopeful that you will outline and begin implementation of a reasonable compliance program quickly.

*Id.*

The U.S. Department of Justice undertook this exact same comparison of U.S. Census Bureau data and other publicly available data – specifically data from the State of Indiana's EAC Report – when it notified state officials of identical NVRA Section 8 violations in 2005, prior to filing its 2006 lawsuit.  *See* ECF No. 1 at ¶ 11-12; *see also U.S. v. State of Indiana, et al.*, Case No. 1:06-cv-01000-RLY-TAB (S. D. Ind.) (complaint filed June 27, 2006).[1]  In that case, the U.S. Department of Justice's 2006 complaint compared 2003 data from the U.S. Census Bureau to 2004 data from the State of Indiana's EAC Report.  *Id.*  By contrast, the February 6, 2012 letter and Plaintiffs' subsequent Complaint compared even more current U.S. Census Bureau data and EAC data than did the U.S. Department of Justice's 2006 complaint.  The 2010

---

[1]     Specifically, the 2006 Department of Justice Complaint alleged, in relevant part:  "The Department of Justice ('Department') first raised NVRA-related concerns in an April 7, 2005, letter addressed to the Indiana Secretary of State, with a carbon copy to the Co-Directors.  In that letter, the Department specifically noted that according to the 2003 Census estimates, Indiana had 23 counties with registration totals that were more than 100% of those counties' voting age populations.  According to data collected voluntarily from each State by the Election Assistance Commission ('EAC') from the November 2004 general election, 19 of 92 Indiana counties had more than 100% of their voting age populations ('2004 VAP') registered to vote.  In addition, 23 counties had 95-100% of their 2004 VAP registered to vote, and an additional 25 counties had registration totals of 90-95%."  The text of the Complaint is available online at http://www.justice.gov/crt/about/vot/nvra/in_nvra_comp.php.

Decennial Census data on which Plaintiffs rely was released on a rolling basis by state beginning in February 2011 and the EAC Report on which Plaintiffs rely was published on June 30, 2011.[2] It is difficult to imagine what data might be more current or more reliable or what information might be more compelling for purposes of demonstrating the failure of a State to satisfy its voter list maintenance obligations than pointing out that the number of names on its voter registration rolls exceeds total voting age population.

In addition, while Defendants quote selectively from the February 6, 2012 letter, other quotes demonstrate that the violations were clearly alleged and explained.  ECF No. 21 at Exhibit 1.  For instance, page 1 of the letter states "[t]his letter serves as advance notice that a lawsuit may be brought against you if you do not take action to correct this apparent violation of Section 8 within 90 days."  *Id*.  The letter then goes on for three more pages to explain the specific statutory subsections of the NVRA Section 8 that the State of Indiana is violating, the evidence of excessively populated Indiana voter roll data which shows this violation, the legal consequences of NVRA violations, and steps Indiana could take to avoid a lawsuit.  *Id*.   The letter provides ample notice of the State of Indiana's violation.

Nor is there any legal support for Defendants' argument that the allegations made in the February 2012 letter did not allege an NVRA violation with sufficient specificity.  The decisions cited by Defendants are either irrelevant or support Plaintiffs' position that the letter provided them with ample notice of the violation.  ECF No. 21 at 6, 8 (*citing Broyles v. Texas*, 618 F. Supp. 2d 661, 692 (S.D. Tex. 2009), *aff'd*, 381 F. App'x 370 (5th Cir. 2010) and *Ferrand v. Schedler*, 2011 U.S. Dist. Lexis 82906, *23 (E.D. La. July 21, 2011)).

---

[2]     Defendants speculate that Plaintiffs compared 2010 census data with 2012 EAC data. Defendants are wrong.  ECF No. 21 at 2, 9-10.  Obviously, 2012 EAC data would not even have been available as of the date of the February 6, 2012 letter.

For instance, the plaintiffs in *Broyles* admitted that they did not provide the State of Texas with *any* written advance notice of an NVRA violation prior to filing a lawsuit – the first "notice" received by the State of Texas was a summons and complaint. *Broyles*, 618 F. Supp. 2d at 691. In addition, *Ferrand* merely stands for the proposition that discovery in an NVRA lawsuit between a State and a private litigant properly extends back to a date 10 years prior to the date of notice of violation. *Ferrand*, 2011 U.S. Dist. Lexis 82906, *22-23.

Defendants' reliance on *Assoc. of Community Orgs. for Reform Now v. Miller*, 129 F.3d 833 (6th Cir. 1997) ("*Miller*") merely serves to illuminate their lack of NVRA compliance. In that case concerning the State of Michigan's NVRA compliance, the Court observed that the sole purpose of the notice requirements under the NVRA was to give states an opportunity to cure their violations before being sued, not to establish complicated procedural hurdles for aggrieved parties seeking enforcement. The Court in *Miller* held:

> The language and legislative history of 42 U.S.C. § 1973gg-9(b) indicate that Congress structured the notice requirement in such a way that notice would provide states in violation of the Act ***an opportunity to attempt compliance*** before facing litigation. Senate Comm. on Rules and Admin., National Voter Registration Act of 1993, S. Rep. No. 6, 103d Cong., 1st Sess. 41 (1993).

*Id.* at 838 (emphasis added). In this case, Defendants made no effort to attempt to comply with the NVRA upon receiving the February 6, 2012 letter. Nor did they claim that they did not understand the letter or required additional specificity. Rather, they issued a blanket denial.[3] ECF No. 1 at ¶ 22.

---

[3]    It should be noted that Defendants' behavior today stands in contrast with its actions upon being sued for essentially the same list maintenance violations by the U.S. Department of Justice in 2006. *See* ECF No. 1 at ¶¶ 11-12. In that case, over a mere two month span, Defendants engaged in a comprehensive effort to comply with the NVRA by removing 120,000 registrations from outdated voter rolls, mailing over 200,000 letter notices, and inactivating an additional 300,000 registrations. ECF No. 1 at ¶ 13. In the present case, six months have passed since the State of Indiana received the February 6, 2012 notice letter, and Defendants apparently have done nothing.

Finally, it simply is not credible that the February 6, 2012 letter did not provide Defendants with sufficient information to be put on notice that they were being accused of violating Section 8 of the NVRA.  As Plaintiffs alleged in their Complaint, the State of Indiana faced a lawsuit in 2006 from the U.S. Department of Justice concerning the same NVRA Section 8 violations alleged now.  ECF No. 1 at ¶ 11.  That 2006 Department of Justice letter made virtually identical claims to those asserted in the February 6, 2012 letter, albeit concerning an earlier time period.  *See* fn. 1, *supra*; *see also* ECF No. 1 at ¶¶ 14, 15, 19.  Given the State of Indiana's history of failing to comply with Section 8 of the NVRA and its entry into a consent decree with the U.S. Department of Justice to settle a similar lawsuit in 2006, Defendants had ample notice of the violations alleged by Plaintiffs in their Complaint.   The notice requirements of 42 U.S.C. § 1973gg-9(b)(1) and (2) were clearly satisfied by the February 6, 2012 letter.

Nor was there any need for a separate notice letter specifically sent in the name of True the Vote.  Defendants even acknowledge that such a requirement would run contrary to case law regarding futility.  ECF No. 21 at 11 (*citing Miller*, *supra.*)  In *Miller*, the Court held that duplicate notices for the same violations are unnecessarily futile acts once the allegations have been denied.  *Miller*, 129 F.3d at 838.[4]  Defendants' March 15, 2012 response to the February 6, 2012 letter was a flat out denial of any violation.  ECF No. 1 at ¶ 22.  Nor did they even hint that they would undertake any steps to satisfy their voter list maintenance obligations.  Accordingly,

---

[4]      Defendants incorrectly describe *Miller* as involving whether parties must provide separate notices of an NVRA violation to a State for purposes of intervention when the parties share the same claim against the State.  ECF No. 21 at 11.  Rather, *Miller* held that no separate violation is required to sue jointly as a second or third plaintiff, not to join as an intervener. *Miller*, 129 F.3d at 838; *see also Assoc. of Community Orgs. for Reform Now v. Miller*, 912 F. Supp. 976, 983 (W.D. Mich. 1995) ("Given the facts of the case, I agree that requiring the above plaintiffs to file individual notice where defendants had already ignored actual notice would be to require them to perform futile acts. For this reason, I find plaintiffs are not barred for failing to file notice.").  Accordingly, *Miller* presents facts nearly identical to the instant case and is directly applicable here.

any duplicative notice sent by True the Vote would have been futile.  Indeed, a contrary ruling would only serve to needlessly delay resolution of this matter, as True the Vote could send its own, separate letter to Defendants tomorrow, triggering the notice and opportunity to cure period once again.  The interests of judicial economy clearly weigh against such an empty gesture.

**B.      Plaintiffs' Complaint Amply States A Claim for Violation of Section 8 of the NVRA.**

Defendants raise a host of arguments challenging whether Plaintiffs' Complaint state a claim for a violation of Section 8 of the NVRA.  All of Defendants' arguments are unfounded.

1.      Decennial U.S. Census Data and EAC Data Are Sufficient
and Presumed Accurate

Defendants challenge Plaintiffs' use of U.S. Census Bureau and EAC data.  *See* ECF No. 1 at ¶ 14.  Not only is the data used by Plaintiffs the most current data available, but Decennial U.S. Census data in particular is presumed to be accurate for purposes of federal voting laws. *McNeil v. Springfield Park District*, 851 F.2d 937, 946 (7th Cir. 1988), *cert. denied*, 490 U.S. 1031 (1989).  In *McNeil*, the plaintiff sought a mid-decade redistricting under Section 2 of the Voting Rights Act based on the alleged dilution of the votes of African-American voters.  The plaintiffs argued that their claims were factually supported because "population growth since the 1980 census has produced a black voting age majority…."  *McNeil*, 851 F.2d at 939.  The Court rejected this argument because it was based on data other than data from the Decennial U.S. Census.  The Court's language is instructive:

> ***The census is presumed accurate until proven otherwise***.  Plaintiffs fail to provide any concrete evidence to rebut the presumption. In the present state of the demographic art, estimates based on past trends are generally not sufficient to override "hard" decennial census data. As the Supreme Court pointed out in *Gaffney* . . . , populations change constantly and kinks in the data are common. Perhaps in the future, there will be some shift in the decennial approach to the facts of population. But the meager evidence before us ***cannot override the presumption of census accuracy***.

*McNeil*, 851 F.2d at 946 (internal citations omitted) (emphasis added).  The same holding was

applied in 2008 in another VRA Section 2 redistricting case.  *U.S. v. City of Euclid*, 580 F. Supp.

2d 584, 594, n.8 (N.D. Ohio 2008) ("The government's demographic information is derived from

the 2000 Census.  While the City has attacked the use of this data as outdated, despite an

opportunity to do so, the City has never provided reliable updated data which would give the

Court an alternative benchmark against which to measure the issues presented.  As a result, the

2000 Census data represents the only meaningful data before the Court.").

In short, in case after case requiring judicial determinations under the federal voting laws,

"[d]ata from a prior decennial census is presumed accurate unless contradicted by clear, cogent,

and convincing evidence."  *U.S. v. Charleston County*, 316 F. Supp. 2d 268 (D.S.C. 2003), *aff'd.*,

365 F.3d 341 (4th Cir. 2004); *see also Johnson v. DeSoto County Bd. of Comm'rs*, 204 F.3d

1335, 1341 (11th Cir. 2000); *Valdespino v. Alamo Heights Ind. Sch. Dist.,* 168 F.3d 848, 853

(5th Cir. 1999); *accord, Garza v. County of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990)

(predictive data may be substituted for decennial census data as evidence in federal voting cases

if it offers the court "a high degree of accuracy" (internal quotations omitted)).

Furthermore, it would present an impossibly high bar for lawsuits seeking to remedy

violations of Section 8 of the NVRA if the plaintiffs bringing such lawsuits had to rely on

something other than the most current Decennial U.S. Census and EAC data available.

Plaintiffs' reliance on 2010 Decennial U.S. Census data, released on a rolling basis in February

and March of 2011, and data from the State of Indiana submissions to the EAC for the November

2010 election, released to the public in June of 2011, is completely reasonable.  *See also Ind.*

*Forest Alliance, Inc. v. U.S. Forest Serv*., 325 F.3d 851, 864 (7th Cir. 2003).

In any event, the sufficiency of Plaintiffs' evidence is a question for the Court to rule on at trial, not on a motion to dismiss.  *McNeil*, 851 F.2d at 946.  Each of the above-cited cases concerning the sufficiency of decennial census data and other data was decided at the evidentiary phase of the proceedings, not on a Rule 2(b)(6) motion.  *McNeil* concerned a judgment rendered after trial.  The decision in *U.S. v. Euclid* was handed down following a bench trial, as was the decision in *U.S. v. Charleston County*.  In addition, *Johnson v. DeSoto County*, *Valdespino v. Alamo Heights*, and *Garza v. Los Angeles* all concerned appeals from lower court rulings following trials.  There is simply no authority for Defendants' assertion that decennial census data and EAC data is insufficient to state a claim for violation of Section 8 of the NVRA as a matter of law.

> 2.      Plaintiffs' Complaint Amply Alleges a Violation of the
> "Records Inspection" Provision of  NVRA Section 8.

Defendants' argument that Plaintiffs have failed to state a claim for a "records" violation of Section 8 of the NVRA also is without merit.  In addition to imposing voter list maintenance obligations on the States, Section 8 of the NVRA also requires that the States "shall maintain for at least 2 years and shall make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  42 U.S.C. § 1973gg-6(i).  The February 6, 2012 letter expressly requested the following:

> Finally, pursuant to the requirements of the NVRA, please make available to us all pertinent records concerning "the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency" of Indiana's official eligible voter lists during the past 2 years.  42 U.S.C. § 1973gg-6(i).

ECF No. 1 at ¶ 20; ECF No. 21 at Exhibit 1, p. 3.

Under the the public records inspection provision of Section 8 of the NVRA, "[f]or a plaintiff to sufficiently allege an informational injury, it must first allege that the statute confers upon it an individual right to information, and then that the defendant caused a concrete injury to the plaintiff in violation of that right." *Project Vote/Voting for America, Inc. v. Long*, 752 F. Supp. 2d 697, 702 (E.D. Va. 2010) (internal citations omitted). Furthermore, plaintiffs "need show [no] more than that they sought and were denied specific agency records." *Id.* at 703 (internal citations omitted).

Plaintiffs quite plainly allege that they requested and were denied access to the State of Indiana's records concerning its voter list maintenance efforts and that they suffered an injury as a result. ECF No. 1 at ¶ 20, 22, 31, 39. Consequently, Plaintiffs have stated a claim for a "records" violation of Section 8 of the the NVRA. *Project Vote/Voting for America, Inc.*, 752 F. Supp. 2d at 702; 42 U.S.C. § 1973gg-6(i).

Defendants argue that Plaintiffs did not give them enough details concerning which records they wanted to inspect and when they wanted to inspect them. ECF No. 21 at 4. However, the NVRA contains no requirement that a requestor specify times and places for the inspection of records. The burden was on Defendants to respond to Plaintiffs' entirely proper request to inspect the State's records. If Defendants had any intention of complying with the request, they obviously would have asked Plaintiffs to select a time a time and place for the inspection. If Defendants truly required any clarification about which particular records Plaintiffs wanted to inspect, they could have asked for additional specificity. They did neither. They only ever issued their blanket "dismissal" of March 15, 2012. ECF No. 1 at ¶ 22. In fact, Defendants have ***still*** not responded to the request to inspect the State's records, even to inform Plaintiffs that the request would be honored on some future date. Accordingly, Defendants'

11

motion to dismiss Plaintiffs' claim for violation of the right to inspect the State's records regarding is voter list maintenance efforts should be denied.

        3.      Plaintiffs' Complaint Amply Alleges a Violation of <u>List Maintenance Obligations of</u> NVRA Section 8.

Nor does Defendants' argument that Plaintiffs' Complaint fails to state a claim for a violation of the voter list maintenance obligations of Section 8 of the NVRA fare any better.  As amply alleged in the Complaint and described above, based on a comparison of 2010 Decennial U.S. Census data and data submitted by the State of Indiana to the EAC for the 2010 general election, no less than **twelve** counties in the State of Indiana are alleged to have more registered voters on the voter rolls than total voting age population.  ECF No. 1 at ¶ 14.  According to the U.S. Census Bureau, the average rate of voter registration during the presidential election year of 2008 was seventy-one percent.[5]  The fact that, based on the most currently available, presumptively reasonable data, a State is alleged to have even a single county with more registered voters than the total voting age population ought to be sufficient to give rise to a claim for a violation of the State's obligation under Section 8 of the NVRA to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters."  42 U.S.C. §§ 1973gg-6.  Any other reading of the NVRA fails to give effect to its plain language.

With so many counties in the State of Indiana alleged to have more registered voters than total voting age population, it is more than merely "plausible" that the State of Indiana has

---

[5]    *See* U.S. Census Bureau, "Voting and Registration in the Election of November 2008," (Issued May 2010), Page 1 ("In 2008, 71 percent of voting-age citizens were registered to vote, a decrease compared to the 72 percent who were registered in 2004."), *also* Page 2, Table 1: "Reported Rates of Voting and Registration: 1996 to 2008," available at www.census.gov/prod/2010pubs/p20-562.pdf (visited August 17, 2012).

violated its voter list maintenance obligations under Section 8 of the NVRA.[6] *Iqbal*, 556 U.S. at 663; 42 U.S.C. §§ 1973gg-6; ECF No. 1 at ¶ 14.  It is compelling.  In addition, Plaintiffs also have alleged that the State of Indiana has a history of violating its voter list maintenance obligations, and, when asked to inspect records of Defendants' voter list maintenance programs and activities in two years prior to February 2012, Defendants either were unable to allow the requested inspection or simply ignored the request.  ECF No. 1 at ¶¶ 11-12, 20, and 22. Plaintiffs have pled ample facts sufficient to state a claim for violation of the voter list maintenance obligations of Section 8 of the NVRA, and Defendants' motion to dismiss Plaintiffs' claims in this regard must be denied.

      **C.**      **Judicial Watch, Inc. and True the Vote Have Standing to Assert Claims for Violations of the List Maintenance Obligations of NVRA Section 8.**

Pursuant to the NVRA, any person who is "aggrieved" by a violation of its provisions "may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation."  42 U.S.C. § 1973gg-9(b)(2).  As an initial matter, Defendants do not claim that Plaintiffs lack standing to pursue their claims for a violation of the records inspection provision of Section 8 of the NVRA.  They plainly have standing.  *Project Vote/Voting for America, Inc.*, 752 F. Supp. 2d at 702.  Defendants only claim that Plaintiffs lack standing to

---

[6]       Nor can Defendants try to push the State of Indiana's voter list maintenance obligations off on the counties.  *See, e.g.*, *U.S. v. Missouri*, 535 F.3d 844, 851 (8th Cir. 2008) ("Although Missouri cannot be required to *enforce* the NVRA against the [Local Election Authorities ('LEA')], any lack of LEA compliance remains relevant to determining whether or not Missouri is reasonably 'conduct[ing] a general program.'  Other remedies besides ordering Missouri to enforce the NVRA against the LEAs may remain.  For instance, if the district court determines a lack of LEA compliance renders Missouri's efforts to conduct a general program unreasonable, it could order Missouri either to (1) develop different or improved methods for *encouraging* LEA compliance, or (2) assume direct responsibility for some or all of the activities needed to remove ineligible voters from the voter rolls (i.e., cease delegating NVRA responsibilities to the non-complying LEAs).").

pursue their claims for violation of the voter list maintenance obligations of Section 8 of the NVRA. Both Judicial Watch, Inc., by and through its members, and True the Vote, as an organization, have asserted unique injuries that give them standing to pursue private rights of action to enforce the list maintenance provisions of Section 8 of the NVRA – rights Congress saw fit to invest in them. 42 U.S.C. § 1973gg-9(b).

    1.    Judicial Watch, Inc. Has Associational Standing
               <u>To Pursue This Claim on Behalf of Its Members</u>.

Defendants do not challenge Judicial Watch, Inc.'s ability to represent its members as an association. Indeed, Judicial Watch, Inc. has associational standing to pursue a claim on behalf of its members who are registered to vote in the State of Indiana because the election integrity issues raised by this claim are directly germane to Judicial Watch, Inc.'s purpose and the participation of its registered voter members is not necessary for resolution of the claim.[7] ECF No. 1 at ¶¶ 23-29.

Judicial Watch, Inc. alleges two types of injuries to its members who are registered to vote in the State of Indiana. First, Judicial Watch, Inc. alleges that these members have suffered an injury to their statutory rights under the NVRA. Second, Judicial Watch, Inc. alleges that the

---

[7]     *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2007). With respect to germaneness, protecting Judicial Watch members' interest in the integrity of elections to federal office is central to Judicial Watch's purpose of ensuring integrity in government and politics. *See Common Cause v. Buescher*, 750 F. Supp. 2d 1259, 1271 (D. Colo. 2010). Judicial Watch members' views on Indiana's failure to protect the integrity of federal elections are known such that Judicial Watch may express them collectively. *Int'l Union v. Brock,* 477 U.S. 274, 290 (1986). Judicial Watch both "provides the means by which [its members] express their collective views" on election integrity issues and "protect[s] their collective interests" in the same. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 345 (1977); ECF No. 1 at ¶ 28. The instant lawsuit brought on behalf of its members is therefore "within the scope of reasons that individuals joined" Judicial Watch. *Friends of the Earth, Inc. v. Chevron Chemical Co.*, 129 F.3d 826, 829 (5th Cir. 1997). Finally, where as here "the relief sought is injunctive, individual participation of the organization's members is 'not normally necessary.'" *Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) (internal citation omitted).

Defendants' failure to satisfy their voter list maintenance obligations under Section 8 of the NVRA is injuring these same members by undermining their confidence in the legitimacy of the elections held in the State of Indiana and thereby burdening their right to vote.

The failure of Defendants to satisfy their voter list maintenance obligations under Section 8 of the NVRA is injuring the statutory rights of members of Judicial Watch, Inc. who are registered to vote in the State of Indiana.  ECF No. 1 at ¶ 26.  Specifically, because these members have registered to vote in the State of Indiana, they have a statutory right to vote in elections for federal office that comply with the procedures and protections required by the NVRA, including the statutory right to be registered on voter rolls that are reasonably accurate and current and reasonably well-maintained.  *See* 42 U.S.C. §§ 1973gg(b)(4), 1973gg-6(a)(1), 1973gg-6(a)(4).  Defendants' failure to satisfy its voter list maintenance obligations under Section 8 of the NVRA is depriving these members of that statutory right, which constitutes a discrete injury for purposes of standing.  *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("*Cox*") (finding an alleged injury to the NVRA statutory right to have a State accept a change of address notification and declaring that "where an alleged injury is to a statutory right, standing exists 'even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute.'").

Defendants' failure to satisfy their voter list maintenance obligations under Section 8 of the NVRA also is injuring the right to vote of Judicial Watch, Inc.'s members who are registered to vote in the State of Indiana.  Importantly, any burden on a right as fundamental as the right to vote is sufficient to establish injury for purposes of standing.  As one court recently held:

> [T]he Secretary wrongly implies that actual "disenfranchisement" is the only injury alleged by Plaintiffs and because voters removed from active voter rolls under the 20-day Rule may still vote provisionally on election day, none can demonstrate actual disenfranchisement. . . ***Any burden on the right to vote***, even

> if it is no more than the cancellation of a voter's records in violation of the NVRA, ***constitutes an injury-in-fact for standing purposes***.

*Common Cause*, 750 F. Supp. 2d at 1271 (emphasis added).  In other words, requiring an eligible voter to fill out a provisional ballot that nonetheless will be counted and afforded the same weight as any non-provisional ballot burdens a voter's right to vote and therefore establishes injury.  Similarly, the Court in *Cox* held that a State's rejection of a voter's mail-in registration update sufficiently burdened a voter's right to vote to constitute an injury for standing purposes even when the voter remained registered to vote.  *Cox*, 408 F.3d at 1352 ("A plaintiff need not have the franchise wholly denied to suffer injury. Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient.").  Likewise in *Black v. McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002) ("*McGuffage*"), the Court found that a disproportionate, prospective risk of future votes not being counted due to disparities in the types of voting machines used in different precincts burdened the right to vote and constituted an injury for standing purposes:

> Plaintiffs have identified an electoral practice (deficient ballot systems), and have alleged that because of that practice they have less opportunity than other members of the electorate to participate in the political process. . .Under the facts alleged in the first amended complaint, the disparate rates of undervotes indicates that Plaintiffs, as voters residing in predominantly Latino and African American precincts where punch card machines are utilized, bear a greater risk that their votes will not be counted than do other voters.  As such, Plaintiffs' participation in the political process could be significantly diminished.

*Id.* at 896 (emphasis added).

Defendants' failure to satisfy its voter list maintenance obligations is injuring members of Judicial Watch, Inc. who are registered to vote in the State of Indiana by burdening their right to vote.  This constitutes an injury that is neither speculative nor conjectural.  Indeed, one of the purposes of the NVRA is "to protect the integrity of the electoral process."  42 U.S.C. §

1973gg(b)(4).  As the U.S. Supreme Court has recognized and the Court in *McGuffage* reiterated,

ensuring that voters have confidence in the integrity of elections is essential to ensuring citizens

continue to participate in American democracy:

> Confidence in the integrity of our electoral processes is essential to the
> functioning of our participatory democracy. . .***Voters who fear their legitimate
> votes will be outweighed by fraudulent ones will feel disenfranchised***.

*Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (emphasis added); *see also Crawford v. Marion*

*County Election Bd.*, 553 U.S. 181, 197 (2008) ("[P]ublic confidence in the integrity of the

electoral process has independent significance, because it encourages citizen participation in the

democratic process.").  When no less than ***twelve*** counties in the State of Indiana have more

persons who are registered to vote than total voting age population, voter confidence in the

electoral process is undermined and voters are less motivated to participate in that process.

*Crawford*, 553 U.S. at 197; *Purcell*, 549 U.S. at 4; *McGuffage*, 209 F. Supp. 2d at 896.

Defendants' failure to satisfy their voter list maintenance obligations is burdening Judicial

Watch, Inc.'s members' right to vote by undermining members' confidence in the electoral

process.  Defendants' failure to satisfy their voter list maintenance obligations is injuring Judicial

Watch, Inc.'s members who are registered to vote in the State of Indiana.  Moreover, because

these members' injury is fairly traceable to the State's failure to satisfy its voter list maintenance

obligations and is likely to be redressed by a favorable opinion in this litigation, they have

standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Because Judicial Watch,

Inc.'s members who are registered to vote in the State of Indiana would have standing to seek

redress for the State's failure to satisfy its voter list maintenance obligations under Section 8 of

the NVRA if these members brought their own claims, Judicial Watch, Inc. has associational

standing to seek redress on their behalf.

2.      True the Vote Has Organizational Standing to
         Pursue This Claim on its Own Behalf.

True the Vote alleges that Defendants' failure to satisfy their voter list maintenance obligations under Section 8 of the NVRA is injuring True the Vote's activities and otherwise impairing its ability to perform its work.  An organization has standing to sue on its own behalf when it "has suffered a 'concrete and demonstrable injury to the organization's activities.'" *Assoc. for Disabled Americans, Inc. v. Claypool Holdings*, 2001 U.S. Dist. Lexis 23729, *43 (S.D. Ind. Aug. 6, 2001), (*citing Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  Where a defendant's actions are alleged to "impair[] [an organization's] ability to perform its work," the organization suffers an injury-in-fact.  *Plotkin v. Ryan*, 1999 U.S. Dist. Lexis 16214, *19 (N.D. Ill. Sept. 28, 1999), *aff'd*, 239 F.3d 882 (7th Cir. 2001).

*Common Cause* is instructive on this point.  In *Common Cause*, the State of Colorado was alleged to have violated the NVRA by cancelling new voter registrations submitted by Common Cause and other groups.  *Common Cause,* 750 F. Supp. 2d at 1269.  Importantly, the State of Colorado was not alleged to have prevented the organizations from collecting and submitting new voter registrations.  Rather, the State of Colorado's actions were only alleged to have rendered the organizations' efforts less effective.  The groups nonetheless were found to have suffered an organizational injury because the State of Colorado's actions made it "difficult or impossible" for the organizations to fulfill one of their "essential purposes or goals."  *Common Cause*, 750 F. Supp. at 1269.

True the Vote's essential purposes and goals include obtaining and analyzing voter registration rolls to improve their accuracy and currency.  ECF No. 1 at ¶¶ 32-37.  To this end, True the Vote obtains official lists of eligible voters and compares these lists to other publicly available date to identify inaccuracies and deficiencies.  *Id.* at ¶ 33.  Registrations that appear to

18

be duplicates or registrations of persons who are deceased, have relocated, or otherwise are

ineligible to vote in a particular jurisdiction are flagged, and citizen complaints are filed with

appropriate election officials.  *Id.*  This "voter list verification program" is among the largest, if

not the largest, of all of True the Vote's programs, and is an integral part of True the Vote's

mission.  *Id.*  The program builds on and supplements, but cannot duplicate or replace, the voter

list maintenance programs required of the States by the NVRA.  *Id.* at ¶ 34.  If a State does not

satisfy its voter list maintenance obligations under Section 8 of the NVRA, then, not only are the

voter lists obtained by True the Vote inaccurate and unreliable, but True the Vote cannot use its

limited resources to make the lists as accurate and current as possible.  *Id.* at ¶ 35.  Instead, it can

only hope to make up for a small part of the State's failure to fulfill its legal obligations.  *Id.*

This is precisely the difficulty True the Vote has experienced in attempting to carry out

its voter list verification program in the State of Indiana.  *Id.* at ¶¶ 32 and 34.  As in *Common

Cause*, Defendants' violation of the NVRA renders True the Vote's voter list verification

program in the State of Indiana less effective.  By failing to satisfy their voter list maintenance

obligations under Section 8 of the NVRA, Defendants are making it "difficult or impossible" for

True the Vote to fulfill one of its "essential purposes or goals." *Common Cause*, 750 F. Supp. at

1270.  In this regard, the organizational injury alleged by True the Vote is directly analogous to

injuries alleged by organizations engaged in voter registration activities:

> [T]he plaintiffs have averred that their actual ability to conduct specific projects
> during a specific period of time will be frustrated by [Florida's strict registration
> laws]…Even though the injuries are anticipated rather than completed events,
> they satisfy the immediacy and likelihood requirements… and for those reasons,
> the Secretary's argument that the organizational injuries are not concrete or
> particularized fails.

*Florida State Conference v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008).  True the Vote has

amply pled an organizational injury.

Defendants devote a single, half-hearted and conclusory paragraph to challenging True the Vote's allegations of organizational injury. ECF No. 21 at 13-14. True the Vote expressly alleged that ensuring that its voter list verification project is "among the largest, if not the largest" of all of True the Vote's programs and "is also an integral part" of True the Vote's public interest mission. ECF No. 1 at ¶ 33; *see also id.* at ¶ 32. True the Vote also expressly alleged that Defendants' failure to satisfy their voter list maintenance obligations under Section 8 of the NVRA is impairing True the Vote from carrying out its mission. *Id.* at ¶¶ 36-37 and 41-43. Because True the vote has expressly alleged that Defendants are impairing True the Vote's ability to carry out one of its essential purposes and goals, it has amply pled an organizational injury. Because True the Vote's alleged organizational injury is fairly traceable to the State's failure to satisfy its voter list maintenance obligations and is likely to be redressed by a favorable opinion in this litigation, True the Vote has standing to seek redress for Defendants' violation of the voter list maintenance obligations under Section 8 of the NVRA. *Lujan*, 504 U.S. at 560-61.

### D.   Defendant Lawson Should Not Be Dismissed.

Defendants' argument for dismissing Secretary of State Connie Lawson also is without merit. Defendant Lawson's office was directly involved in the correspondence between Judicial Watch, Inc. and the State of Indiana prior to the filing of this lawsuit. The February 6, 2012 letter was sent to Defendant Lawson's predecessor as Secretary of State as well as to Defendants King and Deckard in their capacity as Co-Directors of the Elections Division. ECF No. 1 at ¶ 19; *see also* ECF No. 21 at Exhibit 1. When Defendants King and Deckard issued the order "dismissing" what they characterized as Judicial Watch, Inc.'s "complaint or grievance," the order was sent to Judicial Watch, Inc. by Defendant Lawson's office, not by Defendants King and Deckard. ECF No. 1 at ¶ 22. Consequently, it would appear that Defendants King and

Deckard, as Co-Directors of the Election Division, acted with at least some involvement by, if not direction from, Defendant Lawson.

In addition, given that Indiana law makes the Secretary of State responsible for enforcement of the State's obligations under the Help American Vote Act ("HAVA") and these obligations overlap with the State's obligations under Section 8 of the NVRA, Defendant Lawson has at least some role to play in carrying out the State's obligations under Section 8 of the NVRA as well.  Specifically, under Indiana law, the Secretary of State shall "perform all duties required to be performed by the state or the chief state election official under HAVA." Ind. Code 3-6-3.7-2.  Indiana law also states that "[t]he election division shall assist the secretary of state in the implementation of HAVA."  Ind. Code 3-6-4.2-2.5.  In their Complaint, Plaintiffs showed that HAVA augments and elaborates on the State of Indiana's voter list maintenance obligations under Section 8 of the NVRA.  ECF No. 1 at ¶ 9.  Since HAVA overlaps with Section 8 of the NVRA and Defendant Lawson has responsibility for HAVA under Indiana law, Defendant Lawson shares responsibility with Defendants King and Deckard for the NVRA Section violations alleged by Plaintiffs.  Consequently, dismissal of Defendant Lawson is not warranted.

## IV.   CONCLUSION.

For the foregoing reasons, Defendants' Motion to Dismiss should be DENIED.

Dated: August 29, 2012                    Respectfully submitted,

                                          */s/ Paul J. Orfanedes*
                                          Paul J. Orfanedes

                                          */s/ Chris Fedeli*
                                          Chris Fedeli

                                          *Admitted Pro Hac Vice*

                                          JUDICIAL WATCH, INC.
                                          425 Third Street S.W., Ste. 800
                                          Washington, DC 20024
                                          Tel: (202) 646-5172
                                          Fax: (202) 646-5199
                                          Email: porfanedes@judicialwatch.org
                                                 cfedeli@judicialwatch.org

                                          *David R. Langdon*
                                          David R. Langdon
                                          Joshua B. Bolinger

                                          LANGDON LAW LLC
                                          11175 Reading Road, Ste. 104
                                          Cincinnati, OH 45241
                                          Tel: (513) 577-7380
                                          Fax: (513) 577-7383
                                          Email: dlangdon@langdonlaw.com
                                                 Jbolinger@langdonlaw.com

                                          *Attorneys for Plaintiffs*

*Of Counsel:*

J. Christian Adams
Election Law Center, PLLC
300 N. Washington Street, Ste. 405
Alexandria, VA 22314

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of August, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Chris Fedeli*_____
Chris Fedeli
