**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., and<br>TRUE THE VOTE, | ) <br> ) <br> ) | |
| *Plaintiffs*, | ) <br> ) | Case No. 1:12-cv-800-WTL-TAB |
| v. | ) <br> ) | |
| J. BRADLEY KING, TRENT DECKARD,<br>and CONNIE LAWSON, in their official<br>capacities, | ) <br> ) <br> ) <br> ) | |
| *Defendants*. | ) <br> ) | |
| _____ | ) | |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AND STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Plaintiffs Judicial Watch, Inc. ("Judicial Watch") and True the Vote, by counsel and

pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-1, respectfully

submit this Brief in Support of Motion for Summary Judgment and Statement of Material Facts

Not in Dispute ("SOF").   As set forth herein, Defendants have violated Section 8 of the National

Voter Registration Act, and Plaintiffs are entitled to judgment as a matter of law on all counts of

their Complaint.

**Background on the National Voter Registration Act**

The National Voter Registration Act of 1993 ("NVRA") was enacted pursuant to the

*Elections Clause* of the United States Constitution, which gives Congress the power to regulate

the times, places, and manners of holding federal elections.  U.S. Constitution, art. 1, § 4, cl. 1;

*ACORN v. Edgar*, 56 F.3d 791, 794 (7th Cir. 1995).  Specifically, the *Elections Clause* gives

Congress the power to make or amend laws for the election of federal officials, and the states

must implement and comply with those laws.  *Edgar*, 56 F.3d at 794-795.  Unlike in most

*Supremacy Clause* cases, in which there is a presumption against federal preemption, the *Elections Clause* creates the unique presumption that Congress intended federal election statutes to preempt *or alter* state election laws.  *Arizona v. Inter Tribal Council of Ariz., Inc*., 133 S. Ct. 2247, 2256-2257 (2013); *Edgar*, 56 F.3d at 794.

 The NVRA was enacted in part to "protect the integrity of the electoral process" and to "ensure that accurate and current voter registration rolls are maintained."  42 U.S.C. § 1973gg-6(b); see H.R. Rep. No. 103-9, 103rd Cong., 1st Sess., at 1, 56-6 (1993).  Section 8 of the NVRA requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the registrant's death or change of residence.  42 U.S.C. § 1973gg-6(a)(4).  The NVRA directs each state to designate "a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this subchapter."  42 U.S.C. § 1973gg-8.[1]  In enacting the NVRA, both houses of Congress specified that the term "coordinate" in the NVRA means that "each state would have to designate a chief state official responsible for implementing the state's functions under the bill."  S. Rep. 103-6, at 39; H.R. Rep. 103-9, at 23, 1993 U.S.C.A.A.N. 105, at 127.

These "state functions" include "conducting" the general programs of list maintenance required by the NVRA.  As the U.S. Court of Appeals for the Eighth Circuit has held, a state's obligation to "conduct" these list maintenance programs is both an active one and a non-delegable one:

---

[1]	Indiana has designated the two co-directors of its Election Division to be jointly responsible for NVRA coordination.  As of 2013, if the co-directors fail to conduct voter list maintenance or disagree on a necessary expenditure, then the secretary of state becomes the responsible official.  Ind. Code Ann. §§ 3-7-11-1, 3-6-4.2-3, 3-7-38.2-16(a), 3-7-38.2-18.

> Nonetheless, this "conduct" terminology clearly envisions Missouri will actively oversee the general program.  After all, the term "conduct" is an active verb, encompassing the concept of providing leadership.  *See* Webster's Third New Int'l Dictionary 474 (1993) (defining the term as meaning, *inter alia*, "to bring by or as if by leading"; "to lead as a commander"; "to have the direction of"; "to direct as leader the performance or execution of"; and "to act as leader or director").  Under the NVRA's plain language, Missouri may not delegate the responsibility ... to a local official and thereby avoid responsibility.

*U.S. v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008).  Accordingly, a state must actively lead, direct, and oversee the list maintenance efforts required by the NVRA.  *Id.* at 850-51.

As a result, a state's list maintenance obligations under the NVRA are not satisfied by merely offering guidance or training to local election officials.  Rather, a state must provide both active leadership and direction *and* exercise effective oversight.  If, in the course of overseeing the actions of local election officials, a state's chief election officials discover that voter lists are not being maintained properly, the NVRA requires that the state officials take corrective action:

> For instance, if the district court determines a lack of [Local Election Official] compliance renders Missouri's efforts to conduct a general program unreasonable, it could order Missouri either to (1) develop different or improved methods for encouraging LEA compliance, or (2) assume direct responsibility for some or all of the activities needed to remove ineligible voters from the voter rolls (i.e., cease delegating NVRA responsibilities to the non-complying LEAs).

*Id.* at 851.

The states' voter list maintenance obligations under NVRA Section 8 were clarified and elaborated upon by the Help America Vote Act ("HAVA"), which was enacted in 2002.  After the 2000 election, Congress became concerned that the states were not complying with NVRA Section 8.[2]  Accordingly, Congress clarified how and to what extent the states were required to

---

[2]    148 Cong Rec. S 10488, at S 10490 (daily ed. October 16, 2002) (statement of Senator Dodd ("The authors of this bill found that voter rolls across the country are inaccurate or in very poor order, the condition in many jurisdictions, particularly the large jurisdictions, are in a state of crisis.  Voter lists are swollen with the names of people who are no longer eligible to vote in that jurisdiction, are deceased or are disqualified from voting for another reason.  It has been

perform the voter list maintenance activities that they were obligated to perform under NVRA Section 8. *See* 42 U.S.C. §§ 15483(a)(2)(A)(i), 15483(a)(2)(A)(ii) (*citing* 42 U.S.C. § 1973gg-6), and 15483(a)(4)(A) (citing the voter registration list removal requirements of 42 U.S.C. § 1973gg *et seq*.). HAVA specifically requires that each state create a "single, uniform, official, centralized, interactive, computerized statewide voter registration list defined, maintained, and administered at the State level." *See* 42 U.S.C. § 15483(a)(1)(A). HAVA also requires that these computerized lists be maintained on a regular basis, specifies how this maintenance must be performed, and mandates that states' election systems "shall include provisions to ensure that voter registration records in the State are accurate and updated regularly," including "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 42 U.S.C. § 15483(a)(2) and (a)(4).[3]

Finally, NVRA Section 8 also requires that states "maintain for at least 2 years and shall make available for public inspection ... all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters ...". 42 U.S.C. § 1973gg-6(i).

---

found that 650,000 people in this country are registered in more than one State. As of October of 2002, 60,000 people were registered in Florida and at least one other state. In St. Louis County, some 30,000 people were registered to vote in the county and at least one other county in the State.").

[3]    Defendants may argue that HAVA provides no private right of action. While this may be true (*see Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008)), it also is irrelevant. Plaintiffs do not allege a violation of HAVA. Instead, Plaintiffs note that HAVA provides insight into the requirements of NVRA Section 8 because Congress enacted HAVA as a counterpart to NVRA and the two statutes are intertwined, contain numerous cross-references, and impose overlapping obligations. Consequently, the Court may look to HAVA to discern the states' obligations under NVRA Section 8.

## Case Background and History

This Court has seen this problem before, unfortunately. Indiana has a history of failing to comply with its voter list maintenance obligations. In 2006, the United States brought suit against Indiana over Indiana's failure to comply with its NVRA Section 8 obligations. The lawsuit, *U.S. v. State of Indiana, et al.*, Case No. 1:06-cv-01000-RLY-TAB (S. D. Ind.), resulted in a 2006 Consent Decree requiring Indiana to take specific actions to remedy its failure to comply with its voter list maintenance obligations. The Consent Decree required Indiana to conduct all voter list maintenance activities required by both the NVRA and HAVA and to exercise oversight to ensure that all Indiana counties carried through on these maintenance activities by removing the names of voters whose ineligibility had been verified. Sadly, Indiana abandoned most of these efforts when the Consent Decree expired in 2009. SOF at ¶¶ 24-25, 30-31.

By 2010, Indiana's failure to comply with its voter list maintenance obligations had resulted in the state's voter registration rolls being inaccurate and out of date. SOF at ¶¶ 5-7. A comparison of 2010 U.S. Census data and 2010 voter registration data from the U.S. Election Assistance Commission ("EAC") reveals that voter registration rolls for 12 Indiana counties contain more registered voters than the Total Voting Age Population ("TVAP") of those counties. SOF at ¶ 5. If voter registration rolls are being maintained properly, it is highly unlikely that the number of voters on the rolls for any particular county would exceed the number of voting-age individuals living in the county. This same comparison of the number of registered voters and TVAP reveals that the number of registered voters on the voter rolls for another 26 Indiana counties equal between 90% and 100% of those counties' TVAPs. SOF at ¶ 5. These numbers are significantly in excess of the average rate of voter registration in the

5

United States and also indicate a lack of proper voter list maintenance.   SOF at ¶¶ 6-7.

Because Indiana's voter registration rolls are so obviously inaccurate and out of date,

Plaintiffs brought this lawsuit to compel Indiana to comply with its voter list maintenance

obligations under NVRA Section 8.

**Summary Judgment Standard**

Summary judgment is appropriate when the Court, in view of the complete record, finds

that there is no genuine dispute of material fact and that the moving party is entitled to judgment

as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

248-50 (1986).

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

A.   <u>The Structure of Indiana's Elections Bureaucracy.</u>

1.   The Indiana Election Division is led by two co-directors, one from each major

political party, as required by Indiana law.  Appx. Exh. 10, Co-Directors First Interrogatory

Responses, Response 9, pp. 10-11.

2.   During the relevant time period, the two Election Division co-directors must both

have been in agreement in order for Indiana to initiate voter list maintenance programs, and

conversely, either Co-Director could veto the undertaking of a voter list maintenance program.

Appx. Exh. 10, Co-Directors First Interrogatory Responses, Response 14, p. 13.

3.   Co-Director Trent Deckard and his Democrat co-director predecessors have

frequently disagreed with Republican Co-Director J. Bradley King concerning voter list

maintenance, preventing Indiana from initiating numerous voter list maintenance programs.

Appx. Exh. 4. Deckard Tr. at 19:25 to 20:7, 20:8 to 14; Appx. Exh. 5, King Tr. at 13:13 to 14:1,

6

18:12 to 32:7, 42:4 to 43:14, 49:17 to 51:9, 65:11 to 66:8, 77:1 to 78:6, 87:11 to 89:23, 89:24 to

91:8, 92:2 to 12, 92:13 to 93:3.

4.    Indiana has taken a mostly passive approach to voter list maintenance, even

though states are required to actively lead, direct, and oversee a list maintenance program under

the NVRA.  Appx. Exh. 1, Karen Handel Expert Report at 39.

B.    <u>The Inaccuracy of Indiana's Voter Registration Rolls</u>.

5.    A comparison of 2010 U.S. Census data and 2010 U.S. EAC data shows that 12

Indiana counties have voter registration rolls that exceed 100% of TVAP in those counties and

that another 26 Indiana counties have voter registration rolls that contain between 90% and 100%

of TVAP.  Appx. Exh. 1, Handel Report at 13-14, 19; Appx. Exh. 2, Steven Camarota

Declaration and Attach. 1.

6.    The 2010 EAC data shows that Indiana's voter rolls have high ratios of

registrations to TVAP on a statewide basis, higher than the national averages by several

percentage points in every category.  Appx. Exh. 1, Handel Report at 16-17.  Appx. Exh. 3, EAC

Report.

7.    The 2010 Census data and 2010 EAC data demonstrate that Indiana's voter

registration rolls are substantially inaccurate and out of date, indicating that additional efforts to

maintain the accuracy of the rolls are necessary.  Appx. Exh. 1, Handel Report at pp. 19-20, 26.

8.    Co-Directors Deckard and King were aware of data indicating that Indiana's voter

registration rolls were inaccurate and out of date.  Appx. Exh. 4. Deckard Tr. at 66:9 to 67:10,

273:25 to 274:21; Appx. Exh. 5. King Tr. at 34:3 to 15.

9.    Upon becoming aware that Indiana's voter registration rolls were inaccurate and

out of date, Co-Directors Deckard and King did not institute any new list maintenance programs

or activities to remedy the voter rolls' inaccuracies.  Appx. Exh. 5, King Tr. at 79:6 to 81:7;

Appx. Exh. 6, Co-Directors Second Interrogatory Responses, Response No. 3, pp. 6-7.

      10.     Both the poor condition of Indiana's voter rolls, and the failure of Co-Directors

Deckard and King to institute any new list maintenance programs or activities upon learning of

these inaccuracies, are factors that render Indiana's voter list maintenance efforts unreasonable

under industry standards applicable to election administration.  Appx. Exh. 1, Handel Report at

41-42.

C.     Indiana's Lack of Effort to Identify and Remove Deceased Voters or Voters
        Who Have Become Ineligible Due to Relocation.

      11.     Although the Indiana Department of Health ("DOH") is required by Indiana law

to obtain out-of-state death information from other states for purposes of assisting the Election

Division to maintain the voter registration rolls, Co-Director Deckard does not supervise or

coordinate DOH's efforts.  He does not know and has not asked whether DOH has obtained the

required out-of-state death information for voter list maintenance purposes.  Appx. Exh. 4.

Deckard Tr. at 121:10 to 123:11; Appx. Exh. 5, King Tr. at 16:4 to 11, 40:14 to 20.

      12.     DOH only obtained out-of-state death information for list maintenance purposes

within the past year by entering the State and Territorial Exchange of Vital Events ("STEVE")

and Electronic Verification of Vital Events ("EVVE") interstate systems, and previously failed to

comply with Indiana law in this regard.  Appx. Exh. 5, King Tr. at 16:2 to 16, 40:14 to 20.

      13.     Indiana failed to obtain national Social Security Death Index ("SSDI") data from

the Social Security Administration ("SSA") in order to identify and remove deceased voters from

Indiana's voter registration rolls.  Appx. Exh. 10, Co-Directors First Interrogatory Responses,

Response 6, p. 9.

14.     Although Co-Director Deckard spent a year investigating the feasibility of obtaining SSDI data for voter list maintenance purposes, he failed to make a final decision about whether to obtain the data and never even learned what obtaining the SSDI data from SSA would cost the state.  Appx. Exh. 4. Deckard Tr. at 110:6 to 114:14, 281:10 to 284:22.

15.     Indiana failed to obtain the SSDI data for voter list maintenance purposes because of a lack of agreement, since 2004, between the Democrat and Republican co-directors of the Election Division about whether to do so.  Appx. Exh. 5, King Tr. at 92:2 to 12.

16.     Indiana failed to obtain the National Change of Address ("NCOA") database from the U.S. Postal Service ("USPS") because of a lack of agreement between the Democrat and Republican co-directors of the Election Division about whether to do so.  Appx. Exh. 5, King Tr. at 42:4 to 43:14.

17.     Obtaining the NCOA database from the USPS would have helped Indiana to identify voters who had relocated either within Indiana or out-of-state and would have helped Indiana to remove such ineligible voters from the voter registration rolls.  Appx. Exh. 5, King Tr. at 42:4 to 43:14.

18.     Indiana failed to enter the Interstate Voter Registration Cross-Check ("IVRC") program because of a lack of agreement between the Democrat and Republican co-directors of the Election Division about whether to do so, and also failed to obtain the Systematic Alien Verification for Entitlements ("SAVE") database.  Appx. Exh. 5, King Tr. at 92:13 to 93:3; Appx. Exh. 10, Co-Directors First Interrogatory Responses, Responses 5 and 6, pp. 8-9.

19.     Entering the IVRC program would have helped Indiana to identify voters who had relocated out-of-state, and would have helped Indiana to remove such ineligible voters from the voter registration rolls.  Appx. Exh. 5, King Tr. at 28:21 to 29:16.

20.     Co-Director King held discussions with local election officials and determined that Indiana counties bordering other states had the worst voter list maintenance problems due to a general failure to adequately identify voters who had died out-of-state or relocated out-of-state. Appx. Exh. 5, King Tr. at 86:6 to 87:9.

21.     A local election official cannot effectively undertake efforts to maintain voter registration rolls without the coordination and active participation of as many as 6 separate Indiana state offices and local election officials in all 92 Indiana counties, each of which must provide quality information about voters who have died or relocated.  Appx. Exh. 8, Warrick County Election Official Sarah Redman Tr. at 66:23 to 68:2; Appx. Exh. 7, St. Joseph County Election Official Francisco Fotia Tr. at 27:11 to 28:16, 63:23 to 64:11; Appx. Exh. 9, St. Joseph County Election Official Terrence Coleman Tr. at 114:21 to 115:6.

D.      Indiana's Insufficient Oversight of Local Election Officials.

22.     Despite having tools available to it to direct, lead, and actively oversee local election officials' performance of voter list maintenance tasks, Indiana failed to make use of these tools.  Appx. Exh. 1, Handel Report at 37-40; Appx. Exh. 5, King Tr. at 54:11 to 57:4.

23.     Although Indiana state law requires local election officials to file affidavits with the Election Division certifying performance of voter list maintenance tasks, only very few local election officials have complied with this law, and Indiana has taken no action to compel their compliance.  Appx. Exh. 6, Co-Directors Second Interrogatory Responses, Responses No. 4 and 5, pp. 7-8; Appx. Exh. 5, King Tr. at 54:11 to 57:4; Appx. Exh. 4, Deckard Tr. at 31:23 to 32:7, 35:13 to 24, 37:19 to 25, 38:11 to 39:11; Appx. Exh. 7, Fotia Tr. at 65:17 to 66:7.

24.     Following the expiration of the 2006 Consent Decree in 2009, Indiana ceased regularly monitoring local election officials' performance of voter list maintenance tasks and

10

ceased notifying local election officials of violations or apparent problems with voter rolls.
Appx. Exh. 5, King Tr. at 30:16 to 32:7; Appx. Exh. 4, Deckard Tr. at 191:21 to 205:4; Appx.
Exh. 7, Fotia Tr. at 64:12 to 65:16; Appx. Exh. 8, Redman Tr. at 83:10 to 17, 85:23 to 86:1;
Appx. Exh. 9, Coleman Tr. at 58:7 to 60:3, 60:4 to 16.

      25.     Indiana's lack of oversight of local election officials is another factor rendering
Indiana's list maintenance efforts unreasonable under industry standards applicable to election
administration.  Appx. Exh. 1, Handel Report at 37-40, 41.

E.      Conflicting State Advice to Local Election Officials and Inconsistent List
        Maintenance Practices by Local Election Officials.

      26.     Indiana gave conflicting guidance to local election officials about voter list
maintenance practices.  Appx. Exh. 10, Co-Directors' First Interrogatory Responses, Response
14, p. 13; Appx. Exh. 8, Redman Tr. at 47:9 to 48:24, 98:1 to 21; Appx. Exh. 7, Fotia Tr. at 42:8
to 20.

      27.     Local election officials set their own, often inconsistent policies for determining
when to cancel a voter registration, and they base their determinations on varying levels of
information about the death or relocation of a voter.  Appx. Exh. 8, Redman Tr. at 19:12 to 16,
42:9 to 17; Appx. Exh. 7, Fotia Tr. at 28:4 to 21.

      28.     Indiana's conflicting guidance to local election officials is yet another factor
rendering Indiana's list maintenance efforts unreasonable under industry standards applicable to
election administration.  Appx. Exh. 1, Handel Report at 34-35, 37, 40-41.

      29.     Inconsistent list maintenance practices among local election officials is a further
factor in rendering Indiana's list maintenance effort unreasonable under industry standards
applicable to election administration.  Appx. Exh. 1, Handel Report at 30, 32-33, 34-37, 40-41.

F.      Indiana's Insufficient Mailings to Identify Voters Who Relocate.

30.     Since 2006, Indiana has not conducted any NCOA mailings to voters who have relocated nor statewide mailings to all registered voters to identify ineligible registrations, and local election officials in only five counties have performed removal mailings since 2009.  Appx. Exh. 1, Handel Report at 18, 34, 36; Appx. Exh. 5, King Tr. at 36:11 to 18.

31.     Indiana does not undertake remedial steps to direct local election officials to perform county-wide mailings or NCOA mailings required by law when the local election officials fail to perform such mailings.  Appx. Exh. 4, Deckard Tr. at 62:15 to 65:11.

32.     The lack of NCOA, statewide, or county-wide mailings to registered voters is yet another factor rendering Indiana's list maintenance effort unreasonable under industry standards applicable to election administration.  Appx. Exh. 1, Handel Report at 30, 32-34, 36, 40-41.

G.      Indiana's Overall Failure to Make a Reasonable Effort to Conduct Voter
        List Maintenance.

33.     What constitutes reasonable voter list maintenance is situational and varies over time, depending on how accurate and current a state's voter rolls are and what technologies and list maintenance resources are available to the state.  Exh. 5, King Tr. at 67:7 to 73:1.

34.     Local election officials in Indiana are confused about how they should perform voter list maintenance.  Appx. Exh. 9, Coleman Tr. at 83:16 to 84:2; Appx. Exh. 1, Handel Report at 35.

35.     Given the condition of Indiana's voter registration rolls and the list maintenance technologies and methods available to Indiana, the state's overall effort to maintain accurate and

current voter registration rolls are unreasonable under industry standards applicable to election administration.  Appx. Exh. 1, Handel Report at 40-42.

H.     Plaintiffs Have Been Injured by the State's Failure to Undertake Reasonable Efforts to Maintain the Accuracy and Currency of Voter Registration Rolls

36.     Indiana citizens are concerned that inaccurate and out of date voter registration rolls create the potential for voter fraud.  Appx. Exh. 4, Deckard Tr. at 211:22 to 214:1.

37.     Inaccurate and out of date voter registration rolls undermine citizens' confidence in the fairness of elections and foster citizens' concern about voter fraud.  Appx. Exh. 4, King Tr. at 51:10 to 24, 73:2 to 74:20.

38.     Indiana voters have voiced concerns about deceased people being left on the state's voter registration rolls.  Appx. Exh. 7, Fotia Tr. at 67:22 to 68:10.

39.     Indiana voters have voiced concerns that leaving the names of people who have moved away on the voter rolls makes Indiana elections "wide open for some kind of fraud," and that inaccurate and out of date voter rolls damage citizen confidence that elections are being conducted with integrity by creating the perception that the election process is untrustworthy, which undermines the people's trust in their government.  Appx. Exh. 9, Coleman Tr. at 65:17 to 67:23.

40.     Judicial Watch is a membership organization, and Judicial Watch has members who are registered to vote in Indiana.  Appx. Exh. 11, Thomas J. Fitton Declaration at ¶¶ 4-5.

41.     Members of Judicial Watch who are registered to vote in Indiana asked the organization to bring this lawsuit, which expresses the collective wishes of Judicial Watch members who are registered to vote in Indiana.  Appx. Exh. 11, Thomas J. Fitton Declaration at ¶¶ 5-7, Attach. 1-2.

42.     Defendants' actions have harmed Judicial Watch members who are registered to vote in Indiana by lowering these members' confidence that federal elections are being conducted with integrity, which in turn undermines these members' willingness to participate in American democracy.  Appx. Exh. 11, Thomas J. Fitton Declaration at ¶¶ 11-13.

43.     Judicial Watch members exercise significant influence over the organization's activities, and the organization receives support from its members in order to bring lawsuits like the instant action.  Appx. Exh. 11, Thomas J. Fitton Declaration at ¶¶ 4-5, 8-10.

44.     Improperly maintained voter registration voter rolls require more work to clean up and make accurate than voter rolls that have been well maintained.  Appx. Exh. 4, Deckard Tr. at 216:15 to 217:10.

45.     Well-maintained voter registration rolls require less work to keep accurate than do voter rolls that are in disarray.  Appx. Exh. 5, King Tr. at 74:21 to 76:25.

46.     Improperly maintained voter registration rolls create a backlog of work that needs to be performed before the voter rolls can be made accurate and current by removing ineligible voters.  Appx. Exh. 7, Fotia Tr. at 71:19 to 73:2.

47.     True the Vote engages in a variety of election integrity activities, one of which is the organization's Voter List Verification Project, which aims to maximize the accuracy and currency of voter registration rolls throughout the United States by mobilizing volunteers who use database technology to improve the rolls' accuracy and currency.   Appx. Exh. 12, Catherine Engelbrecht Declaration at ¶¶ 4-6.

48.     True the Vote's Voter List Verification Project is active in a number of states, including Indiana.  Appx. Exh. 12, Catherine Engelbrecht Declaration at ¶¶ 4-5, Attach. 1.

49.     While True the Vote's Voter List Verification Project provides a valuable public service, its volunteer efforts are no substitute for a state's efforts to maintain voter registration rolls or improve the accuracy and currency of voter rolls when problems are brought to the state's attention.  Because Indiana has failed to perform reasonable voter list maintenance as required by NVRA Section 8, True the Vote's Voter List Verification Project in Indiana cannot be completed successfully or effectively as it could be if the state undertook reasonable voter list maintenance efforts.  Appx. Exh. 12, Catherine Engelbrecht Declaration at ¶¶ 4-7, Attach 1.

50.     True the Vote's efforts to ensure that voter registration rolls in Indiana are as accurate and current as possible is frustrated and is being impaired by Defendants' failure to undertake reasonable list maintenance efforts, causing injury to True the Vote.  Appx. Exh. 12, Catherine Engelbrecht Declaration at ¶¶ 7-9.

51.     Given Defendants' failure to undertake reasonable list maintenance efforts, True the Vote must spend additional time to conduct its Voter List Verification Project in Indiana, diverting resources that the organization could be spending on training election monitors or other tasks, further injuring True the Vote.  Appx. Exh. 12, Catherine Engelbrecht Declaration at ¶¶ 10-11, Attach. 2.

52.     By letter dated February 6, 2012, Plaintiffs notified Indiana that it was in violation of Section 8 of the NVRA and a lawsuit would be filed against the state if it did not take steps to correct its violations.  Indiana responded with a general denial of any violations.  Appx. Exh. 11, Thomas J. Fitton Declaration at ¶ 14 and Attach. 3.

53.     Plaintiffs' February 6, 2012 letter also requested that Indiana produce documents related to its list maintenance efforts in the two preceding years.  Indiana failed to produce the

requested documents, necessitating litigation to obtain them.  Appx. Exh. 12, Catherine

Engelbrecht Declaration at ¶ 12; Appx. Exh. 11, Thomas J. Fitton Declaration at ¶ 14.

**ARGUMENT**

**I.      Indiana Violated NVRA Section 8's Voter List Maintenance Requirements.**

Under NVRA Section 8, states are required to "conduct a general program that makes a

reasonable effort to remove the names of ineligible voters from the official lists of eligible voters

by reason of (A) the death of the registrant; or (B) a change in residence of the registrant."   42

U.S.C. § 1973gg-6(a)(4).[4]

**A.      The Reasonable Efforts Requirement of NVRA Section 8.**

The manner in which a state satisfies its list maintenance obligations under NVRA can

take various forms.  It can include direct efforts or efforts that are political, financial, or legal in

nature, or some combination thereof – as long as those efforts are *reasonable*.  *U.S. v. Missouri*,

535 F.3d at 851.

**1.      Reasonable Efforts Under A "Plain Meaning" Standard.**

Because Congress recognized that what constitutes a "reasonable effort" will vary from

time to time and based on the condition of a state's voter rolls, the NVRA does not define

"reasonable effort" or prescribe a specific set of list maintenance activities necessary for states to

satisfy NVRA Section 8.  *U.S. v. Missouri*, 2007 U.S. Dist. Lexis 27640, *19 (W.D. Mo. April

13, 2007), *aff'd in part, rev'd in part on other grounds, U.S. v. Missouri*, 535 F.2d at 851.

---

[4]      Plaintiffs note that the NVRA also imposes obligations on states to remove convicted
felons, ineligible or invalid registrations, duplicate registrations, and mentally incompetent
persons from voter registration rolls.  Given the gravity of the NVRA Section 8 violations
Plaintiffs have identified, it is unnecessary for Plaintiffs to prove each of these additional
violations to prevail on their claims.  Plaintiffs have not focused on these additional obligations
for the sake of brevity and to ensure that a disciplined motion is submitted to the Court.  *See* S.D.
Ind. Local Rule 56-1, Local Rules Advisory Committee Comments Re: 2002 Amendment.

Accordingly, courts may give the term "reasonableness" its ordinary meaning when analyzing

NVRA Section 8 claims.  "A fundamental canon of statutory construction is that, unless

otherwise defined, words will be interpreted as taking their ordinary, contemporary, common

meaning."  *Perrin v. United States*, 444 U.S. 37, 42, (1979).  A "reasonable" effort is one that is

"fair and sensible," "fairly or moderately good," "in accordance with reason," and "possessing

sound judgment."[5]  Antonyms for "effort" include inaction, inactivity, indolence, inertia,

languor, laziness, and quiescence.[6]  By applying this plain meaning, courts have determined that

a "reasonable" list maintenance effort requires states to exercise both active leadership and

effective oversight.  *U.S. v. Missouri*, 535 F.3d at 850, 851.

   2. <u>Reasonable Efforts Under Industry Standards</u>.

   In cases such as this one, where professionals labor within vast realms of specialized

knowledge, a determination of the reasonableness of a state's efforts may be aided by an expert

assessment of election administration practices.  In such cases, the "reasonable person under the

circumstances" test can be assessed based upon how a reasonable *professional* under the

circumstances would have acted under "prevailing professional norms."  *United States v.*

*Williams*, 698 F.3d 374, 386 (7th Cir. 2012).  In cases where professionals use specialized

knowledge to perform their jobs, expert testimony is probative of questions concerning the

reasonableness of conduct for evaluating whether defendants' actions met their duty under law.

*Musser v. Gentiva Health Servs*., 356 F.3d 751, 760 (7th Cir. 2004).

   Use of experts is appropriate in the field of election administration.  Because the field of

election administration relies on specialized and complex knowledge of voter list maintenance

---

[5] Merriam-Webster Dictionary, definition of "reasonable," available at
http://www.merriam-webster.com/dictionary/reasonable (visited October 8, 2013).

[6] Merriam-Webster Dictionary, definition of "effort," available at http://www.merriam-webster.com/dictionary/effort (visited October 8, 2013).

technologies and methods, the opinions of expert witnesses are probative in determining liability. *See*, *e.g.*, *Mattke v. Deschamps*, 374 F.3d 667 (8th Cir. 2004) (cases involving "complex issues of science or technology" require expert testimony to assist in a determination of liability). This technical complexity is especially pronounced in the area of voter registration list maintenance, which requires responsible officials to take advantage of different technologies and methods for keeping accurate and current, non-static lists of millions of individuals to maintain public confidence in the integrity of elections.

Similar to the standards of care applied in other areas of the law, its determination first requires an assessment of the question of the practices or actions considered reasonable or prudent by members of the same group in a similar situation. *Alliant Tax Credit Fund 31-A, Ltd. v. Murphy*, 494 Fed. Appx. 561, 573 (6th Cir. 2012). Second, the question of whether the professional is utilizing all reasonable, currently available methods and technologies is brought to bear as well. *See Ward v. United States*, 838 F.2d 182, 187 (6th Cir. 1988) (in determining whether a doctor exercised due care, "regard must be given to the state of medical science at the time"); *Klisch v. MeritCare Med. Group*, 134 F.3d 1356, 1359 (8th Cir. 1998) ("due regard for the state of medical technology at the time of treatment should be the standard by which a physician's actions are judged").

3.   <u>Reasonable Efforts Under An Ordinary Care Standard</u>.

In ordinary negligence cases, evaluating the reasonableness of conduct when a violation of a duty of care has been alleged involves considering the probability of harm to others, the gravity of the resulting injuries, and the burden of preventing those injuries. *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d. Cir. 1947). This test has been adopted as the law of this circuit. *Michigan v. United States Army Corps of Eng'rs*, 667 F.3d 765, 785 (7th Cir. 2011)

18

("The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes."); *Mesman v. Crane Pro Servs.*, 512 F.3d 352, 354 (7th Cir. 2008) ("[F]ailure to take a precaution is negligent only if the cost of the precaution ... is less than the probability of the accident that the precaution would have prevented multiplied by the loss that the accident if it occurred would cause").  Furthermore, this standard has been used to determine whether institutions are in violation of federal law in cases in which federal law imposes a duty, but does not elaborate on the standard of care.  *Fal-Meridian, Inc. v. U.S. Dep't of Health and Human Servs.*, 604 F.3d 445, 448-449 (7th Cir. 2010).  Accordingly, the same duty of care standard applied when a court is evaluating a breach of a duty imposed by common law negligence can be applied to a violation of a federal statute.  *Id.*

### B. Indiana's List Maintenance Efforts Were Not Reasonable Under Any Standard.

Indiana has violated NVRA Section 8's requirement to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters…," and to actively lead, direct, and oversee such efforts.  42 U.S.C. § 1973gg-6(a)(4), *U.S. v. Missouri*, 535 F.3d at 850-51; *see also* 42 U.S.C. § 1973gg-8 (requiring the state to designate a chief state election official "to be responsible for coordination of the State responsibilities under this Act").  Indiana's list maintenance efforts were not reasonable under any standard.

First, the condition of Indiana's voter registration rolls is *per se* evidence that the state violated NVRA Section 8's reasonableness requirement.  Voter registration rolls in Indiana are highly inaccurate and out of date.  The fact that 12 Indiana counties have voter rolls that exceed 100% of TVAP is determinative by itself of a NVRA Section 8 violation.  SOF at ¶¶ 5-10.  If Indiana had made reasonable efforts to conduct voter list maintenance programs, such a result

19

would be virtually impossible.  SOF at ¶¶ 7, 10.  A *per se* finding of a NVRA Section 8 violation is warranted based on this undisputed fact alone.[7]

To the extent that the Court does not find a *per se* violation of NVRA Section 8 based on the poor condition of Indiana's voter registration rolls, the condition of the rolls remains highly relevant to assessing the reasonableness of Indiana's list maintenance efforts.  Whether a state violates NVRA Section 8 is context specific.  What makes a state's "general program" of list maintenance efforts "reasonable" under the plain meaning of that term differs depending on the circumstances and context.  SOF at ¶ 33; *U.S. v. Missouri*, 2007 U.S. Dist. Lexis 27640 at *19. In this case, the relevant circumstances and context includes Indiana's past, systemic failures to conduct reasonable list maintenance programs required by federal law, the abandonment of the state's list maintenance efforts following the expiration of the 2006 Consent Decree, and the undeniably poor condition of Indiana's voter registration rolls.  It also includes the fact that Co-Directors King and Deckard received information indicating that the state's voter rolls were in poor condition.  SOF at ¶ 8.

Under these circumstances and given this context, the list maintenance efforts undertaken by the state should have included at least two, overarching components in order to be "reasonable" under the plain meaning of that term.  These components, in turn, should have included certain, specific activities.  The first component – coordination and facilitation of list maintenance activities – is derived from states' obligation to lead and direct voter list

---

[7]      A *per se* standard for establishing violations of federal law has been applied in the antitrust context.  *See generally Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 57-59 (1977) (discussing effects-based and formal threshold *per se* rules).  Once a *per se* violation is established, no further inquiry need be made into the practices of the parties or the effects of their actions in order to support a finding of illegal conduct.  *United States v. Nat'l Soc. of Prof'l Eng'rs*, 404 F. Supp. 457, 460 (D.D.C. 1975) ("Price fixing is a *per se* violation of the Sherman Act, requiring no further inquiry by a court into the activities, origin, history, or purpose") (*citing United States v. Nat'l Assoc. of Real Estate Bds.*, 339 U.S. 485, 489 (1950)).

maintenance efforts and required Indiana to coordinate with multiple state and federal agencies, as well as other states, in order to obtain and disseminate information necessary for proper list maintenance.  *U.S. v. Missouri*, 535 F.3d at 850-51.  Such coordination and facilitation is more logically handled at the state level rather than by local election officials due to the scope and scale of these undertakings.  The second component is an active oversight program that monitors local election officials' list maintenance activities, investigates problems or failures, and takes steps to remedy them when they occur.  *Id.*

In this case, NVRA Section 8 required Indiana to undertake the following reasonable activities to coordinate and facilitate maintenance of its voter registration rolls:

- Conduct a statewide mailing to all registered voters pursuant to the NVRA to identify voters who have moved;

- Ensure that the Indiana Department of Health obtains death information from other states via the STEVE and EVVE interstate systems and provides the information to the Election Division for list maintenance;

- Obtain the Social Security Death Index ("SSDI") from the federal government and provide appropriate information from the SSDI to each local official;

- Enter the Interstate Voter Registration Cross-Check ("IVRC") program for the identification of Indiana voters who move out-of-state;

- Obtain the National Change of Address ("NCOA") database from the U.S. Postal Service to identify relocated voters; and

- Obtain access to the Systematic Alien Verification for Entitlements ("SAVE") database from the U.S. Department of Homeland Security to identify non-citizen registered voters.

Indiana did not undertake any of these reasonable activities during the relevant time period, rendering its efforts unreasonable.  SOF at ¶¶ 4, 10, 11-21, 30-32, 33, 35.

In addition, given the circumstances, NVRA Section 8 required Indiana to undertake the following reasonable oversight activities:

- Conduct adequate training and instruction of local election officials;

- Monitor local election official's performance of list maintenance on a regular basis;

- Notify local election officials in writing of apparent failures to conduct list maintenance;

- Provide state funding to local election officials to carry out programs of list maintenance;

- Offer state staff assistance to local election officials for list maintenance;

- Threaten a direct State government takeover of any list maintenance programs of local election officials that are not being carried out properly or effectively;

- Threaten noncomplying local election officials with referrals to either the Indiana Attorney General or to the appropriate U.S. Attorney for Indiana with a recommendation for prosecution.

Indiana did none of these reasonable things, rendering its voter list maintenance efforts unreasonable under NVRA Section 8.  SOF at ¶¶ 10, 22-25, 26-29, 31-32, 34-35.  Testimony from state and local election officials also establishes that Indiana failed to actively lead, direct, or oversee list maintenance in the state.  SOF at ¶¶ 1-3, 8-9, 11-21, 22-24, 26-27, 30-31, 34.  This level of indifference and inattention – to which Indiana has admitted – also confirms that Indiana's voter list maintenance efforts were not reasonable under the plain meaning of the term. SOF at ¶ 35.

In addition, Plaintiffs' expert, former Georgia Secretary of State Karen Handel, has opined that Indiana's list maintenance efforts were not reasonable under industry standards applicable to election administration.  SOF at ¶¶ 4, 10, 25, 28-29, 32, 35.  Specifically, Indiana's efforts were not reasonable because the state's list maintenance activities fell short of what would be expected of a chief state election official responsible for voter registration rolls that are

as poorly maintained, inaccurate, and out of date as Indiana's voter rolls are.  SOF at ¶¶ 7, 10,

35.  Plaintiffs' expert concluded that Indiana's voter rolls were in poor condition, and therefore

Indiana's specific actions and inactions in this case were unreasonable.  SOF at ¶¶ 4, 5-7, 10, 25,

35.  These pieces of evidence – the condition of Indiana's voter rolls and the expert assessment

of Indiana's actions – provide this Court with sufficient uncontested facts to find that Indiana's

voter list maintenance efforts were not reasonable under industry standards.

Finally, Indiana's actions and inactions resulted in a near certainty of harm, the resulting

harm was (and is) substantial, and the burden of preventing that harm was small in relation to the

risk and severity of the damage that resulted.  When Indiana's election officials abandoned most

of their voter list maintenance efforts following the expiration of the 2006 Consent Decree, it

was a virtual certainty that the state's voter registration rolls would grow increasingly inaccurate

and out of date.  SOF at ¶ 21.  Since people move and die every day, voter list maintenance must

be done all the time and on a regular basis in order to ensure that voter registration rolls remain

accurate and current.  SOF at ¶¶ 44-46.  The failure to maintain accurate and current voter

registration rolls harms citizens' confidence in the integrity of elections and undermines the

stability and effectiveness of the electoral system.  SOF at ¶¶ 36-39, 41-42.  Given the great

importance of maintaining such confidence and conducting fair elections, the harm that has

resulted from the state's inactivity, and the burden on the state of preventing that harm by

undertaking the fairly modest facilitation, coordination, and oversight activities described herein,

the state's *de minimis* voter list maintenance efforts were plainly unreasonable.  SOF at ¶¶ 4, 25,

32, 35.  Because Indiana's list maintenance efforts were not reasonable, the state has violated

NVRA Section 8.

**C.**    **Indiana Failed to Satisfy NVRA Section 8's Safe Harbor Provision For Voter Changes of Residence.**

Indiana failed to meet NVRA Section 8's safe harbor provision concerning voters who relocate, and so remains subject to the "reasonableness" requirement set forth above with respect to such voters. *See* 42 U.S.C. § 1973gg-6(c)(1). As an initial matter, the NVRA provides no "safe harbor" from the requirement that states make a reasonable effort to remove *deceased* voters from the rolls. Accordingly, under a plain reading of the NVRA, even if a state meets the safe harbor for voters who relocate, it could still be in violation of the requirement to make a reasonable effort to remove deceased voters. Indiana's effort to remove deceased persons was unreasonable. SOF at ¶¶ 11-15, 20, 35. Accordingly, Indiana would remain in violation of NVRA Section 8 *even if* it had met the statutory safe harbor for voters who relocate.

The "safe harbor" provision enables states to satisfy their obligation to conduct a general program to remove voters who become ineligible to vote by reason of a change in residence by using the NCOA list to identify such voters, then following the mail confirmation and removal procedures set forth in the provision. 42 U.S.C. § 1973gg-6(c)(1) and (d)(2). While the safe harbor provision does not specify how regularly and often NCOA mailings must occur, or how many voters who have relocated must receive each NCOA mailing, Indiana cannot have satisfied the provision. Indiana has not conducted a state-initiated mailing of any kind since 2006, and only very few Indiana counties have conducted recent voter mailings. SOF at ¶¶ 30-32. Any contrary reading of the safe harbor provision would lead to an absurd result, and so it is not a possible construction of the provision. *United States v. Granderson*, 511 U.S. 39, 47 & n5 (1994); *Dewsnup v. Timm*, 502 U.S. 410, 427 (1992); *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454 (1989); *see also Woods v. Ill. Dep't of Children & Family Servs.*, 710 F.3d 762, 765 (7th Cir. 2013) (where a statute is silent as to necessary details, courts must fill in the gaps

consistent with Congress' intent); *United Savings Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("only one of the permissible meanings [of an ambiguous phrase] produces a substantive effect that is compatible with the rest of the law").

> ### D.    Plaintiffs Were Injured by Indiana's Conduct.

Plaintiffs have been injured by Indiana's violation of NVRA Section 8.  First, because of the state's failure to properly maintain the voter registration rolls, Judicial Watch's members in Indiana have lost confidence in the integrity of the election process in Indiana and their elected leaders' accountability to ordinary citizens.  SOF at ¶¶ 36-39, 42.  This loss of confidence is a direct result of Defendants' failure to comply with NVRA Section 8.  Because the state's voter registration rolls are poorly maintained, every time an Indiana voter signs a poll book and sees the names of deceased relatives or family, friends or neighbors who have moved away, they are confronted with the fact that their government is failing to keeping accurate records about one of the most fundamental and important aspects of citizenship – the right to vote.  SOF at ¶¶ 37, 38. Protecting citizens' confidence in the integrity of elections is essential to American democracy:

> Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy ... Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised.

*Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (emphasis added); *see also Crawford v. Marion County Election Bd.*, 553 U.S. 181, 197 (2008) ("[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process.").

The law allows Judicial Watch to represent its members who have suffered such an injury *via* association standing.  *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2007).  Protecting Judicial Watch members' interest in the integrity of elections to federal office is both central and germane to Judicial Watch's purpose of ensuring integrity in government and politics.  SOF at ¶¶

40-41, 43; *Common Cause v. Buescher*, 750 F. Supp. 2d 1259, 1271 (D. Colo. 2010).  Judicial

Watch's members' views on Indiana's failure to protect the integrity of its voter rolls in

particular and federal elections in general are known to Judicial Watch such that these members

may express their collectively through the organization.  SOF at ¶¶ 43; *Int'l Union v. Brock,* 477

U.S. 274, 290 (1986).  Judicial Watch both "provides the means by which [its members] express

their collective views" on election integrity issues and "protect[s] their collective interests" in the

same.  SOF at ¶¶ 41; *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 345 (1977);

ECF No. 1 at ¶ 28.  Seeking redress of these injuries is therefore "within the scope of reasons

that individuals joined" Judicial Watch.  SOF at ¶¶ 41; *Friends of the Earth, Inc. v. Chevron*

*Chemical Co*., 129 F.3d 826, 829 (5th Cir. 1997).  Where, as here, "the relief sought is

injunctive, individual participation of the organization's members is 'not normally necessary.'"

SOF at ¶¶ 40-41; *Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir.

2008) (internal citation omitted).

     True the Vote has suffered organizational injuries from Indiana's failure to properly

maintain the state's voter registration rolls.  *Havens Realty Corporation v. Coleman*, 455 U.S.

363, 378 (1982).  As the U.S. Supreme Court has declared, when an actor "perceptibly impair[s]"

an organization's ability to fulfill its purpose, "there can be no question that the organization has

suffered injury in fact."  *Id.*; *see also Plotkin v. Ryan*, 1999 U.S. Dist. Lexis 16214, *19 (N.D. Ill.

Sept. 28, 1999) *aff'd* 239 F.3d 882 (7th Cir. 2001).  True the Vote conducts voter list analysis to

ensure rolls are accurate, along with other election integrity projects, in Indiana and several other

U.S. States.  SOF at ¶¶ 47-48.  True the Vote's ability to carry out its mission of cleaning up

voter registration rolls has been more than "perceptibly impaired" by the Indiana's NVRA

violations.  SOF at ¶¶ 49.  As a result, True the Vote has "suffered a 'concrete and demonstrable

injury to the organization's activities.'"  SOF at ¶¶ 50; *Assoc. for Disabled Americans, Inc. v. Claypool Holdings*, 2001 U.S. Dist. Lexis 23729, *43 (S.D. Ind. Aug. 6, 2001) (*citing Havens Realty*, 455 U.S. at 379).  True the Vote has suffered this organizational injury because Indiana's NVRA Section 8 violations has made it "difficult or impossible" for True the Vote to fulfill one of its "essential purposes or goals."  SOF at ¶¶ 49-50; *Common Cause*, 750 F. Supp. at 1269.

As in *Common Cause*, Indiana's violation of the NVRA renders True the Vote's voter list verification program in the State of Indiana less effective.  SOF at ¶¶ 49; *Common Cause*, 750 F. Supp. at 1269.  In this regard, True the Vote's organizational injury is that its "actual ability to conduct specific projects during a specific period of time will be frustrated by [state action]." *Florida State Conference v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008).   Indiana's NVRA Section 8 violations have made True the Vote's efforts to ensure fair elections several times more difficult than it would have been if Indiana had complied with federal law.  SOF at ¶¶ 49-50.  Each month that Indiana allowed its voter registration rolls to fall further into disarray and neglect was unmistakably adding another month of remedial work that someone else would have to do in the future before the rolls could be made reasonably accurate, forcing True the Vote to divert resources in order to focus on Indiana's poor voter rolls.  SOF at ¶¶ 44-46, 51.  As a result, Indiana has frustrated True the Vote's election integrity efforts in the state, which in turn harmed True the Vote by undermining its organizational purpose.  SOF at ¶¶ 49-50.

## II.     Indiana Violated the Public Records Provision of NVRA Section 8.

In addition to imposing voter list maintenance obligations on states, NVRA Section 8 also "confers upon [Plaintiffs] an individual right to information," and Indiana's failure to provide that information to Plaintiffs violated NVRA Section 8 and caused Plaintiffs' injury. *Project Vote/Voting for America, Inc. v. Long*, 752 F. Supp. 2d 697, 702 (E.D. Va. 2010)

27

(internal citations omitted); 42 U.S.C. § 1973gg-6(i).  Furthermore, Plaintiffs "need show [no] more than that they sought and were denied specific agency records" to establish the violation and resultant injury.   *Id*. at 703.  Plaintiffs have made this showing.  SOF at ¶¶ 53.

It is uncontested that, not only did Indiana deny Plaintiffs' request for records that the state was required to produce to them under NVRA Section 8, but Plaintiffs had to engage in months of litigation to obtain at least some of the requested records.  SOF at ¶¶ 53.  Indiana has continued to violate NVRA Section 8's public records provision by refusing to provide additional  relevant information to Plaintiffs.  As a result, Plaintiffs are entitled to summary judgment on Count II of their Complaint.  *Project Vote/Voting for Am., Inc. v. Long*, 813 F. Supp. 2d 738, 742 (E.D. Va. 2011) *aff'd* 682 F.3d 331 (4th Cir. 2012).

## CONCLUSION

WHEREFORE, for all the forgoing reasons, Plaintiffs respectfully request that the Court

enter an Order:

- Granting summary judgment for Plaintiffs on all claims;

- Awarding declaratory and injunctive relief to Plaintiffs;

- Awarding any other relief that the Court deems just and proper.

Dated: October 11, 2013                                      Respectfully submitted,

| | |
|---|---|
| J. Christian Adams<br>*Of Counsel*<br><br>ELECTION LAW CENTER, PLLC<br>300 N. Washington Street, Ste. 405<br>Alexandria, VA 22314<br><br><br>David R. Langdon<br>Joshua B. Bolinger<br><br>LANGDON LAW LLC<br>8913 Cincinnati-Dayton Rd.<br>West Chester, Ohio 45069<br>Tel: (513) 577-7380<br>Fax: (513) 577-7383<br>Email: dlangdon@langdonlaw.com<br>         jbolinger@langdonlaw.com | */s/ Paul J. Orfanedes*<br>Paul J. Orfanedes<br><br>*/s/ Chris Fedeli*<br>Chris Fedeli<br><br>Admitted *Pro Hac Vice*<br><br>JUDICIAL WATCH, INC.<br>425 Third Street S.W., Ste. 800<br>Washington, DC 20024<br>Tel: (202) 646-5172<br>Fax: (202) 646-5199<br>Email: porfanedes@judicialwatch.org<br>         cfedeli@judicialwatch.org |

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of October, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Chris Fedeli*

Chris Fedeli