# APPENDIX TO STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

## TABLE OF CONTENTS

**EXHIBIT 1 – KAREN HANDEL EXPERT REPORT (EXCERPTS)**

**EXHIBIT 2 – STEVEN CAMAROTA DECLARATION AND ATTACHMENTS**

**EXHIBIT 3 – U.S. ELECTION ASSISTANCE COMMISSION REPORT (EXCERPTS)**

**EXHIBIT 4 – TRENT DECKARD DEPOSITION TRANSCRIPT (EXCERPTS)**

**EXHIBIT 5 – J. BRADLEY KING DEPOSITION TRANSCRIPT (EXCERPTS)**

**EXHIBIT 6 – SECOND INTERROGATORY RESPONSES OF INDIANA ELECTION DIVISION CO-DIRECTORS (EXCERPTS)**

**EXHIBIT 7 – ST. JOSEPH COUNTY ELECTION OFFICIAL FRANCISCO FOTIA DEPOSITION TRANSCRIPT (EXCERPTS)**

**EXHIBIT 8 – WARRICK COUNTY ELECTION OFFICIAL SARAH REDMAN DEPOSITION TRANSCRIPT (EXCERPTS)**

**EXHIBIT 9 – ST. JOSEPH COUNTY ELECTION OFFICIAL TERRENCE COLEMAN DEPOSITION TRANSCRIPT (EXCERPTS)**

**EXHIBIT 10 – FIRST INTERROGATORY RESPONSES OF INDIANA ELECTION DIVISION CO-DIRECTORS (EXCERPTS)**

**EXHIBIT 11 – THOMAS J. FITTON DECLARATION AND ATTACHMENTS**

**EXHIBIT 12 – CATHERINE ENGELBRECHT DECLARATION AND ATTACHMENTS**

**APPENDIX EXHIBIT 1**

**KAREN HANDEL EXPERT REPORT (EXCERPTS)**

# REVIEW OF

# STATE OF INDIANA
# VOTER LIST MAINTENANCE ACTIVITIES

**JUDICIAL WATCH, INC**., and **TRUE THE VOTE**
vs.
**J. BRADLEY KING** and **TRENT DECKARD**,
**Co-Directors of the Indiana Election Division**,
and
**CONNIE LAWSON**, **Indiana Secretary of State**

**Civil Action No. 1:12-cv-800-WTL-TAB (S.D. Ind.)**

**Prepared by:**

Karen C. Handel
Handel Strategy Group
3085 Roxburgh Drive
Roswell, Georgia  30076

**Submitted to:**

Christopher Fedeli, Esq.
Judicial Watch, Inc.
425 Third Street, SW, Suite 800
Washington, DC 20024

**Date:**  June 26, 2013

This analysis revealed that, in 12 Indiana counties, the number of persons on the Indiana voter registration list for those counties exceeded 100% of the total VAP in those counties. For one county, the number of persons on the voter rolls exceeded VAP by more than 43%. Further, 26 other counties had voter rolls that were between 90% and 100% of VAP.

As noted in the Complaint, Indiana has previously faced legal action regarding the accuracy of its voter rolls. (Complaint, Paragraphs 11-13.) Related to this previous case, I reviewed the Consent Decree and Order, Defendants' Motion to Extend Consent Decree Deadlines which included data from various status reports made by Indiana to the United States Department of Justice ("DOJ"), various filing status reports and the state's written plan of compliance submitted by Indiana to DOJ.

Based on my review, I understand the following: In early 2006, the United States sued Indiana for failure to comply with Section 8 of NVRA. *U.S. v. Indiana*, 1:06-cv-1000-RLY-TAB (S.D. Ind.). Indiana and the United States entered into a Consent Decree and Order in June 2006 that resolved the matter. Under the Consent Decree and Order, Indiana agreed to conduct various specific voter list maintenance activities in order to comply with federal voter registration laws. In its September 2007 court filing, Indiana indicated that it had completed these activities in nearly all of its counties and had made significant progress. Indiana also provided specific data to verify its claims of substantial progress. These data included the number of deceased voters removed from voter registration lists, the number of duplicate records removed, and the number of potentially ineligible voter registrations moved to inactive status or cancelled.

As part of the Consent Decree and Order, Indiana also agreed to develop and implement a written compliance plan. This plan was required to set forth certain procedures and processes for identifying and removing ineligible voters from the state's computerized voter registration database, as well as tracking procedures to ensure that counties complied with the list maintenance activities required under NVRA Section 8. Indiana submitted its compliance plan to DOJ in February 2008.

Additionally, as part of the Consent Decree and Order, Indiana was ordered to contact the counties to ensure compliance with the law and to take appropriate action against a county that failed to comply with Federal and state law. The Consent Decree and Order specifically directed the State to initiate litigation against a county that failed to meet the compliance requirements.

Under the terms of the Consent Decree and Order, the termination date was June 30, 2009.

In this current litigation, Plaintiffs contend that, following the expiration of the Consent Decree and Order, Indiana again failed to conduct adequate voter list maintenance efforts. As a result, plaintiffs contend that Indiana is not meeting its obligations under NVRA

The Eighth Circuit Court of Appeals upheld the District Court's evidentiary rulings and reversed on a narrow issue—whether evidence of any LEA noncompliance rendered Missouri's effort to "conduct a general program" unreasonable such that the State of Missouri was in violation of Section 8 of the NVRA. *See* United States v. Missouri, 535 F.3d 844, 851 (8th Cir. 2008). In partially reversing the district court's order of summary judgment and remanding the matter for reconsideration, the Eighth Circuit instructed that "the district court also consider any lack of LEA compliance and determine whether any such noncompliance renders Missouri's efforts to 'conduct a general program' unreasonable in removing the names of ineligible voters."

The Eighth Circuit's ruling noted the important relevance of the NVRA obligation that the **state** must "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of the voters by reason of death or change of residence." The decision specifically emphasized the word "conduct," noting that "states must take specific actions." The Eighth Circuit further noted that the NVRA requirement "envisions the states will actively oversee a general program…." In short, noncompliance with the NVRA's requirements by LEAs could be attributed to the state and prove noncompliance by the state.

On remand, the district court allowed the parties to file briefs on the issue of "whether any evidence of LEA noncompliance in this case demonstrates by a preponderance of the evidence that the State of Missouri violated its obligation to 'conduct a general program' under Section 8 of the NVRA." The United States dismissed its complaint before the issue was briefed. Therefore, there was never a ruling as to whether the conduct of the LEAs constituted a failure of the state to conduct a general program.

## VII.     Accuracy and Currency of Indiana's 2010 Voter Registration List

In challenging the accuracy and currency of Indiana's voter registration list for the 2010 Federal general election, Judicial Watch relied on (1) data from the 2010 U.S. Census data (specifically Indiana's total VAP in 2010); (2) data contained in the EAC's 2011 report to the United States Congress (specifically the total number of individuals contained in Indiana's voter registration list, as reported by Indiana in response to the EAC 2010 Election Administration and Voting Survey); and (3) the analysis of that data by the demographer hired by Judicial Watch.

In order to form my opinions, I have reviewed the demographer's analysis, as well as the excerpts from the Census on which he relied and the EAC 2011 Report data submitted by Indiana. I must make an important clarification regarding the demographer's report that I reviewed. The report contains a column entitled "County Pop." The data reflected here is the county VAP – not county population – according to Christopher Fedeli of Judicial Watch, and the column was simply mislabeled.

In my experience, there is no other way to ascertain the percentage of voting age population registered to vote other than to compare the VAP to the official list of

registrants. The Census is the only official number for total VAP for this decade, and Indiana's self-reported data is the only official record of Indiana's official list of voters. Therefore, the use of those numbers by the demographer is reasonable and, in fact, required.

The demographer's simple mathematical calculations demonstrate that, in numerous counties, the registration exceeds the number of people old enough to be registered, and for the state as a whole, the registration rate is close to 90%. To a reasonable degree of certainty, based on my experience, those facts mean that Indiana's voter rolls were significantly inaccurate and out of date in 2010.

### A. EAC 2011 Report

The EAC is required by Federal law to prepare and submit a report to the U.S. Congress every two years. 42 U.S.C. §1973gg-7(a)(3). This report addresses the impact of NVRA on the administration of Federal elections and must be submitted to the U.S. Congress no later than June 30 in the year following the regular Federal general election.

The data referenced by Judicial Watch is part of the EAC's 2010 report entitled "*The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for the Federal Office 2009-2010,*" as submitted to the 112th Congress on June 30, 2011 (the "EAC 2011 Report.") The EAC 2011 Report covers elections for Federal office during the period following the November 2008 elections through the November 2010 elections. The EAC 2011 Report is the fourth biennial report to Congress by the EAC.[1]

The Executive Summary of the EAC 2011 Report is based on "the results of a survey to all States…."[2] The survey included two questionnaires: The Statutory Overview Questionnaire, focusing on election laws and procedures, and the Election Administration and Voting Survey (known as "EAVS") that collected data from the states on various NVRA-related issues, including voter registration data. The EAC compiled its 2011 Report based on information compiled and submitted by the states to the EAC in February 2011. Indiana was among the states that submitted data for the EAC 2011 Report.

Voter registration data presented by the EAC 2011 Report relevant to this litigation include:

---

[1] The Federal Election Commission submitted previous reports.

[2] The EAC Survey was distributed to all states, the District of Columbia, and territories. However, note that, according to the DOJ's Questions and Answers on the NVRA: "The requirements of the NVRA apply to 44 States and the District of Columbia. Six states (Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin and Wyoming) are exempt from the NVRA because, on or after August 1, 1994, they either had no voter registration requirements or had election-day voter registration at polling places with respect to the elections for federal office. http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php .

The chart below presents Indiana's registration rates for its Voting Age Population (VAP):

### 2010 Indiana Registration Rates for Voting Age Population[6]

| VAP | Reported Registration (Active + Inactive) | Reported Registration (Active + Inactive) % of VAP | Ranking | Active Only % of VAP | Ranking |
|---|---|---|---|---|---|
| 4,875,504 | 4,329,977 | 88.8 | 12 | 86.1 | 8 |

Indiana reported that, among those individuals who are of voting age, nearly 90 percent were registered to vote in the state. Indiana's VAP registration rate of 88.8 percent ranked the 12th highest among the states and the District of Columbia. While Indiana's VAP registration rate among only active voters decreased three points to 86 percent, the percentage of active voters was the 8th highest among states and the District of Columbia.

For comparison, the chart below presents the 15 highest voter registration rates as reported by the state to the EAC (considering all voters—active and inactive):

| | | |
|---|---|---|
| 1. | Alaska | 107.1 |
| 2. | District of Columbia | 102.4 |
| 3. | North Dakota[7] | 100.0 |
| 4. | Maine | 97.6 |
| 5. | Michigan | 96.5 |
| 6. | South Dakota | 94.1 |
| 7. | New Hampshire | 91.8 |
| 8. | Iowa | 91.3 |
| 9. | Missouri | 90.7 |
| 10. | Delaware | 90.1 |
| 11. | Mississippi | 89.5 |
| **12.** | **Indiana** | **88.8** |
| 13. | Illinois | 88.1 |
| 14. | Kentucky | 87.0 |
| 15. | Colorado | 86.6 |

Twenty states reported registration rates in excess of 85 percent. The average reported registration rate among the states was 78.7 percent, more than 10 percentage points *lower* than Indiana's rate.

---

[6] EAC 2011 Report, page 32, Election Administration and Voting Survey, Table 1c. Registration Rates for Voting Age Population (VAP).

[7] North Dakota does not have voter registration. For consistency between the various tables presented in the EAC 2011 Report, the registration was assumed to be the Voting Age Population. (See EAC 2011 Report, page 37). North Dakota is an exception in various other areas because it does not have voter registration.

The EAC 2011 Report also presented state registration rates for Citizen Voting Age Population (CVAP). While VAP looks at all individuals who are of voting age, CVAP includes only citizens old enough to vote. The chart below details Indiana's rates:

**2010 Indiana Registration Rates for Citizen Voting Age Population (CVAP)[8]**

| CVAP | Reported Registration (Active + Inactive) | Reported Registration (Active + Inactive) % of CVAP | Ranking | Active Only % of CVAP | Ranking |
|---|---|---|---|---|---|
| 4,723,809 | 4,329,977 | 91.7 | 15 | 88.8 | 7 |

Indiana's reported CVAP registration rate was 91.7 percent, the 15th highest among the states and well above the 85.9 percent average among reporting states. Among active only voters, Indiana's CVAP registration rate was the 7th highest at 88.8 percent and more than ten percentage points higher than the average 78.6 percent.

## 2.      Voter List Maintenance Data

The EAC 2011 Report presented data regarding a variety of voter list maintenance activities and removal actions conducted by the states from 2008 – 2010. As reviewed in Section VI, the NVRA mandates that states conduct a general program of voter list maintenance to keep voter rolls accurate and up to date, and states are granted flexibility in the administration of list maintenance activities beyond the specific NRVA provisions and requirements.

The EAC 2011 Report surveyed activities regarding:

- Removal notices, including the number sent and responses received;
- The number of registrants moved from active to inactive status; and
- The number of individuals removed from the registration list and the reason (death, failure to vote, felony conviction, mental incompetence, felony conviction, voter request)

---

[8] EAC 2011 Report, page 34, 2010 Election Administration and Voting Survey, Table 1d. Registration Rates for Citizen Voting Age Population (CVAP Using Different Registration Bases).

### a.      Indiana's Removal Notices

The EAC 2011 Report notes "removal notices are an important tool for maintenance of accurate voter registration rolls."[9]  Yet, Indiana reported that this essential list maintenance activity *was not conducted* -- either at the state level or among its counties -- and reported that *no* removal notices were sent during the entire 2008 - 2010 reporting period.[10]  Indiana was one of only three states under the NVRA requirements that reported not sending removal notices. New Mexico reported that no NVRA mailing was done in 2008.  Indiana and Rhode Island did not provide an explanation.[11]

In total, the states that sent removal notices reported sending over 14.5 million such notices, receiving 1.78 million voter confirmations and 518,277 invalid confirmations.  Over 3.6 million of the removal notices were undeliverable while there was no response for the remainder of the notices.

### b.      Other Removal Activities

Indiana reported that 892,460 registrants were removed from the state voter rolls from 2008 - 2010.  This represents 20.6 percent of Indiana's 4,329,977 Reported Registrants, the second highest removal rate among all reporting states.

The following is a breakdown of Indiana's reasons for removal[12]:

|  |  |
|---|---|
| Moved out of jurisdiction | 12,851 |
| Death | 54,061 |
| Failure to vote | 276,950 |
| Voter request | 23,536 |
| Felony conviction | 11,973 |
| Mental incompetence | 0 |
| Other | 709 |
| Not categorized | 512,380 |

Of note, Indiana classified over 500,000 removals, or 57.4 percent of all removals, as "not categorized." No other state reported such a high number.  Mississippi had the

---

[9] EAC 2011 Report, page 8

[10] EAC 2011 Report, Page 59; 2010 Election Administration and Voting Survey, Table 4b. Voter List Maintenance: Removal Notices.

[11] According to the DOJ's Questions and Answers on the NVRA: "The requirements of the NVRA apply to 44 States and the District of Columbia. Six states (Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin and Wyoming) are exempt from the NVRA because, on or after August 1, 1994, they either had no voter registration requirements or had election-day voter registration at polling places with respect to the elections for federal office. http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php.

[12] EAC 2011 Report, page 63-64; 2010 Election Administration and Voting Survey, Table 4b. Voter List Maintenance: Removal Action.

second highest "non categorized" removal with just over 35,000, and most states reported no "not categorized" removals.  In a note from Indiana provided with its EAC submission, Indiana confirmed that it does not send removal notices and indicated that its submission included the number of voter records cancelled due to being in inactive status for more than two Federal general elections.[13]  It is unclear from the report or Indiana's notation whether these cancelled records are reflected as "non categorized" or as "failure to vote" or a combination.

### C.    Judicial Watch Analysis

The Judicial Watch analysis reviewed the county-by-county data as submitted by Indiana to the EAC and available on the EAC website.   According to the Judicial Watch analysis:

- The VAP voter registration rate exceeded 100% in 12 of the state's 92 counties – Newton, Hancock, Brown, Organ, Union, Warren, Franklin, Tipton, Warrick, Crawford, Spencer and Scott counties;

- The VAP voter registration in three counties exceeded 110% -- Crawford (114%), Spencer (119.7%), and Scott (143.2%);

- The  VAP voter registration rates for 26 other counties was between 90 and 100%; and

- 43 counties had VAP voter registration rates in excess of 88.8%, Indiana's overall VAP registration rate as reported to the EAC.

This data demonstrates that, in 12 Indiana counties, there are more people registered to vote and on the voter rolls than are of voting age.  Likewise, in the other counties, the voter rolls included from 90 percent to 100 percent of those county residents who are old enough to vote.

Further, the voter registration rate among the voting age population in 43 counties exceeded Indiana's overall statewide voter registration rate of 88.8 percent.

### D.    Conclusion:  Indiana's 2010 Voter Rolls Contained Significant Inaccuracies

Indiana reported a 20 percent registrant removal rate for 2008 – 2010, according to the EAC 2011 Report.  However, this does not, on its face, indicate that the state's voter rolls are current and accurate.  Other data provided strong evidence to contrary and indicated significant inaccuracies existed within the voter rolls.

First, Indiana's overall statewide voter registration rate was 88.8 percent for active and inactive voters combined, well above the average of 78.7 percent among all reporting

---

[13] EAC 2011 Report, page 65; 2010 Election Administration and Voting Survey, Table 4b. Voter List Maintenance: Removal Action.

states. Second, the voter registration rate in 12 specific counties exceeded 100 percent. Third, in three counties, the registration rate for the voting age population exceeded 110 percent, with Crawford County at 114 percent, Spencer at nearly 120 percent, and Scott at a staggering 143 percent. Together, in just these three counties, the number of registered voters exceeded the number of voting age individuals by more than 12,000.

The number of registrants on the official list of voters, whether on a statewide or county-by-county, can exceed VAP for various reasons. Duplicate registrations have not been identified and removed. Individuals who have died have not been removed. Efforts to identify and remove registrants who have moved out of the jurisdiction have not been adequately performed.

It is my opinion, based on my experience and expertise as the former Secretary of State and Chief Elections Officer for the State of Georgia, and based on the data from the EAC 2011 Report and the Judicial Watch analysis, that Indiana's statewide voter rolls in connection with the 2010 Federal election were significantly inaccurate and out of date, because the registration rate in 12 counties exceeded 100 percent, with three of those counties having rates in excess of 110 percent, indicating a considerable number of duplicate, inaccurate and/or out-of-date registrations.

## VIII. Defining a "General Program" and "Reasonable Effort" for Voter List Maintenance and Measuring Voter Roll Accuracy

A state has flexibility to develop and implement its voter list maintenance program within the framework of the legal requirements of NVRA. As noted previously, the program must be uniform and nondiscriminatory. The program must make a reasonable effort to ensure ineligible voters are removed. The state elections officials and the local elections officials work together in developing and implementing the program. State law designates the state's chief NVRA officer responsible for ensuring that the state meets the requirements of Federal law.

In July 2005, the EAC issued "Voluntary Guidance on the Implementation of Statewide Voter Registration Lists." The report stops short of offering specific criteria for list maintenance, and today there remains a degree of subjectivity in defining a "general program" and a "reasonable effort." However, states can find significant direction from various resources. The DOJ provides a Frequently Asked Questions document regarding the NVRA on its website.[14] The EAC 2011 Report provides a list of the most frequent voter list maintenance activities being conducted by the states, and the National Association of Secretaries of State (NASS) produced a report in 2009 that presents a

---

[14] U.S. Department of Justice NVRA Frequently Asked Questions; http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php

States maintain significant flexibility in conducting list maintenance programs in recognition of the state's role in administering elections. However, this flexibility creates some ambiguity. For this reason, when defining a "general program" and a "reasonable effort," benchmarking the practices across the states is the most meaningful and relevant approach.

In my opinion, based on my experience and expertise and to a reasonable degree of confidence, the list maintenance tasks listed here are widely used among the states and are effective tools in maintaining an official voter list that is as accurate as possible. A reasonable list maintenance program would include most, but not all, of these activities.

In defining "reasonable effort," the activities routinely and regularly employed by other states should be taken into consideration. In my opinion, a "reasonable effort" for voter list maintenance is one that includes: (1) a new voter verification program; (2) a program for the timely removal of registrants who have died, moved outside the jurisdiction, or been criminally convicted or declared mentally incompetent (based on state law); (3) a proactive NCOA match and postcard mailing done at least every 2 years; (4) a general mailing to all registered voters, whether conducted by the state or on a county-by-county basis, the frequency of which is determined by the frequency of the NCOA proactive statewide mailing, but not less frequently than every 10 years regardless; and (5) a removal notice program for inactive voters conducted at least every 2 years.

The tools available for assessing the accuracy and quality of a voter list are limited. Currently, to be the best of my knowledge, a state would have two options: 1) identify and hire a professional data research firm to conduct a unique analysis of a state's voter rolls; or 2) utilize U.S. Census Data and existing voter registration data to calculate the voter registration rate. The first option would likely provide more detailed data that specifically identified invalid, inaccurate and/or duplicate registrations, but would likely require significant funding. The second option can be done at little to no cost.

Therefore, it is my opinion that VAP registration rates are the most reasonably obtained, reliable data currently available for evaluating the accuracy of voter rolls. If a jurisdiction's voter registration rate exceeds 100 percent, this is a very strong indication that the list most likely has a high degree of inaccuracy and further action is warranted. If the voter registration rate for a particular jurisdiction exceeds 90%, this is a strong indication that the list most likely has a significant degree of inaccuracy, and further action is warranted.

Further, in my opinion, the "reasonable" test cannot be met by conducting all or even some of these activities just once. In order to be reasonable, and therefore effective, these activities must be conducted on a consistent, ongoing basis across every jurisdiction in the state.

Additionally, compliance to ensure to ensure that the program is actually being performed in a timely, accurate and legal manner is also essential to any reasonable effort. Simply having a list of maintenance tasks, preparing a written plan, and/or issuing

▪ The Co-Directors noted in this document that "conducting the next statewide mailing to all registered voters during 2008 would result in the expenditure of taxpayer funds." [25] The Co-Directors go on to express ongoing concerns regarding list maintenance. In spite of this assurance, no subsequent statewide mailing has ever been conducted.

▪ The Co-Directors "will, no later than the last business day of January 2009, **and every four years after that date**, compare information provided by SVRS reports regarding active and inactive voters within each county with other data provided by federal or state agencies, such as the United States Census Bureau's population estimates, to determine if there may be significant problems with the accuracy of voter registration lists." [Compliance Plan, p. 7 (emphasis added).] Despite this requirement and specific recognition of the need to monitor the voter rolls for accuracy, Co-Director King said, in his deposition for this matter (Page 79), that he first learned that some county voter rolls exceeded 100 percent of VAP in 2012 from news reports.

Further, on page 11 of the Compliance Plan, the Co-Directors wrote that "For conducting voter list maintenance under the Consent Decree **and** this Plan …." (emphasis added). The use of the word "and" underscores that the activities outlined in Compliance Plan were intended, at least at the time, to be an ongoing effort.

The Compliance Plan also addresses the Co-Directors' obligation to ensure compliance with Federal and state law as well as the Consent Decree and Order. Specifically, the Co-Directors have the authority to take action, including initiate litigation, against a county that fails to comply with Federal and state law.

## C. Indiana's Current Level of Effort

As described by those individuals who have been deposed in this matter, Indiana's current level of effort in regards to list maintenance and compliance activities is significantly less than those under the Consent Decree and set forth in its own Compliance Plan. Further, both Federal and state law provide for other activities that Indiana, unlike most other states, is not currently conducting.

This section reviews and assesses Indiana's current level of effort, including general overview of list maintenance activities, as well as issues that impact the state's ability to conduct a program that satisfies Federal law:

▪ Indiana's current list maintenance activities and relevant issues

▪ Compliance and oversight

---

[25] Written Plan of Compliance, Page 7.

### a. Practices Regarding Voter Record Reviews and Updates

In reading the Redman, Coleman and Fotia depositions, I observed multiple inconsistencies in the way county officials review voter records to determine appropriate next steps, such as updating or canceling the record or moving the registrant to the inactive list.

In the Redman Deposition, Ms. Redman described what is called the "Confidence Factor." This is a percentage rating generated by the SVRS during the matching process to rate the degree of confidence that two records actually match. For example, the Department of Health interfaces with the SVRS, and a process to match death records and voting records is conducted to identify registrants that may be deceased. The matching process compares available data, including name, address, date of birth, driver's license number and/or last four digits of the Social Security number. The system then calculates a "Confidence Factor" based on the extent to which the data matches. For example, a 100% Confidence Factor indicates a complete match, while a 90% Confidence Factor indicates a slightly less than absolute match.

The relevant issue arises in the interpretation of and confusion surrounding the Confidence Factor and what, if any, actions are taken to verify the voter record if the match is not absolute or 100%.

Ms. Redman, on pages 17 – 20 of her deposition, discusses her interpretation of the Confidence Factor rating and approach to list maintenance based on the Confidence Factor. In her responses, she noted "if we're positive, we cancel them," (p. 18) and on follow-up, responded that positive meant "an absolute match." Absence a perfect match, Ms. Redman indicated that there is no established office policy regarding when and what steps to take to determine if the records match. She went on to point out that counties make their own determinations regarding what actions, if any, the Confidence Factor dictates (Redman Deposition, p. 42).

In his deposition, Mr. Coleman said that "it didn't take him long to discover … that we had a lot of dead people on our voting rolls" (p. 13). He pointed out limitations to the system, particularly the Confidence Factor rating. Mr. Coleman also said that if the match is "under 50 percent," it will not be sent as a possible match and indicated that, after his own research, he has "canceled hundreds of deceased persons because…they didn't make it through the process." (p. 17)

Mr. Coleman also noted that, for a time, he was conducting his own research on registrants over the age of 100 to determine if they were deceased. The state advised that this was discriminatory and he stopped. (Coleman Deposition, p. 43).

Mr. Fotia indicated in his deposition that he "does not rely" on the Confidence Factor (Fotia Deposition, p. 26). Mr. Fotia acknowledged that, if one county is "very

conservative" in relying on the Confidence Factor, updates could be missed and the other county would not be notified (Fotia Deposition, p. 28).

### b. Countywide Mailings

General mailings are a common and highly effective tool in conducting list maintenance. Most states conduct some type of general mailing, whether statewide or on a county-by-county basis, on a regular and routine basis, although the frequency varies from every year to every two years to every four years.

In Indiana, counties may conduct countywide mailings. However, such mailings are not required. Between 2009 and 2012, only 5 of Indiana's 92 counties conducted countywide mailings, according to Co-Director King (King Deposition, p. 36).

In July 2012, Warrick County conducted a countywide mailing to its entire voter registration list. Approximately 49,000 registrants received the mailing (Redman Deposition, p. 59). Approximately 13,000 cards, or 26.5 percent, were returned undeliverable (Redman Deposition, p. 61). Since that mailing, 8,500 registrants, or 17.3% of Warrick County's registrant list, were moved to inactive status (Redman Deposition, p. 61).

Of note, Redman indicated that these mailings were a "big way" to determine if a registrant had moved (Redman Deposition, p. 62). She went on to discuss that a mailing to registrants regarding a precinct change is also an option for identifying voters whose residency has changed (Redman Deposition, p. 62).

In contrast, according to Mr. Coleman, St. Joseph County has never conducted a countywide mailing (Coleman Deposition, p. 63). He cited various reasons for this, chief among them funding. Mr. Fotia said he did not know when the last countywide mailing had been conducted in St. Joseph County (Fotia Deposition, p. 32).

### c. Statewide Mailings

More states are adopting statewide mailings as part of their overall list maintenance efforts. Indiana last conducted a general statewide voter mailing in 2006, as part of the Consent Decree it entered into with the DOJ. As previously referenced, the 2006 statewide mailing identified 609,282 possibly ineligible registrants, resulting in 2,247 cancellations and 316,756 transfers to inactive status. Indiana did not conduct additional statewide mailings despite including a specific reference to do so every four years in its own Written Compliance Plan submitted to the DOJ.

When asked whether statewide mailings would contribute to more accurate voter rolls, Mr. Fotia responded that he believed they would (Fotia Deposition, p. 114).

### d. NCOA Mailings

According to its submission for the NASS 2009 Report, the Indiana Secretary of State may conduct an annual residency confirmation mailing to each voter in the state.[26] Counties may utilize the NCOA database to conduct address verification in certain circumstances, according to the depositions of Ms. Redman and Mr. Fotia. However, the state does not utilize nor does it even have the access to utilize the NCOA database for a statewide proactive mailing to its voter list.

Co-Director King noted that, while some NCOA data was obtained, such as checking the validity of an address when it was entered into the SVRS, NCOA data for address forwarding orders was not obtained previously by the state because there had been no agreement with his Co-Director to do so. (King Deposition, p. 42).

The NCOA database is used on a limited basis by the counties to verify address information of registrants being entered into the SVRS. However, there were conflicts with how to proceed even on this limited basis. According to Mr. Fotia, conflicting advice has been given regarding the National Change of Address (NCOA) process and specifically how to handle a letter that is returned undeliverable from the new NCOA address. One Co-Director advised that the registrant be activated for the previous address, while the other Co-Director said the registrant should be canceled. Mr. Fotia indicated that this situation is resolved at the county level. (See pp. 44-45 of Fotia Deposition).

### e. Standard Procedures / Training / Conflicting Guidance

Based on the deposition testimony, Indiana lacks standard procedures for several important list maintenance tasks; training is an opportunity for improvement; and the statutory requirement to have co-directors, one from each political party, results in conflicting advice and opinions on key voter list maintenance activities. The following are several examples:

▪ **Acceptable Mailings / Conflicting Guidance from the State.** Warrick County and St. Joseph County officials have different understandings of the types of voter mailings that are permissible for list maintenance. As referenced above, Ms. Redman listed mailings to all voters in the jurisdiction regarding precinct changes as an appropriate list maintenance option. Mr. Coleman said in his deposition that he was told undeliverable mail from a precinct mailing could not be used for list maintenance (Coleman deposition, p. 40).

---

[26] NASS 2009 Report, page 33.

- **Training.** Mr. Coleman expressed concerns that, during an annual elections conference, it was "clear" to him that there was "not a universal understanding" of voter list maintenance among county elections officials (Coleman Deposition, p. 83). He further stated that "a lot" of the county elections officials had not completed list maintenance activities (Coleman Deposition, p. 85). While this is Mr. Coleman's opinion, he states that he did not get "a lot of training" (p. 11) and his comments are supported by the contradictory practices between Warrick County and St. Joseph County.

- **Significant Conflicting Opinions**. The Co-Directors have disagreed on a number of voter list maintenance issues. Based on Co-Director King's deposition testimony, over his tenure, areas of disagreement regarding list maintenance included: using jury notice declarations (p. 65), relevance of census data for monitoring county compliance (p. 77), encouraging counties to coordinate with colleges (p. 87), and joining the Interstate Cross-Check initiative (p. 92), among others. Co-Director King described the challenges in reaching agreement with his counterpart, and when asked whether this made it more difficult to comply with NVRA, Co-Director King responded "yes" (p. 91).

### D.   Conclusion: Indiana's Current List Maintenance Efforts Lack Consistency and Uniformity

Indiana has had knowledge about the lack of quality in its voter rolls since 2006. The state also has had varying levels of list maintenance effort over that time. Yet, Indiana's current level of effort is substantially less than those required by the Consent Decree and Order and set forth in its own Written Compliance Plan and significantly less than the efforts in other states.

In my opinion, the list maintenance activities required under the Consent Decree and Order more than satisfied the state's Federal obligations under NVRA Section 8. The effort was clearly intensive. The level of effort expended by the counties and the state was naturally much higher because of the lack of ongoing efforts to that date. Further, based on Indiana's own data regarding the significant number of voter records that were updated, cancelled or moved to inactive status, the maintenance program defined in the Consent Decree and Order was effective. The activities were also generally reasonable given the fact that nearly three-quarters of the counties were able to successfully complete the required tasks, and those that did not failed to do so, not because the effort required was too great, but because of extenuating circumstances (such as office flooding). It is my opinion that, if Indiana had continued to perform the maintenance tasks required under this Consent Decree and Order, even with reduced reporting requirements, the state would have a list maintenance effort that satisfied its NVRA requirements.

Indiana also developed a Written Plan of Compliance, which provided a blueprint for an appropriate ongoing program. While the monthly reporting exceeded the reasonable test, once the state, with the counties, had achieved compliance with the Consent Decree and

Order, the Co-Directors could have transitioned to some less frequent reporting, perhaps annual. Indiana would have met its NVRA obligations had the Co-Directors continued to track the activities of the counties, ensured that these activities were being executed appropriately, conducted the voter roll review every four years, and followed through with the verification mailing if a quality issues was identified. (Written Compliance Plan, p. 7-8)

Two areas of inconsistency also raise additional serious concerns and, in my opinion, contribute to the poor quality of Indiana's voters.

First, the Confidence Factor is highly subjective and inconsistent. In the absence of specific standards for how to proceed based on varying degrees of the Confidence Factors, list maintenance activities become overly subjective, leading to counties employing vastly different criteria for updating or canceling a record. For example, one county may conduct certain additional research if the Confidence Factor falls below 90 percent, while another county may not conduct this research unless the Confidence Factor is below 75 percent. The lack of standardization for reviewing and evaluating voter records has led to varying rational for removal of registrants from one county to the next.

Second, countywide mailings have not been conducted in a consistent, uniform manner. Just 5 of Indiana's 92 counties conducted these mailings, according to deposition testimony. While funding may have been an issue, it should not have been an insurmountable one. The cost for the mailings is minimal considering overall county budgets, and the legal obligation to maintain accurate roles should be taken into consideration. For example, St. Joseph County's 2013 total annual budget is set at more than $91.7 million.[27] Further, five counties were able to secure the resources to conduct a general mailing. This lack of uniformity creates a situation in which the records of registrants in one county receive higher scrutiny than those in other counties.

Indiana also does not conduct NCOA mailing to all registrants. It is my opinion that the NCOA mailing is particularly important if a state is not conducting a general countywide or statewide mailing.

In my opinion, more effective training and step-by-step procedures and standards will enhance Indiana's voter list maintenance efforts, so that all election officials are operating under the same or substantially similar procedures. This helps to facilitate uniformity in practices and promotes greater accuracy across the entire registration list.

---

[27] St. Joseph County annual budget;
http://www.stjosephcountyindiana.com/departments/Auditor/2013%20Budget.pdf;
http://articles.southbendtribune.com/2012-10-16/news/34506225_1_county-employees-commissioner-bob-kovach-scale-in-county-government. Note: Two links are provided, because at the time of completion of this document, the direct link to the PDF document on the St. Joseph County auditor's website was not working.

While the conflicting advice is, in part, due to the structure of Indiana elections required under Indiana law, it nevertheless adds to inconsistencies and difficulties in administering voter list maintenance activities. As a result, in my opinion, this leads inconsistent practices from county to county. This issue may well be resolved with the recently passed legislation giving authority to the Secretary of State as the final decision maker in the event of conflicting opinions.

## X.      Compliance and Oversight

In this section, I will review compliance and oversight activities that Elections Co-Directors, as the election officials jointly designated as Indiana's NVRA official, have conducted and continue to conduct in order to ensure that counties, and therefore the state, are conducting a list maintenance program that meets Federal and state law. I also review the implications of the ruling by the U.S. Court of Appeals for the Eighth Circuit in *U.S. v State of Missouri*, 535 F.3d 844 (8th Cir. 2008).

### A.      Indiana's Compliance and Oversight Efforts

Under Indiana law, the Co-Directors of the Election Division have overall responsibility for the state voter registration activities and serve as the state's NVRA official. Ind. Code § 3-7-11-1, -2. The Co-Directors are jointly designated, under 42 U.S.C. § 1973gg-8, as the chief state election official responsible for the coordination of state responsibilities under NVRA. Ind. Code § 3-7-11-1. Among other related duties, the Co-Directors are responsible for coordinating with the State Elections Commission to oversee the implementation and administration of NVRA and protect the fundamental rights of voters. Ind. Code § 3-7-11-2.

Indiana law also permits various voter registration activities, including voter list maintenance activities, to be delegated to county voter registration officials. However, the Co-Directors are still responsible for ensuring that the state meets its obligations under NVRA Section 8.

State law provides the Co-Directors with several tools to ensure compliance. Beyond state law, the Co-Directors can, as part of their authority, require various compliance reports and consider certain data, such as registration rates, as part of a state compliance and oversight effort. Additionally, the 2006 Consent Decree and Order and Indiana's Written Compliance Plan called for significant compliance measures.

The following is a summary of the specific compliance activities available to the Co-Directors:

▪ **Affidavit re Voter Registration Cancellations.** Indiana law requires county voter registrations officials to file an affidavit under affirmation with the election division verifying that list maintenance tasks had been performed. However, there was no deadline for submitting this affidavit. Mr. King noted that the regularity of counties

filing the affidavits was "not frequently" (King Deposition, p. 55). Co-Director Deckard indicated that he became aware that most counties were not filing the required affidavit in 2011 (Deckard Deposition, p. 37). Despite both Co-Directors being aware that the affidavits were not being filed as required by state law, no action was taken to encourage or direct the counties to comply.

In their depositions, Ms. Redman, Mr. Coleman and Mr. Fotia said that they were unaware of this requirement.

In his deposition, Co-Director King noted that provisions contained in a new state law (SB 519) require county election officials to file an affidavit no later than 77 days prior to a Federal general election verifying that list maintenance activities had been properly conducted and completed prior to 90 days before the election. Mr. King acknowledged that the new law, requiring affidavits to be filed by a specific deadline, would "certainly" be beneficial in monitoring county performance (King Deposition, pp. 54-56).

- **County NVRA Implementation Plan.** Under Indiana law, county voter registration officials must file an annual report with the election division detailing revisions to the county NVRA implementation plan adopted during the preceding year. [28] Ms. Redman indicated that she was unaware of this requirement (Redman Deposition, p. 68).

- **Compliance Plan.** To comply with the 2006 Consent Decree, Indiana completed its Written Compliance Plan, discussed earlier. The Compliance Plan set forth detailed tracking procedures and monthly county activity reports to ensure that the counties were complying not only with the activities requirement under the Consent Decree, but also complying with NVRA Section 8 generally.

  Co-Director King acknowledged that these tracking procedures and reporting requirements were discontinued when the Consent Order expired, despite the fact that the SVRS can still generate these reports. Both the Consent Decree and the Compliance Plan contained provisions for violation notices to be sent to the counties. This process was also discontinued. When asked if these compliance tools were helpful, King said that they were (King Deposition, p. 31).

  The Compliance Plan also called for the use of U.S. Census data in monitoring voter registration rates among the Voting Age Population (VAP.) The state discontinued use of this valuable tool for voter roll accuracy measurement.

---

[28] Ind. Code 3-7-12-28.1

## B.    Implications of US. v. Missouri

The Eighth Circuit Court of Appeals case regarding U.S. v Missouri was reviewed in Section VI.  The Eighth Circuit decision noted that the NVRA obligation for conducting a general list maintenance program rests with the state.  The decision emphasized the word "conduct" when discussing this obligation, noting that the NVRA "envisions the states will actively oversee a general program…."  On remand, the U.S. dismissed its case prior to a decision by the District Court as to whether the efforts of the counties were legally sufficient.  Despite the fact that there is no guidance with respect to that particular question, the Eighth Circuit's decision provides valuable insights regarding the nature of a state's obligations and whether the state's role is assertive or passive in conducting and overseeing the voter list maintenance program.

In his deposition testimony, Co-Director Deckard affirmed that he, jointly with fellow Co-Director King, is the NVRA compliance officer and acknowledged that the co-directors are responsible for conducting the list maintenance program (Deckard Deposition, p. 40 and p. 127).   However, Co-Director Deckard further testified that "conducting" means to "provide resource information…" (Deckard deposition, p. 128).  On several occasions in his testimony, Co-Director Deckard defined his role as being a "resource" and an "interpretive resource" to the counties on the NVRA requirements (Deckard Deposition, p. 126-128).  When asked about his ability or obligation to take corrective action when a county was not conducting appropriate list maintenance tasks, Co-Director Deckard said that the Co-Directors' role was to be a "resource and guide point." (Deckard Deposition, p. 130).  When asked if the Co-Directors had the ability to issue "stern" warnings to nonperforming counties or take other corrective action, such as informing a county regarding violations of Indiana law in writing, Co-Director Deckard said "I issue a Guidebook that tells them very specifically about the actions they must taken [sic] under both federal and state law.  That's pretty stern." (Deckard Deposition, p. 129).

Co-Director King also acknowledged that the Co-Directors are responsible for the state's NVRA compliance (King Deposition, p. 67).  Like Co-Director Deckard, Co-Director King referred to the state's role as "serving as a source for information and training to make sure that the county voter registration officials [follow] the requirements of federal and state law and then carry them out" (King Deposition, p. 67).

As noted above in Section X(A), under Indiana law, counties are required to submit affidavits regarding registrant removals and an annual NVRA plan. Co-Director Deckard and King acknowledged that these tools were a resource for compliance efforts, and further confirmed that the counties were not meeting these requirements nor were they making any effort to require that the counties do so.

### C. Conclusion: Indiana Did Not Conduct Sufficient Oversight Activities

A reasonable effort by a state in conducting voter list maintenance must include an adequate compliance effort. Indiana had a robust compliance program under the 2006 Consent Decree and Order and even called for significant compliance efforts as part of its own Written Compliance Plan. Further, Indiana state law requires basic reporting by the counties in the form of affidavits regarding registrant removals and annual NVRA plans.

Today, however, Indiana is performing virtually no oversight or compliance and has failed to enforce, or even attempt to enforce, the state law regarding annual voter list maintenance plan updates and affidavits from its counties.

While there was no final ruling in the Missouri case, the court provided relevant insight into the state's obligations.

It is my opinion, based on my experience and expertise and my direct knowledge in interacting with county election officials, that a basic plan for oversight and compliance is necessary in any reasonable effort to maintain accurate voter rolls. A state's responsibility is an active one and serving as little more than a passive information resource is insufficient to meet the state's NVRA obligations. Further, the Co-Directors had—and still have—at their disposal state law that offers a basic tool in determining if the counties are conducting list maintenance tasks in a timely, appropriate manner.

Therefore, it is my opinion, based on my expertise and the review of depositions and other documents, that this lack of oversight and compliance has rendered Indiana's voter list maintenance program ineffective and unreasonable.

## XI. Overall Opinions and Conclusions

I was retained to provide my opinion on whether Indiana made a "reasonable effort" to maintain and update its voter rolls to ensure currency and accuracy for the 2010 Federal elections. In my opinion, based on my experience and expertise as the former Secretary of State for the State of Georgia, with responsibilities as the chief NVRA official, and to a reasonable degree of confidence, Indiana failed to make a reasonable effort to conduct a general program for voter list maintenance and did not meet its obligations under the NVRA.

My report provides detailed conclusions and opinions, as appropriate in each section. The following is a summary of the key points supporting these opinions and conclusions:

- Indiana had the benefit of strong guidance regarding activities that together generally constituted a "reasonable effort" in the 2006 Consent Decree and Order and its Written Plan of Compliance.

- While Indiana conducts a new voter verification program, it does so based on the highly subjective "Confidence Factor," which led to inconsistent verification practices.

- While Indiana conducts a program for the timely removal of registrants who have died, been criminally convicted or declared mentally incompetent, Indiana does not conduct other generally accepted list maintenance practices:

    – NCOA mailing to all registered voters at least every two years

    – General mailing to all registrants either on a statewide basis or county-by-county at least every 10 years or more frequently in the absence of NCOA mailings

    – Removal notices

- Indiana failed to exercise even minimal oversight and compliance among its counties, including:

    – Failing to ensure that counties were following state and federal law for list maintenance activities; and

    – Failing to ensure that counties followed state law for submitting required reports and plans

- Indiana's minimal activities were not conducted in a uniform, nondiscriminatory manner, including:

    – Countywide mailings were conducted in 5 of the state's 92 counties, subjecting registrants in one county to a higher degree of scrutiny than those in the others;

    – The use of the "Confidence Factor" without adequate standards to determine consistent next steps created inconsistencies in the manner in which voter records were verified and subsequently confirmed or cancelled.

    – Warrick County conducted a mailing regarding a precinct change and utilized the information for list maintenance. The State Election Division advised St. Joseph County that precinct change mailings could not be used for list maintenance.

- Indiana was on notice that its voter rolls were substantially inaccurate and out of date, based on the data the state submitted to the EAC. This data showed that numerous counties had voter registration rates in excess of 100% and three counties had voter registration rates in excess of 115%. Yet, despite the indications of serious quality issues with its voter rolls, the state did not act.

In summary, Indiana has failed to conduct even the most basic list maintenance program to ensure reasonably accurate voter rolls.

First, according to the EAC 2011 Report and data provided by Indiana, Indiana's voter registration rate was nearly 90%, well above the national voter registration rate among states of 78.7%. This data, coupled with the county-by-county data, provides strong evidence that significant inaccuracies exist with Indiana's official list of registrants.

Second, a program that consists of only activities for new voter verification and removals due to death, criminal conviction or mental incompetence is insufficient to meet the "reasonable" test. A general program, based on the commonly used list maintenance task, must include some combination of NCOA mailings, general mailings, and notice mailings

Third, Indiana failed to conduct its list maintenance tasks with consistency and uniformity.

Finally, there is the question of who is ultimately responsible for ensuring that the state meets its NVRA obligations. The Co-Directors are statutorily designated as the state's joint NVRA officials. Certainly, the organizational structure that requires Co-Director, one from each major political party, presents certain challenges. Additionally, the Co-Directors have the authority to delegate certain list maintenance activities to the counties.

In my opinion, none of these factors absolves the Co-Directors from their overall obligations under the NVRA—obligations that they failed to meet in connection with the 2010 Federal election and continue to fail to meet even today.

# # #

**APPENDIX EXHIBIT 2**

**STEVEN CAMAROTA DECLARATION AND ATTACHMENTS**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC.,<br>and TRUE THE VOTE, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 1:12-cv-800-WTL-TAB |
| v. | ) | |
| | ) | |
| J. BRADLEY KING, *et al.* | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

## DECLARATION OF STEVEN CAMAROTA

Pursuant to 28 U.S.C. § 1746, I, Steven Camarota, hereby state and declare as follows:

1.      My name is Steven Camarota.  I am over the age of eighteen and have personal knowledge of the facts set forth below.

2.      My current position is Director of Research for the Center for Immigration Studies, a Washington, DC-based research institute that examines the consequences of legal and illegal immigration on the United States.

3.      I hold a master's degree in political science from the University of Pennsylvania, and a Ph.D. in public policy analysis from the University of Virginia.  During the course of obtaining these degrees, I received graduate level training in the statistical study of human populations, which qualifies me to conduct demographic research on a professional basis.

4.      In 2011, I was retained by Judicial Watch in my individual capacity to perform an analysis of certain voter registration data, including the Indiana county analysis shown on the attached document.  *See* Attach. 1.  I created this Indiana county analysis using population data from the U.S. Census Bureau's American Fact Finder website for the 2010 Census.  To derive

1

total county populations, I used 100% data showing the age 18 and over population for each county.  I generated this data on July 29, 2011.

5.      I then compared this data to 2010 Indiana county voter registration totals available from the U.S. Election Assistance Commission's website from its 2011 Report to Congress. This comparison resulted in a ratio showing the percentage of registered voters to the total voting age population for each Indiana county shown in the attached document.  *See* Attach. 1.

I HEREBY DECLARE under penalty of perjury that the foregoing is true and correct.

Executed on this **10**th day of October, 2013 in Washington, DC.

Steven Camarota, Ph.D.

**ATTACHMENT 1**

**TO DECLARATION OF STEVEN CAMAROTA**

| State | Jurisdiction | County Pop. | Total Number of persons registered and eligible in Nov Election QA1a | REG/TVAP |
|---|---|---|---|---|
| Indiana | SCOTT COUNTY | 18,369 | 26,311 | 143.2% |
| Indiana | SPENCER COUNTY | 15,889 | 19,017 | 119.7% |
| Indiana | CRAWFORD COUNTY | 8,218 | 9,371 | 114.0% |
| Indiana | WARRICK COUNTY | 44,258 | 48,020 | 108.5% |
| Indiana | TIPTON COUNTY | 12,233 | 12,867 | 105.2% |
| Indiana | FRANKLIN COUNTY | 17,054 | 17,879 | 104.8% |
| Indiana | WARREN COUNTY | 6,512 | 6,762 | 103.8% |
| Indiana | UNION COUNTY | 5,631 | 5,751 | 102.1% |
| Indiana | ORANGE COUNTY | 14,953 | 15,180 | 101.5% |
| Indiana | BROWN COUNTY | 12,070 | 12,201 | 101.1% |
| Indiana | HANCOCK COUNTY | 51,664 | 52,052 | 100.8% |
| Indiana | NEWTON COUNTY | 10,965 | 11,001 | 100.3% |
| Indiana | CLARK COUNTY | 84,123 | 83,699 | 99.5% |
| Indiana | ST. JOSEPH COUNTY | 201,080 | 199,738 | 99.3% |
| Indiana | STARKE COUNTY | 17,667 | 17,472 | 98.9% |
| Indiana | VANDERBURGH COUNTY | 139,807 | 138,256 | 98.9% |
| Indiana | HARRISON COUNTY | 30,057 | 29,611 | 98.5% |
| Indiana | MARTIN COUNTY | 7,853 | 7,723 | 98.3% |
| Indiana | FLOYD COUNTY | 56,647 | 54,846 | 96.8% |
| Indiana | FOUNTAIN COUNTY | 13,066 | 12,528 | 95.9% |
| Indiana | POSEY COUNTY | 19,772 | 18,935 | 95.8% |
| Indiana | CARROLL COUNTY | 15,198 | 14,537 | 95.7% |
| Indiana | BOONE COUNTY | 40,723 | 38,802 | 95.3% |
| Indiana | WHITE COUNTY | 18,683 | 17,794 | 95.2% |
| Indiana | HAMILTON COUNTY | 191,631 | 182,397 | 95.2% |
| Indiana | HOWARD COUNTY | 63,167 | 59,932 | 94.9% |
| Indiana | RIPLEY COUNTY | 21,228 | 20,109 | 94.7% |
| Indiana | DELAWARE COUNTY | 94,098 | 87,273 | 92.7% |
| Indiana | DEARBORN COUNTY | 37,532 | 34,801 | 92.7% |
| Indiana | ALLEN COUNTY | 259,371 | 240,419 | 92.7% |
| Indiana | PIKE COUNTY | 9,965 | 9,235 | 92.7% |
| Indiana | PULASKI COUNTY | 10,204 | 9,405 | 92.2% |
| Indiana | CLAY COUNTY | 20,449 | 18,808 | 92.0% |
| Indiana | DUBOIS COUNTY | 31,220 | 28,529 | 91.4% |
| Indiana | MADISON COUNTY | 101,247 | 92,400 | 91.3% |
| Indiana | PARKE COUNTY | 13,626 | 12,402 | 91.0% |
| Indiana | FAYETTE COUNTY | 18,459 | 16,646 | 90.2% |
| Indiana | RUSH COUNTY | 13,085 | 11,796 | 90.1% |
| Indiana | KNOX COUNTY | 30,248 | 27,158 | 89.8% |

| | | | | |
|---|---|---|---|---|
| Indiana | OHIO COUNTY | 4,828 | 4,318 | 89.4% |
| Indiana | LAPORTE COUNTY | 86,085 | 76,963 | 89.4% |
| Indiana | WASHINGTON COUNTY | 21,136 | 18,896 | 89.4% |
| Indiana | DEKALB COUNTY | 31,087 | 27,689 | 89.1% |
| Indiana | VERMILLION COUNTY | 12,468 | 11,081 | 88.9% |
| Indiana | BLACKFORD COUNTY | 9,852 | 8,729 | 88.6% |
| Indiana | BENTON COUNTY | 6,570 | 5,818 | 88.6% |
| Indiana | JACKSON COUNTY | 31,960 | 28,288 | 88.5% |
| Indiana | HENDRICKS COUNTY | 105,540 | 93,366 | 88.5% |
| Indiana | GIBSON COUNTY | 25,358 | 22,214 | 87.6% |
| Indiana | MARION COUNTY | 676,888 | 591,752 | 87.4% |
| Indiana | GRANT COUNTY | 54,892 | 47,889 | 87.2% |
| Indiana | WABASH COUNTY | 25,429 | 22,132 | 87.0% |
| Indiana | MORGAN COUNTY | 51,566 | 44,793 | 86.9% |
| Indiana | JOHNSON COUNTY | 102,754 | 89,068 | 86.7% |
| Indiana | OWEN COUNTY | 16,564 | 14,330 | 86.5% |
| Indiana | BARTHOLOMEW COUNT | 57,434 | 49,602 | 86.4% |
| Indiana | LAWRENCE COUNTY | 35,262 | 30,441 | 86.3% |
| Indiana | SULLIVAN COUNTY | 16,885 | 14,519 | 86.0% |
| Indiana | LAKE COUNTY | 368,732 | 316,137 | 85.7% |
| Indiana | HUNTINGTON COUNTY | 28,329 | 24,263 | 85.6% |
| Indiana | SWITZERLAND COUNTY | 7,891 | 6,744 | 85.5% |
| Indiana | VIGO COUNTY | 84,799 | 72,398 | 85.4% |
| Indiana | WHITLEY COUNTY | 25,109 | 21,369 | 85.1% |
| Indiana | PORTER COUNTY | 124,422 | 105,887 | 85.1% |
| Indiana | JEFFERSON COUNTY | 25,094 | 21,300 | 84.9% |
| Indiana | ELKHART COUNTY | 141,384 | 119,918 | 84.8% |
| Indiana | FULTON COUNTY | 15,673 | 13,243 | 84.5% |
| Indiana | PERRY COUNTY | 15,195 | 12,781 | 84.1% |
| Indiana | WAYNE COUNTY | 53,034 | 44,514 | 83.9% |
| Indiana | JENNINGS COUNTY | 20,995 | 17,617 | 83.9% |
| Indiana | RANDOLPH COUNTY | 19,788 | 16,593 | 83.9% |
| Indiana | MARSHALL COUNTY | 34,402 | 28,650 | 83.3% |
| Indiana | JASPER COUNTY | 24,884 | 20,694 | 83.2% |
| Indiana | WELLS COUNTY | 20,737 | 17,151 | 82.7% |
| Indiana | CLINTON COUNTY | 24,375 | 20,037 | 82.2% |
| Indiana | NOBLE COUNTY | 34,686 | 28,437 | 82.0% |
| Indiana | DAVIESS COUNTY | 22,528 | 18,449 | 81.9% |
| Indiana | KOSCIUSKO COUNTY | 57,541 | 46,287 | 80.4% |
| Indiana | MONTGOMERY COUNTY | 28,985 | 23,279 | 80.3% |
| Indiana | DECATUR COUNTY | 19,180 | 15,357 | 80.1% |
| Indiana | MONROE COUNTY | 115,503 | 92,234 | 79.9% |
| Indiana | GREENE COUNTY | 25,282 | 20,128 | 79.6% |
| Indiana | HENRY COUNTY | 38,418 | 30,516 | 79.4% |

| | | | | |
|---|---|---|---|---|
| Indiana | MIAMI COUNTY | 28,510 | 22,516 | 79.0% |
| Indiana | TIPPECANOE COUNTY | 137,063 | 105,469 | 76.9% |
| Indiana | CASS COUNTY | 28,873 | 22,011 | 76.2% |
| Indiana | JAY COUNTY | 15,609 | 11,882 | 76.1% |
| Indiana | PUTNAM COUNTY | 29,967 | 22,799 | 76.1% |
| Indiana | ADAMS COUNTY | 23,673 | 17,885 | 75.6% |
| Indiana | STEUBEN COUNTY | 26,350 | 19,532 | 74.1% |
| Indiana | LAGRANGE COUNTY | 24,322 | 15,132 | 62.2% |
| Indiana | SHELBY COUNTY | 33,591 | 15,217 | 45.3% |

**APPENDIX EXHIBIT 3**

**U.S. ELECTION ASSISTANCE COMMISSION REPORT (EXCERPTS)**



The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2009-2010

A Report to the 112th Congress June 30, 2011

PL-000107

# The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2009–2010

A REPORT TO THE 112TH CONGRESS

**2010 Election Administration and Voting Survey**
**Table 1c. Registration Rates for Voting Age Population (VAP) Using Different Registration Bases**

The "R" column indicates the inclusion of Active/Inactive voters in the Reported Registration; see footnotes.

| State | Year | R | (VAP) Estimated Voting Age Population | Reported Registration | Report. Reg. % of VAP | Ranking of % of VAP | Active + Inactive % of VAP | Ranking of % of VAP | Active Only % of VAP | Ranking of % of VAP |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Reported Registration | | | Active + Inactive | | Active Only | |
| Alabama | 2010 | C | 3,647,277 | 2,964,070 | 81.3 | 27 | 81.3 | 27 | 70.9 | 30 |
| Alaska | 2010 | A | 522,853 | 560,146 | 107.1 | 1 | 107.1 | 1 | 94.6 | 2 |
| Arizona | 2010 | A | 4,763,003 | 3,502,743 | 73.5 | 41 | 73.5 | 41 | 66.1 | 38 |
| Arkansas | 2010 | C | 2,204,443 | 1,638,135 | 74.3 | 38 | 74.3 | 39 | 60.2 | 44 |
| California | 2010 | A | 27,958,916 | 17,299,347 | 61.9 | 48 | 84.6 | 21 | 61.9 | 43 |
| Colorado | 2010 | C | 3,803,587 | 3,293,942 | 86.6 | 15 | 86.6 | 14 | 65.1 | 39 |
| Connecticut | 2010 | C | 2,757,082 | 2,150,633 | 78.0 | 35 | 78.0 | 36 | 73.5 | 25 |
| Delaware | 2010 | C | 692,169 | 623,425 | 90.1 | 10 | 90.1 | 11 | 87.2 | 6 |
| District of Columbia | 2010 | C | 500,908 | 512,897 | 102.4 | 2 | 102.4 | 2 | 90.8 | 5 |
| Florida | 2010 | C | 14,799,219 | 12,551,969 | 84.8 | 21 | 84.8 | 20 | 75.9 | 19 |
| Georgia | 2010 | C | 7,196,101 | 5,748,459 | 79.9 | 30 | 79.9 | 30 | 69.9 | 34 |
| Hawaii | 2010 | C | 1,056,483 | 692,745 | 65.6 | 46 | 65.4 | 46 | 57.3 | 45 |
| Idaho | 2010 | A | 1,138,510 | 790,531 | 69.4 | 44 | 69.4 | 44 | 69.4 | 36 |
| Illinois | 2010 | O | 9,701,453 | 8,542,397 | 88.1 | 13 | 88.1 | 13 | 76.8 | 17 |
| Indiana | 2010 | C | 4,875,504 | 4,329,977 | 88.8 | 12 | 88.8 | 12 | 86.1 | 8 |
| Iowa | 2010 | C | 2,318,362 | 2,116,170 | 91.3 | 8 | 91.3 | 8 | 85.6 | 9 |
| Kansas | 2010 | C | 2,126,179 | 1,725,012 | 81.1 | 28 | 81.1 | 28 | 74.3 | 22 |
| Kentucky | 2010 | A | 3,315,996 | 2,885,775 | 87.0 | 14 | 91.2 | 9 | 86.9 | 7 |
| Louisiana | 2010 | C | 3,415,357 | 2,935,062 | 85.9 | 16 | 85.9 | 15 | 79.4 | 13 |
| Maine | 2010 | C | 1,053,828 | 1,028,501 | 97.6 | 4 | 97.6 | 4 | 93.4 | 3 |
| Maryland | 2010 | A | 4,420,588 | 3,468,287 | 78.5 | 33 | 78.5 | 33 | 78.5 | 15 |
| Massachusetts | 2010 | C | 5,128,706 | 4,121,180 | 80.4 | 29 | 80.4 | 29 | 71.8 | 27 |
| Michigan | 2010 | C | 7,539,572 | 7,276,237 | 96.5 | 5 | 96.5 | 5 | 96.5 | 1 |
| Minnesota | 2010 | A | 4,019,862 | 3,220,844 | 80.1 | … | 80.1 | … | 80.1 | … |
| Mississippi | 2010 | O | 2,211,742 | 1,978,463 | 89.5 | 11 | 78.2 | 35 | 73.5 | 26 |
| Missouri | 2010 | C | 4,563,491 | 4,137,495 | 90.7 | 9 | 90.7 | 10 | 80.5 | 12 |
| Montana | 2010 | C | 765,852 | 651,335 | 85.0 | 20 | 85.0 | 19 | 71.8 | 28 |

This table indicates how the registration rate, that is, the percentage of the voting age population that are registered, may vary by the way each State reports its "total" registration number.

The methods vary because some States report only active voters and some report a combination of active and inactive as their "total" registration.

The first section of this table reports the method used by the State to report their registration for 2010.

An "A" indicates that the "total" registration reported includes active voters only.

A "C" indicates that the "total" registration reported includes a combination of active and inactive voters.

An "O" indicates that the state either allows local jurisdictions to determine whether to include the inactive voters, or the state uses some other method.

The section entitled "Reported Registration" provides information on the registration rate for the reported registration.

The section entitled "Active + Inactive" provides information on the registration rate for a combined total.

The section entitled "Active Only" provides information on the registration rate for active voters only. States with partial data (…) are not given a rank.

PL-000109

**2010 Election Administration and Voting Survey**
**Table 1c. Registration Rates for Voting Age Population (VAP) Using Different Registration Bases**

The "R" column indicates the inclusion of Active/Inactive voters in the Reported Registration; see footnotes.

| State | Year | R | (VAP) Estimated Voting Age Population | Reported Registration | Report. Reg. % of VAP | Ranking of % of VAP | Active + Inactive % of VAP | Ranking of % of VAP | Active Only % of VAP | Ranking of % of VAP |
|---|---|---|---|---|---|---|---|---|---|---|
| Nebraska | 2010 | C | 1,367,120 | 1,142,247 | 83.6 | 22 | 83.6 | 22 | 74.7 | 21 |
| Nevada | 2010 | O | 2,035,543 | 1,375,848 | 67.6 | 45 | 67.4 | 45 | 54.7 | 46 |
| New Hampshire | 2010 | A | 1,029,236 | 945,341 | 91.8 | 7 | 91.8 | 7 | 91.8 | 4 |
| New Jersey | 2010 | C | 6,726,680 | 5,135,830 | 76.4 | 36 | 76.4 | 37 | 70.2 | 32 |
| New Mexico | 2010 | C | 1,540,507 | 1,147,177 | 74.5 | 37 | 74.5 | 38 | 69.3 | 37 |
| New York | 2010 | C | 15,053,173 | 11,806,744 | 78.4 | 34 | 78.4 | 34 | 71.0 | 29 |
| North Carolina | 2010 | C | 7,253,848 | 6,207,093 | 85.6 | 17 | 85.6 | 16 | 79.4 | 14 |
| North Dakota | 2010 | X | 522,720 | 522,720 | 100.0 | 3 | 100.0 | 3 | 0.0 | 47 |
| Ohio | 2010 | A | 8,805,753 | 8,044,315 | 91.4 | … | 91.4 | … | 91.4 | … |
| Oklahoma | 2010 | C | 2,821,685 | 2,082,428 | 73.8 | 40 | 73.8 | 40 | 62.9 | 41 |
| Oregon | 2010 | A | 2,964,621 | 2,068,798 | 69.8 | 43 | 69.8 | 43 | 69.8 | 35 |
| Pennsylvania | 2010 | | 9,910,224 | 8,220,759 | 83.0 | 24 | 83.0 | 24 | 75.7 | 20 |
| Rhode Island | 2010 | C | 828,611 | 706,161 | 85.2 | 19 | 85.2 | 18 | 78.2 | 16 |
| South Carolina | 2010 | A | 3,544,890 | 2,630,363 | 74.2 | 39 | 83.4 | 23 | 74.2 | 24 |
| South Dakota | 2010 | A | 611,383 | 575,150 | 94.1 | 6 | 94.1 | 6 | 85.0 | 11 |
| Tennessee | 2010 | C | 4,850,104 | 3,952,404 | 81.5 | 26 | 81.5 | 26 | 74.3 | 23 |
| Texas | 2010 | | 18,279,737 | 13,262,432 | 72.6 | 42 | 72.5 | 42 | 62.2 | 42 |
| Utah | 2010 | C | 1,892,858 | 1,500,305 | 79.3 | 31 | 79.3 | 31 | 70.7 | 31 |
| Vermont | 2010 | O | 496,508 | 439,333 | 88.5 | … | 83.6 | … | 77.8 | … |
| Virginia | 2010 | C | 6,147,347 | 5,032,135 | 81.9 | 25 | 81.9 | 25 | 76.8 | 18 |
| Washington | 2010 | C | 5,143,186 | 4,066,517 | 79.1 | 32 | 79.1 | 32 | 70.0 | 33 |
| West Virginia | 2010 | C | 1,465,576 | 1,216,023 | 83.0 | 23 | 0.0 | 48 | 0.0 | 48 |
| Wisconsin | 2010 | A | 4,347,494 | 3,709,229 | 85.3 | 18 | 85.3 | 17 | 85.3 | 10 |
| Wyoming | 2010 | A | 428,224 | 270,083 | 63.1 | 47 | 63.1 | 47 | 63.1 | 40 |
| American Samoa | 2010 | A | | 16,124 | …….. | …….. | …….. | …….. | …….. | …….. |
| Guam | 2010 | A | | 52,821 | …….. | …….. | …….. | …….. | …….. | …….. |
| Puerto Rico | 2010 | | 2,822,494 | | …….. | …….. | …….. | …….. | …….. | …….. |
| Virgin Islands | 2010 | | | | …….. | …….. | …….. | …….. | …….. | …….. |
| Sum of Above | 2010 | | 237,386,565 | 186,874,157 | 78.7 | | 80.7 | | 72.9 | |

This table indicates how the registration rate, that is, the percentage of the voting age population that are registered, may vary by the way each State reports its "total" registration number.

The methods vary because some States report only active voters and some report a combination of active and inactive as their "total" registration.

The first section of this table reports the method used by the State to report their registration for 2010.

An "A" indicates that the "total" registration reported includes active voters only.

A "C" indicates that the "total" registration reported includes a combination of active and inactive voters.

An "O" indicates that the state either allows local jurisdictions to determine whether to include the inactive voters, or the state uses some other method.

The section entitled "Reported Registration" provides information on the registration rate for the reported registration.

The section entitled "Active + Inactive" provides information on the registration rate for a combined total.

The section entitled "Active Only" provides information on the registration rate for active voters only. States with partial data (…) are not given a rank.

PL-000110

## 2010 Election Administration and Voting Survey
## Table 1d. Registration Rates for Citizen Voting Age Population (CVAP) Using Different Registration Bases

The "R" column indicates the inclusion of Active/Inactive voters in the Reported Registration; see footnotes.

| State | Year | R | (CVAP) Estimated Voting Age Population | Reported Registration | Report. Reg. % of CVAP | Ranking of % of CVAP | Active + Inactive % of CVAP | Ranking of % of CVAP | Active Only % of CVAP | Ranking of % of CVAP |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 2010 | C | 3,564,694 | 2,964,070 | 83.2 | 38 | 83.2 | 37 | 72.6 | 38 |
| Alaska | 2010 | A | 501,901 | 560,146 | 111.6 | 2 | 111.6 | 2 | 98.6 | 3 |
| Arizona | 2010 | A | 4,184,909 | 3,502,743 | 83.7 | 36 | 83.7 | 35 | 75.2 | 33 |
| Arkansas | 2010 | C | 2,132,908 | 1,638,135 | 76.8 | 43 | 76.8 | 42 | 62.2 | 46 |
| California | 2010 | A | 22,833,220 | 17,299,347 | 75.8 | 44 | 103.6 | 3 | 75.8 | 31 |
| Colorado | 2010 | C | 3,509,328 | 3,293,942 | 93.9 | 11 | 93.9 | 11 | 70.6 | 41 |
| Connecticut | 2010 | C | 2,538,490 | 2,150,633 | 84.7 | 33 | 84.7 | 33 | 79.8 | 21 |
| Delaware | 2010 | C | 655,459 | 623,425 | 95.1 | 9 | 95.1 | 9 | 92.1 | 6 |
| District of Columbia | 2010 | C | 454,105 | 512,897 | 112.9 | 1 | 112.9 | 1 | 100.1 | 1 |
| Florida | 2010 | C | 13,092,827 | 12,551,969 | 95.9 | 7 | 95.9 | 7 | 85.8 | 12 |
| Georgia | 2010 | C | 6,673,195 | 5,748,459 | 86.1 | 26 | 86.1 | 26 | 75.3 | 32 |
| Hawaii | 2010 | C | 967,531 | 692,745 | 71.6 | 47 | 71.4 | 45 | 62.6 | 45 |
| Idaho | 2010 | A | 1,086,237 | 790,531 | 72.8 | 46 | 72.8 | 44 | 72.8 | 37 |
| Illinois | 2010 | O | 8,833,130 | 8,542,397 | 96.7 | 6 | 96.7 | 6 | 84.4 | 15 |
| Indiana | 2010 | C | 4,723,809 | 4,329,977 | 91.7 | 15 | 91.7 | 16 | 88.8 | 7 |
| Iowa | 2010 | C | 2,254,665 | 2,116,170 | 93.9 | 12 | 93.9 | 12 | 88.0 | 9 |
| Kansas | 2010 | C | 2,027,651 | 1,725,012 | 85.1 | 31 | 85.1 | 31 | 78.0 | 26 |
| Kentucky | 2010 | A | 3,247,176 | 2,885,775 | 88.9 | 19 | 93.1 | 13 | 88.7 | 8 |
| Louisiana | 2010 | C | 3,344,987 | 2,935,062 | 87.7 | 22 | 87.7 | 21 | 81.1 | 19 |
| Maine | 2010 | C | 1,036,379 | 1,028,501 | 99.2 | 5 | 99.2 | 5 | 95.0 | 4 |
| Maryland | 2010 | A | 4,070,646 | 3,468,287 | 85.2 | 30 | 85.2 | 30 | 85.2 | 13 |
| Massachusetts | 2010 | C | 4,683,075 | 4,121,180 | 88.0 | 20 | 88.0 | 19 | 78.7 | 23 |
| Michigan | 2010 | C | 7,269,331 | 7,276,237 | 100.1 | 4 | 100.1 | 4 | 100.1 | 2 |
| Minnesota | 2010 | A | 3,851,317 | 3,220,844 | 83.6 | … | 83.6 | … | 83.6 | … |
| Mississippi | 2010 | O | 2,178,158 | 1,978,463 | 90.8 | 16 | 79.4 | 39 | 74.6 | 36 |
| Missouri | 2010 | C | 4,458,183 | 4,137,495 | 92.8 | 13 | 92.8 | 14 | 82.4 | 17 |
| Montana | 2010 | C | 757,986 | 651,335 | 85.9 | 27 | 85.9 | 27 | 72.5 | 39 |
| Nebraska | 2010 | C | 1,307,890 | 1,142,247 | 87.3 | 24 | 87.3 | 23 | 78.0 | 24 |
| Nevada | 2010 | O | 1,753,381 | 1,375,848 | 78.5 | 40 | 78.2 | 40 | 63.6 | 44 |
| New Hampshire | 2010 | A | 998,027 | 945,341 | 94.7 | 10 | 94.7 | 10 | 94.7 | 5 |

**Notes**

This table indicates how the registration rate, that is, the percentage of those citizens of voting age population that are registered may both by the way each State reports the registration totals and by the estimate of the universe of citizen voting age population (CVAP).

The Bureau of the Census provides information from which an approximation of the CVAP may be obtained.

However, while the estimate of the total voting age population (VAP) is from the 2010 U.S. Census, the corresponding information for the CVAP estimate lags behind due to the release schedule of the American Community Survey (ACS), data periodically released by the Bureau.

The estimate for CVAP in this table has been derived from the most recent ACS data which is for the year 2009.

The rate of the total voting age that is a citizen is taken from the 2005-2009 5-year ACS data. It is applied to the 2010 VAP.

The first section of this table reports the method used by the State to report their registration for 2010.

An "A" indicates that the "total" registration reported includes active voters only.

A "C" indicates that the "total" registration reported includes a combination of active and inactive voters.

An "O" indicates that the state either allows local jurisdictions to determine whether to include the inactive voters, or the state uses some other method.

The section entitled "Reported Registration" provides information on the registration rate for the reported registration.

The section entitled "Active + Inactive" provides information on the registration rate for a combined total.

The section entitled "Active Only" provides information on the registration rate for active voters only.

States with partial data ( … ) are not given a rank.

## 2010 Election Administration and Voting Survey
## Table 1d. Registration Rates for Citizen Voting Age Population (CVAP) Using Different Registration Bases

The "R" column indicates the inclusion of Active/Inactive voters in the Reported Registration; see footnotes.

| State | Year | R | (CVAP) Estimated Voting Age Population | Reported Registration | Report. Reg. % of CVAP | Ranking of % of CVAP | Active + Inactive % of CVAP | Ranking of % of CVAP | Active Only % of CVAP | Ranking of % of CVAP |
|---|---|---|---|---|---|---|---|---|---|---|
| New Jersey | 2010 | C | 5,943,613 | 5,135,830 | 86.4 | 25 | 86.4 | 24 | 79.4 | 22 |
| New Mexico | 2010 | C | 1,422,325 | 1,147,177 | 80.7 | 39 | 80.7 | 38 | 75.0 | 35 |
| New York | 2010 | C | 13,218,007 | 11,806,744 | 89.3 | 18 | 89.3 | 18 | 80.8 | 20 |
| North Carolina | 2010 | C | 6,849,752 | 6,207,093 | 90.6 | 17 | 90.6 | 17 | 84.0 | 16 |
| North Dakota | 2010 | X | 514,816 | 522,720 | 101.5 | 3 | 0.0 | 47 | 0.0 | 47 |
| Ohio | 2010 | A | 8,616,928 | 8,044,315 | 93.4 | … | 93.4 | … | 93.4 | … |
| Oklahoma | 2010 | C | 2,710,457 | 2,082,428 | 76.8 | 41 | 76.8 | 41 | 65.4 | 42 |
| Oregon | 2010 | A | 2,757,741 | 2,068,798 | 75.0 | 45 | 75.0 | 43 | 75.0 | 34 |
| Pennsylvania | 2010 | | 9,611,626 | 8,220,759 | 85.5 | 29 | 85.5 | 29 | 78.0 | 25 |
| Rhode Island | 2010 | C | 764,010 | 706,161 | 92.4 | 14 | 92.4 | 15 | 84.8 | 14 |
| South Carolina | 2010 | A | 3,424,129 | 2,630,363 | 76.8 | 42 | 86.4 | 25 | 76.8 | 27 |
| South Dakota | 2010 | A | 602,163 | 575,150 | 95.5 | 8 | 95.5 | 8 | 86.3 | 11 |
| Tennessee | 2010 | C | 4,695,233 | 3,952,404 | 84.2 | 34 | 84.2 | 34 | 76.8 | 28 |
| Texas | 2010 | | 15,844,483 | 13,262,432 | 83.7 | 35 | 83.7 | 36 | 71.7 | 40 |
| Utah | 2010 | C | 1,766,056 | 1,500,305 | 85.0 | 32 | 85.0 | 32 | 75.8 | 30 |
| Vermont | 2010 | O | 486,687 | 439,333 | 90.3 | … | 85.2 | … | 79.4 | … |
| Virginia | 2010 | C | 5,738,718 | 5,032,135 | 87.7 | 23 | 87.7 | 22 | 82.3 | 18 |
| Washington | 2010 | C | 4,740,920 | 4,066,517 | 85.8 | 28 | 85.8 | 28 | 76.0 | 29 |
| West Virginia | 2010 | C | 1,455,026 | 1,216,023 | 83.6 | 37 | 0.0 | 48 | 0.0 | 47 |
| Wisconsin | 2010 | A | 4,221,513 | 3,709,229 | 87.9 | 21 | 87.9 | 20 | 87.9 | 10 |
| Wyoming | 2010 | A | 419,530 | 270,083 | 64.4 | 48 | 64.4 | 46 | 64.4 | 43 |
| American Samoa | 2010 | A | …….. | 16,124 | …….. | …….. | …….. | …….. | …….. | …….. |
| Guam | 2010 | A | …….. | 52,821 | …….. | …….. | …….. | …….. | …….. | …….. |
| Puerto Rico | 2010 | | 2,760,693 | 0 | …….. | …….. | …….. | …….. | …….. | …….. |
| Virgin Islands | 2010 | | …….. | 0 | …….. | …….. | …….. | …….. | …….. | …….. |
| Sum of Above | 2010 | | 217,555,021 | 186,874,157 | 85.9 | | 88.1 | | 78.6 | |

**Notes**

This table indicates how the registration rate, that is, the percentage of those citizens of voting age population that are registered may vary both by the way each State reports the registration totals and by the estimate of the universe of citizen voting age population (CVAP).

The Bureau of the Census provides information from which an approximation of the CVAP may be obtained.

However, while the estimate of the total voting age population (VAP) is from the 2010 U.S. Census, the corresponding information for the CVAP estimate lags behind due to the release schedule of the American Community Survey (ACS), data periodically released by the Bureau.

The estimate for CVAP in this table has been derived from the most recent ACS data which is for the year 2009.

The rate of the total voting age that is a citizen is taken from the 2005-2009 5-year ACS data. It is applied to the 2010 VAP.

The first section of this table reports the method used by the State to report their registration for 2010.

An "A" indicates that the "total" registration reported includes active voters only.

A "C" indicates that the "total" registration reported includes a combination of active and inactive voters.

An "O" indicates that the state either allows local jurisdictions to determine whether to include the inactive voters, or the state uses some other method.

The section entitled "Reported Registration" provides information on the registration rate for the reported registration.

The section entitled "Active + Inactive" provides information on the registration rate for a combined total.

The section entitled "Active Only" provides information on the registration rate for active voters only.

States with partial data (…) are not given a rank.

**APPENDIX EXHIBIT 4**

**TRENT DECKARD DEPOSITION TRANSCRIPT (EXCERPTS)**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CASE NO. 1:12-cv-800-WTL-TAB

JUDICIAL WATCH, INC.,            )
and TRUE THE VOTE,               )
                                 )
        Plaintiffs,              )
                                 )
v.                               )
                                 )
J. BRADLEY KING, et al.          )
                                 )
        Defendants.              )

The deposition upon oral examination of

**TRENT R. DECKARD,** a witness produced and sworn before

me, Rachel L. Tookolo, a Notary Public in and for the

County of Hamilton, State of Indiana, taken on behalf

of the Plaintiffs at the Indiana Government Center,

South Building, 302 West Washington Street, Conference

Room 5, Indianapolis, Marion County, Indiana,

commencing on the 29th day of May, 2013, pursuant to

the Applicable Rules of Procedure with notice as to

time and place thereof.

ALLIANCE COURT REPORTING
P.O. BOX 78261
INDIANAPOLIS, IN 46278-0261
(317) 875-3914
1 (877) 867-8600
www.alliancecourtreporting.com

1   Q   In the past session.  Is that going to change

2        voter list maintenance in your opinion going

3        forward in the end?

4   A   Well, that would -- that would presuppose that an

5        agreement of the Co-Directors would not be able to

6        be reached in certain cases.  And so I would

7        assume that would not be the case because both

8        Co-Directors are both bound to defend the

9        Constitution of the United States and the State of

10       Indiana, and to perform their duties.  However, I

11       will say we have a long history of bipartisan

12       election administration in Indiana that we cited

13       earlier with Sammons v. Conrad where the Indiana

14       Supreme Court has instructed us that it takes

15       action of both Co-Directors to make a decision for

16       the Election Division.  It's a little different

17       when you have legislation that changes the process

18       slightly, but I can certainly see where it might

19       be a deviation from that.

20   Q   Have the Co-Directors ever disagreed about these

21       maintenance practices during your time in office?

22   A   During my tenure, I cannot recall a specific

23       proposal where we had an option and did not move

24       forward.  I cannot recall that.

25   Q   Did you ever recall if the Co-Directors disagreed

1    about a specific list maintenance procedure and

2    memorialized the disagreement in a document and

3    distributed it to county election officials?

4  A  I do know that we have had disagreements on

5    certain activities that have been documented in

6    our Guidebook, yes.  I mean that's very well

7    documented.

8  Q  Ever disagree on a budgeting decision?

9  A  We have had initial discussions where the

10   Co-Directors expressed differences of opinions

11   over program management features of the Statewide

12   Voter Registration System and different

13   philosophies on whether or not to use a

14   contractor, or an in-house solution, and things

15   like that.  However, I would note that we have,

16   large in part, been able to reach agreement after

17   discussion and consideration.

18 Q  Tell me a little bit more about some of the

19   election integrity, list maintenance measures that

20   the most recent legislation accomplishes.  Do you

21   remember if it -- if the legislation does anything

22   about Indiana's participation in the Interstate

23   Crosscheck Program?

24            MR. JEFFERSON GARN:  Can we just

25   make sure we're clear when we're talking about --

1    A   I cannot recall any discussion like that.

2    Q   Could you flip to the next page of this exhibit

3        for me?

4    A   Sure.  (Witness complies.)

5    Q   We're going to Interrogatory No. 4 and Response

6        No. 4.  If you could just read those to yourself

7        very quickly for me to refresh your memory.

8    A   (Witness complies.)  Okay.  I have read it.

9    Q   Thank you.  Could you tell me a little bit about

10       this?  As I understand this response, Indiana

11       counties are required to file an affidavit to the

12       Election Division certifying that they've

13       performed voter list maintenance; is that correct?

14   A   That is correct.

15   Q   And when are they required to file those

16       affidavits under this Indiana Code, Section 7?

17                   MR. JEFFERSON GARN:  Objection to

18       the extent that it calls for a legal conclusion.

19   Q   You can answer if you understand the question.

20   A   I'm afraid I could not answer that specificity to

21       it without consulting Indiana Code and counsel on

22       that.

23   Q   So if I understand this answer correctly, within

24       the past 365 days of these answers, which were in

25       the past few months, you received four affidavits

1  from Indiana counties concerning this voter list

2  maintenance certification; is that right?

3 A  That is correct.

4 Q  And since you've been in office starting in 2011,

5  how many of these affidavits have you received?

6 A  I could not speak to that at this time.  I don't

7  recall the answer.

8 Q  I think you're one of the experts on this subject,

9  one the designated witnesses for the State.  Does

10  that mean the State doesn't know?

11 A  The State does know.  What I'm saying at this

12  point I don't want to offer you a number and be

13  incorrect upon that number.  And I also would note

14  that as we noted in our answer that with changing

15  technology and changing ways that counties do

16  their business, we would probably -- they would be

17  defining voter list maintenance as daily routines

18  that they do, and so therefore the form has not

19  kept time with the activity.

20  MR. JEFFERSON GARN:  And I would

21  just add as an objection, there was -- in the

22  Notice, there wasn't any particular request for

23  specific statistics or numbers.  If you want

24  those, there are ways to ask that and we can get

25  that for you.

```
1                     discussion was held off the

2                     record.)

3    DIRECT EXAMINATION (Continuing),

4    QUESTIONS BY MR. CHRIS FEDELI:

5    Q  So tell me what you know about these county

6       affidavits of performance and voter list

7       maintenance other than what you've already told

8       me.

9    A  Sure.  The county files that on completion of

10      voter list maintenance activity indicating to the

11      Election Division that they have accomplished

12      that, putting it on the record.

13   Q  And you know that four have been filed.  You're

14      not really sure how many others have been filed;

15      is that what you said?

16   A  Yes.  I believe the answer would be that we have

17      received one additional, but I again want a note

18      that I would need to follow up to get a -- more

19      specificity for you all.

20   Q  So your understanding -- understand with your

21      qualifications that the counties -- since 2011,

22      you have not seen too many of these; is that

23      right?

24   A  Yes, that would be correct.

25   Q  And when was the first time you became aware that
```

```
1       we're clear.
2    A  Yeah.
3    Q  Please answer.
4    A  Well, I started this position in January and began
5       attending and speaking at clerks conferences
6       throughout 2011 and 2012.  I would -- from my best
7       recollection, my first clerks conference I believe
8       would have been in March when I started in this
9       position, and so we continue those throughout the
10      year, and I would recall that we discuss voter
11      list maintenance throughout each of those in some
12      portion or part.
13   Q  And when did you -- was this March of 2011?
14   A  March of 2011 would be when I would start talking
15      about --
16   Q  So that's when you first became aware that the
17      county officials were not filing these affidavits?
18   A  No.  It would --
19   Q  When did you first become aware that county
20      officials were not filing these affidavits, or not
21      most of these counties anyway?
22   A  I would say that I -- we had noticed in the summer
23      of 2011 that we were not receiving these documents
24      as I noted.  All but various documents we would
25      receive; this is one that we would not receive.
```

1 Q And who in particular did you speak to about this

2   when you noticed this in the summer of 2011?

3 A I don't recall speaking to anyone specifically

4   other than indicating to Mr. King that as we

5   continued on doing -- preparing for clerks

6   conferences and training -- including the Indiana

7   Voter Registration Association, which holds their

8   conference -- that we needed to include our voter

9   registration activities, which we agreed, which we

10   do.

11 Q You discussed this with Mr. King. And did you

12   decide to take any action or response to you and

13   Mr. King learning that the counties were not

14   filing these affidavits?

15 A We just continued to do our education and to

16   stress the law of Indiana, and that's the county

17   should always be entering into that continuing --

18 Q And did you communicate to the counties that they

19   needed to file these affidavits of performance of

20   voter list maintenance?

21 A That is correct.

22 Q Did you specifically personally -- yourself?

23 A No, I did not.

24 Q Who in your office did?

25 A Well, it's part of their activity that they have

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | to do.  It's a form that they receive each annual        |
| 2  |   | conference on -- the form that we distribute.  I         |
| 3  |   | would need to locate it in our Voter Registration        |
| 4  |   | Guidebook.  I can't do that specifically right           |
| 5  |   | now, but it would be part of what they would be          |
| 6  |   | required to do, and based on the code.                   |
| 7  | Q | So the form is distributed, the code is in the           |
| 8  |   | law.  Was anything else done to communicate to the       |
| 9  |   | counties that they needed to file these                  |
| 10 |   | affidavits?                                              |
| 11 | A | Not to my recollection.                                  |
| 12 | Q | Okay.  In your capacity as Co-Director of the            |
| 13 |   | Indiana Election Division, are you, along with           |
| 14 |   | your Co-Chair, responsible for ensuring that             |
| 15 |   | Indiana meets the legal requirements of Section 8        |
| 16 |   | of the National Voter Registration Act?                  |
| 17 | A | Speaking for my half of the Division, I believe          |
| 18 |   | that the Co-Directors, working with the counties,        |
| 19 |   | are required to make sure that we are performing         |
| 20 |   | our voter registration activities required under         |
| 21 |   | NVRA, yes.                                                |
| 22 | Q | So do you believe that you and the Co-Director are       |
| 23 |   | responsible for complying with Section 8 of NVRA         |
| 24 |   | for the State of Indiana?                                |
| 25 | A | That I believe that we are responsible for               |

1    addition to -- in the Quest portion, we have an

2    on-site trainer that goes to counties, helps them,

3    assists them with the various processes associated

4    with SVRS including funds to help her do that

5    duty -- and specifically, that's sort of the large

6    component.  Much of that -- well, a portion of

7    that I should say, is also the security of the

8    system, which is held by a firm called Terremark

9    in Texas out of the state.

10 Q  So Terremark, they're another vendor related to

11    SVRS?

12 A  They are -- I believe the correct term would be a

13    subcontractor of Quest that holds the information

14    from Quest -- or holds the -- the system.

15 Q  Okay.  You mentioned earlier that counties can do

16    mailings also under Indiana law?

17 A  That is correct.

18 Q  In your -- in your post, do you know whether

19    counties have been doing those mailings?

20 A  I do know that counties do do the mailings, that

21    they conduct those, and that they often talk with

22    the Election Division and our staff about various

23    components of it.

24 Q  Does someone in your office keep track of which

25    counties have done it and which counties haven't

1     done it?

2  A  We maintain conversations with them and could

3     recall specific lists. We do not maintain a list

4     as "these are the counties that have done it." We

5     can check, if you want.

6  Q  So various people in your office would have that

7     knowledge and could probably generate a list of

8     which counties have done the mailings within the

9     past two years?

10  A  Yes, I believe they could.

11  Q  And what's your office policy for whether

12     counties -- from when counties fail to do this

13     mailing? Do you increase communications with

14     them?

15             MR. JEFFERSON GARN: Objection to

16     the form of the question. It's not clear what you

17     mean by "fail".

18  Q  If a county hasn't done a mailing in, say, four

19     years, what kind of action will that trigger on

20     your part?

21  A  Well, I've only been here for two, but what I can

22     tell you that what we regularly do is educate our

23     counties on our requirements, we update our -- our

24     Registration Guidebook and we distribute that

25     along with all of our forms and Guidebooks, and we

1     do PowerPoint presentations through our December

2     clerks conference, as well as conferences

3     throughout the year educating them on voter list

4     maintenance activities.  One of the large portions

5     that we do is when new laws are passed such as

6     this session, we're literally deciphering

7     everything that's come out of the session.  So our

8     staff will take that information, we will work

9     together -- both sides of the Division -- to get

10     agreed upon interpretation of the code that the

11     General Assembly has given us -- and we're in that

12     process now -- and then pass that to the counties

13     so that they can be aware of changes.

14 Q  So those are communications with all 91 Indiana

15     counties -- conferences, distribution of memos?

16 A  There are 92 counties.

17 Q  Sorry, 92 counties.

18 A  (An affirmative nod.)

19 Q  Will you ever have conversations either written or

20     oral by anybody in your office directly with

21     individual counties concerning -- initiated by

22     your office concerning the fact that they've not

23     done a mailing in four years, two years?

24 A  I would indicate that we would always be messaging

25     that they have to be doing these activities.  I

1      cannot recall a specific example of where myself

2      or a staff member of mine has specifically reached

3      out to a county and instructed, nor a time when,

4      as Co-Directors, we deviated from our education

5      and said specifically "blank county, you must -- "

6      I don't recall.

7  Q   So if you can't recall, I mean it's probably --

8      it's not -- you'd say it's not the policy of the

9      Election Division to initiate those kind of

10     communications?

11 A   Not that type, no.

12 Q   And why is that not your policy?  What thinking

13     went into --

14                 MR. JEFFERSON GARN:  Objection.  I

15     think we're getting into a deliberate process here

16     and I --

17                 MR. CHRIS FEDELI:  Noted.

18 Q   Can you answer the question?  Do you understand

19     the question?

20                 MR. CHRIS FEDELI:  I'm sorry?

21                 MR. JEFFERSON GARN:  You can go

22     ahead and answer.

23 A   What I will say is -- and allow me -- voter list

24     maintenance, voter registration maintenance is a

25     continuing process that -- that must always be in

```
1    a cycle of occurring.  It cannot be and should not
2    be generated around a phenomenon, whether that is
3    an election result, or a perception of an error,
4    or something; a county should always been involved
5    in that process.  And so that is the message we
6    carry to all of our counties, that they have to
7    continue to conduct voter list maintenance
8    activities all -- all cycle long, year-round.
9  Q And when did you first become aware that certain
10   counties in Indiana had voter registration rolls
11   that exceeded either 90 or 100 percent of the
12   total age of the voting population in those
13   counties?
14 A I believe you all raised the issue with us, so
15   whenever that was initiated.
16 Q So that would be when you got the letter from
17   Plaintiffs in this lawsuit?
18 A Right.  And you're referring --
19 Q So in February --
20 A You're referring to census data comparisons to
21   voter registration rolls.
22 Q So the census data compared to Election
23   Administration Commission data, that would -- that
24   would be the comparison?
25 A Yes.
```

1  Q  So in February --

2                    MR. CHRIS FEDELI:  Can we take a

3     quick break really quick off the record?

4                    (A short break was taken.)

5  Q  So you first found out the counties exceeded the

6     total voting age population based on census data

7     and Election Assistance Commission data in

8     February of 2012 when you got Plaintiffs' letter,

9     correct?

10 A  Yes.

11 Q  So you didn't -- you hadn't been monitoring any of

12    that data prior to February of 2012 in your

13    office?

14 A  We -- one of the other capacities of the

15    Co-Directors and the Election Division as a whole

16    is we do maintain precincts for the State of

17    Indiana, and so we work very closely through our

18    Precinct Coordinator through -- with the Office of

19    Census Data which assists the General Assembly

20    through the Legislative Services Agency.  So we

21    always are monitoring census data for those

22    purposes, but specifically with -- in relation to

23    voter list maintenance, that's not a correlation

24    for us, so to speak, because you have apples and

25    oranges of information comparison.

1    A    Oh, I'm sorry.  I was referring to SAVE.

2    Q    Okay.  So then going back to the -- so I

3         understand the question you just gave was in

4         response to the DHS SAVE Database?

5    A    Yes.  I apologize.

6    Q    That's okay.  And how about the U.S. Social

7         Security Administration's Social Security Index

8         for records on deaths?  Are you familiar with

9         that?  Have you heard of it?

10   A    Yes.

11   Q    Okay.  And do you know how much it costs to obtain

12        that database?

13   A    I do not.

14   Q    Have you investigated whether the State of Indiana

15        might be able to obtain it?

16   A    Only explored the Program as a whole.

17   Q    And in your exploration, what did you find out

18        about the Social Security Administration's Death

19        Database?

20   A    Just general information and -- on the Program and

21        how it is implemented.

22   Q    And did you ever consider obtaining that list for

23        use by the Indiana Election Division to ensure the

24        voter rolls for the state are accurate?

25   A    That's always a consideration.

1  Q  And when did you consider it, specifically?  When

2     you took your job in January of 2011 when would

3     you say the first time you considered it was?

4  A  As the concept came into my vision as I was

5     getting up to speed on our possibilities, I would

6     say the summer of 2011 is when discussions and

7     thoughts like that would have entered into the --

8     into my field.

9  Q  Did you ever talk to Brad King about it?

10 A  No.  I have talked to his counsel more

11    specifically.  I do recall asking him about

12    success with the Program in the past.

13 Q  And what did his counsel say about whether it was

14    something had the State should obtain?

15 A  He didn't say whether or not the State should

16    obtain it.  He serves as a counsel and it was just

17    a side conversation.  He just mentioned that it

18    had been done before and -- it had been something

19    that we had done.

20 Q  And what do you think?  Is it something the State

21    should obtain for the purposes of doing voter list

22    maintenance?

23 A  I think it's something the State should definitely

24    explore.

25 Q  Why didn't you do it?

1  A  I'm not saying that I would not have done it; I'm

2      saying that I was not at that point yet.  It's

3      obviously every consideration we have and how we

4      supplement our voter list maintenance --

5      everything available to us is always a

6      consideration.

7  Q  I don't understand what considerations you might

8      have about the -- obtaining the list from the

9      federal government of people who are dead.

10  A  Well, anytime that you are obtaining, again

11     anything, that is called the Social Security Death

12     Index and that you are distributing that to your

13     counties and carrying that out, you have to think

14     about every consideration with that -- both public

15     information and both information that you provide

16     to your clerks so it can best be implemented.

17  Q  So public information -- people that have passed

18     away, dead people -- that's not private

19     information, is it?

20  A  I couldn't speak to that.  I apologize.

21  Q  But you've investigated it and -- if you had

22     investigated it, you would have found out whether

23     that was a concern or not, right?

24  A  It's always a consideration for this Program.  I

25     don't know that I can answer your question.

1   Q   So -- so you didn't obtain this list anytime since

2        you started working at the division in 2011,

3        correct?

4   A   That is correct.

5   Q   And why didn't you?

6   A   We had not reached that point yet.

7   Q   What does that mean?

8   A   We had not reached a point of obtaining it,

9        entering into this, and carrying it out with our

10       counties.

11   Q   That's not an explanation; that's just another way

12       of saying you haven't done it.  Why haven't you

13       done it?

14   A   That's my answer.  I'm sorry that it's not the one

15       you like.

16   Q   So you can't explain why you haven't done it?

17   A   I'm saying that it is an consideration and a

18       deliberation that the Co-Directors have to

19       maintain as part of our voter list maintenance

20       discussion.

21   Q   It sounds like -- it sounds like -- it makes it

22       sound like voter list maintenance was a very low

23       priority for you; is that the case?

24   A   No.

25                MR. JEFFERSON GARN:  Objection,

1    argumentive.

2              MR. CHRIS FEDELI:  Your objection

3    is noted.  He answered "No."

4    DIRECT EXAMINATION (Continuing),

5    QUESTIONS BY MR. CHRIS FEDELI:

6  Q  So you don't really know what the cost of the

7    program is; you investigated it, but you really

8    couldn't give me a good reason why you might have

9    technical or legal considerations with obtaining

10   it, yet you haven't done it; is that your

11   testimony?

12 A  That is correct.

13 Q  And you think that's reasonable?

14 A  I think it's reasonable.

15 Q  How often do you obtain the National Change of

16   Address Database maintained by the U.S. Post

17   Office?

18 A  I couldn't specifically answer that at this time.

19 Q  Have you ever obtained it?

20 A  I cannot specifically answer that at this time.  I

21   need to consult notes and actions of the agency.

22 Q  And wasn't this one of the topics that we provided

23   for you in the Deposition Notice?

24             MR. JEFFERSON GARN:  I'm sorry,

25   could you repeat your first question?

1  DIRECT EXAMINATION (Continuing),

2  QUESTIONS BY MR. CHRIS FEDELI:

3  Q  Okay.  This is a 2009 document.  If you don't

4     know, that's fine.  But do you -- do you know

5     whether Indiana participated in this NASS Report?

6  A  I could not speak to the action of my predecessor

7     because I was not here.

8  Q  You don't know; is that correct?

9  A  I don't know.

10  Q  All right.  If you can flip to the next page --

11     it's 33 in the upper right-hand column.  I'd like

12     to jump down to the bottom in bold -- "Obtaining

13     the Names of Voters Who Are Deceased or Convicted

14     of a Crime".  Could you read that paragraph to

15     yourself, please?

16  A  Under "Obtaining the Names of Voters"?

17  Q  Yes, it's under that bold section.  Please read

18     that paragraph for me.

19  A  (Witness complies.)  Okay.

20  Q  Do you believe this is a correct statement of the

21     law in the State of Indiana?

22  A  I do.

23  Q  So as far as you know, the State Department of

24     Health is required to negotiate with the

25     appropriate agencies in other states to acquire

1    information regarding the deaths of Indiana

2    residents there; is that correct?

3  A  As far as I know, yes, with the Department of

4    Health.

5  Q  And the State Department of Health may offer to

6    share information regarding the deaths of the

7    other state's residents with in Indiana, that's

8    correct?

9  A  That is correct.

10 Q  Do you supervise the State Department of Health's

11   efforts to comply with these election laws?

12 A  I do not.

13 Q  Do you coordinate or conduct the State Department

14   of Health's efforts to make sure Indiana complies

15   with Section 8 of the National Voter Registration

16   Act?

17 A  We serve, as we do to the counties, as a resource

18   for every state agency that interacts with voter

19   registration and election law.

20 Q  So you really don't coordinate or supervise the

21   State Department of Health; is that what you're

22   saying?

23 A  No, I do not coordinate or supervise the State

24   Department of Health.

25 Q  So do you know if they've reached out to any other

1    states for information for people who have died

2    out of state?

3  A  I could not speak directly to it.

4  Q  And do you know whether they've offered to share

5    any of their information with any other states

6    regarding deaths of people who might be on their

7    voter rolls?

8  A  I do not.

9  Q  Have you ever asked?

10 A  I've not asked that specific question to the

11    Department of Health.

12 Q  And we spoke earlier about the U.S. Department of

13    Homeland Security's SAVE Database, and you

14    mentioned that that's not something the State has

15    ever obtained, correct?

16 A  To my knowledge, during my term it has -- never in

17    my term, but to my knowledge prior to my service I

18    do not believe that it has ever.

19 Q  And would it be fair to say --

20 A  I don't believe it was available, but I may be

21    speaking out of turn.

22 Q  But based on your testimony earlier, would it be

23    fair to say that you had very serious concerns

24    with obtaining that information?

25 A  The concern is I would want the legislature to

1   A   I've heard that phrase.  But I --

2   Q   What does it --

3   A   -- don't press charges.  I'm an election

4       administrator.

5   Q   What does that the phrase mean?

6   A   I -- I -- I assume to charge someone with an

7       allegation.  But see, I don't charge people with

8       allegations; a prosecutor would do that.

9   Q   Okay.  But as we discussed -- I'm just going to

10      recap something you already said -- you could talk

11      to prosecutors about crimes that have been

12      committed by a county's violations of the law,

13      what have you, if you wished, correct?

14  A   If I were a witness to a crime of any sort --

15      mugging of me or voter list maintenance, I expect

16      I probably would.

17                  MR. CHRIS FEDELI:  Okay, marking

18      Exhibit 9.

19                  (Exhibit 9 was marked for

20                  identification.)

21  Q   This is the written plan for compliance with

22      Consent Decree -- a letter from J. Bradley King

23      and Pamela Potesta to Ms. Mi Yung Claire Park with

24      the United States Department of Justice,

25      February 29, 2008.  Mr. Deckard, have you ever

1     seen this before?

2  A  I believe that I have but I cannot recall when.

3  Q  Okay.  Do you know what this is, in general?

4  A  This -- though I was not there, I will state for

5     the record -- was our consent -- part of our

6     Consent Decree with the United States Department

7     of Justice in February 2008, according to the

8     letter.

9  Q  Okay.  And what was -- what was that Consent

10    Decree concerning?

11 A  If I understand correctly anecdotally, it was

12    related to voter list maintenance activities.

13 Q  And the State agreed to comply with some set of

14    obligations in order to settle that lawsuit; is

15    that correct?

16 A  I believe that's what this states, yes.

17 Q  Turn to Page 2 of this document.

18 A  (Witness complies.)

19 Q  And I want to go to the second-to-last paragraph,

20    starting "Beginning in March 2008".  Would you

21    mind reading that and the last paragraph for me

22    real quick?

23 A  (Witness complies.)  Okay.

24 Q  What's this describing?

25 A  It is part of the Consent Decree describing

|   |   |   |
|---|---|---|
| 1 |   | actions that would be required to be taken in a |
| 2 |   | Compliance Plan by the Indiana Election Division |
| 3 |   | as part of the settlement. |
| 4 | Q | And this particularly talks about a monthly report |
| 5 |   | by the Department of Health concerning processing |
| 6 |   | death hopper items sent to the county; is that |
| 7 |   | right? |
| 8 | A | It does. |
| 9 | Q | And do you know if this was -- if this was done |
| 10 |   | following the delivery of this Consent Decree, if |
| 11 |   | these monthly reports were performed as specified |
| 12 |   | here? |
| 13 | A | I was not Co-Director following the Consent |
| 14 |   | Decree, so I would not be able to speak to the |
| 15 |   | action taken at that time. |
| 16 | Q | So does that mean you don't know? |
| 17 | A | I do not. |
| 18 | Q | Do these reports currently get made on a monthly |
| 19 |   | basis since your tenure as Co-Director? |
| 20 | A | I do not believe so, no. |
| 21 | Q | And the purpose of this is oversight of the |
| 22 |   | counties to make sure that they're complying with |
| 23 |   | list maintenance; is that right? |
| 24 | A | Yes. |
| 25 | Q | Okay.  I'd like to turn to the next page, Page 3. |

1    And the second and third paragraph here, please go

2    ahead and read that quickly for me.

3  A  (Witness complies.)  Okay.

4  Q  And is this describing another kind of report

5    similar to the one we just talked about?

6  A  It would seem so, yes.

7  Q  And what kind of report is this describing?

8  A  One that determines duplicates and reports that to

9    the county for potential action and judgment as we

10    were talking about earlier.

11  Q  It also has to do with the Department of

12    Corrections; is that right?

13  A  As I understand -- you're on Page 3, correct?

14  Q  Correct.  Page 3, paragraph two and three.

15  A  Oh, I'm sorry.  I was at the bottom.  I'm sorry.

16    My bad.

17                    MR. JEFFERSON GARN:  That's what he

18    said.

19                    MR. CHRIS FEDELI:  Did I say --

20                    MR. JEFFERSON GARN:  Yeah.

21                    MR. CHRIS FEDELI:  Okay.  I'm

22    sorry.

23                    THE WITNESS:  I was like that I've

24    not seen.

25

1  DIRECT EXAMINATION (Continuing),

2  QUESTIONS BY MR. CHRIS FEDELI:

3  Q  Well actually, let's -- okay.  Let's just take a

4     look at where you were at.  There -- so there was

5     also an issue of duplicates, and it would

6     appear -- and if we skip ahead to Page 4 now --

7     that there was a monthly report being generated to

8     detect duplicates; is that right?  And I'm talking

9     about the second paragraph of Page 4.

10 A  Assuming -- I was not there at that time.

11 Q  Right.  So this was something that was written in

12    the Compliance Plan -- a monthly plan concerning

13    processing of duplicates in SVRS.  Is -- is that

14    right based on what you're reading?

15             MR. JEFFERSON GARN:  Can we just

16    make it clear what -- what -- what paragraphs are

17    we talking about?

18             MR. CHRIS FEDELI:  Okay.  So now we

19    are on Page 4, second paragraph, and also the

20    paragraphs that you were reading which were at the

21    bottom of Page 3 and continues over.

22             MR. JEFFERSON GARN:  So the -- the

23    last full paragraph and then the paragraph in a

24    continues onto Page 3 to 4?

25             MR. CHRIS FEDELI:  And the second

1    paragraph on Page 4, correct.

2                    MR. JEFFERSON GARN:  And I don't

3    know if he had read that.

4                    THE WITNESS:  So I think I've done

5    what I was supposed to:  I read the bottom two and

6    the top two.

7                    MR. CHRIS FEDELI:  Yes, that's

8    right.

9    A  Yes, I -- I've seen that.  Yeah.

10   DIRECT EXAMINATION (Continuing),

11   QUESTIONS BY MR. CHRIS FEDELI:

12   Q  Okay.  Are monthly reports concerning duplicate

13      processing by SVRS by the counties -- have those

14      been done since you've been Co-Director?

15   A  I do not believe that they have been the whole

16      time that I've been Co-Director.

17   Q  And now let's go back up on Page 3 to the second

18      and third paragraph.  Could you read those for me

19      really quickly?

20   A  Okay.  Now, we're on DOC again?

21   Q  Department of Corrections, right.

22   A  (Witness complies.)  Okay.

23   Q  And this describes monthly reports concerning

24      processing of DOC hopper items by county; is that

25      right?

1  A  It would -- yes, it would appear to.

2  Q  And is that something that's been done -- monthly

3     reports monitoring the counties -- during your

4     tenure?

5  A  I do not believe that monthly reports for this

6     exist any longer, but I would say that we are

7     communicating with the DOC, and DOC is

8     communicating for our counties.

9  Q  Do you communicate with DOC directly from your

10    office or do you go through Baker Tilly?

11 A  Well, we do both, actually.  We've had

12    communication -- or at least I had an inquiry

13    based on a constituent call related to DOC

14    sometime around the election in which it appeared

15    that DOC was not clear on registration procedures.

16    I had that, but Baker Tilly would communicate with

17    them regarding hoppers.

18 Q  I'd like to turn to Page 7 of this document and

19    look at that last paragraph for a second.  Take a

20    quick look at that for me.  The one that starts

21    with "As a result, the Co-Directors will" -- and

22    then that runs onto Page 8 -- it's a continued

23    paragraph.  Can you read that for me, too?

24 A  (Witness complies.)

25 Q  Let's talk about this for a second.

1    A    Sure.

2    Q    What does this -- starting with the first sentence

3         there.  What are the Co-Directors agreeing to do

4         there?

5    A    The Co-Directors are agreeing to compare

6         information from SVRS reports regarding active and

7         inactive voters within each county and other data

8         provided by federal or state agencies, such as the

9         U.S. Census Bureau's population estimates, to

10        determine if there may be a significant problem

11        with the accuracy with the voter registration

12        lists.

13   Q    So comparison of SVRS reports regarding active and

14        inactive voters like the United States Census

15        Bureau's population estimates, and the purpose of

16        doing this was to determine whether counties are

17        complying with list maintenance; is that right?

18   A    I believe that's why the Co-Directors at that time

19        entered into that, yes.

20   Q    And these SVRS reports regarding the active and

21        inactive voters within each county, this is

22        something that you can access, correct, from your

23        Division?

24   A    We should be able to, yes.

25   Q    And you can pull that up at any time as a snapshot

1     on a given day -- how many voters on your active

2     list, how many voters on an inactive list for a

3     county; is that right?

4 A  We should be able to, yes.

5 Q  Now, when --

6 A  Provided everything -- when you say "any given

7     day" --

8 Q  Roger.

9 A  We want to make sure --

10 Q  And when the State of Indiana and its counties

11     report to the United States Election Assistance

12     Commission concerning voter rolls, is this how you

13     do it? Do you use this data?

14 A  We use the data from our Statewide Voter

15     Registration System, yes.

16 Q  So this is the data you use?

17 A  Uh-huh.

18 Q  So really, the Election Assistance Commission data

19     comes right from SVRS?

20 A  It does.

21 Q  Okay. Moving down on this section, the last

22     sentence there -- that paragraph on Page 7. "In

23     cases where the number of voters registered in a

24     county exceeds 90% and the county's estimated

25     voting age population" -- and then it goes on for

1    a little bit like that -- "the Co-Directors may

2    conduct a voter address confirmation mailing to

3    every voter in the counties in which this problem

4    appears to exist, or to all registered voters in

5    Indiana."

6  A  Uh-huh.

7  Q  Has that policy continued since you've been

8    Co-Director?

9                    MR. JEFFERSON GARN:  Objection to

10   the extent that you're characterizing that as a

11   policy.

12 A  Has that practice been continued since you've been

13   a Co-Director?

14                   MR. JEFFERSON GARN:  Again, I'm not

15   sure that this indicates it as a practice.

16 Q  You can answer as either a policy or a practice as

17   you prefer.

18 A  Is the word "may" in there?  Do you see that?

19 Q  I'm asking you whether this is something you've

20   done since you've been a Co-Director.

21 A  I continuously review the information on our

22   state, but I do not -- at least from my

23   perspective -- believe that the census data, as I

24   said earlier today, is as accurate as what the

25   Department of Justice at that time believed it

1   was.  And so I can't speak to why the Co-Directors

2   at that time agreed to that arrangement, but I

3   believe that we have better ways to work with our

4   counties.

5 Q  Is that a "no"?

6 A  Yes, it is a "no".

7 Q  Okay.  I'd like to turn to Page 9, second

8   paragraph.

9 A  (Witness complies.)

10              MR. JEFFERSON GARN:  Second full

11   paragraph?

12 Q  The paragraph that starts "For example, SVRS

13   contains a program" -- and let me know when you're

14   finished.

15 A  (Witness complies.)  Okay.

16 Q  What's this paragraph describing?

17              MR. JEFFERSON GARN:  I'd just like

18   to note an objection.  This --

19 Q  You can answer the question.

20              MR. JEFFERSON GARN:  Just a second.

21   One second.  This looks to be irrelevant as it

22   solely pertain to HAVA, but he can answer.

23              MR. CHRISTIAN ADAMS:  Well, what

24   difference does it make if it pertains to HAVA?

25   HAVA and NVRA are linked.

1       MR. JEFFERSON GARN:  Because
2   there's no private action on HAVA.
3       MR. CHRISTIAN ADAMS:  If there's
4   obligations under NVRA, there are --
5       MR. JEFFERSON GARN:  I'm just
6   noting my -- obligation -- we can discuss the
7   legal argument later, but I'm just noting an
8   objection.  We can talk about it later.
9       MR. CHRISTIAN ADAMS:  But when did
10  he we start making relevance objections in the
11  deposition?
12      MR. JEFFERSON GARN:  I stated --
13      MR. CHRISTIAN ADAMS:  I thought we
14  waived that.
15      MR. JEFFERSON GARN:  I stated my
16  objection at the very beginning that I was going
17  to bring up objections as we went, although I
18  assumed we were waiving it.  I just want to make
19  it clear.
20      MR. CHRIS FEDELI:  Okay.  Your
21  objection is noted.
22  DIRECT EXAMINATION (Continuing),
23  QUESTIONS BY MR. CHRIS FEDELI:
24  Q  Mr. Deckard, so do you understand what this
25     paragraph is describing here?

1    A    Approximately, yes.

2    Q    Okay.

3    A    I'm sure is it took the Co-Directors and their

4         counsels at the time to thoroughly review it.  I

5         would not necessarily want to go teach it

6         tomorrow, but I think I roughly understand it.

7    Q    And is this describing a process by which the

8         State would use the U.S. Post Office National

9         Change of Address System for list maintenance

10        purposes?

11   A    Let me just look one more time.  (Witness looks at

12        document.)  Yeah, it says it permits -- permits

13        the State to do that.

14   Q    Okay.  Moving down to the last paragraph of

15        Page 9, sentence that starts "No later than seven

16        business days following the generation of this

17        monthly report -- "

18   A    Okay.

19   Q    Have you ever sent -- has your office ever sent a

20        letter like that during your tenure?

21   A    Not to my knowledge, no.

22   Q    So that would be a Notice of Violation letter to a

23        county concerning failure to conduct list

24        maintenance activity described in paragraph four?

25   A    Yeah.  Not to my knowledge.

1   Q   Okay.  Going back to Page 5 of this exhibit --

2       last paragraph here.  Starts with "No later than

3       seven business days following generation of this

4       monthly report -- "

5   A   Okay.

6   Q   You testified earlier that these monthly reports

7       relating to address changes in SVRS were not being

8       provided; is that correct?

9   A   I believe I recall that, yes.  That was my

10      testimony.

11  Q   So is it also the case that the violation --

12      Notice of Violation letter to counties have not

13      been getting sent out based on a report that

14      doesn't exist?

15  A   If I'm understanding this 2008 Decree -- or

16      Consent Decree, yes.

17  Q   Let me go back to Page 2 and 3.  I'm not going to

18      make you read the whole thing, but I'll tell you

19      what's in there:  Something about Notice of

20      Violation letters for failure to process DOH

21      hopper items, a Notice of Violation letters for

22      failure to process DOC hopper items.  You

23      testified that those reports -- monthly reports

24      were not being generated, correct?

25  A   I believe so, yes.

1  Q  And would it follow that those Notice of Violation

2     letters to counties have not been sent out during

3     your tenure?

4  A  That would be correct.

5  Q  What's your understanding of how census data is

6     compiled?  How often is census data compiled from

7     your understanding?

8  A  Again, you're talking to an election

9     administrator, but I understand that beyond the

10    ten-year survey that is required I believe in the

11    Constitution, we have periodical updates to the

12    census that are done, but I couldn't speak with

13    specificity to that.

14 Q  So those would be midterm updates to census data;

15    is that your understanding?

16 A  I am not an expert on census information.

17 Q  So what you did say though is every ten years

18    there is a count that would be made of the

19    population; is that right?

20 A  I do know there is that, yes.

21 Q  And probably the best data you're going to get of

22    anyone's snapshot is when they do this census

23    count; is that right?

24 A  Can you define "best data"?  You're asking an

25    election administrator to speculate on census

1    counties have processed that?

2  A  Yes.

3                MR. CHRIS FEDELI:  Can we take a

4    five-minute break?  I'm going to break real quick

5    here.

6                (A ten-minute break was taken.)

7  DIRECT EXAMINATION (Continuing),

8  QUESTIONS BY MR. CHRIS FEDELI:

9  Q  You testified earlier -- and let me know if I'm

10    mischaracterizing this -- that you, in your

11    capacity as Co-Director, spend time communicating

12    with county officials and even sometimes citizens

13    concerning election issues, either registration,

14    administration, or list maintenance; is that

15    right?

16  A  Yes.

17  Q  And some of that communication with either county

18    officials or citizens has been concerning list

19    maintenance; is that right?

20  A  Yes.  We've -- we -- yeah, there's always

21    discussion about that from all those groups.

22  Q  Any counties or citizens ever express concern to

23    you about the condition of the voter rolls, either

24    in the county or in the state of Indiana?

25  A  You know, as far as citizens calling with

```
 1      questions about that -- and that's truly how I
 2      would gauge that -- we didn't get questions on
 3      that until this all began, but then we had I
 4      believe some membership that called in and
 5      expressed concerns about it at that time.  We
 6      referred that there was pending litigation and
 7      that we would certainly do our best to answer what
 8      we could.
 9   Q  What were their concerns about the voter rolls
10      that they expressed to you?
11   A  It's -- as I recall conversations just that -- I
12      think there were references to inaccurate voter
13      rolls and dead people potentially voting.  And
14      generally, that is, whenever there is a discussion
15      about voter list maintenance, or lack of it, or
16      perception of it, you often hear about dead people
17      voting and the word "purge" will often come up,
18      and I don't like to talk about either of those two
19      things because we don't like either term.
20   Q  So when people called up with concerns about the
21      voter rolls and the concern was -- you
22      characterized it as dead people voting -- would
23      that be that there was concern that you were
24      leaving the door open for fraud?
25   A  No.  I think that they believed that it could
```

1   actually be occurring, that we would have the

2   deceased in some form of fraudulent activity

3   returning to the poll.

4   Q   So they were concerned about fraud and I guess the

5   relationship between that and the voter rolls is

6   that if they believe the voter rolls are

7   accurate -- that there aren't dead people on the

8   rolls -- then it's harder to commit that kind of

9   fraud.  Is that what these -- is that what was

10  being expressed?

11  A   Could you restate that?  I apologize.

12  Q   Yeah.  So the relationship between dead people

13  voting and accurate voter rolls is that if there

14  aren't the names of dead people on voter rolls,

15  it's harder to commit fraud that way; is that

16  right?

17  A   I recall from the conversations that that

18  connection was not made.  It was just implied that

19  the lists were inaccurate and that people were on

20  the rolls and that, in that case, the dead would

21  vote.

22  Q   So -- okay.  So I understand the clarification you

23  made, but it still seems that the concern is one

24  of the potential voter fraud relating to the voter

25  rolls; is that right?

1   A   That seems to be the concern, yes.

2   Q   And those were citizen complaints that you

3       mentioned.  Any similar conversations with county

4       officials that you had about that?

5   A   About citizen complaints?

6   Q   No, about counties officials being concerned about

7       their voter rolls?

8   A   No.  I do not recall an instance where county

9       officials indicated those types of terms about

10      maintaining -- or about dead people voting,

11      inaccurate rolls, and what have you.  Now, I will

12      make a note that we do have receive inquiries from

13      counties about voter list maintenance activities.

14      That's very common, but not the other.

15  Q   And so setting aside the dead people voting

16      example, did the counties ever -- have you ever

17      heard a county communicate to you "I think this is

18      a problem that I have voter rolls that aren't

19      accurate enough"?

20  A   I have had counties express that they want to make

21      sure they're doing what they're supposed to do.

22      The big thing that they will indicate that stands

23      out in my head -- and again, this is just my

24      experience -- is that they want to know what they

25      need to know about the process.  And so a lot of

1    voter list maintenance" -- or they'll use a term

2    similar to that -- "and we just want to walk

3    through the process here," or "We have a new staff

4    member," or something along those lines.

5  Q  So give them some guidance on the law?

6  A  Just to make sure we got this right.  One thing I

7    will say is you do -- one thing I will reiterate

8    is prior to the Statewide Voter Registration

9    System, counties operated without our involvement

10   and a uniform system, though they had a uniform

11   law.  So to my knowledge that -- many of the

12   people that are doing this are now have done it

13   under both as they've come from the experience

14   prior to moving to the updated system.

15 Q  Now, the voter list maintenance -- and this is

16   something that, to some extent, is something you

17   have to do all the time as people die, correct?

18 A  It's a cycle that never stops.

19 Q  And what if you were to stop doing it for a period

20   of ten years or five years?  What would happen to

21   the voter lists?

22 A  If you did not do it for that time period, you

23   would create a potential for very inaccurate voter

24   registration lists in your county.

25 Q  And then would a -- would it take a certain amount

1    of time and effort then to go through those

2    inaccurate lists and clean them up?

3  A  Well, if a county did do that, it would take a

4    process to get themselves back on track.

5  Q  So it would take more effort than if they've been

6    doing it all along; is that right?

7  A  I have never thought of it that way.  I assume

8    they would have more work than if they had been

9    doing what we recommend, which is a continuous

10    cycle.

11  Q  And in your role as Co-Director of the Division,

12    NVRA Official for the State of Indiana, you're

13    also responsible for Section 7 of the NVRA?

14  A  That is correct.

15  Q  And what is Section 7 all about?

16  A  Section 7 primarily concerns the -- what I always

17    say:  8 is the process by which we maintain our

18    list and remove those that should not be on the

19    list.  7 is the process by which the voter

20    registration is offered through various entities

21    and by which voters sometimes enter into the

22    registration process.

23  Q  Okay.

24             MR. CHRIS FEDELI:  Marking

25    Exhibit 10.

1    inaccuracy as well.  I think the counties would

2    make a case that these are also their voters and

3    they should also have a role in that.

4  Q  Can we go back to Exhibit 3 again?  This is the

5    Interstate Voter Registration Crosscheck Program,

6    and we talked about -- Mr. Garn talked about

7    Page 3 of this document a little bit, which is a

8    the map of participants in 2012.  And we said

9    there was 15 states participating.

10 A  Uh-huh.

11 Q  And are you aware that there are eight states that

12    are exempt from complying with the NVRA because

13    they use same-day registration?

14 A  Yes.

15 Q  Okay.  So that would be 23 out of -- we're

16    talking -- I'm sorry, 15 out of 42 states that

17    we're talking about participate in this.  Now, the

18    states that don't participate, do you know what

19    condition their voter rolls are in?

20 A  No, I do not know.

21 Q  You don't know whether they're very accurate,

22    somewhat accurate, completely inaccurate, or in

23    horrible shape?

24 A  I could not speak to that.

25 Q  Okay.  And you're aware that the Election

1   Assistance Commission does a little bit of a

2   metric where they analyze how well maintained, how

3   accurate state voter rolls are kept?

4 A I'm aware that the Election Assistance Commission

5   is devoid of four members and has become a federal

6   bureaucracy that struggles to meet.  They have no

7   appointees.  So I am aware that they're there, we

8   report to them, but as far as federal guidance we

9   are a bit devoid from those leaders.

10 Q And are you aware that that put out a report?

11 A I believe I'm aware of several reports they've

12   had.

13 Q And are you aware that the report they put out

14   every two years contains data on how well the

15   states are maintaining their voter rolls?

16 A I am aware of their reports, yes.

17 Q Is that a "yes" to my question?

18 A I said "yes".

19 Q Okay.  And are you aware that Indiana ranks fairly

20   low on that list?

21 A I am aware of that.

22             MR. CHRIS FEDELI:  All right.  You

23   mind if I take a minute to confer with my counsel

24   for a second?

25             MR. JEFFERSON GARN:  That's fine.

1    question and I'll do my best to answer.

2  Q  Okay.  Is it your decision whether or not the BMV

3     sends information through the hopper to a county

4     regardless of whether they check that box at --

5  A  No.

6  Q  It's not your decision?

7  A  It's not my decision.

8  Q  Whose decision is that?

9  A  It would be the BMV Commissioner and his program.

10 Q  Earlier, you testified that getting the Social

11    Security Death Index is something that you would

12    be interested in doing and you would like to do if

13    you could work out the particulars involved in

14    accomplishing that.  Does that ring a bell?

15 A  Well, working out particulars makes it sound as if

16    I want to build a deck outside of the Election

17    Division.  What I would say is making sure as I've

18    previously answered that as we interact -- whether

19    it's with another state or the federal

20    government -- that we are doing so that satisfies

21    both technical and legal concerns.  Just as the

22    counties are separate entities from the State of

23    Indiana, so are those.

24 Q  What technical and legal concerns present

25    themselves with the Social Security Death Index?

1   A   Sure.  That our information can interface, that it

2         can interface accurately, that it can provide to

3         us what we need to know, that we can get that to

4         our counties, that we're following all legal

5         restrictions.  I'm not of counsel, but that's why

6         I have one.  And so satisfying all of those.

7   Q   Okay.  And so we established earlier that there's

8         no cost to getting the Social Security Death

9         Index, correct?

10  A   I believe you established that.  I -- I did not.

11  Q   You stayed said -- I'm sorry.  You said you hadn't

12        investigated cost.

13  A   I had not investigated cost.

14  Q   Okay.  And how far have you gone in investigating

15        the things you just mentioned, compatibility,

16        technical specs, et cetera?

17  A   Well, I think for the most part, fairly well in.

18        But I will note that actual implementation moving

19        forward with that will require work with Quest,

20        and with SVRS, and our Program Managers to

21        actually carry it out.  Any legislative change --

22        and this is what I always tell the legislature --

23        any legislative change requires very specific

24        programming and follow up to make sure that

25        everything's okay.

1   Q   Okay.  And this investigation was something you

2       made since the new law passed or prior to the new

3       law?

4   A   Prior to the new law, it's been a discussion or a

5       concern of mine, and something that's certainly an

6       election administrator topic.

7   Q   And about had how many of your hours would you say

8       of your time that you spend investigating the

9       topics you mentioned?

10  A   I couldn't recall specifically a number of hours,

11      but I'd say I deliberate on all things like this,

12      you know, weekly.  If not an hour, two hours,

13      three hours.

14  Q   And did you -- as a result of your investigation,

15      did you come to the conclusion that it would be

16      workable or not?

17  A   I think it would be highly workable for the State.

18      I think we just -- as we would implement, we have

19      to do so in a way that addresses both technical

20      and legal concerns.

21  Q   And that's what I was asking about when you, you

22      know, looked at those, investigated those

23      technical and legal concerns you came to the

24      conclusion that it was workable, right?  Is that

25      what you just said?

1  A  Well, from what I understand now, the actual

2       implementation may be another thing, but we will

3       work through and can do -- I will make a note here

4       that if you were changing a voter registration

5       form in the Statewide Voter Registration System,

6       it typically will take about I think ten hours and

7       cost about $2,500, and so every specific change is

8       a process when you have a system like what we

9       have.

10  Q  So you hadn't really reached a conclusion about

11      the feasibility until this year, did I understand

12      you correctly?  You started investigating last

13      year, but the conclusion was more like this year?

14  A  I believe so, but I would also note that I do not

15      recall a specific moment where my counterpart had

16      come to me and said "Let's move forward with this

17      and are you ready to move forward?"  I do not

18      recall that.  And sometimes action comes from my

19      side or suggestions, and sometimes vice versa.

20  Q  So it was about a year deliberating this issue,

21      correct?

22  A  Given or take, yes.

23  Q  Earlier, you mentioned state law lists which

24      writings are sufficient for immediate removal.

25  A  Can you restate that?

**APPENDIX EXHIBIT 5**

**J. BRADLEY KING DEPOSITION TRANSCRIPT (EXCERPTS)**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CASE NO. 1:12-cv-800-WTL-TAB

JUDICIAL WATCH, INC.,           )
and TRUE THE VOTE,              )
                                )
          Plaintiffs,           )
                                )
v.                              )
                                )
J. BRADLEY KING, et al.         )
                                )
          Defendants.           )

          The deposition upon oral examination of

**J. BRADLEY KING**, a witness produced and sworn before

me, Rachel L. Tookolo, a Notary Public in and for the

County of Hamilton, State of Indiana, taken on behalf

of the Plaintiffs at the Indiana Government Center,

South Building, 302 West Washington Street, Conference

Room 5, Indianapolis, Marion County, Indiana,

commencing on the 30th day of May, 2013, pursuant to

the Applicable Rules of Procedure with notice as to

time and place thereof.

ALLIANCE COURT REPORTING
P.O. BOX 78261
INDIANAPOLIS, IN 46278-0261
(317) 875-3914
1 (877) 867-8600
www.alliancecourtreporting.com

1    maintenance duties.

2  Q  And did you have similar conversations with

3     legislators concerning this legislation?

4  A  Yes, I did.

5  Q  And who were the primary sponsors of this

6     legislation?

7  A  Representative Kathy Richardson was the author,

8     and Senator Landske was the Senate Sponsor.

9  Q  And did you speak to both of them?

10 A  Yes.

11 Q  And did you advocate for passage of this bill?

12 A  Yes, I did.

13 Q  Do you feel this bill addressed certain needs

14    within the Election Division for list maintenance

15    in the State of Indiana?

16 A  Referring to 1391, yes, I did.

17 Q  And what were those needs?

18 A  The need to have a mechanism to ensure that the

19    voter list maintenance procedures either

20    authorized or required by statute were carried out

21    even when disagreements occurred between the two

22    Co-Directors.

23 Q  So there have been disagreements concerning list

24    maintenance between the two Co-Directors in the

25    past?

1    A    Yes, certainly.

2    Q    And this legislation should address that going

3         forward, correct?

4    A    Yes, that's correct.  It provides that --

5    Q    And then going back to SB 519, would you say this

6         legislation also addressed needs for list

7         maintenance in the State of Indiana?

8    A    Yes, I would.

9    Q    And if you could identify a few of those needs,

10        some of maybe the key needs for me.

11   A    Certainly.  The language in Senate Enrolled Act

12        519 provided for a number of new mechanisms for

13        voter list maintenance, in particular the

14        statewide -- or state -- multistate data-sharing

15        through the Kansas Consortion.  We had had

16        discussions in the Election Division previously,

17        and this Consortion was referenced in the previous

18        Consent Decree, but we had not been able to reach

19        agreement among the Co-Directors to proceed with

20        that data-sharing.  Under Senate Bill 519, the

21        State's now mandated to enter into the Memorandum

22        of Understanding to participate in that.

23   Q    And was there also provisions concerning obtaining

24        the Social Security Administration's Death Index

25        in this bill?

1    purposes such as voter list maintenance.

2  Q  So Senate Bill 519 requires Indiana to participate

3    in these two databases?

4  A  Indiana had already joined through its Department

5    of Health the Steve and Eve Databases, but the

6    legislation specifically authorized the use of the

7    data for voter list maintenance purposes.

8  Q  And when did Indiana join through its Department

9    of Health?

10  A  I don't have direct knowledge, but from what I've

11    read, within the last year or so.  Fairly recent.

12  Q  So upon joining, the legislature has now

13    authorized additional measures to require

14    specifically the use of that data for list

15    maintenance; is that accurate?

16  A  That would be accurate.

17  Q  Anything else about 519 that comes to mind?

18  A  We have a provision that I think allows a very

19    common sense measure, and that is the use of

20    published obituaries and notice of a state

21    administration to allow local voter registration

22    offices to cancel decedents.  In many cases, the

23    County Voter Registration Offices have advised us

24    that they know from personal office or from local

25    media that an individual has died, but they

1      disagreements between the Co-Directors concerning

2      either expenditures of money or activities to be

3      undertaken in regards to list maintenance,

4      correct?

5  A  Yes, that's true.

6  Q  And then House Enrolled Act 1391 was designed to

7      solve that by adding a tie-breaking vote by the

8      Secretary of State when the Co-Directors are

9      deadlocked concerning list maintenance; is that

10     accurate?

11  A  That is accurate.

12  Q  Tell me about some of the disagreements that you

13      can recall between yourself and your Democratic

14      counterpart over list maintenance in the past.

15  A  Well, I should say they have been consistent and

16      extensive through the time that I've served.  I've

17      had several different individuals serve as my

18      Democrat counterparts.  The first instance that

19      comes immediately to mind is the Social Security

20      Administration Death List.  We were able to agree

21      to obtain that on one occasion, in 2003 I believe.

22      There were some problems encountered in one county

23      with the use of the information from the list, and

24      after that I would make offers to have our agency

25      purchase the Social Security List which is not

1    particularly expensive, but I could never get

2    agreement from any Democrat counterpart.

3 Q  So that would be an example of a disagreement that

4    has occurred over the years?

5 A  Yes, that's correct.  I would add that probably

6    one of the more significant disagreements for the

7    purpose of this proceeding would be with regard to

8    the Consent Decree and efforts to obtain the

9    extension of its term.

10 Q  And so you said there was a disagreement between

11    you and the Co-Director concerning the Consent

12    Decree, and this would be the 2006 Consent Decree

13    with the Department of Justice?

14 A  That would be correct.

15 Q  And there were discussions between you and the

16    Co-Director about extending the term of that

17    Consent Decree?

18 A  Discussion between the two of us and also with

19    representatives from the Department of Justice.

20 Q  And what were those -- how would characterize

21    those discussions?  I take it you disagreed?

22 A  I thought the extension of the Consent Decree

23    should be considered.  The Department of Justice

24    representatives whom we spoke to -- this was by

25    conference call; I don't recall immediately who

1   they were, but this would have been during the

2   final few months of the Consent Decree's effect in

3   2009.  I raised the possibility of the benefits of

4   extending the Consent Decree, but my Democrat

5   counterpart did not see any benefit nor did the

6   Department of Justice indicate any benefit from

7   their perspective.

8  Q   And if you recall, did either your counterpart or

9      the Department of Justice offer as a rationale for

10      not continuing with the Consent Decree?

11  A   I think the only rationale is a general statement

12      that improvements had been made to the voter

13      registration rolls under the period the Consent

14      Decree was in effect.

15  Q   So they believed -- they indicated they thought

16      the Consent Decree was no longer necessary because

17      improvements had been made?

18  A   I think that would be a fair summary.

19  Q   And then talking -- going back for a moment to

20      your disagreements with your counterpart

21      concerning obtaining the Death List from the

22      Social Security Administration:  If you recall,

23      what were your counterpart's objections during

24      that?

25  A   They were founded in the experience that Marion

County, Indiana -- the location of Indianapolis --
had experienced when information from that list
had been provided to their County Voter
Registration Office in the May 2004 Primary, it
became apparent that the County Voter Registration
Office staff here in Marion County as opposed to
the remaining 91 counties had not read or
understood the instructions provided with the
Social Security List and had proceeded to cancel
everyone up to a certain point.  I was told that
the individual primarily responsible had canceled
names until she came across the name of someone
she knew and then stopped, but did not tell anyone
that she had canceled everyone previous to that
name.  And so on Primary Election Day in May 2004,
several individuals with names -- last names in
that range appeared at the polls to vote and were
told they had been canceled because they were
reported deceased.

Q   And this was in 2004?

A   Yes.

Q   So if I understood you, in 2004 a county official
used the Social Security Database to cancel the
names of living people, not only dead people?

A   Yes.  I would say I have no reason to believe that

1    was deliberate, but that was the effect.

2  Q  Okay.

3  A  And if I could add to say that that was the

4     rationale for not purchasing the Social Security

5     Administration List in future years was that there

6     had been a bad result in one county in one

7     election.

8  Q  Did you investigate possible causes of that error

9     and possible solutions to it?

10 A  Not directly because the Marion County Election

11    Board itself became aware of the problem on

12    Election Day, and so they immediately began an

13    investigation, and I believe there were published

14    reports that they had determined it was a training

15    problem and there was no invitation to the State

16    or any rationale for further State investigation

17    because the County Election Board on-site had

18    addressed it.

19 Q  And I'm curious because I only know so much about

20    Social Security Databases:  Is it possible to

21    obtain a database from the Social Security

22    Administration of only deceased individuals?

23 A  Yes.  Yes.

24 Q  And was that not done in 2004?

25 A  Yes, that's what was obtained prior to the 2004

1  election.

2 Q So -- just so I understand, so in 2004 a list was

3  obtained that included not only the names of

4  deceased people from the Social Security

5  Administration, but also the names of living

6  people?

7 A No, that's not correct.  The list, as I understand

8  it, is compiled by the Social Security

9  Administration and lists all beneficiaries of

10  Social Security who have died.  But it does not

11  necessarily tie that individual recipient to a

12  voter registration record.  So everyone who

13  received Social Security and bore the name John

14  Smith is on the Death List at Social Security

15  Administration --

16 Q I think I understand.  So in 2004, the issue was

17  you had a nationwide database of deceased people

18  that hadn't been processed correctly by the county

19  to ensure that the names removed were not people

20  that died in another state or county; is that

21  right?

22 A That would be correct.

23 Q Okay.

24      MR. CHRIS FEDELI:  Can we take a

25  break really quickly?

1                      (A four-minute break was taken.)

2  DIRECT EXAMINATION (Continuing),

3  QUESTIONS BY MR. CHRIS FEDELI:

4  Q  Continuing on what we were discussing, I want to

5      go back for a second to the conversations that led

6      to the expiration of the Consent Decree.  You

7      mentioned that you spoke to -- it was your

8      Co-Director as well as individuals at the

9      Department of Justice who were of the opinion that

10     the Decree should expire; is that correct?

11 A  I'm not sure if it was phrased affirmatively.  It

12     was more on the order that they saw no interest or

13     benefit in having it continue.

14 Q  Okay.  So no interest in continuing it?

15 A  Yes.

16 Q  Do you remember -- do you remember the names of

17     the anybody at the Department of Justice who was

18     part of that conversation?

19 A  I don't recall it here.  I might be able to obtain

20     that information.  But I know it was -- it might

21     have been Ms. Park, but I could be mistaken.  A

22     female attorney is what I recall from the

23     conference call, but beyond that --

24 Q  And how many Department of Justice attorneys were

25     on that call?

1   A  Well, to my knowledge, probably two.

2   Q  I'm going to read some names and if one of them

3       rings a bell as an attorney participating, would

4       you let me know.

5   A  Certainly.

6   Q  Was Becky Wertz one of the attorneys on the call?

7       It might have been Rebecca Wertz.

8   A  That is a familiar name.  Possibly.

9   Q  Possibly.  What about Robert Popper?

10  A  We did have phone calls with Robert Popper as a

11      participant, yes.  And again, I can't recall

12      exactly that final phone call, but yes, I would

13      not be surprised if he was on that final phone

14      call.

15  Q  So you mentioned that Mr. Popper had participated

16      in some of the conversations, correct?

17  A  Yes.  During the tenure the of the Consent Decree,

18      he was involved in several telephone

19      conversations.

20  Q  But you don't recall if he was on that final call

21      or not?

22  A  I'm sorry, I don't know.

23  Q  Okay.  How about Chris Herren?  Do you remember if

24      he was on that call?

25  A  I don't believe so.  I know -- I know Chris from

1    other interactions, but I don't believe he was on

2    that call.

3  Q  How about Brian Heffernan?

4  A  Could you spell that last name?

5  Q  Yeah.  It's H-e-f-f-e-r-n-a-n.

6  A  No, I'm sorry, that doesn't ring a bell at all.

7  Q  How about Richard Dellheim?

8  A  No, I'm sorry.

9  Q  Julie Fernandez?

10 A  Julie Fernandez does ring a bell.  I don't think

11   she would have been the primary person on that

12   call, but may have participated.

13 Q  She may have participated in that call or at

14   another time?

15 A  Yes.

16 Q  How about Bruce Gear?

17 A  I'm sorry, could you spell that?

18 Q  Gear.  I'm sorry, G-e-a-r.

19 A  Gear, G-e-a-r.  No, I'm sorry, I don't recall him.

20 Q  And how about Tom Perez?

21 A  I certainly know who Tom Perez is, but I don't

22   think he was involved in the call.

23 Q  So we were talking about some disagreements

24   between you and the Co-Directors.  I think we got

25   there were a couple of them.  There were

1   disagreements on the death list and then also on

2   whether to extend the Consent Decree.  Were there

3   any others that you can remember?

4   A   Yes.  I -- I think the -- the other that I more

5   clearly recall is with regard to the Kansas

6   Consortion for sharing multistate data.  We had

7   had reference to participating in data-sharing

8   through Kansas as part of the Consent Decree, but

9   after the expiration of the Decree, my counterpart

10   was unwilling to enter into any further

11   discussions or stop to sign a Memorandum of

12   Understanding to permit the data sharing.

13   Q   What was his rationale for disagreeing with that?

14   A   It would have been Pam Potesta.  Her -- her -- her

15   rationale I think is set forth in a letter that's

16   been provided, so I'll try to summarize it.  I

17   think her point was that she didn't know the

18   criteria by which potential matches were

19   identified and was not convinced that they were

20   sufficiently reliable for use by Indiana county

21   voter registration issues.

22   Q   And any other disagreements concerning list

23   maintenance between you and the Co-Director that

24   you can remember?

25   A   I don't think any others where we reached an

1   impasse.  I think there were certainly occasions
2   in following up with counties under the Consent
3   Decree where the timing and the content of
4   communications were ones that we did have initial
5   agreement on but were able to reach some sort of
6   compromise.
7 Q And going back to the disagreement about the --
8   obtaining the Social Security Deceased Persons
9   Database, did you agree with your counterparts
10  rationale as to why you should not obtain the
11  list?
12 A No, I did not.
13 Q And why is that?
14 A Because I felt that the issue was primarily one of
15  training county voter registration officials and
16  that -- and 91 other counties to all of our
17  knowledge and information, the task was carried
18  out competently, although I'm sure in a project of
19  that size, human error would result until some
20  mistakes, but there was no systemic problem.
21 Q And when it came time to decide whether to enter
22  into the Kansas Consortion for Interstate
23  Crosscheck, you disagreed with your colleague's
24  opinion.  Why was that?
25 A I felt that the Kansas program had been developed

1   over a number of years, and although the number

2   states participating has risen quite -- to quite a

3   high number more recently -- I believe 22 or 23 --

4   even at that time, more than a dozen states were

5   involved.  And my discussions with my counterparts

6   from Kansas in particular and some of the other

7   participating states, they had not encountered any

8   problems with administering the results --

9   processing the results that they received from the

10  data match.

11  Q  So you felt it could have been implemented

12     effectively?

13  A  Yes.

14  Q  And it would have helped maintain accurate voter

15     rolls in the State of Indiana?

16  A  Yes, certainly.

17  Q  And then when you came to your decision by your

18     counterpart not to with the -- not to extend the

19     Consent Decree, why did you disagree with that?

20  A  I felt that there had been some tools provided in

21     that Consent Decree that were not available to us

22     in state legislation primarily, and we had no

23     tiebreaker, if you will, as we have by virtue of

24     House Enrolled Act 1391.  And so we were losing

25     those potential tools to carry forward on the

1    work.

2  Q  What were some of those tools?

3  A  The tools that I was thinking of in particular

4     were the ability to bring enforcement actions

5     against counties, for example, which is not

6     provided for in our state statute.  The Consent

7     Decree provided that we would be willing -- or we

8     would do that if we determined it to be necessary,

9     and of course the Attorney General was a party on

10    behalf representing the State in that regard.  In

11    the absence of that Consent Decree under the

12    administration of a Federal Court, we had not

13    statutory authority to engage in that sort of

14    enforcement.

15 Q  Anything else?

16 A  In that more general sense, the structure

17    reporting that was set forth in the Consent Decree

18    required the ongoing cooperation of the

19    Co-Directors, and after the expiration of the

20    Consent Decree my counterpart showed no interest

21    or willingness to continue that sort of agency

22    review and follow up on the information provided.

23 Q  So when you say "the structured reporting", were

24    those the monthly reports concerning county

25    performance?

1   A   Yes.  That's what I was referring to, yes.

2   Q   And those were not continued after the expiration

3       of the Consent Decree?

4   A   The system has the ability to generate the

5       reports, but no, there was not a meeting of the

6       Co-Directors to review the reports and take action

7       based on what the report showed.

8   Q   And anything else you can remember that the

9       Consent Decree gave you that you liked?

10   A   I suppose in more general terms, helping to

11       enforce or reinforce the importance of voter list

12       maintenance as part of our training efforts for

13       county voter registration, county election

14       officials.

15   Q   And in the Consent Decree, was there also a

16       provision concerning Notice of Violation letters

17       from the Co-Directors to the counties to be issued

18       in certain circumstances?

19   A   Yes, that's correct.

20   Q   And was that something that you found to be

21       helpful during the time of the Consent Decree?

22   A   Yes, certainly.

23   Q   And was it continued after the expiration?

24   A   No, not -- certainly not in the format that had

25       been used under the Consent Decree.  We did have

1    occasions where individuals within a county, say

2    one member of the county for voter registration,

3    would raise a issue or a problem, and we would

4    respond with either information or instructions

5    about the requirements to be followed and to

6    correct the problem.  But no, not exactly in the

7    format under the Decree.

8  Q  Anything else you can remember under either the

9    Consent Decree or the Compliance Plan that was

10   produced in that Decree?

11 A  No, nothing beyond what I already addressed.

12 Q  Beyond the issues we've just discussed, are any

13   parts of either the Consent Decree or the

14   Compliance Plan produced under that Decree still

15   being followed by you and your Co-Director?

16 A  I'm not sure I understand exactly the scope of the

17   question.  I would say that, yes, we're certainly

18   making a reasonable effort to comply with federal

19   NVRA.

20 Q  And beyond the reasonable effort, are there any

21   specific kind of additional or enumerated, I

22   guess, requirements in either that Consent Decree

23   or the Compliance Plan that you had begun in

24   response to that lawsuit and are still doing?

25 A  I would say probably the most significant

1   but that can be accounted for from a variety of

2   reasons.

3  Q  You said earlier that the -- there was agreement

4   that there had been improvement in the accuracy

5   and currency of the voter rolls between 2006 and

6   2009?

7  A  Yes.

8  Q  Do you know if there was a similar improvement

9   between 2009 and 2012?

10  A  No, I don't know.  I would say there, in my

11   opinion, there was not a similar improvement in

12   terms of the scope.  There were large numbers of

13   records that were either inactivated or canceled

14   during that first period that reflected the

15   absence of doing that for several years before.

16  Q  And one of the activity undertaken pursuant to

17   that Consent Decree was a statewide mailing for

18   removing relocated voters?

19  A  That's correct.

20  Q  And when was that mailing undertaken, if you

21   remember?

22  A  That was following the May 2006 Primary and then

23   concluded the first part of August 2006.

24  Q  And that had the effect of removing a number of

25   voter registrations and moving them to inactive,

| | | |
|---|---|---|
| 1 | | starting with the period between 2006 and 2009? |
| 2 | A | Yes. |
| 3 | Q | And about how many counties did those mailings to |
| 4 | | the best of your knowledge? |
| 5 | A | I would guess in the neighborhood of five to ten. |
| 6 | Q | And -- |
| 7 | A | Particularly -- I know some of the -- I recall off |
| 8 | | the top Monroe, which is where Bloomington is |
| 9 | | located, and I believe Allen County may have done |
| 10 | | one during the time period. |
| 11 | Q | And after the expiration of the Consent Decree |
| 12 | | between the period of 2009 and 2012, did some |
| 13 | | counties do countywide voter list maintenance -- |
| 14 | | mailings? |
| 15 | A | Yes, they did. |
| 16 | Q | And about how many counties to the best of your |
| 17 | | memory? |
| 18 | A | About the same number, perhaps.  Probably no more |
| 19 | | than five. |
| 20 | Q | Okay.  Was there any information that the Election |
| 21 | | Division was entering into the SVRS System either |
| 22 | | through to vendors or distributing to counties |
| 23 | | during the period of the Consent Decree that the |
| 24 | | Election Division had not been maintaining earlier |
| 25 | | than that? |

Q  Any changes to the -- the BMV's role in the most
   recent legislation?

A  No.  I think most of the changes we've had have
   been fairly minor.  I believe it was in 2012 we
   attempted to save some cost by having paper copies
   of the voter registrations transmitted by means
   other than Certified Mail, but I don't recall any
   other significant changes.

Q  And the Department of Health, they send
   information to the counties concerning removals;
   is that what you stated?

A  Identifying individuals who may be deceased
   voters.

Q  And does the Department of Health -- have they
   negotiated agreements with other states or
   entities for out-of-state death lists?

A  I'm not aware that they had prior to the adoption
   of the Steve and Eve Systems.

Q  Which was last year?

A  That's when Indiana entered into it.

Q  Do you also, in your capacity as Co-Director, have
   conversations with branches of the federal
   government concerning list maintenance for the
   purposes of obtaining information?

A  I suppose that the FVAP, the Federal Voter

| | | |
|---|---|---|
| 1 | | is that right? |
| 2 | A | Yes, that would be correct. |
| 3 | Q | And had that been done previously? |
| 4 | A | Not in the fashion that I believe the legislation |
| 5 | | envisions.  The NCOA information regarding address |
| 6 | | forwarding orders, for example, is not one that |
| 7 | | we've obtained previously from the Postal Service. |
| 8 | | We have had some data, like checking the validity |
| 9 | | of an address when it's entered into the system. |
| 10 | Q | Were there any discussions between you and the |
| 11 | | Co-Director about obtaining that information |
| 12 | | previously? |
| 13 | A | During the period prior to the Consent Decree, I |
| 14 | | believe there was.  But again, my counterpart did |
| 15 | | not indicate a willingness or interest in doing |
| 16 | | that.  I don't recall any discussions about that |
| 17 | | afterwards. |
| 18 | Q | Do you remember your counterpart's rationale for |
| 19 | | not wanting to obtain that information? |
| 20 | A | I think, again, it focused on reliability of data. |
| 21 | | I recall that, again, in one county -- in |
| 22 | | Monroe -- the County Voter Registration Office had |
| 23 | | initiated its own NCOA program and had reported |
| 24 | | problems with false matches or incorrect |
| 25 | | information.  And so I think my counterpart |

1   extrapolated that to the entire database or entire

2   program.

3  Q  And you disagreed with that rationale?

4  A  Yes.

5  Q  And why did you disagree?

6  A  Because again, although any huge amount of data is

7     going to have mistakes that occur through human

8     error, the NCOA is a nationwide program that's

9     used by both government and private business to

10    conduct routine business, so I think it's

11    reliable.

12 Q  And is it your understanding that other U.S.

13    states use the NCOA for list maintenance?

14 A  I believe that's correct.

15 Q  And how about having the Department of Health

16    enter into the Steve and Eve Databases?  Before

17    2012, had there been discussions between you and

18    your counterpart Co-Director concerning this

19    issue?

20 A  No, I don't -- I don't recall.  I think we -- we

21    learned about the Steve and Eve Databases at one

22    of our national association meetings where it came

23    to us from sources outside the state, not from

24    internal discussions or investigations.

25 Q  So information about the availability of these

1    sanction for that.

2  Q  So was the instruction in the publication, was it

3     shaped by both you and your Co-Director, or more

4     by you in that instance?

5  A  Of course, ultimately we both have to agree.

6     Regarding the content of the publication, I

7     certainly was the one who brought it forward.

8  Q  Were you happy with the results of the advice to

9     the counties?

10  A  Yes.

11  Q  Do you feel it could have been better had your

12     Co-Director agreed more or earlier?

13  A  Not in this particular case.  We distribute our

14     major publications once-a-year, and so there's

15     plenty of discussion and negotiation that goes on

16     prior to that actual moment of publication.

17  Q  Regarding the several list maintenance procedures

18     we've been talking about that you advocated for

19     over your colleague's objections, do you view your

20     positions to reflect good government policies and

21     best practices for list maintenance?

22  A  I would view that -- I view the position or

23     activities I advocated for as being the best

24     practice for carrying out the responsibilities of

25     the state under federal law and our own statute.

1  Q  You're views are not partisan views, are they?

2  A  I am influenced by the fact that I have a partisan

3     affiliation, but that does not determine my view.

4     There have been cases unrelated to this matter

5     where I've certainly disagreed with my political

6     party publicly.

7                    MR. CHRIS FEDELI:  Do you need a

8     break?

9                    THE WITNESS:  I believe I'm just

10    fine.  Thanks.

11 DIRECT EXAMINATION (Continuing),

12 QUESTIONS BY MR. CHRIS FEDELI:

13 Q  Tell me a little bit about your conversations with

14    the -- let me go back to what we were just talking

15    about for a second.  So you view your policy

16    positions concerning list maintenance that you've

17    argued about with your Co-Director, you view these

18    as best practices for good government for list

19    maintenance?

20 A  Yes, that's correct.

21 Q  And you think independent of party affiliation

22    these are the practices the state should be

23    following?

24 A  I'll speak to Indiana:  Yes.  There's certainly

25    differences in other states, but in our case, yes.

1   Q  And why is that?

2   A  Because of my experience with the administration

3      of elections in Indiana.  It's extensive and I've

4      known and worked with many of the County Voter

5      Registrations and Election Officials for decades

6      as well as the key members of the legislature over

7      the years, and they have a good foundational

8      understanding of what works and what doesn't work

9      as well.

10   Q  And why is it important that list maintenance

11      works well?

12   A  To maintain public confidence in the integrity of

13      the election process.

14   Q  And if the lists are not well-maintained and the

15      public loses confidence, what's the result?

16   A  If the public loses confidence or questions the

17      entire electoral process, then that undermines our

18      Republican system.

19   Q  Could it lead to decrease in participation?

20   A  Certainly.  I think any time that an individual

21      wonders whether the results of an election are

22      accurate, whether there's been fraud committed, it

23      diminishes the confidence that the public has in

24      the process and in government.

25   Q  You mentioned earlier you participate in the

1   after that I took the lead about communicating

2   with the Department of Revenue, so I don't recall

3   any statements she made about it.

4 Q Did you also communicate with the Department of

5   Justice concerning those -- those investigations?

6 A We provided, persaunt to the Consent Decree, the

7   correspondence with the Department of Revenue.

8   And during our conference calls with the

9   Department of Justice, I communicated the

10   conversation with our Department of Revenue.

11 Q Now, is there an Indiana state law requiring

12   county officials to submit affidavits that they

13   have performed voter list maintenance tasks?

14 A Yes, there is.

15 Q And how often under this law are county officials

16   required to submit those affidavits?

17 A Under the current version of the law, there is no

18   specific deadline or period for them to do so.

19 Q And with as that law revised during the recent

20   legislative process?

21 A Yes, it was.  It was revised in Senate Bill 519 to

22   require the affidavit to be executed and filed I

23   believe no later than 77 days before the election

24   that reflected the 90-day period under federal law

25   for the completion of most voter list maintenance

```
 1        activities.  So another two weeks following that

 2        for the county to file the affidavit with the

 3        Election Division that those tasks had been

 4        completed.

 5    Q   That sounds more specific than the old

 6        requirement.

 7    A   Well, considerably more than the most recent

 8        version of the law.  The original version back in

 9        1987 required this filing with the County Auditor

10        rather than with the State.

11    Q   And then the more recent version prior to this

12        spring required filing with the State, but not at

13        a specified time?

14    A   That's correct.

15    Q   Had the counties been filing those affidavits

16        frequently?

17    A   No, not frequently.

18    Q   About how many of those affidavits would you say

19        you'd seen in the past starting with -- between --

20        going back to 2009?

21    A   I would say no more than a dozen.

22    Q   And prior to that, had the compliance with that

23        provision been increased or greater?

24    A   No, I don't think there was a significant

25        difference prior to that.  There was a significant
```

1   change from the original statute that probably had

2   a major impact on the filing.  The original

3   statute in 1987 called for the filing of the

4   affidavit each October with the County Auditor.

5   The penalty provided in the statute was -- the

6   rationale for filing with the Auditor which was if

7   the affidavit was not filed, the County Voter

8   Registration Officer's salary for October would

9   not be paid.  That statute was away repealed in

10  1995, and since that time, there was not a

11  specific schedule set forth in the statute for

12  filing affidavits.  And so they -- they were not

13  filed in large numbers since that point.

14 Q  Is the new law requiring filings on specific dates

15  going to be a benefit to your office in monitoring

16  county performance?

17 A  Certainly.

18 Q  And was the -- and conversely, was -- the lack of

19  compliance previously, was that inhibiting your

20  ability to maintain an adequate monitoring over

21  the counties?

22 A  I don't think I could characterize it as

23  inhibiting because it was, in essence, a

24  self-reporting, so I don't think "inhibited".

25 Q  Would you view this as an effective tool for the

1    State Election Division to ensure that counties

2    are doing their job, complying with the law under

3    penalty?

4  A  Yes.

5  Q  Do county officials typically understand how the

6    inactive voter lists are supposed to be used?

7  A  Typically, I would say "yes".

8  Q  So do you find they generally are familiar with

9    the requirement to wait two general elections --

10   one presidential, one midterm -- before removing a

11   voter on the inactive list?

12 A  I would say -- again, they are generally -- we

13   emphasize this restriction on the cancellation of

14   inactives at every conference or almost every

15   conference where we get into voter registration.

16   So yes, I would think they would be.

17 Q  Ever encounter any confusion from the counties on

18   that issue?

19 A  Yes.  There have certainly been some counties who

20   did not understand the inactivation procedure, the

21   length of time required until cancellation.  I

22   would say those are probably relatively isolated.

23   I can think of two or three counties that had

24   actual problems that resulted from this

25   understanding of that.

```
 1  Q  And have you always agreed on what the NVRA says
 2     about when you can remove a voter?
 3  A  No.  I'm sure we've not always agreed.
 4  Q  And do you remember what some of those
 5     disagreements might have been?
 6  A  Well, certainly with regard to the uniform
 7     nondiscriminatory requirements for voter list
 8     maintenance in particular.
 9  Q  And what position would your Co-Directors have
10     taken on that?
11  A  I think over the period -- I think before I
12     produced that instructional material from what was
13     then the Federal Election Commission, I could not
14     get agreement from my counterparts on triggering
15     notices based on jury service returns, which
16     obviously are not sent to all voters of county.
17  Q  And what was their rationale for not using those
18     as a trigger?  Did they believe it would be
19     discriminatory?
20  A  Yes.  I think the argument was more often phrased
21     that they were not uniform, that they were not
22     "all voters" and therefore did not meet the
23     requirement and certainly could be discriminatory.
24  Q  And why did you disagree with that?
25  A  For the same reason that I would argue that
```

```
 1      sending or using the notices sent to advise voters
 2      of polling place changes -- although not sent to
 3      every voter in the county if conducted on a
 4      consistent, uniform basis -- would meet the
 5      language of the requirement.  There would be no
 6      opportunity for discrimination if the same
 7      procedure is followed in each case where it
 8      occurs.
 9   Q  And earlier when we were talking about the NVRA
10      criteria for removal, the section I read -- it
11      didn't say anything about permission of the voter,
12      did it?
13   A  Well, the section you read did not.
14   Q  So there might be multiple sections to your
15      recollection concerning removal of voters?
16   A  Well, I'd want to review the text of the statute,
17      but --
18   Q  So under the NVRA, the official's responsible for
19      Indiana's compliance with the NVRA are designated
20      by state law; is that right?
21   A  Yes, that's correct.
22   Q  And in Indiana, who are those officials who are
23      responsible for compliance with the NVRA?
24   A  The Co-Directors of the Election Division.
25   Q  And that's designated by state law?
```

1  A  Yes, it is.  It's in Indiana code.

2  Q  So one of your responsibilities is to ensure that

3     the State is conducting a program -- a reasonable

4     program for maintaining accurate voter rolls,

5     correct?

6  A  That's correct.

7  Q  And tell me a little bit about how you understand

8     that obligation.  What's your -- what's your

9     general sense of what it means to conduct a

10    reasonable program for maintaining accurate voter

11    rolls?

12              MR. JEFFERSON GARN:  Objection to

13    the extent you're asking for him to make a legal

14    conclusion.

15 A  I think it involves two components.  The first is

16    our office's core function of serving as a source

17    for information and training to make sure that the

18    County Voter Registration Officials understand the

19    requirements of federal and state law and then

20    carry them out.  The -- the other piece is

21    efficiently managing the resources we have

22    available to do our job, which of course includes

23    not just appropriations from the General Assembly,

24    but a staff of a limited size.

25 Q  And would these reasonable efforts in both

1    educating counties, advising, and managing

2    resources, those would include specific activities

3    at specific times in your view?

4 A  Yes.  The election cycle, of course, dictates to

5    some extent which activities come to the front.

6    Probably the two biggest factors would be the

7    scheduling of general elections and the influx of

8    voter registrations that typically precedes them.

9    And then immediately prior to that, the 90-day

10   deadline for completion of most voter list

11   maintenance work.

12 Q Would the activities that your office would

13   undertake to comply with this provision, would it

14   matter whether or not the voter rolls were in very

15   accurate condition, or less accurate condition; in

16   other words, would that variable affect what you

17   viewed as your responsibilities under the NVRA?

18 A I suppose it's difficult to -- it's a question of

19   degree.  We operate with the understanding that

20   the voter registration rolls will never be

21   completely accurate.  There is going to be some

22   data that changes every day.  So I guess I would

23   say:  No, I don't believe that the relative

24   accuracy has at least a direct impact on the

25   ability of our office to carry out those

```
 1    responsibilities.
 2  Q So talk to me about that concept of the degree of
 3    inaccuracy or outdatedness of the voter rolls.  If
 4    the voter rolls were in a very inaccurate
 5    statement -- I'm sorry -- if the voter rolls were
 6    in a very inaccurate condition, certainly it would
 7    be reasonable for the responsible officials to
 8    make some effort to improve that accuracy; is that
 9    right?
10  A Yes, within their ability to do so.
11  Q Would it be reasonable for the Co-Directors to
12    take some of the actions we've discussed here
13    today in order to improve those rolls?
14  A I would believe it's reasonable for the
15    Co-Directors to undertake some of the activities,
16    yes.
17  Q The Social Security Administration Death Database,
18    for example?
19  A I believe that was a reasonable action to take.
20  Q The Post Office National Change of Address
21    Database, obtaining that?
22  A Uh-huh.  Yes.
23  Q Entering into the Interstate Crosscheck Program?
24  A Yes.
25  Q Entering into the Steve Database Program?
```

```
1    A    Yes.

2    Q    And the Eve Database Program?

3    A    Right.

4    Q    And engaging in county monitoring programs?

5    A    Yes, I think it was reasonable to do that.

6    Q    And it would be reasonable to also notify counties

7         of potential violations in response to that

8         monitoring?

9    A    In general, yes.  I think there's a -- there's a

10        judgment call in particular cases to assess the

11        extent of the nature of a problem in an individual

12        county.

13   Q    Now, in your view, would all of these actions be

14        necessary for NVRA list maintenance compliance all

15        at time?

16   A    No, I suppose not all of the time.

17   Q    So in other words there might be some times when

18        the voter rolls were in very good shape,

19        reasonably accurate, reasonably well-maintained

20        when the priority of these actions might be less;

21        is that fair to say?

22                   MR. JEFFERSON GARN:  Objection; I

23        think you're assuming facts in evidence -- assumes

24        certain conclusions that haven't been established.

25                   MR. CHRIS FEDELI:  Objection is
```

1    noted.

2   A  Would you mind repeating that?

3   DIRECT EXAMINATION (Continuing),

4   QUESTIONS BY MR. CHRIS FEDELI:

5   Q  Yes.  My question is:  Would it be fair to say

6      that if the voter rolls were very well maintained

7      and very accurate, some of these activities might

8      be either less important or less important to do

9      with the same frequency as if they were in not

10     such great shape?

11  A  I think as a general answer, yes.

12  Q  Okay.  And same could be said about postcard

13     mailings done on a statewide basis?

14  A  Yes, I think so.

15  Q  So in other words, if the voter rolls were in very

16     good shape, it might be an issue of "We don't need

17     to do it this year," but when the voter rolls are

18     in worse shape, then it might become an issue of

19     "We really should do this in order to clean up the

20     rolls"?

21  A  Yes, I think that's -- that would be my personal

22     assessment, yes.

23  Q  So it sounds like what's reasonable list

24     maintenance under NVRA bears some relationship to

25     the condition of the voter rolls.  Would you agree

```
 1      with that?
 2   A  I think I would with a slightly different focus.
 3      I think it becomes a question of "Which tools are
 4      available and which tools are most suitable to be
 5      used to achieve it?"
 6   Q  And when you say, "Which tools are available",
 7      what is that?
 8   A  I reference, for example, the statewide mailing
 9      which I think is particularly effective.  But
10      we've not -- until this year's budget -- had
11      funding from the General Assembly to pay the
12      postage or any processing costs.  And so yes, I
13      think that's a more effective tool than perhaps
14      some of the others, but if that's not available to
15      us, then we have to consider the use of others.
16   Q  So you have to use the tools that are available to
17      you?
18   A  Exactly.
19   Q  And is that a standard that would change over time
20      too, based on the technological tools available?
21   A  I would think so.  We have expectations that are
22      founded in technology that we did not have 20
23      years ago.
24   Q  NVRA is 20 years old.  What was reasonable in '93
25      is probably not reasonable in 2013.
```

1   A  Yes.

2   Q  In your role as Co-Director, do you ever have

3      conversations with the members of public about

4      voter list maintenance?

5   A  Yes, certainly.

6   Q  And have you ever heard members of the public

7      express concern about the accuracy and currency of

8      Indiana's voter rolls?

9   A  Yes.

10  Q  And over your tenure, when have you heard those

11      kind of concerns?

12  A  I think those are a relatively constant concern.

13      They're obviously more frequent when we're in the

14      midst of a high-profile election cycle, but they

15      occur more or less continuously.

16  Q  So as long as you've been in office, you've heard

17      that kind of concern?

18  A  Yes.

19  Q  And when citizens communicate about their concerns

20      of the voter rolls, do they tell you why they're

21      concerned?

22  A  Typically, yes.  There will often -- probably most

23      frequently is where an individual or a family

24      member is shown on the poll list at their precinct

25      and they're concerned that the name is still there

1    despite the fact that the family member has moved

2    to college or has died and may not under the

3    restrictions that the county office is under with

4    regard to canceling voter registration.

5 Q  And why would that will bother that somebody --

6    that a family member who is dead is still on the

7    voter rolls?

8 A  I think that's an obvious emotional grieving

9    reaction to be reminded of a loss.

10 Q  And what about in the case of somebody who has

11   moved away out of town?  Why would it bother them

12   if they're still on the voter rolls?

13 A  Well, I think it would cause concern that since

14   the voter rolls were not accurate in reflecting

15   where this living person was that there is the

16   potential for a duplicate registration where the

17   person does currently live, and a potential for

18   fraud if someone were to impersonate the voter and

19   vote at the precinct where their name still

20   appears on the list.

21 Q  You mentioned earlier that in 2006 the State did a

22   statewide mailing to remove a lot of ineligible

23   voters who were no longer registered at the

24   correct address.  About how long did it take to

25   complete that process of completing the -- mailing

1    moving voters to the inactive rolls?

2  A  The large majority of the work was done by the

3    90-day period, which I believe started August the

4    10th. There were a number of counties who --

5    because of misunderstanding instructions or

6    whatever other individual reasons might have

7    occurred -- did not make the August 10th deadline

8    for designating voters as inactive. In those

9    cases, that task was picked up after the 2006

10    Election and completed in 2007.

11  Q  And as a result of that process, my memory is that

12    several hundred thousand voters were moved from

13    active to inactive?

14  A  Yes, that's correct.

15  Q  And once that process was complete and not only

16    after they were removed to the inactive rolls but

17    then two, two-and-a-half years later -- whatever

18    the case may be -- they were canceled, the rolls

19    would have been substantially cleaner. Once

20    that's done, does it become easier then to perform

21    routine day-to-day list maintenance on the list,

22    let's say for a county official?

23  A  It's difficult for me to characterize it as

24    easier; it's more a question of volume.

25  Q  So less work?

1    A   So there's less overall work.  It may still

2        require the same judgment calls and comparisons,

3        but it's not quite the volume, certainly.

4    Q   So if a county were looking at thousands upon

5        thousands of moved and deceased individuals on its

6        rolls, it would be like Sisyphus, you know,

7        looking at the -- pushing a boulder up a hill.  It

8        might be more than they could get to in a year,

9        that's fair to say?

10   A   Yes, recalling that Sisyphus had the ball roll

11       back, that's a fair -- fair comparison.

12                   MR. JEFFERSON GARN:  Not to object

13       to the analogy, but --

14                   MR. CHRIS FEDELI:  Close enough.

15   DIRECT EXAMINATION (Continuing),

16   QUESTIONS BY MR. CHRIS FEDELI:

17   Q   And was the -- so once those -- you know, in that

18       example -- once those names had been cleared from

19       the roll, that county official would no longer be

20       faced with an enormous backlog or list of names to

21       investigate, but could focus more readily on daily

22       hopper items, investigating, making sure

23       sufficient confidence was achieved to clean the

24       rolls, correct?

25   A   Yes, I believe that's correct.

1  Q  Was there a provision in the Consent Decree or the

2     Compliance Plan which created a triggering for the

3     State upon learning that a county exceeded

4     90 percent of its total voting age population on

5     its voter rolls?

6  A  There was a provision in the Compliance Plan, as I

7     recall, that indicated that having more than

8     90 percent of voting age population registered in

9     the county was an indicator of a significant

10    problem, but not necessarily a trigger to a

11    specific action.

12 Q  And you would learn about -- under the Compliance

13    Plan, you would learn about when counties' voter

14    rolls exceeded 90 percent of total voting age

15    population through monitoring?

16 A  Yes, I believe that's right.

17 Q  And once the Compliance Plan expired, you wouldn't

18    learn about those events anymore?

19 A  Not through the mechanism set forth in the

20    Compliance Plan.

21 Q  Would you learn about that from other mechanisms?

22 A  Not automatically, no.  It would require the --

23    the action of the Co-Directors to obtain the

24    information.

25 Q  And do you believe that 90 percent of total voting

1    age population count for county voter rolls is

2    indicative of a potential problem?

3  A  It's indicative of a potential problem.

4  Q  And did your Co-Director agree with that?

5  A  Well, for purposes of signing the Consent Decree,

6    yes.  Beyond that, I don't believe so.

7  Q  Earlier you mentioned -- just at few minutes

8    earlier -- that in order to find out whether a

9    county had 90 percent of total voting age

10    population on its rolls, it would require some

11    decision by the Co-Directors at least after the

12    expiration of the Consent Decree.  Was that your

13    testimony?

14  A  I was referring to what steps, if any, would be

15    taken following that information.  Of course, any

16    member of the public can obtain the data, but it's

17    agency action that would require the agreement on

18    the Co-Directors.

19  Q  And following the expiration of the Consent

20    Decree, were there any times that you were

21    notified by either somebody in your office or by a

22    vendor -- I think I heard the name Baker Tilly

23    mentioned quite a bit yesterday -- that counties

24    had exceeded 90 percent of total voting age

25    population?

1   A   I recall, of course, in recent times we've had

2       media reports that included that information.

3       After the Consent Decree expired, I don't recall

4       any communication from Baker Tilly or other

5       vendors about that.

6   Q   And following 2009, when would you say the first

7       time was that you heard certain counties might

8       exceed 90 percent or 100 percent of the total

9       voting age population?

10   A   Probably at the beginning of 2012.  Certainly when

11       the presidential election was beginning to get

12       underway.

13   Q   And do you remember how that was brought to your

14       attention?

15   A   Just through media articles.  We have a service

16       called ElectionLine, for example, that publishes

17       national news clippings related to elections and

18       oftentimes will pull up something from a local

19       Indiana newspaper that I might not ordinarily see.

20       So some source like that.

21   Q   And were those news reports about the same time

22       that you got a letter from Judicial Watch

23       discussing that issue?

24   A   The reports that I'm remembering, yes.  As I say,

25       there might have been earlier reports, but I do

```
 1      remember media coverage at more or less the same
 2      time.
 3   Q  So this would be have been around February of
 4      2012?
 5   A  Yes, that's correct.
 6   Q  And upon learning this information, did you have a
 7      conversation with the Co-Director about this?
 8   A  Yes.
 9   Q  And tell me about that conversation.
10   A  We discussed the filing of the grievance for
11      complaint, and I think in the context of that note
12      that there had been media reports concerning the
13      same topic.
14   Q  Did you have any conversation about whether or not
15      you wanted to take steps to improve the accuracy
16      of the voter rolls at that time?
17   A  Not in context of this conversation.  We might
18      have had some discussions because the legislature
19      was in session during January and February, and I
20      had been involved in the preparation of a bill
21      that year to make some of the same voter list
22      maintenance improvements that were ultimately
23      enacted this year.
24   Q  Where is -- was there -- were there any steps
25      taken by the Election Division Office in response
```

1       to learning about this prevalence of 90 percent or

2       over 100 percent TVAP counties in Indiana in 2012?

3  A  I believe we had communications with at least some

4       of the counties that was specifically mentioned,

5       and I don't recall any further actions that were

6       taken beyond that other than the processing of the

7       grievance.

8  Q  Can you remember what those communications might

9       have been to the counties, the nature?

10  A  We had communications that were based on those

11      same media reports where a county would say:  We

12      were mentioned in a newspaper or website as having

13      more than 100 percent VAP.  What does this mean?

14      What impact does this have on us?

15  Q  And did you participate in any of those

16      conversations?

17  A  Yes.  I'm sure I had phone conversations with at

18      least some of those counties.

19  Q  And in discussing those, did you have any

20      conversations about what was causing those voter

21      rolls to be high?

22  A  I would not have speculated about the cause.  I

23      would more likely have asked questions about

24      whether voter list maintenance activities had been

25      undertaken in the usual way.

1   Q  And I've been referring to those as high

2       percentages.  Would you agree with that

3       characterization?

4   A  Yes.  I think that would come within the

5       90 percent and above.

6   Q  So going back to my earlier question, is it fair

7       to characterize what you were saying is that you

8       were able to eliminate problems with the DOH

9       hopper and problems with BMV processing as

10      contributing to list maintenance problems in 2012?

11  A  With regard to these particular counties in the

12      conversation, yes.

13  Q  And what else did you learn about process of

14      asking these questions to the counties?

15  A  Well, in discussions with them and looking at the

16      overall content of the reports, what I noted was

17      that many of these counties were small rural

18      counties, and several of them were counties on the

19      state's borders.  And so in discussions with the

20      counties I did raise the question as to whether

21      they experienced problems that might be accounted

22      for because voters had moved across the state line

23      or had died in a hospital across state line, and

24      at least some counties indicated yes, they were

25      aware with problems with their rolls for that

1  particular reason.

2  Q  So was the -- counties particularly that were near

3     the border with another state that were having

4     problems based on out-of-state moves and

5     out-of-state deaths; is that right?

6  A  Yes, that's correct.

7  Q  And that was, in your opinion, one contributor to

8     the condition of the voter rolls in 2012?

9  A  Yes, that is true.

10 Q  Anything else?

11 A  Not with regard to causation.  I think I'll just

12    add Brown County, with the exception of being on

13    the state line, is similar in that it has a highly

14    transient population of folks who might move out

15    of state because they're associated with Indiana

16    University and would be less likely to stay there.

17 Q  And which county was that?

18 A  Brown.

19 Q  Brown County.  And did you talk to Brown County

20    about that issue with Indiana University?

21 A  Not on that occasion, no.

22 Q  Have you talked to them on other occasions about

23    that?

24 A  I am sure at some point over the years I have, but

25    not as part of this particular episode we're

discussing here.

Q  And what -- which counties would be doing cases
   where they have college students moving in and out
   and registering and leaving to maintain their
   voter rolls in accurate condition?

A  Well, I think one thing that counties can do that
   has a history of some success is working with the
   college or university -- to ask that body to
   identify students who have graduated and use that
   as a basis -- not for the inactivation process
   because we have concerns there about being
   uniform, discriminatory -- but instead to send
   cancellation notices, the VRG-14 Form that I
   mentioned earlier.  And at least what I've heard
   from St. Joseph County where South Bend is
   located, they got enough of a response to justify
   that outreach.  So I think there are some things
   that those counties can do.

Q  So you talked to St. Joseph County about this
   issue as well?

A  I think I heard about this program the -- from
   Linda Silka who is then the Republican member of
   the Board of Registration.

Q  And --

A  -- because I've not heard that question come in

1    independently. I think she brought this up.

2  Q  And about what year would that conversation have

3    been?

4  A  I would say in the last couple of years, 2010.

5    Linda has since retired and so I know it was

6    sometime prior to that.

7  Q  So this is something that's not only permitted

8    under Indiana state law, but encouraged -- working

9    with the colleges to --

10  A  I personally would encourage it, yes.

11  Q  Ever discuss this issue with your Democratic

12    Co-Director?

13  A  No. I don't recall ever discussing it with one of

14    my counterparts.

15  Q  So is this working with colleges to keep track of

16    students who graduate or move, to ask them to

17    affirmatively cancel their registrations, that's

18    something the Election Division encourages

19    counties to do?

20  A  Well, I have to give the Sammons v. Conrad

21    excerpts in that -- yes, I would encourage

22    counties to do that, but I can't say the Election

23    Division is.

24  Q  What's your understanding of Sammons v. Conrad?

25  A  Sammons v. Conrad is an Indiana Supreme Court case

that arose in 2000 involving a dispute about the
two Co-Directors about the certification of a
candidate for the November 2000 General Election
ballot.  The Court's holding in the end was that
although the candidate should have been on the
November 2000 ballot, that the action by one
Co-Director to sign a certificate was ineffective
because the statute required the action of both
Co-Directors in concert to perform any task.

Q   So --

A   They also made a less-than-complimentary allusion
to co-general counsel as being an oxymoronic term.

Q   So this decision, in some cases, limit what one
Co-Director can do without the other's active
participation?

A   That's like saying the Titanic was a big boat.
Yes, it -- we are -- if we are unable to agree --
we are required to agree to pay bills for the
photo copier.  He have an alteration made to our
statement financial system just for us so that the
approval of both Co-Directors was documented to
pay bills.

Q   So if it can cause problems in paying the photo
copier, I imagine -- as we've discussed -- it also
causes problems in performing those maintenance

```
 1      tasks?

 2   A  Yes.

 3   Q  Does it make it more difficult for the

 4      Co-Directors to perform list maintenance?

 5   A  Yes.

 6   Q  Does it make it more difficult to comply with the

 7      NVRA?

 8   A  Yes.

 9   Q  Going back briefly to the issue with colleges, do

10      you know if instructions concerning a county

11      dealing with colleges for list maintenance --

12      would that have been included in educational

13      materials or in conference instructions to the

14      best of your memory?

15   A  It would not have been included yet in

16      instructional materials.  I think it might have

17      been mentioned at one of our conferences or

18      association meetings with clerks.

19   Q  And would it have been mentioned in the form of a

20      presentation?

21   A  Just in terms of probably discussion.  We

22      typically have a question-and-answer period as

23      part of the presentation, and I know counties will

24      often either volunteer methods they found to be

25      successful or will ask others to volunteer it.  So
```

1    I think that would have been the context.

2  Q  Assuming the Co-Directors both agree, does the

3     Indiana Election Division have the power to obtain

4     the Social Security Death Database, in your

5     opinion?

6  A  Yes.

7  Q  And why was it not obtained?

8  A  There has not been agreement since that episode I

9     mentioned involving Marion County to obtain it.

10 Q  So there hasn't been agreement between

11    Co-Directors?

12 A  That's right.

13 Q  Excuse me.  And same question about the Interstate

14    Crosscheck Program -- if the Co-Directors agree,

15    your opinion is your office has the power to turn

16    to that program?

17 A  Yes.  It would even -- absent the statute that was

18    enacted.

19 Q  And the Co-Directors did not agree; is that

20    correct.

21 A  That would be correct.  In that particular case,

22    we had conflicting testimony before the

23    legislative committees when Senate Enrolled Act

24    519 was under consideration.

25 Q  And what were those -- were those the conflicting

1    opinions we discussed earlier?

2  A  Yes, with regard to the general reliability of the

3    data produced by the Kansas Consortion.

4              MR. CHRIS FEDELI:  Can we go off

5    the record for a moment?

6              (A short break was taken.)

7  DIRECT EXAMINATION (Continuing),

8  QUESTIONS BY MR. CHRIS FEDELI:

9  Q  Now, I understand that Indiana state law places

10    responsibility to do voter registration

11    cancellations on the county official.  Is my

12    understanding right?

13  A  That's correct.

14  Q  Now, does federal law also speak to the power to

15    cancel voter registrations by either the state or

16    the county, do you know?

17  A  I don't recall that it addresses it other than

18    establishing the duty to do it under the

19    circumstances of NVRA.

20  Q  Does the Help America Vote Act empower the State

21    of Indiana to cancel registrations under certain

22    circumstances?

23              MR. JEFFERSON GARN:  Object on the

24    grounds of relevance.  I --

25              MR. CHRIS FEDELI:  Relevance, Jeff.