**APPENDIX EXHIBIT 6**

**SECOND INTERROGATORY RESPONSES OF INDIANA ELECTION DIVISION
CO-DIRECTORS (EXCERPTS)**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC.,<br>and TRUE THE VOTE, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs,* | ) | Case No. 1:12-cv-800-WTL-TAB |
| v. | ) | |
| | ) | |
| J. BRADLEY KING, *et al.* | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## DEFENDANTS TRENT DECKARD AND J. BRADLEY KING'S ANSWERS TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

Defendants Trent Deckard and J. Bradley King, Co-Directors of the Indiana Election Division, by counsel, pursuant to Rule 33 of the Federal Rules of Civil Procedure, respond to Plaintiffs' Second Set of Interrogatories, as follows:

## GENERAL STATEMENT

By responding to these Interrogatories, Defendants do not waive their right to object to the use of the following responses at any time, on any ground, in this or any other proceeding. Further, Defendants have not completed preparation for trial. Thus, these responses are limited to the information known to Defendants at this time and do not constitute a waiver of Defendants' right to introduce additional evidence at trial. Defendants reserve the right to supplement or amend these responses in the event further information is obtained and to supplement or amend these responses based on information that may be obtained during the pendency of this case.

will be included in the supplemental response to Plaintiff's Requests For Production Nos. 6, 10 and 12.

c.   Even though the Consent Decree had expired, Defendants periodically reviewed voter registration levels for Indiana counties and were aware, even before January of 2013, of registered voters as compared to voting age population comparisons in the counties.  Instead of focusing on a particular county, or a particular group of counties, defendants have had discussions internal and external to the agency about legislation and funding for additional voter list maintenance activities. IED has also continued to support counties, like Warrick, Madison, Warren, Elkhart, Brown, and Floyd Counties, for example, who determined to perform a county-wide mailing pursuant to IC 3-7-38.2 and as described in SOP VRG 58.2 (the latter being an attachment in response to Request for Production Nos. 6 and 12).  Defendants have continued to adapt the Statewide Voter Registration System to enable counties to identify voters with address changes more quickly than even the statewide mailing is capable of and would again note that that the Consent Decree expired in 2009.  The SVRS generated monthly reports tracking Indiana counties' voter registration list maintenance actions of address confirmation mailings, NCOA information processing, NCOA address information updates, NCOA address confirmation notices, and designation of voter registrations as inactive for each Indiana county each month. These were reviewed and written violation notices were sent to a county if the Co-Directors determined a county was not in compliance with the National Voter Registration Act or the terms of the Consent Decree. Monthly reports and any correspondence will be included in the supplemental response to Plaintiff's Requests For Production Nos. 6, 10 and 12.

**INTERROGATORY NO. 3:**  Subsequent to 2009, when you first become aware that the official voter registration lists of certain Indiana counties had more registered voters than the total voting age population of those counties, please list all steps you took to ensure Indiana county election officials were executing voter list maintenance tasks.

**RESPONSE NO. 3:**

Defendants object to this interrogatory for the reason it seeks information protected from disclosure by the deliberative process privilege, the attorney/client privilege, and attorney work product doctrine.  Defendants object to this interrogatory because it seeks information which might disclose the mental impressions, conclusions, opinions, or legal theories of Defendants, Defendants' attorneys, or Defendants' representatives.  Defendants also object to this interrogatory because it is vague, ambiguous, overly broad, and without

6

reasonable particularity.  Further, Defendants object to this interrogatory for the reason
that it seeks information for which inquiry would be unduly burdensome.  Defendants
specifically object to the underlying assumption that there is necessarily a correlation
between total voting age population, the number of registered voters, and the execution of
voter list maintenance task.

Subject to and without waiving the above objections, as indicated in response to
Interrogatory No. 2 (c) defendants have had internal discussions about legislation and
funding for additional voter list maintenance activities. The state also continued to support
Warrick, Madison, Warren, Elkhart, Brown, and Floyd Counties, for example, who
determined to perform a county-wide mailing pursuant to IC 3-7-38.2 and as described in
SOP VRG 58.2 (the latter being an attachment in response to Request for Production Nos.
6 and 12).

**INTERROGATORY NO. 4:**  Pursuant to Ind. Code § 3-7-12-27, how many circuit court clerks

or board of registration members have filed affidavits of performance of voter list maintenance

program tasks within the past year?

**RESPONSE NO. 4:**

Defendants object to this interrogatory because it seeks information which is neither
relevant to the claims or defenses or the parties, nor is it reasonably calculated to lead to
the discovery or admissible evidence.  Specifically, the failure to file the affidavit has no
bearing on whether or not the county has complied with the voter list maintenance
requirements of IC 3-7-38.2.  The statute was first added in 1987, when counties each
maintained their own voter registration databases that the state could not access.  Since the
Statewide Voter Registration Database went live in 2006, the state now has multiple ways
to monitor county activities.  Defendants also object to this interrogatory because it is
vague, ambiguous, overly broad, and without reasonable particularity.

Subject to and without waiving the above objections, if "past year" means during 2012,
then one.  If "past year" means 365 days from the date of this answer, the answer is four.

**INTERROGATORY NO. 5:**  What penalties are circuit court clerks or board of registration

members subject to for either perjury by affidavit, or for failure to file the affidavit of

performance of voter list maintenance program tasks pursuant to Ind. Code § 3-7-12-27?

**RESPONSE NO. 5:**

**Defendants object to this question because it is directed to the wrong party.  Defendants further object to this interrogatory because it calls for analysis and conclusions of law.**

I declare under penalty of perjury that the factual statements set forth in the foregoing responses are true and correct:

_____
Trent Deckard
Co-Director Indiana Election Division

_____
J. Bradley King
Co-Director Indiana Election Division

Respectfully submitted,

GREGORY F. ZOELLER
Indiana Attorney General
Attorney No. 1958-98

By:   _____
Jefferson S. Garn
Deputy Attorney General
Attorney No. 29921-49

8

**APPENDIX EXHIBIT 7**

**FRANCISCO FOTIA DEPOSITION TRANSCRIPT (EXCERPTS)**

# In The Matter Of:

*Judicial Watch, Inc., and True The Vote -v-*
*J. Bradley King, Trent Deckard and Connie Lawson*

---

*Francisco Fotia*
*May 28, 2013*

---

*Midwest Reporting, Inc.*
*1448 Lincolnway East*
*South Bend, Indiana 46613*
*574-288-4242*
*reporters@midwestreporting.net*

Original File fotia francisco.txt

**Min-U-Script® with Word Index**

1   most of the time it's a hyperlink I have to click

2   on.

3  Q  Earlier, when you described your responsibility,

4   you mentioned you were responsible for

5   maintaining the voter rolls in an accurate

6   condition in St. Joseph County, correct?

7  A  Yes.

8  Q  Does your responsibility extend to maintaining

9   accurate voter rolls in other counties in

10   Indiana?

11  A  I don't believe that's a responsibility.  But

12   we're on a statewide system, so we use each

13   other's information and we notify each other.  I

14   mean, if we've taken somebody from their county,

15   they get notified.  We can't do that without

16   notifying them.

17       So, I suppose the system makes us all

18   responsible because we also make -- take great

19   pains to make sure that if we see somebody's

20   registered in another county and they're moving

21   in, we take them.  We don't just leave them there

22   and process a new registration, which the system

23   would allow.  So, I suppose in that regard we do

24   all maintain the statewide system.

25  Q  So, in your case, you mentioned that you use

28

```
 1      the -- the factors you use to decide whether to
 2      do an update or a new registration, correct?
 3   A  Yes.
 4   Q  If another county were being very conservative
 5      about getting those matches, it's possible they
 6      could just enter a new registration without
 7      updating a registration of somebody that had
 8      moved out of St. Joseph's County and into theirs,
 9      correct?
10   A  I suppose it's possible.
11   Q  And you wouldn't get a hopper item if they're
12      just processing a new registration, correct?
13   A  I don't believe so.  I would -- I'm not familiar
14      with the algorithm or whatever the system uses to
15      get that.  But, to my knowledge, I don't believe
16      so.
17   Q  My point being, there's some affirmative step you
18      have to take, a decision the county has to take,
19      to notify another county of a possible move back
20      and forth?
21   A  Yes.  What we do is we look everybody up and then
22      we'll update the actual record.  We won't process
23      it as a new one.  We'll actually say, "This
24      person in Elkhart County moved here, so we're
25      gonna take their Elkhart County record and update
```

**42**

1  Q  So, it would be safe to say you talk to the --

2  A  Dale, yeah.

3  Q  -- Republican staff more than the Democrat staff

4     on the phone?

5  A  Our office talks to the Republican staff more

6     than the Democrat staff.  Usually we just talk to

7     Brad King.

8  Q  Do you ever get conflicting advice from Brad King

9     and Trent Deckard?

10 A  Sometimes I get conflicting advice from Brad King

11    because he's very good at telling me when Trent

12    disagrees with him and will say, "Well, I say

13    this.  Trent says this.  We've left that up to

14    the county Election Division -- or County

15    Election board to decide.  So, just want to let

16    you know we're not in agreement on a particular

17    issue."

18         And, in fact, the publications they put out

19    will say, you know, "This is Brad's answer.  This

20    is Trent's answer."

21 Q  And what do you and Terry Coleman do in those

22    cases?

23 A  We bring it to the Election Board and ask them to

24    make a decision.

25 Q  Who's on the Election Board other than you and

63

```
 1        incarcerated in other counties as well.
 2    Q   How about federal incarcerations?  Do they tell
 3        you about that, too?
 4    A   Last week, I actually got the federal order
 5        remanding somebody to a federal prison.
 6    Q   Who sent you that?
 7    A   I don't know.  I didn't get the envelope.  I was
 8        just -- somebody else in the office had opened
 9        whatever envelope it came in, and I just got the
10        document.  So, I don't know where it came from.
11    Q   So, then, in addition to the hopper items that we
12        already mentioned, the jail, the Secretary of
13        State, the Election Division, will all send you
14        paper items for processing as well?
15    A   Uh-huh.
16    Q   And then in addition to all of these state
17        entities or county entities, you'll also get
18        hopper items from 91 other counties concerning
19        moves, transfers, for you guys to maintain your
20        voter rolls accurately; is that right?
21    A   Yes.  And the FSSA offices get voter registration
22        applications and turn those in as well.
23    Q   So, it's 91 counties and about six state offices
24        that I've counted, does that sound right, that
25        send you voter roll registration maintenance
```

64

1    updates?

2  A  Sure.

3  Q  So, your ability to keep the voter rolls clean is

4     largely a function of how well -- how good the

5     input of information you're getting from these

6     other offices, correct?

7  A  It's a function of how often the voters notify

8     the agencies when they move.

9  Q  And then a function of how well the agencies and

10    the counties notify you?

11 A  I suppose.

12 Q  So, in your two -- you've been there, in the

13    election office, since 2011.

14        In that time, have you ever seen or have you

15    ever been aware of the state sending St. Joseph

16    County a notice letter concerning the number of

17    voter registration removals the county's made?

18 A  No.

19 Q  Has the state ever sent a notice letter

20    concerning the number of voter registration

21    address transfers the county had made in a given

22    month?

23 A  No.

24 Q  Has the state ever sent a notice letter informing

25    the county that the number of registered voters

1       exceeded 90 percent of the total voting age

2       population?

3   A   Not to my knowledge.

4   Q   Has the state ever sent a notice letter

5       concerning your NCOA information processing and

6       SVRS list management in any given month?

7   A   Not to my knowledge.

8   Q   Has the state ever sent St. Joseph County a

9       letter specifically concerning the number of

10      voter registrations they moved to inactive in any

11      given month?

12  A   Not that I'm aware of.

13  Q   Has anyone in the state ever called you to tell

14      you your list maintenance efforts have been

15      inadequate?

16  A   Not that I'm aware of.

17  Q   Has anyone in the state ever asked you or anyone

18      else in the office to file an affidavit about

19      list maintenance?

20  A   No.  In fact, I just found out a week ago that

21      that existed.  It's a VRG-24 form affidavit

22      involving list maintenance, which was brought to

23      my attention by my counterpart.  And we both

24      discussed it and weren't entirely sure what it

25      was asking us to attest to.  So, we haven't filed

66

1     one yet.  But apparently we're supposed to do one

2     every January.

3  Q  So, you just heard about that, huh?

4  A  Yes.

5  Q  Your predecessors didn't mention anything to you

6     about it?

7  A  No.  To be fair, though, one of our predecessors

8     was arrested and the other one retired.  So --

9  Q  And was this related to the petition of fraud

10    scandal that happened?

11 A  The arrest was.  The retirement wasn't.

12 Q  And that petition case, just very briefly, so

13    obviously that was an unfortunate incident.

14         What could've been done to prevent it, in

15    your opinion?

16                   MR. GARN:  Objection; calls for

17              speculation.  And objection;

18              irrelevant.

19 BY MR. FEDELI:

20 Q  You can answer if you know.

21 A  I was gonna ask why it was relevant as well.

22    So --

23 Q  So, is your testimony that you don't know?

24 A  My testimony is I'm not gonna answer that

25    question.  Do we want to discuss his objections?

67

1              MR. FEDELI:  Counsel, would

2          you --

3              MR. HERBSTER:  You can answer his

4          questions.  He hasn't asked for any

5          privileged information.  We just put

6          objections on the record that we

7          object to the question.

8              So, I mean, you can object to the

9          best of your -- you can answer to the

10          best of your ability.

11  A  Okay.  Can you repeat the question then?

12  BY MR. FEDELI:

13  Q  What could've been done to prevent the petition

14     of fraud better in the future?

15  A  Hiring people who are honest.

16  Q  And anything relating to the maintenance of

17     accurate voter rolls, would that have helped?

18  A  The petition case had to do with people forging

19     people's signatures.  I don't know that that has

20     anything to do with whether or not there were

21     inflated rolls.

22  Q  Do you ever interact with citizens of St. Joseph

23     County concerning election administration, list

24     maintenance, and the like?

25  A  We're a public office, and we have a very large

68

1          counter that people walk up to all the time and

2          ask questions.

3     Q   So, you have personally interacted?

4     A   Yes.

5     Q   Anyone ever express concerns to you about the

6          accuracy of the voter list, voter registration

7          list, in St. Joseph County?

8     A   As far as just members of the public?

9     Q   Yeah.

10    A   Yes.

11    Q   What did they say?

12    A   People, especially poll workers who see a lot of

13         deceased people on the rolls -- and the problem

14         with that is when -- back 40 years ago when

15         people registered to vote, we didn't ask for

16         Social Security numbers.  We didn't ask for

17         birthdates.  We just asked, you know, what year

18         were you born, are you over 21, or are you over

19         18 when that law changed.  And, so, when people

20         die, we have no unique identifier for them.

21             So, a lot of times the birthday will be

22         wrong in the system because they were just given

23         a generic 1-1 of whatever year they said they

24         were born in because we didn't know.  We won't

25         have a Social or sometimes women, older women,

71

```
 1        understand my question?
 2    A  I don't.
 3    Q  Okay.  So, in terms of the amount of work it
 4        takes you guys to maintain accurate voter rolls,
 5        does it take -- does it take more work if the
 6        voter rolls are very populated with the names --
 7        you know, have a lot of inaccurate names on them?
 8                         (Attorney Jamie Woods re-joined
 9                          the deposition at this time.)
10    A  I guess that would depend on the function we were
11        doing.  We deal with every -- every voter on an
12        individual basis.  So, if --
13   BY MR. FEDELI:
14    Q  Let me rephrase the question.
15    A  If, you know, the person's registered in three
16        different spots, but -- we would just be able to
17        merge those.  I don't know that it takes that
18        much extra work.
19    Q  So, if nobody had done any maintenance on the
20        list in, you know, five years and you came in and
21        your job was to clean it all up, that would be
22        more work than if everybody had been maintaining
23        it for five years, correct?
24    A  I suppose.  But I guess I want some clarification
25        on what you mean by maintenance because I think
```

**72**

1        you're lumping a lot of -- like every function

2        our office does as maintenance.

3             So, if the implication is that if for

4        five years everybody registered every

5        registration as a new registration and never

6        looked to see if they were registered anywhere

7        else, then they wouldn't be doing their job.  So,

8        I think that's different than the type of

9        maintenance that would be triggered from doing,

10       say, a mailing.

11  Q    Okay.  So, when I ask, I'm asking about the

12       removal of deceased people --

13  A    Uh-huh.

14  Q    -- and the removal of people who have moved out

15       of the county in a process by whatever method

16       that is available to you.

17            So, just limiting it to those, if nobody had

18       done any maintenance on the county voter rolls in

19       five years, that would be creating more work for

20       whoever needed to come in and then perform that

21       maintenance, correct?

22  A    I suppose.  I don't know that it would -- I mean,

23       if there's, you know, 10,000 people we have to

24       cancel now, then --

25  Q    That would be more work?

73

1   A   It would be the same amount of work done at a

2       different time.

3                       MR. FEDELI:  All right.  I think

4                   I'd like to end my Direct at that

5                   point and turn it over to you.  But

6                   I'll likely do some Redirect after

7                   you're done.

8                       MR. GARN:  Do you want a break?

9                       THE WITNESS:  I'm good.  Thank

10                  you.

11                      MR. GARN:  I'll keep this short.

12                  CROSS-EXAMINATION

13  BY MR. GARN:

14  Q   Again, my name's Jeff Garn.  I'm from the Office

15      of the Attorney General on behalf of the Election

16      Division.

17          You mentioned some of your duties, including

18      registration.  Can you just expand on that a

19      little bit?

20          What personally do you do with registration

21      of voters?

22  A   I -- I also take -- and I apologize.  I should've

23      mentioned this earlier.  I also take the

24      incomplete registrations.  So, if a person

25      registers to vote on a paper, or handwritten one,

**APPENDIX EXHIBIT 8**

**SARAH REDMAN DEPOSITION TRANSCRIPT (EXCERPTS)**

# In The Matter Of:

*Judicial Watch, Inc., et al. v.*
*J. Bradley King, et al.*

*Sarah Redman*
*May 20, 2013*

*Tri-State Reporting, Inc.*
*901 S. Kenmore Drive*
*Evansville, IN  47714*
*Phone:  (812) 477-7666    Fax: (812) 477-8032*
*www.tsreporting.com*

Original File redman.txt
**Min-U-Script® with Word Index**

DEPOSITION OF SARAH REDMAN
TAKEN ON MAY 20, 2013

19

1        because their name might be Junior or Senior.  So,

2        with that, we would know the date of birth, it's

3        very important.  If not, we check with our local

4        department, because a lot of times you get the

5        stuff from the State.  Not everybody passes away

6        in Warrick County.  We check with our local Health

7        Department and try to find some more guaranteed

8        information.

9   Q  So based on the confidence factor, you might, in

10       other words, spend some time researching?

11   A  Absolutely, yes.

12   Q  Now, is there a hard and fast rule for various

13       confidence factors that either the State sets or

14       is it something that you set by policy?

15   A  By policy in our office.  I'm not comfortable just

16       canceling somebody if we're not certain --

17   Q  Right.

18   A  -- because, of course, that's going to cause some

19       problems.

20   Q  Right.

21   A  So that's why we started taking a more aggressive

22       approach to finding out for sure.

23   Q  Okay.  And when you say "certain," would you mean

24       confidence factor of 100 percent?

25   A  No.  No, not 100 percent.  I think about 75.  It

42

1    Q  -- word that the 65 percent match turned up,

2       somebody's still registered in Warrick, it would

3       be their decision to send it to your hopper?

4    A  We had three this morning.  Yes.

5    Q  Come from other counties?

6    A  Uh-huh, transfers.

7    Q  Is that a typical day?

8    A  Yeah, some days.  Some days not.

9    Q  And then -- but then, again, the other counties,

10      they would make the judgment of 65 percent,

11      50 percent confidence factor, 90 percent, what

12      have you, before notifying you of a potential

13      match; is that right?

14   A  I do believe so.

15   Q  It's really pretty much up to each individual

16      county to use their judgment?

17   A  Yes.

18   Q  Let's flip ahead to the next section of this

19      excerpt, BMV Registrations in SVRS.  Then I have

20      one except from this chapter on the next page, and

21      just I'd like to call your attention to the

22      second -- or Part 4, Number 3, "General Guidance

23      on Processing BMV Hopper Items."

24   A  Uh-huh.

25   Q  And it says, "Details regarding the formula that

47

1          lot.  It's easier.  Information tends to match a

2          little better.  The difficulties really lie in the

3          new registrations and name changes and so forth.

4               (Exhibit 4 was marked for identification.)

5     Q  Exhibit 4, this is the Indiana Voter Registration

6          Guidebook, excerpts.  Ms. Redman, have you seen

7          this document before?

8     A  Yes, I have.

9     Q  Okay.  If you could, turn to -- this is an

10         excerpt, again, so Page 21, which is just a few

11         pages in, Section J, "Updates to an Existing Voter

12         Registration Record."  A couple of paragraphs down

13         starts with, "The Co-Directors have encountered a

14         disagreement regarding whether what action, if

15         any, must be taken by the county," et cetera.

16         Have you encountered this issue before?

17    A  A known insufficient address, yes.

18    Q  Okay.

19    A  Uh-huh.

20    Q  And are you familiar with the Co-Directors'

21         disagreements on this issue?

22    A  A little bit, yeah.

23    Q  Which Co-Director do you agree with on this?

24    A  Do you mind if I read these again, so I --

25    Q  Please.  Yeah.

DEPOSITION OF SARAH REDMAN
TAKEN ON MAY 20, 2013

48

```
 1    A  Okay.  Thank you.  Sorry.  I'm re-reading
 2       Mr. Deckard's again.
 3              MR. GARN:  Just while we're waiting, I'm
 4       just going to briefly object to the extent that
 5       you're calling for a legal conclusion.
 6    A  Okay.
 7    Q  So if it was your policy and it is your policy to
 8       set this for the county, which advice would you
 9       follow?
10    A  I guess I would lean towards -- it's kind of
11       overwhelming reading their interpretations of it.
12       But if somebody is registering for a new
13       registration and we immediately -- we input them
14       in the system, we send an acknowledgment card
15       directly to the address that they say that they
16       live at and it comes back as a bad address, and
17       then my policy is to then send out the NCOA
18       notice.
19    Q  So would you say that's more in line with --
20    A  I think that would be more in line with
21       Mr. King's, I think, so --
22    Q  Okay.
23    A  Yeah, if I had to pick one.
24    Q  Flip to the next page for me, "Sample Jury
25       Questionnaire."  Have you ever seen this before?
```

DEPOSITION OF SARAH REDMAN
TAKEN ON MAY 20, 2013

66

1           address and they give their previous address,

2           which was in Warrick, and then they ask do you

3           want us to take you off the voter list, and they

4           say no, that information will still go into SVRS?

5      A    I do not know.  That's not my area.

6      Q    Okay.  How about the Indiana Department of

7           Revenue, do they ever put information in the

8           hopper?

9      A    Not to my -- not to my knowledge.

10     Q    You never had any dealings with them?

11     A    No, not on this -- in regards to this I have not.

12     Q    How about the Warrick County revenue office,

13          taxation, anything --

14     A    No.

15     Q    -- from them?  How about the United States

16          Attorney for the Southern District of Indiana?

17     A    Not to my knowledge.

18     Q    You never had any dealings with them with your

19          office?

20     A    For -- regarding elections?

21     Q    Regarding convictions for felonies.

22     A    Not -- I have not.

23     Q    So recapping, so the Department of Health, the

24          Department of Corrections, the Election Division,

25          the Bureau of Motor Vehicles, and the other 91

67

1          counties in Indiana, all of these entities may

2          send you hopper items; is that right?

3    A    Yes.

4    Q    And to a pretty good extent, it would seem, you're

5          reliant on them sending you hopper items to keep

6          your voter rolls clean?

7    A    Yes.

8    Q    So, in Warrick County, you're the final authority

9          on whether to remove a voter, correct?

10   A    Technically.

11   Q    And it also seems that you're, kind of, the last

12         link in a chain of people who need to all do their

13         jobs in order to remove voters from the rolls;

14         would that be fair to say?

15   A    I don't know that that would be fair to say, that

16         I'm the last link in the chain, but ultimately, I

17         have to take responsibility, yes.

18   Q    You're one link in the chain?

19   A    Yes.

20   Q    Certainly there's many --

21   A    There's many departments that need to work

22         together.

23   Q    Many entities, okay.  So if they're not all

24         working together and not all doing their jobs,

25         it's pretty hard for you to do your job; is that

DEPOSITION OF SARAH REDMAN
TAKEN ON MAY 20, 2013

68

1        right?

2    A   Uh-huh, yes.

3            MR. FEDELI:  Counsel, do you want to take

4        a quick break?

5            MR. LONG:  Sure.

6            MR. FEDELI:  Off the record.

7            (A brief recess was taken.)

8    BY MR. FEDELI

9    Q   I want to talk a little bit about your

10       interactions with the State of Indiana concerning

11       list maintenance in your county.  Has the State

12       ever asked you to submit a report concerning, you

13       know, execution of list maintenance on your voter

14       rolls?

15   A   What do you mean "report"?

16   Q   Any kind of a plan or document submitted to them

17       concerning your efforts to maintain voter roll.

18   A   Well, there was a lot of verbal back and forth and

19       a lot of interest in how my process went and

20       quite -- I mean, we spent a lot of time talking on

21       the phone.

22   Q   When was this?

23   A   I basically asked them to hold my hand as I got

24       through it.  This was last year --

25   Q   Okay.

83

1    Q  Yeah.  Right.  So, this is --

2    A  And we've had reminders, E-mails.

3    Q  Okay.  Now, were most of these communications or

4       were all of them -- were they sent out to all of

5       the clerks in the State or were they -- any

6       specifically sent to you?

7    A  I would not know who.  They were addressed to

8       clerks, so I would assume that they were to all

9       clerks but...

10   Q  So you never got a phone call from the State that

11      was specifically to you saying, Ms. Redman, let's

12      talk about your voter list maintenance, anything

13      like that?

14   A  No, I did talk to the -- and I don't remember

15      which members of the Election Division.  I've

16      talked to them about them at conferences about

17      just my different options.  Because since I took

18      office the first year in 2009, it really wasn't on

19      my radar.

20   Q  Okay.

21   A  I was learning a lot that year.  And in 2010, when

22      I began to get a good feel for the elections and

23      processes is when we started asking a lot of

24      questions about it.

25   Q  So these communications happened during

85

```
 1          couldn't understand how that could be.
 2     Q    Okay.  So it seems like most of the
 3          communications -- tell me if I'm wrong -- was
 4          initiated by you on this subject with the State.
 5          Would that be fair to say?
 6     A    Not initially.  Initially it was from memos that I
 7          received that even gave me any inclination that
 8          that was, you know, one of my duties, because, as
 9          I said, before I -- you know, you're learning as
10          you come in.  I didn't come in from the office, I
11          didn't work there prior, so everything was new to
12          me.  So, as I saw the memos and the information
13          that they put out through the State on it, that's
14          when I began to ask a lot more questions.
15     Q    Okay.  And these were, as you mentioned, memos
16          that were addressed to, you know, Circuit Court
17          Clerks, various counties, State of Indiana, as
18          opposed to, Ms. Redman, that kind of thing?
19     A    Yes.  I don't -- I don't recall.  I --
20     Q    You don't recall a letter?
21     A    I don't recall if there was one specifically to me
22          or not.
23     Q    You don't recall a letter to you, specifically, to
24          you, Dear Ms. Redman, we need to talk about
25          Warrick County's voter registration rolls?
```

DEPOSITION OF SARAH REDMAN
TAKEN ON MAY 20, 2013

86

1    A  I don't recall that.

2    Q  Any phone call along those lines?

3    A  Well, yeah, there was discussions about that, what

4       I needed to do to make sure that I completed the

5       voter list maintenance.

6    Q  So when was the first phone call like that you got

7       from the State in your four years?

8    A  Honestly, I -- it's been about -- when I was

9       talking to them at conferences, they would follow

10      up with me and call me, so I would say

11      December 2011 --

12   Q  Okay.

13   A  -- would probably be the first initiated phone

14      calls.

15   Q  Something along the lines of let's talk about

16      voter list maintenance?

17   A  Yeah.

18   Q  Okay.

19   A  It's very difficult to remember these timelines.

20   Q  Understood.

21   A  Okay.

22           MR. FEDELI:  I would like to reserve some

23      chance for questioning after you're done, but

24      pending that, you can go ahead and start, if you'd

25      like.

DEPOSITION OF SARAH REDMAN
TAKEN ON MAY 20, 2013

98

1    Q  As far as earlier, you were asked about how it

2       looks like there's a conflict between the

3       Co-Directors.  Do you think that's helpful to have

4       the two views?

5    A  No.

6    Q  No?  You don't?

7    A  No.  I hate that.  I do.  There's been several

8       things I've gone to -- I know there's a Republican

9       side and there's a Democrat side, whatever.  I

10      just want the same answer.  That's my opinion on

11      that.

12   Q  Okay.

13   A  I think it should all be nice and black and white

14      there.  But again, I know it's the real world as

15      well.  Everybody has got opinions about how things

16      should be.

17   Q  And why do you want it in black and white?

18   A  So that I know exactly how I'm supposed to handle

19      something and it's not left to interpret, which

20      much the law in our society is up to

21      interpretation.

22   Q  You were asked also about the new bill.  Do you

23      think -- and you mentioned the statewide mailing,

24      that you were kind of not happy to hear about

25      that.  And why was that again?

**APPENDIX EXHIBIT 9**

**TERRENCE COLEMAN DEPOSITION TRANSCRIPT (EXCERPTS)**

# In The Matter Of:

*Judicial Watch, Inc., and True The Vote -v-*
*J. Bradley King, Trent Deckard and Connie Lawson*

---

*Terrence Coleman*
*May 28, 2013*

---

*Midwest Reporting, Inc.*

*1448 Lincolnway East*

*South Bend, Indiana 46613*

*574-288-4242*

*reporters@midwestreporting.net*

Original File coleman terrence.txt

**Min-U-Script® with Word Index**

58

1     about working with colleges to keep track of

2     registrants who move out of state or out of

3     county following completion of their college

4     enrollment?

5  A  No.  I don't recall anyone talking to me about

6     that.

7  Q  So, you mentioned when you found out St. Joseph

8     County was over 90 percent of -- you know, it had

9     a relatively high voter registration percentage,

10    this was something that you found out on your own

11    or you heard about or what was the exact

12    circumstances?

13  A  Well, I found out on my own.  I put together a

14    spreadsheet of the 18 largest counties in

15    Indiana.  And, you know, I have -- I don't have

16    it with me, but I have a spreadsheet that

17    shows -- you know, I used what I thought were the

18    most current population figures for the age group

19    18 and over and got all the contemporary

20    registration figures for whatever the population

21    figures were.

22       And there's -- there's only -- I mean, we

23    weren't alone.  And there was lots of counties

24    that were --

25  Q  Who did you tell about this?

1   A   Anybody that would -- anybody that would listen.

2   Q   Did you talk to Frank about it?

3   A   Yes.

4   Q   And what did -- what was the nature of that

5       conversation?

6   A   Oh, I don't know.  I mean, I don't remember a

7       specific conversation.  I mean, we talk

8       frequently.  I mean, I just -- I think I've --

9       I've just -- with anybody that -- I would share

10      this with anybody who would want to hear about

11      it.

12  Q   Did you tell the state?

13  A   Well, I did when I -- you know, I talked to

14      Leslie Barnes about, you know, the amount of

15      voters that we had.  I mentioned it to Michelle

16      Brzycki when we were down there in Indianapolis.

17  Q   This was in the context of the conversations you

18      told me about --

19  A   Correct.

20  Q   -- earlier?

21  A   Correct.  I mean, forgive me.  But I didn't -- I

22      didn't think it was any secret.  I didn't think I

23      was the -- the sole possessor of this knowledge.

24      I --

25  Q   Nobody from the state ever contacted you first

60

1     about, you know, "Hey, your county has a lot of

2     people registered, perhaps more than it should."?

3  A  No one's ever said that to me.

4  Q  And no one ever called you or sent you a letter

5     concerning the way you're processing out-of-state

6     transfers or deaths?

7              MR. WOODS:  Can we clarify?  No

8          one from the State of Indiana?

9              MR. FEDELI:  State Election

10         Division.

11 A  Not to my knowledge.

12 BY MR. FEDELI:

13 Q  And since you've been with the division, no one

14    from the state has ever called you to ask how

15    your list maintenance procedures were going?

16 A  No, not to my knowledge.  No one's done that.

17 Q  Now, we talked about transfers that are based on

18    processing by other counties.  In other words,

19    when they get a new voter registration, you know,

20    they can decide whether to send you a transfer,

21    in essence, based on potential matches that SVRS

22    finds.

23        My understanding is that the county official

24    who's processing the new registration has to look

25    at the data, determine if there's a match, and

65

1       registered where they're supposed to be and are

2       they voting in the proper election?

3   Q   And that would affect whether they're voting for

4       the proper candidates?

5   A   Correct.   I mean, you know -- I mean, if you have

6       a ton of folks not in the right district, you

7       have a ton of folks who could have influence on

8       an election they're not supposed to have

9       influence on.

10  Q   Do you ever interact with, you know, citizens of

11      St. Joseph County about voter registration and

12      voter list maintenance issues?

13  A   Probably not as much -- no.   I mean, not a lot.

14      The common citizen doesn't really -- isn't aware

15      of all the -- all the stuff we've been talking

16      about today.

17  Q   Anyone ever express any concern to you about, you

18      know, the number of dead people on the rolls,

19      that kind of thing?

20  A   You know, I've had some people -- like I

21      described to you earlier, I had some -- some

22      citizens on the phone who were, you know, getting

23      mail for folks that hadn't lived at their house

24      in a long, long time.   So, that counts.   I mean,

25      they were -- they were pretty irate and concerned

66

1   about how it was that these folks were still

2   registered to vote at their address.

3 Q Why were they concerned, if they explained to

4   you?

5 A Well, they were concerned because they hadn't

6   lived there in whatever it was; 15, 16 years.

7   And they said, "Well, gee --" their feeling was

8   it was wide open for some kind of fraud.

9     And that's another thing we didn't touch on

10   is -- I mean, we all know this because we're all

11   involved in some degree to politics, is politics

12   is perception.  And, you know, being one who has

13   come into a difficult situation in an office

14   that's been tarnished, that's been out in the

15   public, how we're perceived is important.

16     So, we need -- we need to be efficient so

17   that we will be perceived as being trustworthy,

18   that we have integrity, that we're doing our

19   jobs, that we're doing our job.  A public's not

20   gonna understand -- a public's not gonna

21   understand why we have 50,000 extra voters on our

22   rolls.  They're not gonna understand that.  Alls

23   they're gonna know is, gee, aren't you doing your

24   job?

25     So, I think it's equally important -- you

67

1      know, you might call it superficial.  But, you

2      know, it's still important.  I mean, we're in the

3      business of government and -- and, you know, I

4      can say this because I've been involved in

5      government, is one of its shortcomings is

6      maintaining the public's trust.

7           Well, let's -- we want to do that.  We want

8      to be able to say to the public, "We got 150 --"

9      you know, whatever the figure is.  "We got

10     150,000 registered voters in St. Joe County, and

11     that number's pretty darn accurate," as opposed

12     to today, "How many voters you got?"

13          "Well, we got 200,000."

14          "How many adult population folks do you

15     have?"

16          "200,000."

17   Q  So, it's a way of letting people know that you're

18      actually keeping track of these elections?

19   A  Yeah, and we're doing -- and that there -- that

20      there is integrity and that there is fairness and

21      there's accuracy in -- in -- in the election

22      process.  And if you don't -- if you don't have

23      that, then people's trust is gonna be diminished.

24   Q  You've put a lot of effort into the dead voter

25      removal process in the past six months or so,

1    A   If I had a hundred thousand dollars, I would've.

2        I would've been encouraged to do it.  We made

3        every effort to get our hands around the issue.

4        I -- I -- as I told you, I spoke with Leslie

5        Barnes on the phone about -- not only to get a

6        complete understanding of what was required, this

7        was prior to the July meeting, but also not

8        any -- not any help on how to get a hundred

9        thousand dollars.

10           And we asked specifically about would our

11       county have the ability to get the list from the

12       post office, which seemed to be -- at least my

13       understanding at that moment, seemed to be a more

14       efficient way of going about undertaking the

15       process by which to inactivate voters.

16           You know, I must say this.  And I know you

17       didn't ask.  But it was very obvious to me during

18       the presentation of the voter list maintenance

19       program at that July conference that most of the

20       folks in the room had no idea this was the way to

21       do it.  And it was very clear to me that there

22       was not a universal understanding of how to go

23       about that.

24           There were people in the room who believe

25       that if you hadn't voted in two election cycles

**84**

1    that that automatically was reason to cancel you

2    from voting.

3  Q  Did they -- did anyone disabuse -- did anyone

4    from the state disabuse those people of that

5    notion that --

6  A  I'm not familiar with that.  Sorry.

7  Q  Sorry.  Did anyone make it clear that that was

8    not allowed?

9  A  Oh, yeah.  They made it clear.  Well, actually,

10    let me -- let me -- let me pull back and say they

11    made an effort.  Now, how clear they were, I -- I

12    don't know.

13  Q  I'm sorry.  Just so we're clear on who we're

14    talking about, so who was in attendance at this

15    meeting?

16  A  Clerks and voter registration people from all

17    across the State of Indiana.

18  Q  So --

19  A  And they -- when this -- this was the liveliest

20    discussion of the whole conference, of the -- of

21    the two -- of the two-day conference that we were

22    there.  You know, it was just one of those things

23    that you just did it and all of sudden the room

24    came alive.

25        And it was obvious to me that not everybody

114

1    A   We have different hoppers.

2    Q   How many hoppers do you have?

3    A   Well, you have the -- (Cell phone interruption.)

4            I just want to make sure it's not a family

5        emergency.

6    Q   Sure.

7    A   Nope.  The different hoppers.  Okay.  DOC hopper,

8        DOH hopper, BMV hopper, online registration

9        hopper, OVR.  There's got to be more.  Transfer

10       hopper.  Five?  You gotta help.

11                       MR. WOODS:  It's your deposition.

12   A   That's all I can think of right now.

13   BY MR. FEDELI:

14   Q   So, the DOC, the DOH, and the transfer hopper,

15       those mostly involve items for your attention,

16       voters that need to be removed, correct?

17   A   Yes.

18   Q   And the BMV and the online registration, those

19       mostly involve voters that need to be added?

20   A   Correct.

21   Q   Of all those government entities we talked about,

22       Election Division, county jails, you know,

23       Department of Corrections, Department of Health,

24       and it seems like you're fairly reliant on other

25       entities and other counties letting you know when

115

1       you need to remove registrations on a daily basis

2       through your hopper, in other words, if they're

3       not entering that information, sending it to

4       Quest, doing what have you, in most cases you

5       won't get notified of that; is that right?

6   A   I think that is a fair assessment.

7                        MR. FEDELI:  I think I'm done.

8                Do you have any other questions?

9                        MR. GARN:  No.

10                       MR. WOODS:  We will review and

11               sign.

12                        (Deposition concluded and

13                        witness excused at 3:55 p.m.)

14                        *  *  *

15

16

17

18

19

20

21

22

23

24

25

**APPENDIX EXHIBIT 10**

**FIRST INTERROGATORY RESPONSES OF INDIANA ELECTION DIVISION
CO-DIRECTORS (EXCERPTS)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| JUDICIAL WATCH, INC.,<br>and TRUE THE VOTE,<br><br>     *Plaintiffs,*<br> v.<br><br>J. BRADLEY KING, *et al.*<br><br>     *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:12-cv-800-WTL-TAB |

## DEFENDANTS TRENT DECKARD AND J. BRADLEY KING'S ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendants Trent Deckard and J. Bradley King, Co-Directors of the Indiana Election Division, by counsel, pursuant to Rule 33 of the Federal Rules of Civil Procedure, respond to Plaintiffs' First Set of Interrogatories, as follows:

## GENERAL STATEMENT

By responding to these Interrogatories, Defendants do not waive their right to object to the use of the following responses at any time, on any ground, in this or any other proceeding. Further, Defendants have not completed preparation for trial. Thus, these responses are limited to the information known to Defendants at this time and do not constitute a waiver of Defendants' right to introduce additional evidence at trial. Defendants reserve the right to supplement or amend these responses in the event further information is obtained and to supplement or amend these responses based on information that may be obtained during the pendency of this case.

county voter registration official from various sources (the family of a voter who has moved away or information from a College or University, for example).

Indiana registration forms provide a space where an individual can provide their prior address and the forms contain the following statement to be signed by the registration applicant: "I authorize my voter registration at any other address to be cancelled."

In addition, see answer to Interrogatory No. 3 which is incorporated herein by reference in response to his Interrogatory.

**INTERROGATORY NO. 5:**  Describe all efforts you have made to obtain the computerized

statewide voter registration lists of other U.S. states, including but not limited to the states of

Ohio, Illinois, Kentucky, and Michigan, for the purposes of updating the Indiana computerized

statewide voter registration to remove registrations of individuals who have moved out-of-state,

and identify all states with which you have made such collaborative efforts.

**RESPONSE NO. 5:**

Defendants object to this interrogatory for the reason it seeks information protected from disclosure by the deliberative process privilege, the attorney/client privilege, and attorney work product doctrine.  Defendants object to this interrogatory because it seeks information which might disclose the mental impressions, conclusions, opinions, or legal theories of Defendants, Defendants' attorneys, or Defendants' representatives.  Defendants also object to this interrogatory because it is vague, ambiguous, overly broad, and without reasonable particularity. Further, Defendants object to this interrogatory for the reason that it seeks information for which inquiry would be unduly burdensome.

Subject to and without waiving the objection, Defendants state that the Indiana Election Division made inquiries to the States of Florida, Michigan, Ohio, Illinois, Kentucky and Kansas by written correspondence. Copies of the signed letters to Florida and Michigan are attached. The Indiana Election Division has not been able to locate signed copies of the other correspondence.

In addition, Indiana Election Division staff participated in telephone calls with election officials in other states regarding matching Indiana voter registration data with the voter registration data of other states.

At this time, the Indiana Election Division is considering both technical and legal issues involved in providing voter registration information to other states for the purpose of identifying and removing registrations of individuals who have moved out of the State of Indiana.

**INTERROGATORY NO. 6:**  Describe all efforts you have made to obtain databases maintained by the federal government for the purposes of removing ineligible voters, including but not limited to the U.S. Department of Homeland Security's Systematic Alien Verification for Entitlements ("SAVE") database and the U.S. Social Security Administration's Social Security Death Index ("SSDI") database for the purpose of conducting a program for removing ineligible voters from the official lists of eligible voters.

**RESPONSE NO. 6:**

Defendants object to this interrogatory for the reason it seeks information protected from disclosure by the deliberative process privilege, the attorney/client privilege, and attorney work product doctrine.  Defendants object to this interrogatory because it seeks information which might disclose the mental impressions, conclusions, opinions, or legal theories of Defendants, Defendants' attorneys, or Defendants' representatives.  Defendants object to this interrogatory because it seeks information which is neither relevant to the claims or defenses or the parties, nor is it reasonably calculated to lead to the discovery or admissible evidence.  Defendants also object to this interrogatory because it is vague, ambiguous, overly broad, and without reasonable particularity.  Further, Defendants object to this interrogatory for the reason that it seeks information for which inquiry would be unduly burdensome.

Subject to and without waiving the objection, Defendants state that, while the Indiana Election Division obtained the U.S. Social Security Administration's Social Security Index for the purpose of conducting a program of removing ineligible voters, it has not done so in the time period identified in Instruction number 1 for Plaintiffs' First Set of Interrogatories.

**INTERROGATORY NO. 7:**  Describe all efforts you have made to conduct a program to remove names from the voter registration lists based on the State Indiana's records on criminal convictions and incarcerations, identifying each State and County organization with which you communicate for this purpose.

**RESPONSE NO. 7:**

Defendants object to this interrogatory for the reason it seeks information protected from disclosure by the deliberative process privilege, the attorney/client privilege, and attorney work product doctrine.  Defendants object to this interrogatory because it seeks information which

might disclose the mental impressions, conclusions, opinions, or legal theories of Defendants, Defendants' attorneys, or Defendants' representatives. Defendants also object to this interrogatory because it is vague, ambiguous, overly broad, and without reasonable particularity. Further, Defendants object to this interrogatory for the reason that it seeks information for which inquiry would be unduly burdensome.

Subject to and without waiving the objection, Defendants state that the state designed the SVRS system to connect to the state's department of corrections database and notify counties daily when a registered voter is sentenced following conviction of a crime. See Standard Operating Procedures VRG 12.1 and 39.1.

In addition to daily notices from our Department of Correction, Indiana requires all county sheriffs to provide quarterly reports to the county voter registration office for all those individuals incarcerated in a local facility following conviction. IC 3-7-46-6 The IED provides guidance to the county voter registration officials on these quarterly reports. See 2012 Voter Registration Manual, page 25.

**INTERROGATORY NO. 8:**  Identify all outside consultants, firms, contractors, agents, or other outside parties you have hired to assist with, advise on, or administer in any way, your election administration and voter registration list maintenance responsibilities under Section 8 of the NVRA.

**RESPONSE NO. 8:**

Quest Information Systems, 5975 Castle Creek Parkway N. Dr., Suite 200, Indianapolis, IN 46250.

Baker Tilly Virchow Krause, LLP, Baker Tilly Virchow Krause, LLP 205 N Michigan Avenue, Chicago, IL  60601-5927

### State Voter Registration and Election Administration Personnel and Communications

**INTERROGATORY NO. 9:**  Identify all persons in your office who are responsible for communicating directly with the County Voter Registration Officers for each purpose described in Interrogatories 1 through 8 above.

**RESPONSE NO. 9:**

The Indiana Election Division was created by statute according to IC 3-6-4.2 and is lead by two Co-Directors, nominated by the two major party state chairman and appointed by the Governor. Each Co-Director employs staff. The Indiana Election Division employs Quest Information Systems and Baker Tilly Virchow Krause for a variety of purposes, but occasionally to communicate directly with a county.

The following is a list of Indiana Election Division employees of the Democratic Party Co-Director who communicate with county voter registration officials as described in Interrogatory No. 9:
Trent Deckard, Co-Director, Indiana Election Division (2011-Present)
Pamela Potesta, Co-Director, Indiana Election Division (2007-2010)
Kristi Robertson, Co-Director, Indiana Election Division (2006-2007)
Michelle Brzycki, Special Projects Coordinator, Indiana Election Division (2006-2008, 2011-Present)
Leslie Barnes, Co-Counsel, Indiana Election Division (2007-Present)
Cody Kendall, Co-Counsel, Indiana Election Division (2006-2007)

The following is a list of Indiana Election Division employees of the Republican Party Co-Director who communicate with county voter registration officials as described in Interrogatory No. 9:
J. Bradley King, Co-Director, Indiana Election Division
Dale Simmons, Co-Counsel, Indiana Election Division
Lori Clark, Special Projects Coordinator, Indiana Election Division

Address for all persons currently working for the Indiana Election Division is: 302 West Washington Street, #E204, Indianapolis, IN 46204. Addresses for former employees are unknown.

**INTERROGATORY NO. 10:**  Identify the person or persons with whom you or your office communicates within the offices of each Indiana governmental organization, foreign State government, United States governmental office, or other entity for the purposes described in Interrogatories 3 through 8 above.

**RESPONSE NO. 10:**

Defendants object to this interrogatory because it is vague, ambiguous, overly broad, and without reasonable particularity.

Subject to and without waiving the objection, Defendants list the following persons:

Contact for Department of Correction-Jeanne McFarland, Senior Programmer, IGCS 302 West Washington Street, E327, Indianapolis, IN 46204. Jmcfarland@idoc.in.gov 317-232-5400

11

might disclose the mental impressions, conclusions, opinions, or legal theories of Defendants, Defendants' attorneys, or Defendants' representatives. Defendants also object to this interrogatory because it is vague, ambiguous, overly broad, and without reasonable particularity. Further, Defendants object to this interrogatory for the reason that it seeks information for which inquiry would be unduly burdensome.

The Indiana Election Division compiles the information requested by the U.S. Election Assistance Commission and, after review of the information, submits the information to the U.S. Election Assistance Commission. See Response to Plaintiff's First Request for Production of Documents No. 11.

**INTERROGATORY NO. 14:** Describe the purpose of providing conflicting opinions to County Voter Registration Officers at page 21 of the "2012 Indiana Voter Registration Guidebook" identified in Defendants' Initial Disclosures concerning removal or non-removal of registrations for single voters registered under two different addresses.

**RESPONSE NO. 14:**

Defendants object to this interrogatory for the reason it seeks information protected from disclosure by the deliberative process privilege, the attorney/client privilege, and attorney work product doctrine. Defendants object to this interrogatory because it seeks information which might disclose the mental impressions, conclusions, opinions, or legal theories of Defendants, Defendants' attorneys, or Defendants' representatives. Defendants also object to this interrogatory because it is vague, ambiguous, overly broad, and without reasonable particularity.

Subject to and without waiving the objection, Defendants state that the purpose was to indicate the Co-Directors have a difference of opinion on an issue. Given the Indiana Supreme Court's decision in *Sammons v. Conrad,* if the Co-Directors are unable to agree on an issue, then the Indiana Election Division cannot take official action. 740 N.E.2d 114 (Ind. 2000). Illustrating a difference of opinion when it exists permits the local election officials to make an informed decision.

**INTERROGATORY NO. 15:** Describe the purpose, in the sample jury questionnaire appended to the "2012 Indiana Voter Registration Guidebook" identified in Defendants' Initial Disclosures, of asking prospective jurors whether they wish to remain registered to vote in a county where they have affirmed they do not reside.

**RESPONSE NO. 15:**