# In The Matter Of:

*Judicial Watch, Inc., and True The Vote -v-*
*J. Bradley King, Trent Deckard and Connie Lawson*

---

*Terrence Coleman*
*May 28, 2013*

---

*Midwest Reporting, Inc.*
*1448 Lincolnway East*
*South Bend, Indiana 46613*
*574-288-4242*
*reporters@midwestreporting.net*

Original File coleman terrence.txt
Min-U-Script® with Word Index

Exhibit
4

1

1          UNITED STATES DISTRICT COURT
2      SOUTHERN DISTRICT OF INDIANA (INDIANAPOLIS)

JUDICIAL WATCH, INC., and    )
3  TRUE THE VOTE,               )
                               )
4          Plaintiffs,          )
                               )
5     -vs-                      )    Case No.
                               )    1:12-cv-00800-WTL-TAB
6  J. BRADLEY KING, TRENT       )
   DECKARD, and CONNIE LAWSON,  )
7                               )
          Defendants.           )
8  _ _ _ _ _ _ _ _ _ _ _ _ _ _  )

9

10        The Deposition of TERRENCE A. COLEMAN

11

      Date:    Tuesday, May 28, 2013
12
      Time:    1:04 p.m.
13
      Place:   Thorne Grodnik, LLP
14                420 Lincolnway West
                  Mishawaka, Indiana
15

16          Called as a witness by the Plaintiffs in

17          accordance with the Rules of the United

18          States District Court, Southern District of

19          Indiana, Indianapolis Division, pursuant to

20          Notice.

21
   Before Sharon L. Brady, Court Reporter
22  and Notary Public

23
              MIDWEST REPORTING, INC.
24              1448 Lincolnway East
            South Bend, Indiana 46613
25                (574) 288-4242

2

```
 1    APPEARANCES:

 2            MR. CHRIS FEDELI
                  Senior Attorney
 3                Judicial Watch
                  425 Third Street, S.W.
 4                Suite 800
                  Washington, DC  20024
 5                cfedeli@JudicialWatch.org

 6            and

 7            MR. JOSHUA B. BOLINGER
                  Langdon Law, LLC
 8                8913 Cincinnati-Dayton Road
                  West Chester, Ohio  45069
 9                jbolinger@langdonlaw.com

10            On behalf of the Plaintiffs;

11


12            MR. JEFFERSON S. GARN
                  Deputy Attorney General
13                State of Indiana -
                  Office of the Attorney General
14                Civil Litigation
                  302 West Washington Street
15                IGCS Fifth Floor
                  Indianapolis, Indiana  46204
16                jefferson.garn@atg.in.gov

17            On behalf of the Defendants;

18


19            MR. JAMIE C. WOODS
                  Thorne Grodnik, LLP
20                420 Lincolnway West
                  Mishawaka, Indiana  46544
21                jwoods@tglaw.us

22            On behalf of the Deponent.

23                         * * *

24


25
```

1                    I    N    D    E    X

2                  THE DEPOSITION OF
                 TERRENCE A. COLEMAN
3
DIRECT EXAMINATION
4        By Mr. Fedeli ...............................4

5    CROSS-EXAMINATION
         By Mr. Garn ...............................73
6
   REDIRECT EXAMINATION
7        By Mr. Fedeli .............................109

8                       *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    TERRENCE A. COLEMAN,
 2   called as a witness by the Plaintiffs, having been
 3   first duly sworn, was examined and testified as
 4   follows:
 5                    DIRECT EXAMINATION
 6   BY MR. FEDELI:
 7   Q   Good morning.
 8   A   Good morning.
 9   Q   My name is Chris Fedeli.  I'll be taking your
10       deposition today.
11   A   Okay.
12   Q   Could you please state your name for the record?
13   A   Terrence, T-e-r-r-e-n-c-e, middle initial A.,
14       Coleman, C-o-l-e-m-a-n.
15   Q   Okay.  And I'm joined by my co-counsel, Josh
16       Bolinger, and --
17                    MR. GARN:  Jefferson Garn from
18              the Office of the Attorney General.
19                    MR. WOODS:  For the record, this
20              is Jamie Woods on behalf of the
21              deponent.
22                    Just, I guess, a preliminary
23              matter.  We're going to return the
24              check for the witness fee today in the
25              amount of $65 back to counsel for
```

1    got pretty good at it.  I mean, everyone brings

2    their little problem, people they think are dead

3    or -- to me and I check into it.  I wrote a memo

4    to Marsha Carrington, the HAVA administrator.

5    And she obviously has a big part in SVRS.  I

6    wrote her a memo in which I talked about the two

7    issues, I mean the two primary reasons, and

8    suggested some fixes for them.

9         Now, they don't solve the whole problem.

10   But they're -- they're -- what I would say is

11   they're an attempt to make SVRS a little more

12   effective coming up with dead people.  And I

13   explained -- in this memo, I explained what I

14   just explained to you, those two primary issues.

15        And my suggestions were, is, can you do a

16   couple of things?  Number one is, can you -- we

17   have access -- and I'm sorry.  Let me step back,

18   is we have access -- something I just discovered

19   in the last month or so just by happenstance, we

20   have access to the Department of Health's

21   maintenance file.  It's kind of like a back door

22   into it.  It's not -- it has a little search

23   function that I think is very limited.

24        So, I just can't find all of the dead people

25   that they have on file for St. Joe County.  But

22

1    if I have a pretty good idea you're -- you know,

2    I know you were -- you're in St. Joe County and

3    you die, you know, I might punch your name in

4    there and I might find you in the maintenance

5    file.  That means, bingo, you're in there.

6    You're dead.

7        And then -- so, I made a suggestion.  I

8    said, "Here's my fix, that I'm proposing that you

9    create a search field by county in the Department

10   of Health's maintenance file."  So, that way, I

11   can just -- I can just type in whatever --

12   however it is, St. Joseph or Number 71 or however

13   it is they set it up, I can put that in the field

14   and then, boom, it will -- maybe I'll put some

15   other parameter in there, maybe a birthdate.

16       And then I can get everybody born on such

17   and such a birthdate that's in the entire

18   Department of Health file from St. -- that's dead

19   from St. Joe County.

20   Q  Just so I understand --

21   A  That way, I can find matches.

22   Q  And when you say the DOH maintenance file, these

23      would be filled with names of deceased people

24      whom you wouldn't have gotten a hopper item for?

25      Is that why you want to search them?

23

1    A    Correct.  Exactly.  They're -- somehow, SVRS has

2         a little portal into their maintenance file.  I

3         didn't know about this until, I don't know, a

4         month ago.  I was just kind of -- someone else in

5         the office who had a little more experience on

6         SVRS said, you know, "Here.  Here's this -- this

7         thing."

8              "Oh, yeah.  What's this?"  And I found out

9         that this could be a very useful tool.  And, so,

10        I've been able to find a lot of people that way.

11        But it's a hit or miss when it doesn't have a

12        very good search function.

13             So, that's why I suggested here, let's --

14        let's start small.  Throw in a -- throw in a

15        search field by county.  And I can -- I can find

16        out who's in there from St. Joseph County.

17             Now, it's kind not gonna solve all my

18        problems.  But I bet you I'll find -- I bet you

19        I'll find -- if that happens, I'll find scores

20        more of folks that are deceased.

21             I made a second suggestion.  In SVRS,

22        there's a -- independent of the DOH hopper, we

23        have this little -- this little button that says

24        DLN, Driver's License Number, Info.  So, if you

25        hit this button, it will -- I can pull up your

24

1    record, Chris Fedeli.  There you are.  You live

2    in Indianapolis, for example.

3         And we -- we hit this DLN button, and it

4    will give me your driver's license information.

5    It'll tell me, you know, what kind of license you

6    have, when -- if it's current, when it expires,

7    blah, blah, blah, blah, blah.

8         It also has a single match function.  And

9    the best I can tell, it's -- it's connected to

10   some Social Security database.  And it's awesome

11   because you died yesterday.  There's a good

12   chance you -- it knows, unlike the DOH hopper

13   which can take -- they tell you it can take up to

14   60 days.

15        This must be the national Social Security

16   database.  And when you -- and I've been learning

17   more.  I've been asking.  I've been talking to

18   the Health Department, Coroner's Office, going

19   online, trying to find out how it all works.

20        And I found out that and I'm -- I'm

21   surmising that this database finds out about you

22   dying the night the funeral home takes your body

23   in and types in on a computer your Social

24   Security number, bing, you're dead.

25        So, this little feature is dynamite because

1      Quest if you have questions about the technical

2      issues?

3  A  Yes.  I've called the help desk and asked

4      questions.

5  Q  And how often have you contacted them?

6  A  I don't know.  About a dozen times in the last --

7      at least a dozen times in the last -- you know,

8      since I've been there.

9  Q  Did you go to a -- did you go to the meeting, the

10     meeting for the -- in July of last year on --

11  A  Yes.

12  Q  -- voter registration?

13  A  Yes.

14  Q  Do you remember what was discussed at that

15     meeting?

16        And when I say discussed, I mean like the

17     topics of the official discussions.

18  A  Somewhat, yes.  I remember some of them.

19  Q  Can you tell me what that was, what those were?

20  A  Well, I know one subject they did talk about.

21     They talked about voter list maintenance.

22  Q  What did they say there?

23  A  They had a slide show, and they -- they outlined

24     the SOP for -- for the prescribed method by which

25     to do voter list maintenance.

1    Q    And you also said that you -- I believe you said

2         that you and Frank spoke to Trent, was it, about

3         some of your concerns?

4    A    Well, actually, we ended up -- we may have.  But

5         we basically talked to Michelle Brzycki that

6         particular day that I recall.

7    Q    And how did that happen?  Did you just go out and

8         contact her or was there a time when there was

9         mingling or --

10   A    I think it was a time when there was mingling.

11   Q    Okay.

12   A    Right there in the room, like a break.  And --

13   Q    Did you feel like there was --

14   A    Someone pigeonholed somebody or -- yeah.

15   Q    And you said there was a slide show.  Were any

16        materials given to the participants?

17   A    Oh, yeah, the -- the -- you know, as all

18        conferences, the printout of the slides on the

19        page.

20   Q    Do you remember if you were ever encouraged to

21        contact the Election Division if you had

22        questions or if you --

23   A    Sure.  Yeah.  We were encouraged to contact them.

24   Q    Were you encouraged to do the voter list

25        maintenance would you say?

83

1   A   If I had a hundred thousand dollars, I would've.

2       I would've been encouraged to do it.  We made

3       every effort to get our hands around the issue.

4       I -- I -- as I told you, I spoke with Leslie

5       Barnes on the phone about -- not only to get a

6       complete understanding of what was required, this

7       was prior to the July meeting, but also not

8       any -- not any help on how to get a hundred

9       thousand dollars.

10          And we asked specifically about would our

11      county have the ability to get the list from the

12      post office, which seemed to be -- at least my

13      understanding at that moment, seemed to be a more

14      efficient way of going about undertaking the

15      process by which to inactivate voters.

16          You know, I must say this.  And I know you

17      didn't ask.  But it was very obvious to me during

18      the presentation of the voter list maintenance

19      program at that July conference that most of the

20      folks in the room had no idea this was the way to

21      do it.  And it was very clear to me that there

22      was not a universal understanding of how to go

23      about that.

24          There were people in the room who believe

25      that if you hadn't voted in two election cycles

84

1    that that automatically was reason to cancel you

2    from voting.

3  Q  Did they -- did anyone disabuse -- did anyone

4    from the state disabuse those people of that

5    notion that --

6  A  I'm not familiar with that.  Sorry.

7  Q  Sorry.  Did anyone make it clear that that was

8    not allowed?

9  A  Oh, yeah.  They made it clear.  Well, actually,

10    let me -- let me -- let me pull back and say they

11    made an effort.  Now, how clear they were, I -- I

12    don't know.

13  Q  I'm sorry.  Just so we're clear on who we're

14    talking about, so who was in attendance at this

15    meeting?

16  A  Clerks and voter registration people from all

17    across the State of Indiana.

18  Q  So --

19  A  And they -- when this -- this was the liveliest

20    discussion of the whole conference, of the -- of

21    the two -- of the two-day conference that we were

22    there.  You know, it was just one of those things

23    that you just did it and all of sudden the room

24    came alive.

25       And it was obvious to me that not everybody

97

1   Q   Why not?

2   A   -- just because I knew that you moved.

3   Q   Why won't you?

4   A   Well, because I'm not allowed to.  Now, I might

5       mail you a cancellation form.  And then you

6       would, on your own volition, fill it out.

7           Or when you registered to vote in Arlington

8       County, then they would send us a little notice

9       saying that you registered there and that I

10      was -- I was free to cancel you.  But the law

11      doesn't permit me to just cancel you just because

12      I knew or -- because I personally knew that you

13      moved.

14          That's much like the deceased.  I can't just

15      cancel my own mother even though she passed away.

16      I can't just cancel her just because of that.  I

17      have to follow the rules that say that she's got

18      to come through the DOH hopper or through what

19      we -- you know, the BMV button, the DNL -- DLN

20      information.  Those are the only ways I'm

21      supposed to cancel you.

22  Q   So --

23  A   Now, if I -- if you died yesterday and I knew

24      that, I just can't cancel you.

25  Q   So, when you get information from the hopper, is

1        there ever a time when you have a certain level

2        of discretion as to whether to cancel that person

3        or not?

4    A   Yes.   It's implied because -- I mean, it's

5        implied because we're the only ones that can do

6        it.   I mean, the Department of Health doesn't

7        cancel them.   SVRS doesn't cancel them.   They

8        throw it to us, and it's up to us to decide if

9        it's a match.

10           You know, they might have a confidence

11       factor listed, 75 percent.   But maybe that's a

12       fluke.   Maybe there's someone else a lot like you

13       that has -- shares some similar information and

14       it's not really you or -- and, so, it's up to us

15       to finally decide that it's a match, boom.

16           Ultimately, yeah.   I mean, there is some --

17       the discretion is in deciding whether or not it's

18       a match.

19   Q   Are you careful in exercising that discretion?

20   A   I think so.

21   Q   Why?

22   A   Because I certainly won't want to cancel someone

23       who shouldn't be canceled.

24   Q   Why not?

25   A   Well, because that would prevent -- that would

99

1       take away -- I would be taking away their right

2       to vote, which I think is one of the most

3       important -- you know, one of the most important

4       things that we do.

5            Now, I'm not saying that this gives one, you

6       know, cart blanche to cancel people.  But I also

7       know -- and people are human and they do make

8       mistakes.

9            If I did make a mistake -- and I know they

10      happen.  I mean, I've seen it.  If you showed up

11      to vote on election day and we -- I personally

12      canceled you by mistake, I have the power to

13      grant you a COE, certificate of error, that would

14      give you the right to vote on election day.

15           Now, obviously we don't want that to be a

16      common thing.  But it is a failsafe that's

17      available to us.

18  Q   But even with these failsafe mechanisms in place,

19      you still have obligations that you have to have

20      a certain level of confidence before you cancel

21      someone's registration?

22  A   Yeah.  We should have pretty high confidence.

23      There's no question about that.

24  Q   All right.  Just briefly on the colleges, you

25      were asked about any conversations you might have

1  with colleges letting you know when someone's

2  moved out.  You said that -- I believe you said

3  that you hadn't had any conversations with them.

4 A You know, I've had conversations about

5  registering college students.  But specifically

6  about knowing whether they've moved or not, I

7  don't recall.

8 Q Do you see any issues with that, like

9  confidentiality or any other problems with a

10  college providing you with that kind of

11  information?

12 A I know -- I think I understand what you're asking

13  me.  I've never approached a college and asked

14  them for that kind of information.

15 Q Is one reason why that might not have happened is

16  you just don't see the colleges particular to

17  St. Joseph County as being a particularly -- a

18  specific cause of any problems that the county

19  may have with voter registration?

20 A Well, it certainly doesn't -- I'd challenge

21  anyone who says that it's college students that

22  account for the excess voter registrations in

23  St. Joseph County.  I would challenge anybody who

24  would contend that.

25    That doesn't mean that there aren't.  I have

105

```
 1    Q   Right.  But -- I'm sorry.  I thought -- yes.
 2        Absolutely.  But that's -- sorry.  Scratch that.
 3             So, you think as far as what the state could
 4        do or at more the local level is a countywide
 5        voting -- the mailing, or the second thing is you
 6        see a problem with the NVRA or Help America Vote
 7        Act and the obligations there?
 8                        MR. WOODS:  I'm going to object
 9                   to the extent I think you're -- you're
10                   coloring his testimony regarding the
11                   second.
12                        The way I interpreted it was
13                   there's one or two things that can
14                   happen.  They can undertake this voter
15                   list program or perhaps they can do
16                   something at the federal level.  I
17                   didn't hear him express any
18                   displeasure about anything.  So,
19                   that's my objection.
20    BY MR. GARN:
21    Q   Do you have any displeasure with the requirements
22        of the federal law?
23                        MR. WOODS:  You may answer the
24                   question.
25    A   Okay.  I do.  I think the law is -- I think it's
```

106

1     particularly cumbersome.  I think it's

2     impractical.  And, but, that's just my opinion.

3     I'm just one person out there.  And, but, since

4     you asked, yes, I do.

5          I think it's -- I think that's why we have

6     lots of problems and, you know, with our voter

7     registration numbers; not just in St. Joseph

8     County, but in a lot of other counties.

9          It's -- since you asked, it's -- it's

10    tantamount to an unfunded mandate.  And I would

11    like to believe that there's a better way by

12    which counties can maintain accurate voting rolls

13    than to have to follow this process.

14         But, simultaneously, I know it is the law

15    and -- and it's -- that's why I said that's why

16    the other option is possible is because the only

17    other way to do it then is to undertake that law

18    and follow it.  And unfortunately for us is that

19    it's a very expensive proposition and we -- we're

20    doing our best with what we have.  We're doing

21    our best to churn butter with a toothpick.

22  BY MR. GARN:

23  Q  Are you aware of the -- are you familiar with the

24    recent legislation passed by the General Assembly

25    about elections?

107

1  A  Somewhat familiar.

2  Q  Are you aware of the statewide mailing that's

3     been funded through the most recent budget?

4  A  Yes.  I'm aware of that.

5  Q  Do you think that would be helpful?

6  A  Oh, it'll be helpful.  It will be helpful.  And

7     it's still gonna take four years to remove what,

8     in my opinion, is 50,000 voters in St. Joseph

9     County who don't belong on the rolls.  But, yes,

10    it'll be helpful.

11 Q  Are you aware of the changes -- well, scratch

12    that.  Nevermind.

13       Just briefly about the mailing that the

14    county undertook as part of the redistricting,

15    were those targeted to certain areas or was

16    that -- how was it decided where the -- who would

17    get the mail, who would get the letters or the --

18 A  How it was decided?  It was decided by all those

19    who were affected by -- by redistricting.

20 Q  So --

21 A  And it, you know -- and more importantly, if --

22    if -- if someone thought that there would be any

23    discrimination in the mailing, then it would be

24    logical then there must have been discrimination

25    in the redistricting.

1    And, therefore, someone -- that's the real

2    issue.  And if there was -- if there was

3    discrimination in their redistricting, someone

4    should've brought that to somebody's attention.

5    But I know that wasn't the case, that that wasn't

6    the case.  I mean, this -- that process underwent

7    every -- everybody's eyes.

8         And that's why I feel personally that a

9    mailing such as that isn't inherently

10   discriminatory, because what it represented --

11   what it represented was a nondiscriminatory

12   process, at least so we think, that -- when our

13   county went under reprecincting.

14  Q  That's just about it.  Let me -- do you see the

15     voter -- your work to maintain the rolls, do you

16     see that as an ongoing process?

17  A  Yes.

18  Q  Why is that?

19  A  Well, because your -- your voter list is always

20     evolving.  People are dying every day.  People

21     are -- people are moving in and out of your

22     county every day.  People are moving in and out

23     of your state every day.  People are becoming 18

24     and registering for the first time.  It -- you

25     know, it's a lot like our census.  I mean, you