# In The Matter Of:

*Judicial Watch, Inc., and True The Vote -v-*
*J. Bradley King, Trent Deckard and Connie Lawson*

---

*Francisco Fotia*
*May 28, 2013*

---

*Midwest Reporting, Inc.*
*1448 Lincolnway East*
*South Bend, Indiana 46613*
*574-288-4242*
*reporters@midwestreporting.net*

Original File fotia francisco.txt

Min-U-Script® with Word Index

Exhibit
5

1

1           UNITED STATES DISTRICT COURT
2       SOUTHERN DISTRICT OF INDIANA (INDIANAPOLIS)

   JUDICIAL WATCH, INC., and    )
3  TRUE THE VOTE,               )
                                )
4           Plaintiffs,         )
                                )
5     -vs-                      )   Case No.
                                )   1:12-cv-00800-WTL-TAB
6  J. BRADLEY KING, TRENT       )
   DECKARD, and CONNIE LAWSON,  )
7                               )
           Defendants.          )
8  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

9

10      The Deposition of FRANCISCO CHRISTOPHER FOTIA

11

12      Date:   Tuesday, May 28, 2013

13      Time:   9:02 a.m.

14      Place:  Thorne Grodnik, LLP
                420 Lincolnway West
15              Mishawaka, Indiana

16          Called as a witness by the Plaintiffs in

17          accordance with the Rules of the United

18          States District Court, Southern District of

19          Indiana, Indianapolis Division, pursuant to

20          Notice.

21
   Before Sharon L. Brady, Court Reporter
22 and Notary Public

23
              MIDWEST REPORTING, INC.
24            1448 Lincolnway East
           South Bend, Indiana 46613
25              (574) 288-4242

2

1    APPEARANCES:

2         MR. CHRIS FEDELI
              Senior Attorney
3             Judicial Watch
              425 Third Street, S.W.
4             Suite 800
              Washington, DC  20024
5             cfedeli@JudicialWatch.org

6         and

7         MR. JOSHUA B. BOLINGER
              Langdon Law, LLC
8             8913 Cincinnati-Dayton Road
              West Chester, Ohio  45069
9             jbolinger@langdonlaw.com

10        On behalf of the Plaintiffs;

11

12        MR. JEFFERSON S. GARN
              Deputy Attorney General
13            State of Indiana -
              Office of the Attorney General
14            Civil Litigation
              302 West Washington Street
15            IGCS Fifth Floor
              Indianapolis, Indiana  46204
16            jefferson.garn@atg.in.gov

17        On behalf of the Defendants;

18

19        MR. JAMIE C. WOODS
          MR. DANIEL HERBSTER
20            Thorne Grodnik, LLP
              420 Lincolnway West
21            Mishawaka, Indiana  46544
              jwoods@tglaw.us
22            dherbster@tglaw.us

23        On behalf of the Deponent.

24                    * * *

25

3

1                    I    N    D    E    X

2                THE DEPOSITION OF
              FRANCISCO CHRISTOPHER FOTIA

3
DIRECT EXAMINATION
4       By Mr. Fedeli ..................................6

5  CROSS-EXAMINATION
        By Mr. Garn ..................................73

6
REDIRECT EXAMINATION
7       By Mr. Fedeli .............................109

8  RECROSS-EXAMINATION
        By Mr. Garn ................................116
9

10                      *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1      MR. FEDELI:  Okay.  The case name

2      is Judicial Watch and True The Vote

3      versus J. Bradley King, Trent Deckard,

4      and Connie Lawson in their official

5      capacities, U.S. District Court,

6      Southern District of Indiana.  My

7      name's Chris Fedeli, here representing

8      Plaintiffs.

9           Would you like to introduce

10     yourselves, Counsel?

11          MR. GARN:  Jefferson Garn from

12     the Office of the Attorney General on

13     behalf of the Defendants.

14          MR. WOODS:  Jamie C. Woods and

15     Dan Herbster on behalf of the

16     deponent.

17          MR. FEDELI:  Counsel, before we

18     start, would you guys like to agree to

19     the usual stipulations for today's

20     deposition?

21          MR. WOODS:  We will -- we'll deal

22     with any issues regarding objections

23     as they arise.  So, we'll not agree to

24     that at this point in time.

25          MR. FEDELI:  Okay.  Will you

37

1     their new address just like any other voter?

2  A  They can't be singled out because they're college

3     students.

4  Q  Just like any other voter, you will take them off

5     your list either in response to a mailing or an

6     affirmation or postcard or in response to an SVRS

7     hopper item, correct?

8  A  Correct.

9  Q  What's the --

10  A  I mean, they don't check a box on their

11     application that says, "Hey, I'm a college

12     student." So, really, we wouldn't know that they

13     were other than knowing that they reside in a

14     dorm if they did that.

15  Q  What's the VRG-14 Authorization to Cancel

16     Registration form?

17  A  It's a form authorizing us to cancel a

18     registration.

19  Q  And you can send it to any voter that appears on

20     your rolls that you have reason to believe no

21     longer lives there?

22  A  Yes.

23  Q  Do you use those?

24  A  We do.

25  Q  And about how many do you send out a year?

38

1   A   I personally don't send out any.  There are

2       people in our office that do, one of the

3       employees at one time, when we got change of

4       address -- or change of voting location postcards

5       that came back.  So, if your particular precinct

6       had a change in their polling location, we'd

7       notify you through a postcard.

8           And if it came back and said you now --

9       "Here's an address in Florida, here's an address

10      in Michigan," if it had the forwarding address on

11      there, then she mailed them an Authorization to

12      Cancel form.

13  Q   Do the local four-year colleges give you any

14      address information or graduation information

15      concerning students registered on your voter

16      rolls?

17  A   No.

18  Q   Have you ever asked for any assistance from them?

19  A   No.

20  Q   Would assistance from them be helpful to you for

21      maintaining accurate voter rolls?

22  A   Is that legal?  That doesn't violate any

23      confidentiality the university has with the

24      students?

25  Q   Do you believe it would be helpful or don't you?

39

1    A    I don't believe we can get address information

2         from a third party and have that in any way

3         affect our voter rolls.

4    Q    You could use it to do mailings, couldn't you?

5    A    I suppose we could use it to do mailings if that

6         was allowable within the law.  I don't know that

7         being told by an entity other than the post

8         office that somebody lives somewhere else we can

9         take that.

10   Q    Now, prior to assuming your current position, how

11        much interaction did you have with the state

12        Election Division or Secretary of State's Office?

13   A    When I worked for the county party, I called Brad

14        King several times on party-related issues, such

15        as holding caucuses to appoint a vacancy in

16        several elected offices.

17   Q    So, that was party business.  You mentioned that

18        you've been with the county election office since

19        2011, correct?

20   A    Yes.

21   Q    And what were your interactions with the state in

22        your capacity with the county elections office?

23   A    I call Brad King frequently to get clarification

24        on several things.

25   Q    And would one of those things be list

40

1       maintenance?

2   A   Yes.

3   Q   And have you had conversations with Brad about

4       list maintenance over the past couple years?

5   A   Yes.

6   Q   What were the nature of those conversations?

7   A   Our predecessors, Terry's predecessor and my

8       predecessor, would use change of address or, I'm

9       sorry, change of polling location postcards.

10      When they came back, they would use those to mark

11      voters inactive.

12          And I spoke to Brad King and was told that

13      because it wasn't a countywide mailing we could

14      not use those to do that anymore.  So, we stopped

15      that.  But I also talked to him about possibly

16      using BMV records that say "moved out of the

17      state."  So, if we look up somebody and their BMV

18      record says that they've moved out of the state,

19      he told me I could send them NCOA letters as

20      well.  And I have done a few of those.

21          And we also talked about the possibility of

22      using jury pool questionnaires as a -- people who

23      have those letters come back, to get that

24      information.  And I've tried to get that

25      information from the clerk's office; though the

41

```
 1        jury clerk, I don't think, fully understood

 2        because she sent me a list of everybody whose

 3        questionnaire came back not served.

 4             But we didn't have the reason why it wasn't

 5        served, so I couldn't act on that.  Because if it

 6        came back because they were temporarily away, I

 7        can't -- that's not a trigger.  But if it came

 8        back saying the person doesn't live there

 9        anymore, then -- and they sent it to an invalid

10        address, that's different and I could've sent

11        them an NCOA letter.  But I didn't get full

12        information from the clerk's office on that.

13   Q    Did you and Brad King ever talk about the

14        condition of the St. Joseph County voter rolls?

15   A    I'm sure we did in passing.  I try not to

16        speculate.  Usually our conversations are

17        concerned with how the state interprets

18        particular statutes and what we're supposed to

19        do.

20   Q    Do you ever talk to anybody else in the Election

21        Division other than Brad King?

22   A    I've spoken to Leslie Barnes, I know, on the

23        phone; Trent Deckard at the IVRA conference.  I

24        don't remember if I've ever spoken with Trent on

25        the phone.
```

42

1  Q  So, it would be safe to say you talk to the --

2  A  Dale, yeah.

3  Q  -- Republican staff more than the Democrat staff

4     on the phone?

5  A  Our office talks to the Republican staff more

6     than the Democrat staff.  Usually we just talk to

7     Brad King.

8  Q  Do you ever get conflicting advice from Brad King

9     and Trent Deckard?

10  A  Sometimes I get conflicting advice from Brad King

11     because he's very good at telling me when Trent

12     disagrees with him and will say, "Well, I say

13     this.  Trent says this.  We've left that up to

14     the county Election Division -- or County

15     Election board to decide.  So, just want to let

16     you know we're not in agreement on a particular

17     issue."

18        And, in fact, the publications they put out

19     will say, you know, "This is Brad's answer.  This

20     is Trent's answer."

21  Q  And what do you and Terry Coleman do in those

22     cases?

23  A  We bring it to the Election Board and ask them to

24     make a decision.

25  Q  Who's on the Election Board other than you and

43

```
 1        Terry Coleman?
 2   A    We're not on the Election Board.
 3   Q    Who is on the Election Board?
 4   A    It's -- Murray Winn is the Republican appointee.
 5        Jim Korpal is the Democrat appointee.  And the
 6        county clerk serves as secretary and ex-officio
 7        member of the board.
 8   Q    That would be Terri Rethlake?
 9   A    Terri Rethlake.
10   Q    So, this three-person board makes decisions in
11        cases where you and Terry Coleman can't make a
12        decision for whatever reason on some particular
13        part of your responsibility; is that right?
14   A    Well, they have the authority to make decisions
15        more than we do.  We -- we make up the board of
16        voter registration.  And we make decisions based
17        on particular voter registration issues, such as,
18        you know, is this an appropriate form, things
19        like that.
20             But if we're talking procedure and it's not
21        prescribed within statute, then the Election
22        Board directs us.  We don't have that decision
23        making ability --
24   Q    How often does the --
25   A    -- or authority.
```

44

1    Q    I'm sorry.  Please continue.

2    A    No.  I'm fine.

3    Q    How often does the Election Board make decisions

4         on list maintenance activities for you and

5         Mr. Coleman?

6    A    I don't know that they have because that's, to my

7         knowledge, not something that the Indiana

8         Election Division has been unclear on.

9    Q    You mentioned they provide conflicting advice

10        from time to time?

11   A    From time to time.  But I don't believe they -- I

12        don't know them to provide conflicting advice on

13        voter list maintenance other than what to do in

14        the case of an NCOA letter coming back as being

15        undeliverable for a voter that was registered at

16        a previous address.

17             Trent Deckard, I believe, thinks that we

18        should activate them at their old address.  I

19        think Brad's changed his mind.  He used to say

20        that he thinks that we should just cancel them

21        because we know they don't live now at either

22        address.

23             But we've issued some certificates of error

24        on election day in the past, so I think it's just

25        best that we revert them back to the old address.

61

1    saying, you know, "I registered.  Here it is."

2    So, the Election Board voted to go ahead and let

3    his vote count.

4  Q  So, there was two provisional ballots; one

5    because of a list maintenance glitch and one

6    because of an SVRS glitch.  And both voters got

7    provisional ballots, and both counted?

8  A  Yes.

9  Q  Has anybody ever been disenfranchised from an

10    accident on your part?

11  A  I wouldn't know.

12  Q  A list maintenance error on the county's part?

13                    MR. GARN:  Objection.  Calls for

14          speculation.

15  BY MR. FEDELI:

16  Q  You can say you don't know if you don't know.

17  A  I would have no way of knowing.

18  Q  So, to recap a little bit, you mentioned earlier

19    that you need to get hopper items from -- the

20    Department of Corrections, the Department of

21    Health, the Bureau of Motor Vehicles, and the

22    Election Division all send items to your hopper

23    concerning people who have moved, people who have

24    died, people who have been convicted of a crime

25    that you will need to process to maintain your

1    voter rolls; is that right?

2  A  Been convicted of a crime and incarcerated.

3    Conviction alone isn't grounds for removal.

4  Q  But did I get all the offices right that need to

5    communicate with your county?

6  A  The jail also communicates.  Not through a

7    hopper.  They send an actual report.  The

8    Secretary of State's Office sends paper reports

9    as well.

10       We get from -- other states will send to the

11    Indiana Election Division notices that people

12    have registered in New York, New Jersey,

13    Nebraska, Oregon sometimes, Florida.  And we can

14    cancel them then.

15  Q  And those notices will come directly from the

16    other states?

17  A  They'll come to the Indiana Election Division.

18    And then the Indiana Election Division will send

19    us an envelope every so often with -- maybe

20    weekly with everything they had gotten in the

21    last week.

22  Q  And the Secretary of State, the reports that they

23    send consist of what exactly?

24  A  People who have -- what do we get from them?

25    I'll get a report for people who have been

1      incarcerated in other counties as well.

2  Q  How about federal incarcerations?  Do they tell

3      you about that, too?

4  A  Last week, I actually got the federal order

5      remanding somebody to a federal prison.

6  Q  Who sent you that?

7  A  I don't know.  I didn't get the envelope.  I was

8      just -- somebody else in the office had opened

9      whatever envelope it came in, and I just got the

10     document.  So, I don't know where it came from.

11  Q  So, then, in addition to the hopper items that we

12     already mentioned, the jail, the Secretary of

13     State, the Election Division, will all send you

14     paper items for processing as well?

15  A  Uh-huh.

16  Q  And then in addition to all of these state

17     entities or county entities, you'll also get

18     hopper items from 91 other counties concerning

19     moves, transfers, for you guys to maintain your

20     voter rolls accurately; is that right?

21  A  Yes.  And the FSSA offices get voter registration

22     applications and turn those in as well.

23  Q  So, it's 91 counties and about six state offices

24     that I've counted, does that sound right, that

25     send you voter roll registration maintenance

64

1      updates?

2   A   Sure.

3   Q   So, your ability to keep the voter rolls clean is

4      largely a function of how well -- how good the

5      input of information you're getting from these

6      other offices, correct?

7   A   It's a function of how often the voters notify

8      the agencies when they move.

9   Q   And then a function of how well the agencies and

10     the counties notify you?

11  A   I suppose.

12  Q   So, in your two -- you've been there, in the

13     election office, since 2011.

14        In that time, have you ever seen or have you

15     ever been aware of the state sending St. Joseph

16     County a notice letter concerning the number of

17     voter registration removals the county's made?

18  A   No.

19  Q   Has the state ever sent a notice letter

20     concerning the number of voter registration

21     address transfers the county had made in a given

22     month?

23  A   No.

24  Q   Has the state ever sent a notice letter informing

25     the county that the number of registered voters

1       because you'd take names off more accurately; is

2       that correct?

3  A  That -- I suppose.  But, like I said, that --

4       we're talking maybe 15 a month, if that.  That

5       doesn't happen very often.  I think most of the

6       time people in our area do a fairly good job

7       registering -- linking up the cards to the right

8       person even if they're not in the right county.

9  Q  You have people?  Is that what you said?  Your

10      people?

11  A  Well, I think voter registration offices in the

12      area, like in surrounding counties as well.

13      Occasionally, we'll find somebody registered in

14      two counties.  But it doesn't happen very often.

15  Q  Are you in contact with the surrounding counties,

16      with their offices?

17  A  Marginally.  Most of the time we don't have to

18      call them because we don't find mistakes like

19      that.

20  Q  Are you careful about canceling --

21  A  Yes.

22  Q  -- voter registrations?  Why is that?

23  A  We appreciate how much of a hassle it is when

24      somebody shows up and they're not on the rolls.

25      It's very frustrating for the voter and me, and

98

1    we wouldn't ever want to disenfranchise somebody

2    who is entitled to vote.

3         And I understand that there are failsafes in

4    place, but I also understand that people don't

5    think necessarily that provisionals ever get

6    counted.  There's a lot of misinformation.  They

7    think that a provisional's only counted if it's

8    close and the provisional is needed to sway an

9    election one way or the other, which is not true.

10   But I've been told that on numerous occasions.

11        We also want the records to be as accurate

12   as possible.  And removing somebody in error is

13   just as bad as registering somebody in the wrong

14   place.  We want them to be accurate.  So, I think

15   we take great pains in both registering and

16   removing.

17 Q So, you see your obligations to register and to

18   the maintaining -- you see those as -- are you

19   doing a balancing act kind of between those two

20   obligations?

21 A I think we have an obligation to maintain our

22   records as accurately as possible within the

23   constructs of the law.  And whether we're adding

24   new voters or removing voters, we try to do that

25   as accurately as possible.

99

1   Q  Do you think there are a lot of constrictions to

2       removing people off the rolls?

3   A  Personally?

4   Q  Uh-huh.   Yes.

5   A  I do.   I think a lot of times it runs contrary to

6       common sense.   But I understand that, I mean, the

7       law is what it is and we can't just do what we

8       want to do because we think it's better.   We have

9       to follow the rules.

10  Q  So, for keeping your rolls as accurate as

11      reasonably possible, you do have to rely on other

12      counties to --

13  A  We do.

14  Q  Do you have to rely on the SVRS system?

15  A  Yes.   We all work with -- it's a statewide

16      system.   We all have access to every registered

17      voter in the state.

18  Q  Do you also rely on the residents in St. Joe

19      County and residents of Indiana in general to let

20      you know that they move?

21  A  Oh, ultimately it's the voter's responsibility to

22      notify us when they change residences or change

23      counties.

24  Q  You mentioned that you canceled approximately

25      5,600 voters in January.   How did that come

100

1      about?

2           How did they get on the inactive list?  How

3      did they eventually get to the point where they

4      could be removed from the list?

5   A  They would've gotten on there due to NCOA letters

6      coming back.

7   Q  Why were those sent out in the first place?

8   A  When a voter registers to vote, every registered

9      voter -- every application triggers an

10      acknowledgement notice or a notice of

11      dispensation based on whether or not we approved

12      or rejected it.

13           And if it's approved, we send you a letter

14      to the address on your application whether it's

15      your residence address or -- if you provided a

16      mailings address, we'll use the mailing address.

17           If that letter comes back and you're still

18      on pending status, which will be about

19      seven days, then you just get canceled.

20           If it comes back because it's forwarded to

21      some other address, such as the post office says

22      you don't live there anymore, you live somewhere

23      else, or if it's a vacant house, we know nobody's

24      living there.

25           If it comes back because it's temporarily