**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **JUDICIAL WATCH, INC., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **1:12-cv-800-WTL-TAB** |
| | ) | |
| **J. BRADLEY KING, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**INTRODUCTION**

The plaintiffs brought this lawsuit based on the misimpression that Indiana's voter rolls were inaccurate in 2010. They claimed that, based on a comparison of census and voter registration data, there must be a violation of Section 8 of the National Voter Registration Act of 1993 ("NVRA"), 107 Stat. 77, as amended, 42 U.S.C. § 1973gg *et seq.* But Indiana's rolls are relatively accurate. In fact, the undisputed, empirical evidence in this case is that the accuracy of Indiana's rolls average or above average when compared to those of the other states. And the plaintiffs' problem is deeper than that. There is simply no evidence to support their claim that Indiana is failing in its duty to make reasonable efforts to maintain voter registration rolls. The efforts of Indiana officials who carry out the duties under the NVRA are reasonable as a matter of law. Also, these efforts are backed up with hard data that show that Indiana's voter rolls are not inaccurate, and thus, contrary to the plaintiffs' allegations, Indiana cannot be liable for a harm based on a mistaken belief that the rolls are inaccurate. Finally, there was no violation of the records provision of the NVRA. The plaintiffs misunderstand the requirements for states related to record retention and public access. There is no requirement that the state must <u>produce</u>

1

any documents on demand.  Relatedly, because there was no violation and no allegation of a violation at all in the letter Judicial Watch sent in February 2012, the plaintiffs did not provide notice of a records violation prior to bringing the lawsuit, and thus, this claim is barred.  For these reasons set forth in more detail below, the defendants request that the Court grant summary judgment in their favor on both counts.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### I. Facts concerning the Indiana's Voter List Maintenance

1. The Indiana Election Division ("IED") is the state agency responsible for compliance with the National Voter Registration Act.  Ind. Code 3-7-11-1.

2. The Indiana General Assembly tasked Indiana's counties with carrying out voter list maintenance activities and mailing notices as required under the voter list maintenance program.  Ind. Code 3-7-12-26.  The exact relationship between the State (specifically the IED) and the counties has changed over the years with the intention of improving voter list maintenance while simultaneously encouraging people to register to vote.  *See, e.g.,* P.L. 12-1995*;* H.E.A. No. 1391, 118th General Assembly (In. 2013); S.E.A. No. 519, 118th General Assembly (In. 2013).

3. The IED is a bipartisan agency, with co-directors from two different political parties and appointed by the governor.  *Sammons v. Conrad*, 740 N.E.2d 114, 118 (Ind. 2000).   In addition to the co-directors being from different parties, the administrative staff is also divided equally between the major political parties of the state.   *Id.* This "perfectly balanced" agency only acts officially when both co-directors agree.  *Id.*

4. The IED, both officially as an agency and through its employees, conducts a

multi-faceted approach to complying with both the NVRA and state law.  (Exhibit 1, Responses 3, 4).

5.    These tasks include, among other things:

    a.  providing guidance to local election officials on voter registration responsibilities through web-ex training sessions, written publications, in-person training sessions, daily access to IED staff;

    b.  in 2006 and biannually starting in 2014, conducting a mailing to each active voter in Indiana to identify voters who have moved and then sent  follow up mailings consisting of notices and cards described in 42 U.S.C. §§ 1973gg-6(c)(1)(A)(i) (counties may conduct their own county-wide mailing);

    c.  hosting and attending conferences throughout an election year and instructing local election officials on election maintenance, providing Voter Registration Manual and Standard Operating Procedure;

    d.  coordinating and maintaining the Statewide Voter Registration System ("SVRS") which provides notices from the IED to local election officials, information regarding registered voters whose status may need to be cancelled or merged with another file, whether these individuals are reported as deceased, to have moved to another jurisdiction, or incarcerated, and other election maintenance tools.

    Exhibit 1, Responses 3-4.

6.    Specifically with respect to the SVRS, the IED works closely with its vendors and the counties to improve the SVRS.  Ex. 2, p. 134. The IED takes suggestions from county officials, often during conference calls from the County Advisory Team,

where the IED receives suggestions from county users about system improvement. Ex. 2, pp. 135-136.  And county officials take advantage of the opportunity to provide feedback. Ex. 4, p. 21

7.    The SVRS is linked electronically to three state agencies: the Bureau of Motor Vehicles, the Department of Health, and the Department of Correction.  The agency information should be used by county officials to determine whether a certain individual's voter registration should be cancelled.  The IED also receives information from the U.S. Attorney's Office about those convicted of a federal crime, and the IED passes the information on to the counties.  Ex. 2, p. 41.

8.    The IED works with the counties on voter list maintenance, including an annual conference of county election administrators and their staff. Ex. 2, p. 137.  County officials are encouraged to ask IED staff questions.  Ex. 2, p. 138.

9.    The IED considers training of county officials to be a critical component of the IED's duties.  This training has been continuous since the NVRA was enacted, but the training continues to evolve, providing more detailed information to the county election and voter registration officials. Ex. 2, pp. 32-33

10.   While the state of Indiana had entered into a consent decree with the United States Department of Justice in 2006, and that decree expired in 2009, since the expiration of consent decree, some activities identified in the consent decree remain in place. Ex. 2, pp. 33-34

11.     The IED also encourages state agencies who provide voter data to counties through SVRS to process information related to voter list maintenance promptly. Ex. 2, p. 83.

12.     Overall, the IED understands its role as serving as a source for information and training to make sure that the county voter registration officials understand federal and state law, and effectively managing an agency with limited funds and limited staff.  Ex. 2, p. 67.

13.     Additionally, the IED may work with counties that are not carrying out their obligations.  Specifically, in one situation a county was not processing its inactive voters, the IED documented the county's obligation and strenuously urged County employees to undertake voter list maintenance Ex. 2, p. 149.

14.     The IED's budget over the past few years was approximately $4 million per year, which includes SVRS operation maintenance and voter outreach. Ex. 2, p. 113. The state has spent approximately $30 million on the SVRS since its implementation.  Ex. 2, p. 172.

15.     Not surprisingly, the IED does what it can do with a limited budget, but recognizes there are always additional activities that could conceivably be undertaken.  For example, while a statewide mailing may be particularly effective, it was not until the 2013 General Assembly session when funding was obtained to carry out more frequent mailings.  Ex. 2, p. 72.  The last statewide mailing in 2006 was paid for by federal funds obtained through the Help America Vote Act. Ex. 2, pp. 133-134.

16.     In addition to its duties with the SVRS and counties, the IED also works with the
Indiana legislature.  Specifically, at least one IED co-director had for several
years advocated for funding for a statewide mailing, but, perhaps due to the
economic circumstances, the General Assembly did not act on the requests until
2013.  Ex. 2, p. 128. H.E.A. No. 1391, 118th General Assembly (In. 2013); S.E.A.
No. 519, 118th General Assembly (In. 2013).

17.     In addition to the statewide mailing, the new laws, S.E.A. 519 and H.E.A. 1391,
create new, specific obligations under state law for voter list maintenance.  *Id.*
While many of the provisions had been proposed before, a number of
circumstances, both political and economic, contributed to its not garnering the
necessary support in past General Assembly sessions. Ex. 2, p. 152.

18.     Indiana's election administration – both decentralized and bipartisan – results in
accommodation and compromise between the parties and the State and counties in
election administration.  For example, while one co-director may be interested in
entering a certain program such as using the National Change of Address
database, the other co-director may raise concerns about the reliability of the data,
pointing to counties who reported problems with false matches or incorrect
information. Ex. 2, p. 42.

19.     Thus, while the IED may make reasonable efforts to maintain accurate voter
registration lists, the IED cannot undertake every conceivable activity.  Ex. 2, p.
142.

20.     But the IED recognizes the potential benefit of allocating responsibility equally and to representatives from both major political parties. Ex. 2, p. 131.   For example, the co-directors can provide two perspectives on what is permitted under the NVRA. Ex. 2, pp. 45-46.

21.     It is estimated that the co-directors agree approximately 90% of the time.   Ex. 2, p. 133

22.     The decentralized character of election administration permits officials who live in the community to help keep the rolls relatively accurate in their own community, although the provisions of the NVRA itself often make the application of any such local perspective difficult to apply. Ex. 2, pp. 147-48.

23.     The counties themselves carry out voter list maintenance, which are uniform and nondiscriminatory.  Ex. 2, p. 48

24.     The local county officials may be the elected county clerk, or, in some counties, bipartisan board members.  Ex. 5, pp. 9-10.

25.     Between 2009 and 2012, approximately five counties carried out their own countywide mailing to identify people on the registration list who no longer lived at the address listed in the voter registration rolls. Ex. 2, p. 36.

26.     In addition, the counties use the SVRS daily to process cancellation based on information and guidance received from the system.  Ex. 6, p. 12.

27.    The county officials also rely on the voters' identification cards to carry out their election duties. including registration and verification of a voter's identity.  Ex. 6, p. 117

28.    Local election officials also receive notices from the IED about people who are now living out of state and whose registration should be cancelled.  Ex. 5, p. 62

29.    Local election officials acknowledge that the IED encourages voter maintenance programs.  For example, the county clerk of Warrick County said that, when the county conducted a countywide mailing in 2012, the IED "[t]old me everything I needed to know.  Essentially, I leaned on them 20 times a day to make sure that, you know, what I was doing was right." Ex. 6, p. 102

30.    The IED also hosts a conference where voter list maintenance is always discussed.  Ex. 4, p. 82.

31.    The county officials acknowledge they received, "quite often," memoranda from the state about voter list maintenance.  Ex. 6, p. 20

32.    The IED emphasizes to county officials the importance of being judicious about canceling a registered voter.  Ex. 4, p. 98

33.    The quality of Indiana's voter lists is average or better than average when compared to the other states.  Dr. Eitan Hersh, an assistant professor at Yale University, studied various data related to voter list maintenance across the country. Specifically, he looked to the rate of missing fields, undeliverable addresses, missing and January 1 registration dates, records of voters presumed to

be deceased, deadwood, vote history discrepancies, and unusual birth date data. In all of these areas Indiana has similar or better records than the median state. In other words, "the rate of missing address fields, undeliverable addresses, missing and January 1 registration dates, records of voters presumed to be deceased, deadwood, vote history discrepancies, and unusual birthdate data, are all lower in the state of Indiana than is the average across states." Ex. 6.

34.     Despite this empirical data, officials in Indiana at times express frustration about the NVRA and the restrictions it puts on voter maintenance activities. Specifically, its vague language at times results in conflicting advice from the IED to the counties. In such instances, the IED determined that leaving the decision to the county is an appropriate compromise solution. Ex. 5, p. 42.

35.     The NVRA has been described as "cumbersome," impractical," and contrary to common sense, and is a law that does not take into account our mobile society. Ex. 4, pp. 105-106; Ex. 5, pp. 99, 37.

36.     Given the cumbersome nature of the NVRA's requirements, officials acknowledge that the voter registration rolls can never be completely accurate. Ex. 2, p. 68

**II. Facts concerning the plaintiffs**

37.     In February 2012, Judicial Watch sent a letter to the Indiana Secretary of State and the Indiana Election Division. The letter alleged that some Indiana counties had high total voting age population numbers (from 2010 census data) when

compared with publicly available voter registration data (also from 2010).  Dkt. 1, ¶ 19.

38.   Judicial Watch in the letter also asserted that it may bring a lawsuit against the state.  Dkt. 1. ¶ 21.

39.   The Indiana Election Division responded by dismissing the allegation because the census data in comparison with voter registration data do not mean there was an NVRA violation.   Dkt 1, ¶ 22.

40.   Neither Judicial Watch nor True the Vote responded to the dismissal prior to filing this lawsuit.  They did not provide a date when they wished to inspect documents, nor provide notice that they had been denied access to any records.  Dkt. 1.

## STANDARD OF REVIEW

The Seventh Circuit's standard for granting summary judgment is well-established:

[S] summary judgment is warranted only if there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law.

The initial burden of production rests with the moving party to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Once the moving party satisfies this burden, the nonmovant must set forth specific facts showing that there is a genuine issue for trial. The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be material.

*Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)(internal quotes and citations omitted.

## ARGUMENT

## I.   The defendants are in compliance with the NVRA in terms of Voter List Maintenance.

In *Arizona v. Inter Tribal Council of Arizona*, the United States Supreme Court explained that, "[o]ver the past two decades, Congress has erected a complex superstructure of federal regulation atop state voter-registration systems."   133 S. Ct. 2247, 2251, 186 L. Ed. 2d 239 (2013).   The Indiana Election Division coordinates the State's responsibilities for an important part of this "complex superstructure," the National Voter Registration Act.   Ind. Code 3-7-11-1. The National Voter Registration Act of 1993 (NVRA), 107 Stat. 77, as amended, 42 U.S.C. § 1973gg *et seq.*   Congress passed the NVRA with the express purposes of "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for federal office [and] to ensure that accurate and current voter registration rolls are maintained.   42 U.S.C. § 1973gg(b)(1), (4).   The law is based on Congress's finding that "the right of citizens of the United States to vote is a fundamental right; [] it is the duty of the federal, State, and local governments to promote the exercise of that right; and [] discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities."   42 U.S.C. § 1973gg(a).

Congress, through the NVRA, mandated several duties as part of election administration for the states. For example, under Section 5, a state's driver's license application must also serve as a voter registration application or, under Section 7, a state's public assistance office must offer voter registration services.   42 U.S.C. § 1973gg-3; 42 U.S.C. § 1973gg-5.   In addition, under Section 8, in "the administration of voter registration for elections for Federal office, each State shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of [] the death of the

registrant; or [] a change in the residence of the registrant."  42 U.S.C. § 1973gg-6(a)(4).  States must "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters."   42 U.S.C.  §  1973gg-6(c)(2)(A).   These programs must "be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. § 1973 *et seq.*) 42 U.S.C. § 1973gg-6(b)(1).

### a. The undisputed facts show that the State of Indiana makes reasonable efforts to maintain voter rolls as a matter of law

The crux of this case is whether Indiana conducts "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of [] the death of the registrant; or [] a change in the residence of the registrant."  42 U.S.C. § 1973gg-6(a)(4).  Indiana complies with the NVRA.

The NVRA <u>only</u> mandates maintenance activities for the death of registrants and a registrant's change of residence.  But even that directive only  uses the general phrase "reasonable efforts."  While the NVRA suggests some permissible maintenance programs, it lacks specific requirements with the exception what states may <u>not</u> do.  For example, a state may not remove a registrant's name from the voting list unless the registrant confirms in writing that she has changed her residence outside her jurisdiction in which she is registered, or has not responded to a notice and does not vote in two general federal elections.  42 U.S.C. § 1973gg-6(d)(1).  Also, if a state receives notice from a U.S. Attorney of a conviction of a federal crime, but subsequently receives notice that the individual's conviction was overturned, the state must notify the local election officials.  42 U.S.C. §1973gg-6(g)(5).  In other words, this particular mandate is to make sure a person's name is put back on the voting lists.

Thus, the sum total of guidance from Congress on what a state must do in terms of maintaining the lists is to make "reasonable efforts."  Courts have struggled with this term in other contexts, referring to the phrase as "ill-defined," making standards in this area hard to define or manage.  *Jeanine B. v. McCallum*, 93-C-0547, 2001 WL 748062 (E.D. Wis. June 19, 2001).  Indeed, the U.S. Supreme Court in *Suter v. Artist M.,* analyzing the term "reasonable efforts," also in a different context, found that the phrase does not unambiguously confer an enforceable right, and could be read as only a generalized duty on the state, and that Congress's use of such a phrase suggests that a great deal of discretion was left to the states.  503 U.S. 347, 362, 112 S. Ct. 1360, 1369, 118 L. Ed. 2d 1 (1992).

There is little guidance from the courts in the area of election law as to what "reasonable efforts" are or are not.  But looking to other areas of the law may be instructive to what kind of deference a state should get when they conduct election administration under the NVRA.  For example, in the area of administrative law, under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, a court should defer to an agency's interpretation if the enabling statute is ambiguous.  467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984); *Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 983 (7th Cir. 1998).  Here, the statute is undoubtedly ambiguous and vague. But also, an election administrative structure and plan for voting list maintenance was enacted by an elected body – the Indiana General Assembly – unlike an agency whose actions and interpretations of statutes are less responsive to the democratic processes.  Therefore, if anything, more deference should be given to a state than an agency acting under similar laws. Indeed, this comports with Supreme Court guidance that, while a court may recognize that other, helpful steps may be taken by a municipality, merely showing that something may be helpful was not done does not establish liability.  *Connick v. Thompson*, 131 S. Ct. 1350, 1363, 179 L.

Ed. 2d 417 (2011). Thus, as a general matter and introductory consideration, the state should be granted a great deal of deference given the lack of specificity in the NVRA itself.

Specifically, the undisputed facts in this case demonstrate that Indiana conducts a general program that makes reasonable efforts to maintain voting rolls. First, the State of Indiana has a decentralized system of voter list maintenance. For example, while the IED is responsible for compliance with the NVRA, Indiana, through the legislative process, has tasked the counties with carrying out voter list maintenance activities and mailing notices as required under the voter list maintenance program. Ind. Code 3-7-12-26. The exact relationship between the State (specifically the IED) and the counties has changed over the years with the intention of improving voter list maintenance, while simultaneously encouraging people to register to vote. *See, e.g.,* P.L. 12-1995*;* H.E.A. No. 1391, 118th General Assembly (In. 2013); S.E.A. No. 519, 118th General Assembly (In. 2013).

But the IED is responsible for compliance with the NVRA as a whole and, thus, may not lose sight of the importance of balancing the, at times, competing obligations of the different sections of the act. The NVRA is intended to "establish procedures that will increase the number of eligible citizens who register to vote in the elections for Federal office," but also "to ensure that accurate and current voter registration rolls are maintained." 42 U.S.C. § 1973gg(b). Recognizing that differing perspectives may be helpful, Indiana has a bipartisan agency responsible for NVRA compliance. (Facts, ¶ 3). At times, this means that the agency does not undertake certain maintenance activities because one co-director has concerns about, for example, reliability of data that another state or agency may have. (Facts, ¶ 18).

The NVRA does not require the state to undertake every conceivable effort, or even every reasonable effort. Instead, the state must make "reasonable efforts." And that is what

Indiana does.  At the State level, Indiana spends millions of dollars a year on voter list maintenance. (Facts, ¶ 14).   Much of this money goes towards the SVRS, the computerized system that provides voter data directly to the county official who cancel voter registrations for those who die or move out to a different jurisdiction.  (Facts, ¶ 7).  In addition, the IED trains local county officials, holds conferences, and perform many other activities for the purpose of improving the accuracy of voter lists.        (Facts, ¶ 5).

Indiana's program for voter list maintenance includes activities at the county level.  The facts of the case demonstrate a dedication to accurate rolls at both the state and county levels.  In fact, in one of the counties the plaintiffs identified as having voter registration rolls that exceed 100% of the total voting age population was Warrick County.  Dkt. 1, ¶ 14.  The clerk of Warrick County, in her deposition, described the countywide mailing program she undertook.  This countywide mailing program, described in 42 U.S.C. § 1973gg-6(c) is a per se reasonable program for voter list maintenance by the terms of the NVRA. In carrying out the mailing process, she noted the encouragement and assistance provided by the IED. (Facts ¶ 29).  But while every county does not carry out a countywide mailing, the undisputed facts are that the counties carry out "reasonable efforts" to maintain the voting rolls in other ways, such as daily processing of information received through the SVRS.  (Facts ¶ 26, 28).

Indiana's plan and efforts to maintain accurate rolls are not static.  IED seeks and receives input from the counties, acknowledging the unique insight the county officials may have.  (Facts, ¶ 6).  In addition, the IED lobbies the General Assembly about ways that the maintenance efforts may be improved.  (Facts, ¶ 16).

Indiana's dedication to maintain accurate rolls is backed up by empirical data.  Specifically, Dr. Eitan Hersh, a professor at Yale, independently analyzed data related to voter

list maintenance across the country, for this litigation and independently, and found that Indiana has similar or better records than the median state. (Facts, ¶ 33).  Dr. Hersh looked to data from 2010, which is the same and only timeframe the plaintiffs looked to in their complaint to allege a violation of the NVRA.  But instead of providing any evidence of violations, the only empirical data by an expert in this case that specifically looks to the accuracy of the voter rolls demonstrates that Indiana's rolls are the same or better than most other states.

The undisputed facts demonstrate that Indiana is conducting a reasonable program to remove the names of voters ineligible because of death or change of residence.  At both the state and county level, those tasked with maintaining the rolls should be commended for their work in not only complying with Section 8 of the NVRA, but carefully carrying out programs that reflect the larger purpose of the NVRA and election administration in general.

### b.  The plaintiffs lack standing

The plaintiffs in this case have not been harmed by the actions or alleged inaction of the State of Indiana with respect to voter list maintenance.  Rather, as discussed above, Indiana – at both the state and county level – undertakes reasonable efforts to remove those who are deceased or move to another jurisdiction.

The basis for the plaintiffs' lawsuit and the only allegation of purported injury with respect to voter list maintenance is the comparison between the number of persons registered to vote in certain counties and the total voting age population as determined by the census. Both data are from 2010.  Dkt. 1, ¶ 14.  This Court found that, at the initial pleading stage, the plaintiff demonstrated a plausible injury entitling them to standing..  Dkt. 37, p. 7.  But in a motion for summary judgment, the plaintiffs must set forth specific facts to support their allegations.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137, 119 L. Ed. 2d 351 (1992).

The plaintiffs cannot set forth such facts.  Again, the basis for their claims – that Indiana's voter rolls in 2010 were inaccurate – is not supported by the evidence.  In fact, the only empirical, expert evidence about the accuracy of Indiana's rolls shows the opposite.  The accuracy of Indiana's rolls are either average or above average.  (Facts, ¶ 33).  The harm alleged, that Indiana's rolls are causing members consternation or interfering with the organizations' activities, is simply not based on fact.  Comparing Indiana's rolls with the rolls of other states is the only benchmark we can use to determine whether a State's rolls are accurate.  Indeed, that Indiana's voting rolls are of average accuracy should be considered in relationship to the goals of the NVRA itself.  Indiana election officials express their frustration with the NVRA in terms of how difficult it is to remove someone from the rolls.  But these statutory obstacles for quickly and efficiently removing someone from the rolls fits with the NVRA's express purpose to "establish procedures that will increase the number of eligible citizens who register to vote in elections," and Congress's finding and intention to redress "discriminatory and unfair registration laws and procedures [that] can have a direct and damaging effect on voter participation in elections."  42 U.S.C. § 1973gg(a).  In other words, Indiana's "average-ness" comports with and reflects the intention of the NVRA.

In addition, Judicial Watch has not put forth any members allegedly harmed by the quality of Indiana's voter rolls.  Instead, in response to an interrogatory seeking the names of Judicial Watch members who are citizens of Indiana, Judicial Watch objected to the request, claiming privilege under the First Amendment.  The defendants recognize that there may be instances where an association may have legitimate grounds for seeking to maintain the anonymity of its members.  *See, e.g., Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 452, 78 S. Ct. 1163, 1166-67, 2 L. Ed. 2d 1488 (1958).  But

it is unclear why membership in the organizations who brought suit that is something that needs to remain hidden.  The plaintiffs may only continue to assert an amorphous and vague harm based on the misimpression that Indiana's voter rolls are inaccurate.  Given the restrictions that the NVRA places on states preventing an efficient and perhaps "common sense" approach to voter list maintenance, given the economic restrictions states and counties face, given the mobile society we live in, the voter rolls are not going to be perfect and cannot be under the standards set by the NVRA itself.  But because Indiana's rolls are relatively accurate, the plaintiffs have not been harmed, and judgment should be granted in the defendants' favor.

**II.  The plaintiffs cannot show that the defendants failed to make records available**

The Court should find in favor of the defendants for Count II of the plaintiffs' complaint because the plaintiffs cannot show that the defendants violated the records provision of the NVRA, and that count is procedurally barred because the plaintiffs never provided notice of a records violation.  For Count II, the plaintiffs claimed to be harmed because the Indiana Election Division and Secretary of State "failed to produce or otherwise make records available to" the plaintiffs.  Dkt. 1, ¶ 46.  Section 8 of the NVRA requires a State to "maintain for at least 2 years and shall make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters . . ." 42 U.S.C. 1973gg-6(i).

First, it should be noted that the heading in the plaintiffs' complaint for Count II is "Violation of the NVRA: Failure to Produced Records."  (Dkt. 1, p. 13).  There is no requirement that a state must "produce" documents.  Those documents must only be made available to the public. The plaintiffs nowhere allege that they were prevented access to any documents. Their only allegation is that, after sending a four page letter from the organization with one sentence

demanding that the state "make available to us all pertinent records concerning 'the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency' of Indiana's official eligible voter lists during the past 2 years," they were not provided with the documents.  (Dkt. 1, p. 13; Dkt.21-1).

While this specific provision has not been heavily litigated, it is telling to look at a case where a violation was found, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012). In that case, the Virginia official specifically responded to a request and stated she would not allow inspection or copying of the requested materials.  A second request was made, which was again rejected.  Further representatives from the organization visited the Virginia official's office, demanding access to the documents.  *Id.*  In contrast, the plaintiffs did not receive a specific reply and, given how the request was buried in a letter alleging violations, this is not surprising.  But more important, the plaintiffs cannot show anything to demonstrate that the records were not made available, and, whatever documents the IED or Secretary of State may have is available to the public for inspection.  The only thing that the IED did not do was produce the documents for the plaintiffs.  But the NVRA does not require the state to produce on demand these documents – they only need to be made available.  And the plaintiffs can show no facts to show that those documents were not available.

Second, the plaintiffs did not provide notice of a <u>records</u> violation as required by the NVRA.  Before filing a lawsuit under the NVRA, a plaintiff must provide notice of a violation. 42 U.S.C. § 1973gg-9(b).  While the Court found that the notice was adequate for purposes of voter roll maintenance, there was no notice of a records violation at all.  Instead, with respect to the records, Judicial Watch's February 2012 letter is only a request for documents.  There is no allegation of a records violation at all (and the defendants maintain that there never was one).

Dkt. 21-1.  As discussed in the defendants' motion to dismiss, the purpose of the notice is to provide a State with an opportunity to remedy any situation prior to the lawsuit being brought. *See Broyles*, 618 F. Supp. 2d at 692.  *Broyles v. Texas*, 618 F. Supp. 2d 661, 692 (S.D. Tex. 2009) *aff'd*, 381 F. App'x 370 (5th Cir. 2010).  The plaintiffs understood, and apparently still understand, the NVRA as obligating a state to produce documents, no matter how vague the request, to whomever makes such a request on demand.  But the plaintiffs misunderstand the NVRA records requirement.  Thus, because the plaintiffs did not provide notice of this violation, and because their allegation that the plaintiffs are required to produce documents on demand is unsupported by law, the Court should enter judgment in favor of the defendants.

CONCLUSION

The plaintiffs are unable to show any violation of the NVRA.  The Indiana Election Division with the county election officials carry out those reasonable efforts required by the NVRA.  The NVRA cannot have been intended as a tool for private parties to use to micromanage state affairs, especially when the states are acting under such broad and general terms as "reasonable efforts."  Instead, the states should be allowed to craft programs to meet the needs of their particular state.  And they should be allowed, as Indiana has done, to continue to improve and experiment with different ways of administering election law.  For these reasons, the plaintiffs request judgment be granted in their favor.

Respectfully submitted,

GREGORY F. ZOELLER
Indiana Attorney General
Attorney No. 1958-98

By:      */s/ Jefferson S. Garn*
Jefferson S. Garn
Deputy Attorney General
Attorney No. 29921-49

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of October, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**Paul J. Orfanedes**
JUDICIAL WATCH, INC.
porfanedes@judicialwatch.org

**Chris Fedeli**
JUDICIAL WATCH, INC.
cfedeli@judicialwatch.org

**David R. Langdon**
LANGDON LAW LLC
dlangdon@langdonlaw.com

**Joshua B. Bolinger**
LANGDON LAW LLC
jbolinger@langdonlaw.com

*/s/ Jefferson S. Garn*
Jefferson S. Garn
Deputy Attorney General


Office of the Indiana Attorney General
Indiana Government Center South, 5th Floor
302 W. Washington Street
Indianapolis, IN  46204-2770
Telephone:     (317) 232-6292
Fax:              (317) 232-7979
Email: jefferson.garn@atg.in.gov