UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JUDICIAL WATCH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:12-cv-800-WTL-TAB |
| | ) | |
| J. BRADLEY KING, et al., | ) | |
| | ) | |
| Defendants. | ) | |

RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I.       Introduction

The Indiana Election Division and Secretary of State respectfully request that the plaintiffs' motion for summary judgment be denied. This is a case about what a state does ensure that those who want to vote may do so with ease. It is also about what states do within the limits set by particular circumstances and federal law to maintain reasonably voter registration rolls. But one should never lose sight of what the National Voter Registration Act ("NVRA") is about – human beings participating in a democracy. As much as the plaintiffs focus on abstract names on rolls, those names are residents of Indiana who have registered to vote, affirmatively expressing a desire to participate in the American democratic system. Indiana officials recognize the gravity their duty to maintain rolls under federal law, but also recognize a duty to those whose names are on the rolls. The state and county officials tasked with maintaining the rolls do so with great care, and the record is full of examples of these officials' recognition of their, at times, competing obligations.

The plaintiffs focus myopically on removing people from rolls. Conversely, the Indiana officials know that maintaining the rolls is critical, and work hard to maintain those rolls. But

they also recognize that a state may not undertake list maintenance without great thought and care, and that, while it may be unfortunate that someone's name remains on the rolls after moving (something that is made inevitable by the NVRA), the state officials must do everything they can to make sure that, when someone goes to vote, she does not find her name improperly stricken from the rolls, giving her the impression that she has been disenfranchised because of a bureaucratic glitch.

The plaintiffs here ask the Court to take an extraordinary step into micromanaging state election administration. But such an intrusion would be improper because of general principles related to the separation of powers, and because Indiana is making reasonable efforts to maintain the election rolls. The plaintiffs are not entitled to judgment as a matter of law, and their motion for summary judgment should be denied.

## II.      Statement of Material Facts in Dispute

The "facts" listed below are taken from the plaintiffs' statement of material facts not in dispute found on pages 6 through 16 of the plaintiffs' memorandum in support of their motion for summary judgment (Dkt. 69). To the extent that the defendants do not disagree with a fact or the fact is immaterial, it is not listed below. The plaintiffs' section of "material facts in dispute" is replete with blatant opinions and statements of law, often un-cited and incorrect.

Plaintiffs assert: "2. During the relevant time period, the two Election Division co-directors must both have been in agreement in order for Indiana to initiate voter list maintenance programs, and conversely, either Co-Director could veto the undertaking of a voter list maintenance program." Dkt. 69, p. 6.

Response: The plaintiffs are incorrect about the state of the law during the "relevant time period." The "relevant" period continues to the present time because the plaintiffs requested

injunctive relief.  As explained in this opposition's statement of facts not in dispute, Indiana law now increases the role of the Secretary of State in relation to NVRA compliance.

Plaintiffs assert: "3. Co-Director Trent Deckard and his Democrat[ic] co-director predecessors have frequently disagreed with Republican Co-Director J. Bradley King concerning voter list maintenance, preventing Indiana from initiating numerous voter list maintenance programs."

Response: The defendants disagree with the characterization of frequent disagreement. To the contrary, the co-directors actually agree 90% of time, allowing them to carry out numerous voter list maintenance programs.  Dkt. 71, ¶ 21.

Plaintiffs assert: "4. Indiana has taken a mostly passive approach to voter list maintenance, even though states are required to actively lead, direct, and oversee a list maintenance program under the NVRA."

Response:  The only evidence in support of this false assertion is the report from Karen Handel, who the plaintiffs have identified as their expert.  Handel's report and testimony should be excluded for the reasons set forth in section IV below.  In addition, the plaintiffs take an active roll, directing and overseeing list maintenance.  Dkt. 71, ¶ 5.

Plaintiffs assert: "5. A comparison of 2010 U.S. Census data and 2010 U.S. EAC data shows that 12 Indiana counties have voter registration rolls that exceed 100% of TVAP in those counties and that another 26 Indiana counties have voter registration rolls that contain between 90% and 100% of TVAP."

Response:  The defendants object the use of Handel's report.  The defendants also object because the relationship between these two numbers does not demonstrate any violation of the

NVRA. Further, the data is from 2010, but the plaintiffs use the present tense "have," alleging, without support, that these numbers are static.

Plaintiffs assert: "6. The 2010 EAC data show[] that Indiana's voter rolls have high ratios of registrations to TVAP on a statewide basis, higher than the national averages by several percentage points in every category."

Response: The defendants again object Handel's report.

Plaintiffs assert: "7. The 2010 Census data and 2010 EAC data demonstrate that Indiana's voter registration rolls are substantially inaccurate and out of data, indicating that additional efforts to maintain the accuracy of the rolls are necessary."

Response: The defendants again object Handel's report.

Plaintiffs assert: "8. Co-Directors Deckard and King were aware of data indicating that Indiana's voter registration rolls were inaccurate and out of data."

Response: The defendants object to this circular allegation. What the co-directors were aware of is the letter sent by the plaintiff Judicial Watch. Rather than being "aware" of inaccurate and out of date rolls, the co-directors rejected the basis for the plaintiffs' allegations in the first place, that census data can give a clear indication of the status of the voter rolls. Dkt. 69-3.

Plaintiffs assert: "9. Upon becoming aware that Indiana's voter registration rolls were inaccurate or out of state, Co-Directors Deckard and King did not institute any new list maintenance programs or activities to remedy the voter rolls' inaccuracies."

Response: The defendants object to this allegation for the same reason as the above. Second, Indiana is constantly improving existing maintenance programs by, for example, maximizing the potential of the Statewide Voter Registration System.  Ex. A, p. 134-135.  In

addition, Indiana has instituted several new maintenance programs in the 2013 legislative session. Material Facts Not in Dispute, Section III, *infra*.

Plaintiffs assert: "10. Both the poor condition of Indiana's voter rolls, and the failure of Co-Directors Deckard and King to institute any new list maintenance programs or activities upon learning of these inaccuracies, are factors that render Indiana's voter list maintenance efforts unreasonable under industry standards applicable to election administration."

Response: The allegation here again assumes a fact – the "poor condition of Indiana's voter rolls" – which is not supported by the record.  Dkt. 71, exhibit 6 (the defendant's expert report).  The defendants again object to this allegation because its sole basis is Handel's report, which nowhere discusses "industry standards."

Plaintiffs assert: "11. Although the Indiana Department of Health ('DOH') is required by Indiana law to obtain out-of-state death information from other states for purposes of assisting the Election Division to maintain the voter registration rolls, co-director Deckard does not supervise or coordinate DOH's efforts.  He does not know and has not asked whether DOH has obtained the required out-of-state death information for voter list maintenance purposes."

Response:  First, the defendants object to this allegation because the plaintiffs are wrong about the law.  DOH, under Indiana Code Ind. Code 3-7-45-5(a), must *negotiate* with appropriate agencies in each state other than Indiana.  The state department of health *may* offer to share with each other state information regarding the deaths of the other state's residents in Indiana.  There was no mandate for DOH to obtain the information from other states in May 2013, when co-director Deckard was asked questions regarding DOH's activities. Further, the co-directors and their staff divide labor with respect to certain activities (Ex. B, p. 239), and the other co-director may have a more detailed knowledge of certain agency actions.  (Ex. A, pp. 15-16).

Plaintiffs assert: "12. DOH only obtained out-of-state death information for list maintenance purposes within the past year by entering the State and Territorial Exchange of Vital Events ('STEVE') and Electronic Verification of Vital Events ('EVVE') interstate systems, and previously failed to comply with Indiana law in this regard."

Response: The plaintiffs again misstate the law. Only in July 2013 did Indiana mandate that DOH "acquire information regarding the deaths of Indiana residents occurring in each of the other states from those states or from the" STEVE and EVVE systems.  Ind. Code 3-7-45-5(a). Further, only in July 2013 did the legislature specifically permit the use of the data through STEVE and EVVE for voter list maintenance.  Thus, contrary to the allegation, as there was obligation, there could have been no failure.

Plaintiffs assert: "13. Indiana failed to obtain national Social Security Death Index ('SSDI') data from the Social Security Administration ('SSA') in order to identify and remove deceased voters from Indiana's voter registration rolls."

Response: The defendants object to the characterization of their action as a failure.  To fail is to "prove deficient or lacking; perform ineffectively or inadequately." *The American Heritage Dictionary, 3d Edition, 1992.*  As there was no obligation, the defendants could not have "failed" to undertake a duty.  Specifically, because there was a reasonable disagreement about the use of the death index and reported problems related to its use for voter list maintenance, this decision not to take a certain step was not deficient, but was rather a discretionary decision by a state agency.  Ex. A, pp. 18-19.

Plaintiffs assert: "14. Although Co-Director Deckard spent a year investigating the feasibility of obtaining SSDI data for voter list maintenance purposes, he failed to make a final

decision about whether to obtain the data and never even learned what obtaining the SSDI data from SSA would cost the state."

Response: The defendants object to the characterization of the Election Division's action as a failure for the same reasons as stated above.

Plaintiffs asserts: "15. Indiana failed to obtain the SSDI data for voter list maintenance purposes because of a lack of agreement, since 2004, between the Democrat[ic] and Republican co-directors of the Election Division about whether to do so."

Response: The defendants again object to the characterization of the Election Division's action as a failure.

Plaintiffs asserts: "16. Indiana failed to obtain the National Change of Address ('NCOA') database from the U.S. Postal Services ('USPS') because of a lack of agreement between the Democrat[ic] and Republic co-directors of the Election Division about whether to do so."

Response: The defendants again object to the characterization of the Election Division's action as a failure.

Plaintiffs assert: "17. Obtaining the NCOA database from the USPS would have helped Indiana to identify voters who had relocated either within Indiana or out-of-state and would have helped Indiana to remove such ineligible voters from the voter registration rolls."

Response: The defendants object to the limited perspective of this fact. While it may have helped identify voters who had relocated, others within the Indiana Election Division voiced reasonable concerns about the reliability of the data.  Dkt. 71, ¶ 18.

Plaintiffs assert: "18. Indiana failed to enter the Interstate Voter Registration Cross-Check ('IVRC') program because of a lack of agreement between the Democrat[ic] and Republican co-

directors of the Election Division about whether to do so, and also failed to obtain the Systematic

Alien Verification for Entitlements ('SAVE') database."

Response: The defendants again object to the characterization of the Election Division's

action as a failure given the lack of a duty.  In addition, the NVRA makes no requirement with

respect to identifying non-citizens through the SAVE program, and any obligation regarding

identifying non-citizens was proposed as an amendment to the NVRA and specifically rejected.

139 Cong. Rec. S5739-01, 1993 WL 151568.

Plaintiffs assert: "19. Entering the IVRC program would have helped Indiana to identify

voters who had relocated out-of-state, and would have helped Indiana to remove such ineligible

voters from the voter registration rolls."

Response: The defendants again object to the incomplete characterization of the options

before the Election Division, that neglects concerns voiced by some in the Election Division. Ex.

A, pp. 28-29.

Plaintiffs assert: "20. Co-Director King held discussions with local election officials and

determined that Indiana counties bordering other states had the worst voter list maintenance

problems due to a general failure to adequately identify voters who had died out-of-state or

relocated out-of-state."

Response: The defendants object to the characterization of the evidence in support of this

"fact."  The evidence does not support the claim that Indiana counties bordering other states "had

the worst voter list maintenance problems due to a failure to adequately identify voters who had"

died or relocated out-of-state. Rather, the testimony supports the common sense conclusion that

counties on a border have difficulties maintaining the rolls of a highly transient population, and

the Election Division, recognizing this additional burden, ensures that these counties receive particularized information regarding voter list maintenance.  Ex. B, p. 118.

Plaintiffs assert: "21. A local election official cannot effectively undertake efforts to maintain voter registration rolls without the coordination and active participation of as many as 6 separate Indiana state offices and local election officials in all 92 Indiana counties, each of which must provide quality information about voters who have died or relocated."

Response: The defendants object to the characterization of the duties of an election official in the United States to the extent it says anything more than a federal system of government in the 21st century requires the cooperation of several sovereigns and agencies.

Plaintiffs assert: "22. Despite having tools available to it to direct, lead, and actively oversee local election officials' performance of voter list maintenance tasks, Indiana failed to make use of these tools."

Response: The defendants again object to the reliance on Handel's report. Further, the defendants object to the characterization of co-director King's testimony, as the testimony cited only refers to a general obligation of county officials to file affidavits, but the Indiana statute provided no enforcement mechanism or deadline by which the counties officials had to file the affidavit.  Ex. A, pp. 54-57.

Plaintiffs assert: "23. Although Indiana state law requires local election officials to file affidavits with the Election Division certifying performance of voter list maintenance tasks, only very few local election officials have complied with this law, and Indiana has taken no action to compel their compliance."

Response:  The defendants again object to the characterization of the counties as failing to comply with an Indiana law that provides for no timeline, and the suggestion that the Election

Division failed to fulfill a duty by not prosecuting or compelling certain actions when the statute had no enforcement mechanism.  Ex. A, pp. 54-57.

Plaintiffs assert: "24. Following the expiration of the 2006 Consent Decree in 2009, Indiana ceased regularly monitoring local election officials' performance of voter list maintenance tasks and ceased notifying local election officials of violations or apparent problems with voter rolls."

Response: The defendants object to this fact because the Election Division continues to monitor county maintenance activities, and still may generate reports that indicate county compliance.  Ex. A, p. 31; Ex. B, pp. 67-69.

Plaintiffs assert: "25. Indiana's lack of oversight of local election officials is another factor rendering Indiana's list maintenance efforts unreasonable under industry standards applicable to election administration."

Response: The defendants again object Handel's report.

Plaintiffs assert: "26. Indiana gave conflicting guidance to local election officials about voter list maintenance practices."

Response: The defendants object to the characterization of this allegation.  Because the co-directors could not come to an agreement about an ambiguous area of election law, the co-directors provided counties with both views, permitting the local election officials to determine for themselves the right course of action.  It is hardly surprising that a bipartisan agency should occasionally disagree on statutory interpretation.

Plaintiffs assert: "27. Local election officials set their own, often inconsistent policies for determining when to cancel a voter registration, and they base their determination on varying levels of information about the death or relocation of a voter."

Response:  The defendants object to the characterization to the extent is says anything more than local officials are given discretion in carrying out their duties, and base determinations on something other than omnicompetence.

Plaintiffs assert: "28. Indiana's conflicting guidance to local election officials is yet another factor rendering Indiana's list maintenance efforts unreasonable under industry standards applicable to election administration."

Response: The defendants again object to the use of Handel's report.

Plaintiffs assert: "29. Inconsistent list maintenance practices among local election officials [are] a further factor in rendering Indiana's list maintenance efforts unreasonable under industry standards applicable to election administration."

Response: The defendants again object to the use of Handel's report.

Plaintiffs assert: "30. Since 2006, Indiana has not conducted any NCOA mailings to voters who have relocated nor statewide mailings to all registered voters to identify ineligible registrations, and local election officials in only five counties have performed removal mailings since 2009."

Response:  The defendants again object to the use of Handel's report. In addition, the defendants object because counties undertake NCOA mailings on a regular basis.  Ex. C, Standard Operating Procedure VRG 58.2, p. 4-5.

Plaintiffs assert: "31. Indiana does not undertake remedial steps to direct local election official to perform county-wide mailings or NCOA mailings required by law when the local election officials fail to perform such mailings."

Response: The defendants object to the characterization of Indiana law as requiring countywide mailing, and object to the recurring description of Indiana law without providing any

citation. In addition, the Election Division encourages and provides support for counties able to undertake countywide NCOA mailings.  Dkt. 71, ¶29.

Plaintiffs assert: "32. The lack of NCOA, statewide, or county-wide mailings to registered voters is yet another factor rendering Indiana's list maintenance effort unreasonable under industry standards applicable to election administration."

Response: The defendants again object to the use of Handel's report.

Plaintiffs assert: "34. Local election officials in Indiana are confused about how they should perform voter list maintenance."

Response: This "fact" mischaracterizes what a local election official said.  The official stated that he was at a training session led by the Election Division where he believed local officials did not understand some specific procedures.  Officials may not have been clear about their duties, but the Election Division helped explain the procedure, which is exactly what they should be doing as the NVRA officials for the state.  Pl. Appx. Exh. 9.  The defendants again object to the use of Handel's report, and are mystified as to how a former secretary of state of Georgia living in Georgia would have any idea about the state of mind of Indiana county election officials.

Plaintiffs assert: "35. Given the condition of Indiana's voter registration rolls and the list maintenance technologies and methods available to Indiana, the state's overall effort to maintain accurate and current voter registration rolls are unreasonable under industry standards applicable to election administration."

Response: The defendants again object to the use of Handel's report.

Plaintiffs assert: "39. Indiana voters have voiced concerns that leaving the names of people who have moved away on the voter rolls makes Indiana elections 'wide open for some

kind of fraud,' and that inaccurate and out of date voter rolls damage citizen confidence that elections are being conducted with integrity by creating the perception that the election process is untrustworthy, which undermines the people's trust in their government."

Response:  The defendants again object to the basis for this allegation – that Indiana's voter rolls are inaccurate and out of date.  The plaintiffs rely exclusively on the 2010 comparison of census data and reported voter registration numbers, a comparison of disputable utility.  Ex. B, pp. 67-69.  Further, the empirical evidence provided by the defendants demonstrates that, relative to other states, Indiana's rolls were not inaccurate or out of date.  Dkt. 71, ex. 7.

Plaintiffs assert: "40. Judicial Watch is a membership organization, and Judicial Watch has members who are registered to vote in Indiana."

Response: The defendants object to this fact because the plaintiffs base this information on hearsay, and refused to provide information about the alleged Indiana members. Ex. D, Plaintiff Judicial Watch's responses to interrogatories. Additionally, the claim that members of Judicial Watch are residents of Indiana seems to be based exclusively on an internet poll.  Dkt. 69-3.

Plaintiffs assert: "41. Members of Judicial Watch who are registered to vote in Indiana asked the organization to bring this lawsuit, which expresses the collective wishes of Judicial Watch members who are registered to vote in Indiana."

Response: The defendants object to this fact for the same reasons as stated above.

Plaintiffs assert: "42. Defendants' actions have harmed Judicial Watch members who are registered to vote in Indiana by lowering these members' confidence that federal elections are being conducted with integrity, which in turn undermines these members' willingness to participate in American democracy."

Response: The defendants object to this fact for the same reasons as stated above, and for the additional reason that the plaintiffs are unable to show they have been harmed because the voter registration rolls are not inaccurate or out of date. Dkt. 71, ex. 7 (defendants' expert report).

Plaintiffs assert: 47-49 The plaintiffs describe various activities of plaintiff True the Vote.

Response:  The defendants are continuing discovery regarding True the Vote's project, and request deferral of any decision regarding the accuracy of this alleged fact if material.

Plaintiffs assert: "50. True the Vote's efforts to ensure that voter registration rolls in Indiana are as accurate and current as possible [are] frustrated and [are] being impaired by Defendants' failure to undertake reasonable list maintenance efforts, causing injury to True the Vote.

Response: The defendants object to the assertion of any failure on the part of Indiana's voter list maintenance; thus, the defendants maintain that there is no basis for the plaintiffs' allegations that there is any harm at all, because the voter rolls are relatively accurate.  Further, the defendants are continuing discovery of True the Vote's activities.

Plaintiffs assert: 51.  An additional assertion about True the Vote.

Response: The defendants are continuing discovery regarding True the Vote's project, and request deferral of any decision regarding the accuracy of this alleged fact if material.

Plaintiffs assert: "52. By letter dated February 6, 2012, Plaintiffs notified Indiana that it was in violation of Section 8 of the NVRA and a lawsuit would be filed against the state if it did not take steps to correct its violations.  Indiana responded with a general denial of any violations."

Response: As explained in their motion to dismiss, the plaintiffs notice did not state that Indiana was in violation of Section 8, but merely that certain counties *may be* in violation; further, while the defendants deny that there was any Section 8 violation, the response to the notice was not strictly a general denial of claims, but a ruling that, even if the "facts" presented in the plaintiffs' notice were true, there would be no violation. Dkt. 69-3.

Plaintiffs assert: Plaintiffs' February 6, 2012 letter also requested that Indiana produce documents related to its list maintenance efforts in the two preceding years.  Indiana failed to produce the requested documents, necessitating litigation to obtain them."

Response:  The defendants again object to "fail," implying that there is an obligation to produce documents, when the NVRA merely requires that the documents be made available.  42 U.S.C. § 1973gg-6(i).

### III.    Material Facts Not in Dispute

While the defendants provided a statement of material facts in their motion for summary judgment and incorporate that statement here, a few facts, especially those related to recently enacted legislation in Indiana are addressed briefly below.

1.    The Indiana General Assembly in 2013 passed two laws that changed voter list maintenance, specifically House Enrolled Act 1391 and Senate Enrolled Act 519.

2.    While the laws and the 2013 budget make several changes, including structural changes to the decision-making process of the Indiana Election Division, earmarked funds for specific voter list maintenance activities, and provided additional authority to undertake certain actions at specified intervals of time.

3.    For example, while before DOH was to explore acquiring information from the STEVE and EVVE systems, the department now must acquire the information from the

appropriate agency. S.E.A. 519, 118th General Assembly 1391 (Ind. 2013).   Codified as Ind. Code 3-7-45-5.

4.      The Election Division must enter into a memorandum of understanding with the Kansas Secretary of State to participate with a consortium of states that share voter registration data.  *Id.* Codified as Ind. Code 3-7-38-2-5(d).

5.      The Election Division must enter into agreement and annually share information with Florida, Illinois, Kentucky, Michigan, and Ohio.  *Id.* Codified as 3-7-38.2-5.

6.      Additionally, if the co-directors are unable to resolve a dispute between themselves, the secretary of state may now resolve the matter, and the secretary of state must now perform statutory duties if the Election Division does not. House Enrolled Act 1391, 118th General Assembly (Ind. 2013). Codified as Ind. Code 3-7-38.2-7.5 and Ind. Code IC 3-7-38.2-18.

7.      On each even-numbered year, the Election Division must conduct a "residency confirmation and outreach procedure," *i.e.*, "a mailing by U.S. mail, postage prepaid, to each active voter." S.E.A. 519.  Codified as 3-7-38.2-16.

8.      The most recent budget allocates $2,100,000 for voter list maintenance, $770,126 for personal services, $128,983 for additional operating expenses, $2,500,000 for the voter registration system, $750,000 for voter outreach and education, and $500,000 for voter system technical oversight program. House Enrolled Act 1001 (Ind. 2013).

9.      The U.S. Election Assistance Commission records Indiana as removing 801,605 voters from the rolls between 2010 and 2012. Ex. F.

#### IV.     The plaintiffs' expert's testimony and report should be excluded

The plaintiffs rely heavily on the "expert report" by Karen Handel. Ex. G. Her report and testimony should be excluded. First, the subject of Handel's report is improper and should be excluded for that reason alone. The report is a legal brief. Even if Handel's background provided expertise in this area – which it does not – such a report would be inappropriate because the "only legal expert in a federal courtroom is the judge." *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008). Handel, for the sum of $1,500 per hour for deposition testimony and $2,000 per hour for trial testimony (fees which will be challenged at the appropriate time), wants to usurp the role of the Court.

The plaintiffs allege in Count I of their complaint that the defendants "have failed to make reasonable efforts to conduct voter list maintenance programs, in violation of Section 8 of the NVRA, 42 U.S.C. § 1973gg-6. Dkt. 1, ¶41. Section 8 requires a state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" a registrant's death or change of address. 42 U.S.C. § 1973gg-6(a)(4). Handel's report is not a report that could assist the trier of fact, but is merely a legal analysis of what "reasonable efforts" are under the NVRA. Handel's only opinion is whether Indiana made reasonable efforts to maintain voter registration lists, something that only this Court may do.

On June 26, 2013, the plaintiffs served the report purported to have been prepared by Karen Handel. Ex. G.  Handel summarized what she was asked to do as the expert and the purpose of her report:

> "Specifically, I was asked to review data regarding Indiana's voter registration rates
> and voter list maintenance efforts and provide my opinions on whether Indiana's
> program meets the requirements of Section 8 of the National Voter Rights [*sic*] Act

> (NVRA), 42 U.S.C. § 1973gg-6.  In short, does Indiana make a 'reasonable effort' to maintain and update its voter rolls to ensure currency and accuracy?" Ex. Report, p. 3.

The plaintiffs merely asked Handel to decide for the Court what only the Court can decide. While expert testimony may be "appropriate and beneficial in resolving dispute before the Court," "an expert may *not* testify as to whether the legal standard itself has been satisfied." *Indiana ex rel. Naylor v. Indiana State Teachers Ass'n,* 1:09-CV-01506-SEB, 2013 WL 2476726 (S.D. Ind. 2013)(citing *United States v. Caputo,* 517 F.3d 935, 942 (7th Cir.2008)).   Expert testimony about legal conclusions determinative of the outcome of the case is inadmissible. *Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003). Further, the report is an attempt to interpret the statute for the Court, but permitting an "expert" to testify about the meaning of a statute is improper. *Id.* As Handel's report is nothing but multiple ways of arguing what the NVRA means and that Indiana has not met the legal standard, her testimony would not aid the trier of fact and her report should be excluded.

Further, Handel is unqualified as an expert. Her background does not provide her with the necessary knowledge, she provides no methodology by which she reached her conclusions, and she is unreliable. As part of a *Daubert* analysis, the first question is whether the witness is qualified "as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993).  Her sole basis for "expertise" is the time she served a partial term as the Georgia Secretary of State. Ex. F, p. 3. Handel provides no reason why her three years as Secretary of State provide any knowledge, skill, training, experience, or education that would enable to her to say what reasonable efforts are for every state of the Union. The plaintiffs concede, "[w]hat constitutes reasonable voter list maintenance is situational and varies over time, depending on how accurate and current a state's voter rolls are and what technologies and list maintenance resources are available to the state."  Dkt. 69, ¶

33.  Handel provides no reason why she may decree what is reasonable for Indiana.  As secretary of state, she "maintained the overall obligation to ensure that federal and state law, as well as any rules or guidelines set by the Secretary of State, the State Elections Director, and/or the State Elections Board were followed." Ex. G, p. 3. While the plaintiffs try to spin her report into a kind of "industrial standards" analysis, Handel does not provide any basis for technical or scientific expertise, instead stating baldly that her expertise is in figuring out what the law says.  *Id.*  But that is the job for lawyers and, ultimately, the judge; as impressive as her position as former secretary of state may be, she did not complete college or law school, is not an attorney on this case, and does not provide any basis for any testimony as to a state election official's obligations.

Further, her record as secretary of state also calls into question her reliability as an expert. While she lectures Indiana on what is reasonable, as secretary of state, she and Georgia illegally changed its election laws to the detriment of voters without first receiving preclearance for changes as required by Section 5 of the Voting Rights Act.  *Morales v. Handel*, 2008 WL 9401054, *6-*7 (N.D. Ga. 2008) (not published).  Under the Help America Vote Act ("HAVA"), in 2007 Georgia began to check the citizenship status of individuals registering to vote.  *Id.* at *7. Because the post-HAVA automated system for checking registration altered Georgia law, it constituted a change under the Voting Rights Act, requiring Georgia to get preclearance, something Handel and Georgia failed to do.  *Id.* at *8.  A court also found Handel in violation of the NVRA.  *Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F. Supp. 1320, 1329 (N.D. Ga. 2012).

Finally, an expert's reasoning and methodology must be scientifically reliable.  *Daubert,* 509 U.S. at 592–93.  Handel discloses no methodology at all.  *Daubert* provides guideposts to determine reliability of an expert's methodology: "(1) whether the proffered theory can be and

has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *CDX Liquidating Trust ex rel. CDX Liquidating Trusee v. Venrock Associates,* 411 B.R. 571, 579 (N.D. Ill. 2009) (internal citations omitted).   Contrary to the plaintiffs' characterization of her report, nowhere does Handel mention "industry standards," and that is because she has no experience or expertise on which to base such a conclusion.   Instead of detailing scientific or technical aspects of the "industry," Handel reviews the law and some discovery from this case.   This is not scientifically reliable.   Her report is nothing but a long legal conclusion that should be excluded because it is improper, and Handel is unreliable and unqualified as an expert.

## V.   Background

As noted in the defendants' memorandum in support of summary judgment, Congress passed the NVRA with the express purposes of "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for federal office [and] to ensure that accurate and current voter registration rolls are maintained." 42 U.S.C. § 1973gg(b)(1), (4). Specifically cited as a finding in support of the law, Congress found that "the right of citizens of the United States to vote is fundamental right; [] it is the duty of the federal, State, and local governments to promote the exercise of that right; and []discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 42 U.S.C § 1973gg(a). Congress noted a history where "restrictive registration laws and administrative procedures were introduced in the United States in the late nineteenth and early twentieth centuries to keep certain groups of citizens from voting[, and that] selective

purges, elaborate administrative procedures and annual reregistration requirements were some of the techniques developed to discourage participation." H.R. REP. 103-9, 2, 1993 U.S.C.C.A.N. 105, 106.

### A. Compromise and the balancing of interests has always been at the heart of the NVRA

The plaintiffs, discounting history and the purpose of the NVRA, ask this Court to order selective voter list maintenance activities in Indiana, and focus exclusively on a discrete section of the NVRA. The State of Indiana, on the other hand, recognizes the competing interests in the NVRA and election law in general, and built compromise and balancing into the very structure of its election administration.

In response to the defendants' motion for summary judgment, additional background about some concerns raised by legislators during the debate should be noted. First, like much legislation, the NVRA is a product of compromise. The two Kentucky senators were especially instrumental in its passage and final form: Republican Mitch McConnell and Democrat Wendell Ford. 139 Cong. Rec. S5746-03, 1993 WL 151575.

But there was vocal opposition to the proposed law. Specifically, Senator Chuck Grassley (R-IA), complained that the law was yet another of the "unfunded mandates on the States." 139 Cong. Rec. S5744-01, 1993 WL 151572. State officials also bemoaned what was characterized as "an insidious intrusion into the rights of the States." 139 Cong. Rec. S5746-03, 139 Cong. Rec. S5746-03, 1993 WL 151575. Lawmakers from the beginning were concerned that the law itself would encourage voter fraud; one went so far as to say that it should be called the "auto-fraudo bill." (Bob Livingston R-LA) 139 Cong. Rec. H2264-03, 1993 WL 143004.

Of course there also was vocal, and, in the end, successful support for the bill, a bill that one supporter called "an invitation to enjoy democracy." (Mark Hatfield, R-OR) 139 Cong. Rec.

S5739-01, 1993 WL 151568.   Supporters recognized that this bill was a product of a compromise, what Henry Clay has been quoted as calling "negotiated hurt."  (Wendell Ford, D-KY). 139 Cong. Rec. S2988-01, 1993 WL 75574.

Regardless of whether the NVRA represented wisdom or folly, legislators then recognized that the bill was not perfect, but knew it required a balancing of competing interests to secure passage. And this balancing is something with which present-day election officials must grapple. But the words of John McCain may still be acknowledged when interpreting the NVRA:  "My view is that the least government, the local government, can decide best. Obviously, because of this legislation the view by the majority party is that only the Congress knows what is best and we will mandate the States to do these things and, as I said, in the height of arrogance, we will make them pick up the bill for what we decide is best for them." 139 Cong. Rec. S2738-03, 1993 WL 67435.  The plaintiffs now tell this Court what Indiana must do, fulfilling the greatest fears of those who said that the bill represented an arrogant, unfunded mandate from Washington. Instead, this Court should look to the overriding intention and purpose of the NVRA and permit Indiana to continue administering election regulations in the way that has produced fine rolls when compared to other states, and cannot be shown to cause real harm on either plaintiff or any of their members.

## B.   The states must balance competing obligations

This compromise that played a central roll in the passage of the NVRA is evident in Section 8, which is, of course, the section at issue in this case. Despite the plaintiffs' zeal for Section 8 enforcement, the primary focus of Section 8 is not obliging states to remove ineligible voters from the rolls. Rather, the emphasis goes the other way – making sure the states exercise utmost care in maintaining the voter rolls to prevent the improperly removal of eligible voters.  A

state's first obligation in Section 8 is "to ensure that any eligible applicant is registered to vote in an election." 42 U.S.C. § 1973gg-6(a)(1). The second is a requirement for the "appropriate State election official to send notice to each applicant of the disposition of the application." 42 U.S.C. § 1973gg-6(a)(2). The third precludes the state from removing registered voters unless requested by the registrant, a registrant changes address under limited circumstances, state law permits it for convicted offenders, and under certain, strict circumstances when a registrant does not vote for two elections.  42 U.S.C. § 1973gg-6(a)(3).  Only in the fourth paragraph of the subsection does the statute address what the plaintiffs have elevated to the overriding principle of election administration: a state must "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant; or . . . a change in the residence of the registrant, in accordance with subsections (b), (c), and (d) of this section." 42 U.S.C. § 1973gg-6(a)(4).

At the very least, the section of the NVRA that is the subject of this lawsuit requires states to balance the obligations of list maintenance with the directive to ensure no one is incorrectly removed from the list. While a state must undertake general, unspecified "reasonable efforts" with respect to list maintenance, a state must "*ensure* that any eligible applicant is registered to vote in an election." (emphasis added) 42 U.S.C. § 1973gg-6(a)(1). The imperative language regarding state obligations contrasts with the maintenance requirements – states must make *reasonable efforts* to keep the rolls clean, but must *ensure* that the no one is improperly removed from the rolls.  In sum, the structure and language of the NVRA itself exhibit the legislative intent for states to balance interests, ensuring those who are registered to vote remain registered unless possessing a clear reason to remove a registrant, and, if anything, direct states

to err on the side of suffrage, not, as the plaintiffs wish, on the side of striking names of voters of the rolls.

### C. Indiana List Maintenance

As discussed in the defendants' motion for summary judgment, Indiana, while maintaining a bipartisan and decentralized official election system, has undertaken reasonable efforts to maintain the voter list maintenance, while balancing its obligations under the entire NVRA.  Dkt. 71, p. 14.  These efforts, at the state level, include encouraging county list maintenance activities through the State Voter Registration System, training, the publishing of standard operating procedures, daily access to Election Division staff, the hosting of conferences, and urging county compliance with the NVRA.  Dkt. 71, p. 4-5.

Now, with the passage of Senate Enrolled Act 519 and House Enrolled Act 1391, the General Assembly specifically authorized certain state activities, including participation in the STEVE and EVVE systems, and enhanced involvement by the Secretary of State in NVRA tasks. *Facts not in dispute*, 1-8. The General Assembly also allocated over $2 million for a statewide mailing, which means the Election Division will oversee during every even-numbered year a postcard mailing to every active voter in Indiana. This mailing helps identify ineligible voters by notifying the Election Division by way of a NCOA return notice that the registrant may have moved to another jurisdiction. Upon receipt of this notice, the Election Division may then place the registrant on the inactive list, and cancel her from the rolls if she does not vote for two election cycles.  42 U.S.C. § 1973gg-6(d).

These changes are likely to only improve the quality of Indiana's voter registration rolls. And, relative to other states' voter registration rolls, Indiana's rolls are already accurate.  The plaintiffs claim that, although the State did yeoman's job of voter list maintenance under the

consent decree with the Department of Justice that expired in 2009, the voter registration rolls were suddenly inaccurate and out-of-date in 2010. Dkt. 69, p. 5. The plaintiffs do not explain how that is possible, given basic demographic facts and limitations on voter list maintenance activities in the NVRA. The plaintiffs, even at this stage, have no more empirical evidence about Indiana's voter registration rolls than they did when they filed suit, pointing again to numbers from 2010 from some Indiana counties where the number of registered voters is 90% or higher than the total voting age population.  Dkt. 69, p. 7.  The plaintiffs point to no specific county that has failed to undertake voter list maintenance. Instead, the plaintiffs seem to suggest, without support, that these numbers are enough for this Court to find a "per se" violation. Dkt. 69, p. 20.

But the only empirical evidence before the Court that truly addresses the condition of Indiana's rolls in 2010 was provided by the defendants, and shows that Indiana's rolls are relatively accurate and up to date.  Dkt. 71, Ex. 7. Indiana does an average or better than average job at removing the deceased and undeliverable addresses. *Id.* In fact, despite the plaintiffs' attempt to paint Indiana as neglectful of their voter list maintenance duties, Indiana reported over 800,000 voter's registration cancelled between 2010 to 2012, a number on par with such states as California (906,528), New York (914,642), and Illinois (797,884).  Undisputed Facts, ¶ 9.

## VI.   Argument

The plaintiffs are wrong about what the NVRA and about what Indiana has done in terms of voter list maintenance.  For these two reasons, their motion for summary judgment should be denied.

The NVRA does not say what the plaintiffs think it says.  The plaintiffs have a single-minded focus on removing people from voter registration rolls, ignoring a state's obligation to ensure an eligible registrant remains on the rolls, and confusing permissive language for

mandatory language, belying how radical their position is. For example, in a footnote of their memorandum in support of summary judgment, the plaintiffs "note that the NVRA also imposes obligations on states to remove convicted felons, ineligible or invalid registrations, duplicate registrations, and mentally incompetent persons from voter registration rolls." Dkt. 69, p. 16. Trying to paint themselves as disciplined litigants, they actually only mischaracterize the NVRA. The plaintiffs do not cite these additional "obligations" because these obligations do not exist. For example, the plaintiffs suggest that there is an obligation under the NVRA to remove convicted felons or the mentally incapacitated, making up out of whole cloth a federal law that disenfranchises convicted felons or the mentally incapacitated; no such federal laws exists, much less an obligation to remove convicted felons or the mentally incapacitated from voter registration rolls.  What the NVRA does say is that a "name of a registrant may not be removed from the official list of eligible voters except  - (A) at the request of the registrant; (B) as provided by State law, by reason of criminal conviction or mental incapacity; or (C) [through a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of the death of a registrant; or a change in the residence of the registrant if certain strict procedures are followed]."  In addition, the plaintiffs insist that there is something in the NVRA about immigrants.  There is not.  Dkt. 69, p. 21 (stating that the NVRA mandates the state to obtain access to the Systematic Alien Verification for Entitlements to identify "non-citizen registered voters."). In fact, the legislators specifically addressed questions regarding undocumented immigrants with respect to voting and rejected placing any obligations on states in terms of these ineligible voters. 139 Cong. Rec. S5739-01, 1993 WL 151568.

While State law permits the disenfranchisement of individuals by reason of, for example, incarceration, what the plaintiffs want this Court to order state officials to carry out state law in a certain way. And "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).  The Court should decline to take such an unprecedented role of mandating certain steps in the administration of election law and deny the plaintiffs' motion for summary judgment.

### A.   Indiana meets its obligations under the NVRA and Indiana's list maintenance efforts are reasonable under any definition

Despite the plaintiffs' attempt to turn the NVRA into a tool for intrusion on State sovereignty, the NVRA obligations in terms of voter list maintenance are very general – the state must undertake reasonable efforts to maintain voter list maintenance to remove those who die or move to another jurisdiction.  By any understanding of reasonable efforts, Indiana has met its obligations.

### 1.   Indiana satisfied the NVRA's Section 8's "Safe Harbor Provision"

The plaintiffs argue that Indiana did not satisfy the NVRA's "safe harbor provision."  To make this argument, they rely on interpretative gymnastics, ignoring the plain meaning of the text and, once again, they ask this Court to take an extraordinary step of micromanaging state election administration.

The plaintiffs correctly identify a "safe harbor" in Section 8 of the NVRA.  The statute plainly states that "A State may meet the requirement of subsection (a)(4) of this section by establishing a program under which" United States Postal Service change-of-address–information (NCOA) is used to identify registrants whose addresses may have changed and the state invokes certain safeguards to ensure a registrant is not improperly removed from the rolls

27

(this is accomplished by identifying a registrant as having potentially moved, placing that registrant on the inactive list, and only removing the registrant from the rolls after the registrant does not vote in two general elections). 42 U.S.C. § 1973gg-6(c)(1). The plaintiffs argue that this safe harbor only protects a state in its obligation for registrants who relocate, not who die. But that is not what the law says. The law says that a state meets the requirement in (a)(4), and (a)(4) encompasses the obligation to remove for both relocation and death. The plaintiffs provide no reason why the language of the statute should be disregarded besides the conclusory statement that "the NVRA provides no 'safe harbor' from the requirement that states make a reasonable effort to remove *deceased* voters from the rolls."  Dkt. 69, p. 24. They provide no reason why this Court should ignore what the statute plainly says: states that carry out a program using NCOA information meet their obligations – period.  One can surmise that the plaintiffs do not think this safe harbor applies for the same reason they think the NVRA obligates states to remove the mentally incapacitated – that's what they want it to say.

The plaintiffs then rely on another interpretative leap to force the NVRA to mandate what they want it to mandate – a time requirements for NCOA mailings. The plaintiffs acknowledge that a state-wide mailing would satisfy the safe harbor provision. Dkt. 69, p. 24. And they further acknowledge that Indiana conducted such a statewide mailing in 2006. *Id.* Indiana will conduct a statewide mailing in even-numbered years starting in 2014, and over $2 million has been allocated for this program. Facts, 7-8. Thus, it seems that the plaintiffs' argument is that this is too long, but fail to say how frequent the statewide mailing would need to be.  But there is no reason why, contrary to the plaintiffs' argument, eight years and every subsequent second year is necessarily too long.  If the census, which determines how much representation a state will get in

congress, only takes place every ten years is an appropriate interval, eight years is not necessarily "absurd" for an extensive statewide mailing.

Here, as above, the plaintiffs appear to rely on the canon against absurdities. The plaintiffs argue that a reading that an eight year interval is permissible is an absurd result, just as the interpretation of the safe harbor provision to those who die would be absurd. But the plaintiffs have taken the canon of statutory construction – that if the statute would lead to an absurd result, the plain reading cannot stand – too far. These results would not be absurd, they just would not fit with the plaintiffs' overly expansive reading of the NVRA. In other words, the result may be incongruous with their understanding, but that does not mean it would be absurd. A court should consider other factors "when the result [the naked text] apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454-55, 109 S. Ct. 2558, 2567, 105 L. Ed. 2d 377 (1989). But the "canon against absurdities" should only be employed "where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.* where it is quite impossible that Congress could have intended the result . . . and where the alleged absurdity is so clear as to be obvious to most anyone." *Public Citizen v. Department of Justice,* 491 U.S. 440, 470–471, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (*Kennedy, J., concurring in judgment*). Further, "before disregarding the plain meaning of a constitutional provision, the case "must be one in which the absurdity and injustice of applying the provision to the case, would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application." *Small v. United States, 544 U.S. 385, 404, 125 S. Ct. 1752, 1764, 161 L. Ed. 2d 651 (2005) (Thomas, J., dissenting) (quoting Sturges v. Crowninshield,* 4 Wheat. 122, 203, 4 L.Ed. 529 (1819). Neither result would be monstrous. In fact, application of the safe harbor provision to satisfy obligations related to both those who

relocate and those who die would be in line with an understanding of the NVRA as a bill that Congress intended to increase the number of registered voters, ensure those who want to register remain registered, but did not want to place too heavy of an unfunded mandate on the states.

But Indiana dies, in fact, employ the NCOA data to enjoy safe harbor protection under the NVRA through activities other than the statewide or countywide mailings.  For example, whenever a routine office correspondence is returned as undeliverable, the county takes certain steps to move the voter from active to inactive, and possibly cancelling the voter's registration. Ex. C, pp. 4-5. In other words, Indiana uses NCOA data on a regular basis, not just through a state or county wide mailing, and, because they undertake such activities, should enjoy safe harbor under the NVRA.

### 2.   By any definition, Indiana makes reasonable efforts

Even if the Court does not find that Indiana met requirements under 42 U.S.C. § 1973gg-6(c)(1), Indiana fulfills its duties under the NVRA. The plaintiffs look to a variety of legal concepts that they argue provide guidance to the Court about whether Indiana made "reasonable efforts" to maintain voter registration rolls, including a "plain meaning" standard, "industry standards," and "ordinary care standard." These standards are not appropriate because the state election officials are not making widgets. The State is helping people participate in a democracy, and its "reasonable efforts" will, as the plaintiffs correctly note, vary, but the NVRA does not prescribe any specific list maintenance activities.

In other contexts related to state actors, courts have noted that, while courts may enforce reasonableness standards, the use of the term "reasonable" indicates the state entity's entitlement to deference. *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 430, 107 S. Ct. 766, 774, 93 L. Ed. 2d 781 (1987). Some courts have looked to the phrase "reasonable

efforts" and identified it as a "flexible standard that leaves much to the discretion of the states," *Norman v. Johnson*, 739 F. Supp. 1182, 1187 (N.D. Ill. 1990) *abrogated by Suter v. Artist M.*, 503 U.S. 347, 112 S. Ct. 1360, 118 L. Ed. 2d 1 (1992)("our examination of it leads us to conclude that Congress was concerned that the required reasonable efforts be made by the States, but also indicated that the Act left a great deal of discretion to them."). In the context of § 1983 litigation, courts have provided qualified immunity for state actors, recognizing "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," only finding liability when there is a clear violation of statutory or constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009). While recognizing that § 1983 immunity also raises issues related to liability and monetary remuneration not at issue here, the principle carries over that, in general, courts should be chary of finding a statutory violation by a state actor unless the violation is clear. Finally, courts have also deferred to states when undertaking executions, warning courts of transforming into "boards of inquiry charged with determining 'best practices' for executions." Baze v. Rees, 553 U.S. 35, 51, 128 S. Ct. 1520, 1531-32, 170 L. Ed. 2d 420 (2008).

This Court should not become a board of inquiry searching for best practices. Instead, the defendants request that the Court set aside the plaintiffs' haughty litany of what they think are best practices, and allow Indiana to continue its reasonable efforts in conjunction with the local county officials. For example, the plaintiffs chastise Indiana for only using the STEVE and EVVE systems within the last couple of years. Dkt. 69, ¶ 12. But the STEVE system only started in late 2007, and new pilot programs were being run as late as 2009. The plaintiffs want this Court to find it unreasonable by law that Indiana did not enter into a relatively novel system that

is not mandated by state or federal law. The Court should not take such an extraordinary step.  In addition, the plaintiffs insist that the state of Indiana should "threaten a direct State government takeover" of certain county duties from local election officials. Dkt. 69, p. 22. Mandated "government takeover" are rarely the only reasonable action. In contrast to the plaintiffs' insistence on government takeover of other governmental entities, however one looks at what Indiana is doing, it meets the standard of reasonable efforts, to the extent that such a determination can be made.

The plaintiffs primarily rely on *U.S. v. Missouri* for the "plain meaning" of "reasonable efforts." *United States v. Missouri*, 535 F.3d 844 (8th Cir. 2008). But the specific question of what "reasonable efforts" are was not specifically before that court, but rather, what constitutes a proper relationship between county and state election officials. *Id.* at 851. There, the assumption was that there were counties not undertaking proper list maintenance.  Here, the plaintiffs have made no such showing, instead rehashing the census and voter registration numbers. As explained in the defendants' memorandum in support of their motion for summary judgment, the only evidence regarding a county the plaintiffs identified as having voter registration rolls that exceeded 100% of the total voting age population was Warrick County, and this county just carried out a countywide NCOA mailing with help from State election officials.  Dkt. 71, Facts ¶ 29. The plaintiffs' point to nothing that is unreasonable or "lazy," and, it should be noted, such a baseless suggestion is offensive. Instead, the plaintiffs merely list a number of activities they think are reasonable, disregarding the testimony where the election officials provided sound, if controversial, reasons for not undertaking certain activities. Dkt. 71, Facts ¶ 18.

The plaintiffs then suggest that the defendants are not meeting industry standards in terms of voter list maintenance. This argument is apparently to support Handel's report, although

Handel never uses the phrase "industry standard," and only lists activities she undertook in Georgia, never explaining why Georgia's activities define the industry. For the reasons stated above in Section III, Handel's report should be excluded, and the plaintiffs have provided the Court with no industry standard by which to measure Indiana's activities.

Finally, the plaintiffs invoke an "ordinary care" standard, but fail to develop the standard to address what is at stake. The plaintiffs appear only to be aware of potential harm to themselves because someone is on the rolls who either died or moved. Dkt. 69, p. 23. They appear oblivious to the critical issues facing election officials – the more zealous one is in undertaking voter list maintenance, the greater the potential for committing the great harm of improperly removing someone from the rolls, giving the appearance of accidental and nonchalant disenfranchisement. Indiana officials, both state and county, recognize the potential harm, still carry out their duties, but undertake their tasks with great care so as not to cause harm. Ex. E, p. 102; Dkt. 71, ¶ 18; Ex. A, p. 42. In other words, the officials every day meet and exceed the ordinary care standard.

**B.     The plaintiffs cannot show injury**

The plaintiffs claim that they were harmed by Indiana state officials, but only look to "the condition of Indiana's voter rolls" in 2010 (in relation to census numbers), and their expert assessment. While the plaintiffs have not shown harm for the reasons explained in the defendants' motion for summary judgment, looking closely at what the plaintiffs are really complaining about may be helpful.

In their "undisputed facts" section, the plaintiffs make various assertions about how people are concerned about the condition of the voter rolls. For example, in ¶ 36, they assert, "Indiana citizens are concerned that inaccurate and out of date voter registration rolls create the potential for voter fraud." But, as discussed *supra*, this concern is inherent in the NVRA itself. Relatedly,

in ¶ 37, "Inaccurate and out of date voter registration rolls undermine citizens' confidence in the fairness of elections and foster citizens' concern about voter fraud," and in ¶ 38, "Indiana voters have voiced concerns about deceased people being left on the state's voter registration rolls."  To the extent anyone is harmed as alleged by the plaintiffs, the problem stems from the structure of the NVRA.  The plaintiffs may be better served by seeking a political solution, rather than asking this Court to carry out its desired political goals.

As almost an afterthought, the plaintiffs allege that they were harmed because Indiana did not produce records related to voter list maintenance.  They cite no law that mandates such action by the state, and, for the reasons stated in the defendants' motion for summary judgment, this count should be granted in favor of the defendants.

## VII.   Conclusion

The plaintiffs ask this court to take the radical step of micromanaging traditional state affairs and order the State of Indiana to take steps that are not set forth in any statute, including steps that are unrelated to the statue in question, all for the purpose of satisfying two organizations' ideological purposes.

At bottom, the plaintiffs are opposed to compromise on matters that are the essence of the democratic process itself – elections.  Ronald Reagan, in his 1990 autobiography *An American Life*, recalled his work in California, when "a lot of the most radical conservatives who had supported me during the election" did not like that he entered "into the give and take of legislative bargaining in Sacramento."  He recalled that "'compromise' was a dirty word to them and they wouldn't face the fact that we couldn't get all of what we wanted today.  They wanted all or nothing and they wanted it all at once."  To the contrary, Reagan had "learned while negotiating union contracts that you seldom get everything you asked for.  And [he] agreed with

FDR, who said in 1933; 'I have no expectations of making a hit every time I come to bat.  What I seek is the highest possible batting average.'" *Id*, p. 171.  Reagan said that, "If you got seventy-five or eight percent of what you were asking for, I say, you take it and fight for the rest later, and that's what I told these radical conservatives who never got used to it." *Id*.  The plaintiffs here have not gotten used to compromise. From Washington, D.C. and Texas, they instruct Indiana officials on what they should do. They reject the wisdom of two of the great minds of 20th century American politics. This Court should not accept the plaintiffs' invitation to throw out the State's reasonable plan and follow the plaintiffs' in their inappropriate and misguided attempt to tell the State how it should best administer elections.  Instead, the defendants respectfully request that this Court deny the plaintiffs' motion for summary judgment, and enter judgment in favor of the defendants.

Respectfully submitted,

GREGORY F. ZOELLER
Attorney General of Indiana
Atty. No. 1958-98

Respectfully submitted,

GREGORY F. ZOELLER
Indiana Attorney General
Attorney No. 1958-98

By:     */s/ Jefferson S. Garn*
Jefferson S. Garn
Deputy Attorney General
Attorney No. 29921-49

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of November, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**Paul J. Orfanedes**
JUDICIAL WATCH, INC.
porfanedes@judicialwatch.org

**Chris Fedeli**
JUDICIAL WATCH, INC.
cfedeli@judicialwatch.org

**David R. Langdon**
LANGDON LAW LLC
dlangdon@langdonlaw.com

**Joshua B. Bolinger**
LANGDON LAW LLC
jbolinger@langdonlaw.com

J. Christian Adams
ELECTION LAW CENTER
a@electionlawcenter.com

*/s/ Jefferson S. Garn*
Jefferson S. Garn
Deputy Attorney General

Office of the Indiana Attorney General
Indiana Government Center South, 5th Floor
302 W. Washington Street
Indianapolis, IN  46204-2770
Telephone:     (317) 232-6292
Fax:               (317) 232-7979
Email: jefferson.garn@atg.in.gov