# REVIEW OF

# STATE OF INDIANA
# VOTER LIST MAINTENANCE ACTIVITIES

JUDICIAL WATCH, INC., and TRUE THE VOTE
vs.
J. BRADLEY KING and TRENT DECKARD,
**Co-Directors of the Indiana Election Division,**
and
CONNIE LAWSON, Indiana Secretary of State

Civil Action No. 1:12-cv-800-WTL-TAB (S.D. Ind.)

**Prepared by:**

Karen C. Handel
Handel Strategy Group
3085 Roxburgh Drive
Roswell, Georgia  30076

**Submitted to:**

Christopher Fedeli, Esq.
Judicial Watch, Inc.
425 Third Street, SW, Suite 800
Washington, DC 20024

**Date:**  June 26, 2013

EXHIBIT
G

# TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | Introduction | | Page 3 |
| II. | Professional Qualifications / Compensation | | Page 3 |
| III. | Materials Reviewed | | Page 4 |
| iV. | Overview of Plaintiffs Claims | | Page 7 |
| V. | Summary of Opinions | | Page 9 |
| VI. | State Obligations Under Federal Voter Registration Law | | Page 10 |
| | A. | National Voter Registration Act | Page 10 |
| | B. | Help America Vote Act | Page 12 |
| | C. | US v. State of Missouri | Page 12 |
| VII. | Accuracy and Currency of Indiana's 2010 Voter Registration List | | Page 13 |
| | A. | EAC 2011 Report | Page 14 |
| | B. | Indiana's EAC 2011 Report Data | Page 15 |
| | C. | Judicial Watch Analysis | Page 19 |
| | D. | Conclusion | Page 19 |
| VIII. | Defining a "General program" and "Reasonable Effort" for Voter List Maintenance and Measuring Voter Roll Accuracy | | Page 20 |
| | A. | Commonly Use List Maintenance Activities | Page 21 |
| | B. | Defining "Reasonable"/Measuring Effectiveness | Page 24 |
| | C. | Conclusion | Page 25 |
| IX. | Indiana's Voter List Maintenance Activities | | Page 27 |
| | A. | 2006 Consent Decree and Order | Page 27 |
| | B. | Indiana's Written Plan of Compliance | Page 29 |
| | C. | Indiana's Current Level of Effort | Page 30 |
| | D. | Conclusion | Page 35 |
| X. | Compliance and Oversight | | Page 37 |
| | A. | Indiana's Compliance and Oversight | Page 37 |
| | B. | Implications of US. V Missouri | Page 39 |
| | C. | Conclusion | Page 40 |
| XI. | Overall Opinions and Conclusions | | Page 40 |

Addendums:

| | | | |
|---|---|---|---|
| 1. | Handel Curriculum Vitae | | Page 43 |

## I.      Introduction

I have been retained by Judicial Watch, Inc., ("Judicial Watch") and True the Vote to provide an expert report in connection with *Judicial Watch and True the Vote vs. J. Bradley King and Trent Deckard, Co-Directors of the Indiana Election Division, and Connie Lawson, Indiana Secretary of State, Civil Action No. 1:12-cv-800, United States District Court for the Southern District of Indiana, Indianapolis Division.*

Specifically, I was asked to review data regarding Indiana's voter registration rates and voter list maintenance efforts and provide my opinions on whether Indiana's program meets the requirements of Section 8 of the National Voting Rights Act (NVRA), 42 U.S.C. § 1973gg-6.  In short, does Indiana make a "reasonable effort" to maintain and update its voter rolls to ensure currency and accuracy?

## II.     Professional Qualifications / Compensation

My *Curriculum Vitae* is attached as Addendum 1.  My specific qualifications in this matter relate to my service as Georgia's Secretary of State from January 2007 through January 2010.  As Secretary of State, I served as Georgia's chief elections officer, responsible for the administration of elections in the state, including the development, implementation and oversight of the state's voter list maintenance program.

Like Indiana, Georgia's county elections officials were largely responsible for the day-to-day administration of elections, including conducting list maintenance tasks.  However, as Secretary of State, I maintained the overall obligation to ensure that federal and state law, as well as any rules or guidelines set by the Secretary of State, the State Elections Director, and/or the State Elections Board were followed.

Georgia's list maintenance program includes:

- New voter verification program that matches the registrant's information with the Georgia Department of Driver Services, including citizenship verification.
- Program for the timely removal of registrants who have died, moved out of the jurisdiction, or been convicted of a felony or declared mentally incompetent.  The Georgia Department of Corrections provides a data file of those who have been convicted of a felony, and the Vital Records office provides a data file of deceased individuals.
- A statewide National Change of Address mailing, which is conducted every 2 years;
- Removal notices to inactive voters every two years; and
- General mailing to all registrants on the official voter registration list every 10 years, following the U.S. Census.

The State Elections Division maintains an online education, reference and training tool within its "e-learn" Internet portal for local elections officials. County elections officials can obtain detailed instructions and explanations regarding list maintenance responsibilities, routine activities, and standard operating procedures. Additionally, training is conducted twice a year during the annual meetings of the Georgia Election Officials Association and the Voter Registrars of Georgia. The State Elections Division monitors the activities of the counties in a number of ways to ensure that required list maintenance activities are conducted in a timely manner and in accordance with federal and state law.

My compensation from Judicial Watch for this project is: $500 per hour for time spent reviewing documents, analysis, and report preparation; $1,500 per hour for time spent giving deposition testimony; $2,000 per hour for time spent giving trial testimony; and expenses.

### III.   Materials Reviewed

In familiarizing myself with this matter and formulating my opinions and conclusions for this report, I reviewed and relied upon the following materials and documents:

- Complaint filed by Plaintiffs Judicial Watch and True the Vote in this litigation;

- Consent Decree and Order, dated June 2006, between the United States and the State of Indiana regarding *U.S. v. State of Indiana, et al.*;

- Defendants' Motion to Extend Consent Decree Deadlines, filed in September 2006, in *U.S. vs. State of Indiana, et al.*;

- Indiana's Written Compliance Plan submitted to the US Department of Justice and dated February 29, 2008;

- Deposition of Trent Deckard, Co-Director, Indiana Election Office;

- Deposition of J. Bradley King, Co-Director, Indiana Election Office;

- Deposition of Sarah Redman, Clerk of the Circuit Court, Warrick County;

- Deposition of Terrence Coleman, Board of Voter Registration, St. Joseph County;

- Deposition of Francisco Fotia, Board of Voter Registration, St. Joseph County;

- The following additional pleadings in this litigation:

  - Plaintiff Judicial Watch's Answers and Objections to Defendants' First Set of Interrogatories

  - Defendants Deckard and King's Answers to Plaintiffs' First Set of Interrogatories

  - Notice of Depositions

  - Defendant Connie Lawson's Answers to Plaintiffs' Second Set of Interrogatories

  - Defendants Deckard and King's Answers to Plaintiffs' Second Set of Interrogatories

- Plaintiff Judicial Second Set of Interrogatories to Defendants Deckard, King and Lawson

- Defendants Deckard and King's Responses to Plaintiffs' First Requests for Production of Documents

- Defendant Lawson's Response to First Request for Production of Documents and the following related documents:
  - ➢ Correspondence from Indiana Election Co-Directors to the Department of Justice regarding "Annual Reporting Requirements," January 27, 2009 (SOS 000001);
  - ➢ Statewide Voter Counts by County and Status (SOS 000002-000008);
  - ➢ Memorandum to Indiana Election Directors and Indiana SVRS Users from Quest Information Systems regarding Auto Cancel Registration, updated November 2012 (SOS 000009 – 000017); and
  - ➢ Correspondence from Secretary of Rokita to US Attorney David Capp, et al, "Official Request for Investigation into Voter Registration Law Violations," October 22, 2008 (SOS 000018-000022)

- Plaintiffs First Set of Interrogatories to Defendant Lawson;

- Entry on Motion to Dismiss; and

- Order on Consent Motion for Extension of Time to Make Expert Disclosures and File Expert Report

- Indiana Code regarding state election statutes;

- Section 8 of the National Voter Registration Act;

- Decision in *U.S. v. State of Missouri, 535 F.3d 844 (98th Cir. 2008);*

- U.S. Department of Justice Frequently Asked Questions document regarding the National Voter Registration Act;

- Relevant sections of the Help America Vote Act;

- Demographer's data regarding Indiana's voter registration rates for the voting age population;

- Correspondence from Indiana Election Co-Directors to the Department of Justice, regarding deceased and duplicate registrations, August 15, 2006;

- DOJ Consent Decree Report, Duplicate Voter Processing Report;

- Correspondence from Indiana Election Co-Directors to the Department of Justice regarding "Report on Statewide Mailing, August 25, 2006;

- Indiana county-by-county report regarding ineligible, cancelled and inactivated registrants;

- Correspondence from Indiana Election Co-Directors to the Department of Justice regarding deceased and duplicate registrations, October 18, 2006;

- DOJ Consent Decree Report, Deceased Voter Processing Results;
- Correspondence from Johnson County Clerk, Johnson Circuit & Superior Courts, regarding potential duplicate report processing, August 3, 2006;
- Correspondence from Martin County Clerk to Indiana Election Co-Director King regarding potential deceased voters; October 6, 2006;
- Correspondence from Indiana Election Co-Directors to Circuit Court Clerks of Bartholomew, Jennings, Martin, and Parke Counties regarding potentially deceased voters, all dated September 6, 2006;
- Correspondence from Indiana Election Co-Directors to the Department of Justice, February 26, 2008, regarding the annual report of the active and inactive voters;
- Voter Counts County by County – State of Indiana; August 25, 2006;
- Memorandum from Indiana Election Co-Director Pamela Potesta regarding "Statement Regarding VIT Meetings," dated July 22, 2009;
- U.S. Election Assistance Commission Report to the 112th Congress, dated June 30, 2011, entitled "The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2009 – 2010, including the report and accompanying tables, state questionnaire instrument, and Indiana's response data;
- Report by the National Association of Secretaries of State, entitled "NASS Report: Maintenance of State Voter Registration Lists—A Review of Relevant Policies and Procedures," dated September 2009;
- Indiana State Voter Registration System Best Practices Guideline;
- 2012 Indiana Voter Registration Guidebook;
- Indiana state legislation regarding elections, specifically Indiana SB 519 and Indiana HB 1391;
- Press release entitled "Indiana Secretary of State Lawson's 2013 Legislative Victories," May 1, 2013;
- Georgia list maintenance activities;
- List maintenance standard operating procedures guide for Muscogee County, Georgia;
- California's voter list maintenance guide;
- Orange County (California) Registrar of Voters, Voter Registration Accuracy and Voter List Maintenance Guide;
- Pew Center on the States report, "Inaccurate, Costly and Inefficient: Evidence that America's Voter Registration System Needs an Upgrade," February 2012; and
- St. Joseph County 2013 Budget;

## IV.    Overview of Plaintiffs' Claims

The first document I reviewed is the complaint filed by Plaintiffs Judicial Watch and True the Vote. In this complaint, Judicial Watch and True the Vote seek a declaration that the State of Indiana, specifically the Secretary of State and the Co-Directors of the State Elections Division, did not comply with their legal obligations under Federal law, specifically Section 8 of the NVRA ("NVRA Section 8"), to ensure that voter rolls are accurate and current for Federal elections and to produce records related to the state's maintenance efforts (Complaint, paragraph 1). Further, Plaintiffs request an injunction compelling the State and the named individuals to make that reasonable effort (Complaint, paragraph 1).

As noted by Judicial Watch and True the Vote in their Complaint, NVRA Section 8 requires states to (1) conduct a general voter registration list maintenance program that include a "reasonable effort" to remove the names of ineligible voters from the official voter registration lists if the registrant dies or moves, 42 U.S.C. § 1974gg-6(a)(4); (2) conduct any systematic removal of ineligible voters not later than 90 days prior to the date of the primary or general election for a Federal office, 42 U.S.C. § 1974gg-6(c)(2)(a); and (3) have list maintenance programs or activities that are "uniform, nondiscriminatory and in compliance with the Voting Rights Act of 1965 (42 U.S.C. § 1973 *et seq.*)." 42 U.S.C. § 1974gg-6(b)(1). (Complaint, paragraph 8.) Judicial Watch and True the Vote also cite the NVRA Section 8 requirement that a state must "maintain for at least 2 years and shall make available for public inspection…all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of voters…" 42 U.S.C. § 1973gg-6i. (Complaint, paragraph 10.)

In their complaint, Judicial Watch and True the Vote reference the Help America Vote Act of 2002 ("HAVA"), which supplements NVRA Section 8 and provides for additional voter list maintenance activities. Complaint, Paragraph 9. HAVA established the U.S. Election Assistance Commission ("EAC"), an independent, bipartisan commission charged with developing guidance to meet HAVA requirements, adopting voluntary voting system guidelines, and serving as a national clearinghouse of information on election administration, among other elections-related oversight responsibilities. Judicial Watch and True the vote list HAVA's requirements that (1) a state's computerized voter registration list be maintained on a regular basis; (2) states ensure that voter registration records are accurate and updated regularly; and (3) a reasonable effort be made to remove ineligible voters from the list of eligible voters. (Complaint, Paragraph 9).

I understand from Christopher Fedeli of Judicial Watch that, in 2011, Judicial Watch engaged a demographer to conduct an analysis of Indiana's voter roll data and population data. Both sets of data were and are available publicly on the websites of the 2010 U.S. Census and the EAC, respectively. Specifically, the demographer compared 2010 U.S. Census Voting Age Population ("VAP") data to 2010 voter roll data provided by Indiana to the EAC.

This analysis revealed that, in 12 Indiana counties, the number of persons on the Indiana voter registration list for those counties exceeded 100% of the total VAP in those counties. For one county, the number of persons on the voter rolls exceeded VAP by more than 43%. Further, 26 other counties had voter rolls that were between 90% and 100% of VAP.

As noted in the Complaint, Indiana has previously faced legal action regarding the accuracy of its voter rolls. (Complaint, Paragraphs 11-13.) Related to this previous case, I reviewed the Consent Decree and Order, Defendants' Motion to Extend Consent Decree Deadlines which included data from various status reports made by Indiana to the United States Department of Justice ("DOJ"), various filing status reports and the state's written plan of compliance submitted by Indiana to DOJ.

Based on my review, I understand the following: In early 2006, the United States sued Indiana for failure to comply with Section 8 of NVRA. *U.S. v. Indiana*, 1:06-cv-1000-RLY-TAB (S.D. Ind.). Indiana and the United States entered into a Consent Decree and Order in June 2006 that resolved the matter. Under the Consent Decree and Order, Indiana agreed to conduct various specific voter list maintenance activities in order to comply with federal voter registration laws. In its September 2007 court filing, Indiana indicated that it had completed these activities in nearly all of its counties and had made significant progress. Indiana also provided specific data to verify its claims of substantial progress. These data included the number of deceased voters removed from voter registration lists, the number of duplicate records removed, and the number of potentially ineligible voter registrations moved to inactive status or cancelled.

As part of the Consent Decree and Order, Indiana also agreed to develop and implement a written compliance plan. This plan was required to set forth certain procedures and processes for identifying and removing ineligible voters from the state's computerized voter registration database, as well as tracking procedures to ensure that counties complied with the list maintenance activities required under NVRA Section 8. Indiana submitted its compliance plan to DOJ in February 2008.

Additionally, as part of the Consent Decree and Order, Indiana was ordered to contact the counties to ensure compliance with the law and to take appropriate action against a county that failed to comply with Federal and state law. The Consent Decree and Order specifically directed the State to initiate litigation against a county that failed to meet the compliance requirements.

Under the terms of the Consent Decree and Order, the termination date was June 30, 2009.

In this current litigation, Plaintiffs contend that, following the expiration of the Consent Decree and Order, Indiana again failed to conduct adequate voter list maintenance efforts. As a result, plaintiffs contend that Indiana is not meeting its obligations under NVRA

Section 8 with respect to adequate list maintenance or producing records of its efforts, as also required.  (Complaint, pages 12-14).

## V.    Summary of Opinions

As noted in Section I above, I have been asked to provide an opinion on whether the State of Indiana's voter list maintenance efforts make a "reasonable effort" to maintain updated voter rolls to ensure currency and accuracy for Federal elections.  42 U.S.C. § 1974gg-6(a)(4).  In formulating my findings and conclusions, I have considered and relied upon my experience and expertise as the former Secretary of State and Chief Elections Officer for the State of Georgia, a position that included responsibility for NVRA compliance.  I also considered and relied on facts contained in the documents listed in Section III – Works Considered.  The conclusions presented herein are accurate to a reasonable degree of certainty.

For the reasons detailed in this report, it is my opinion that, to a reasonable degree of certainty, Indiana did not conduct a general program that makes a reasonable effort to maintain an accurate, up-to-date statewide voter registration list before the 2010 election and still fails to do so today.

My report is organized as follows:

- State obligations under Federal voter registration laws
- Accuracy and currency of Indiana's 2010 Voter Registration List
- Defining and measuring a "general program" and "reasonable effort" for voter list maintenance
- Indiana's voter list maintenance efforts:
    - 2006 Consent Decree and Order
    - Written Compliance Plan submitted by Indiana to DOJ in 2008
    - Indiana's current level of effort
- Compliance and oversight:
    - Compliance and oversight activities by the State of Indiana
    - Implications of the Missouri 8th Circuit Appeals Court Decision

Additionally, for clarity, I provide a summary opinion in certain sections relevant to the issues specifically addressed in that section.

## VI.   State Obligations Under Federal Voter Registration Law

States have broad authority over the administration of both Federal and state elections. However, the U.S. Constitution and various federal statutes set forth certain requirements related to federal elections, including NVRA and HAVA mandates for voter registration before those elections and programs to maintain accurate and current lists of eligible voters for those elections.

### A.   National Voter Registration Act (NVRA)

Congress enacted the NVRA, which is sometimes also referred to as the "motor voter law," in 1993. The NVRA mandates a number of activities that the states must perform related to voter registration and the upkeep of the official list of eligible voters for Federal elections. While states maintain a high degree of flexibility with regard to voter list maintenance activities, NVRA Section 8 sets forth various specific mandates. This overview focuses on those requirements relevant to this litigation.

First, NVRA Section 8 requires that states keep voter registration lists accurate and current by conducting a "general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters …" 42 U.S.C. § 1973gg-6(a)(4).

Second, NVRA Section 8 requires that any list maintenance programs or activities "shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. § 1973 *et seq*)." 42 U.S.C § 1974gg-6(b)(1).

Third, the NVRA prohibits states from removing voters from the rolls simply because they failed to vote in an election. However, as discussed below, voters who fail to respond to notices sent to them because of information suggesting they have moved outside the jurisdiction AND failed to vote in two or more consecutive federal elections may be removed. 42 U.S.C § 1974gg-6(d).

Fourth, states may not remove a voter who has moved within the same voting jurisdiction, even if that voter failed to notify the voter registrar of the move. 42 U.S.C § 1974gg-6(d).

However, under the general maintenance program called for by the NVRA, states may remove a registrant from the official voter rolls in the following events:

- Death of registrant;

- Registrant's confirmation of an address change outside of the jurisdiction; or

- If the registrant does not respond to confirmation mailings (sometimes also called "removal notices" or "notice mailings") and does not vote in two consecutive Federal general elections subsequent to the mailing.

42 U.S.C § 1974gg-6(c)(B)(i),-6(b)(2).

The NVRA mandates certain requirements for "notice mailings." Specifically, the NVRA requires that the notice be a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address. The notice must advise the registrant (1) if he or she did not change residence or did but remained in the registrar's jurisdiction, the card must be returned by the deadline for mail registration; (2) if the card is not returned, the registrant may have to affirm or confirm his or her address before being allowed to vote in any Federal election during the time between the date of the notice and the day after the date of the second general election for Federal office occurring after the notice date; (3) if the registrant does not vote in an election during that period, the registrant's name will be removed from the list of eligible voters. This notice must also tell the registrant how to remain eligible to vote if the registrant has moved to a place outside of the registrar's jurisdiction. 42 U.S.C § 1974gg-6(d)(2).

NVRA also permits States to remove individuals from the official voter roll as follows:

- At the request of the registrant;

- By reason of criminal conviction and incarceration, as allowed by State law; and

- By reason of mental incompetency, as allowed by State law.

42 U.S.C § 1974gg-6(a)(3).

Further, if U.S. Postal Service information suggests that a registrant may have moved, States are authorized to take the following actions:

- If a registrant moves to a different address within the same voting jurisdiction in which the registrant is already registered, the registrar updates the voter's record and sends a notice of the change with a postage prepaid pre-addressed return form, so that the registrant can verify or correct the address.

- If the registrant moves to an address that is not in the same voting jurisdiction, the registrar does a notice mailing to the individual to confirm the change of address.

42 U.S.C § 1974gg-6(c)(1)(B).

States must complete any program that systematically removes ineligible voters from the official voters no later than 90 days prior to the date of a primary or general election for Federal office. 42 U.S.C § 1974gg-6(c)(2)(a).

NVRA Section 8 also requires that each state maintain all records regarding the implementation of programs and activities conducted to ensure the accuracy of voter registration lists for at least two (2) years and that these records be available for public inspection. 42 U.S.C § 1974gg-6(i). The information must include the lists of the names and addresses of all individuals who were sent "removal notices," as referenced above and information regarding whether those receiving the notices responded. 42 U.S.C § 1974gg-6(i)(2).

### B.   Help America Vote Act of 2002 (HAVA)

HAVA established certain mandated minimum standards that states must follow in regard to elections administration and augmented the NVRA. Related to the NVRA, HAVA mandated that states implement a statewide voter registration system.

Specifically, HAVA required that all states create a "single, uniform, official, centralized, interactive, computerized statewide voter registration list defined, maintained, and administered at the state level." 42 U.S.C. § 15483(a)(1)(A). Under HAVA, states must also ensure that the computerized voter registration lists are maintained on a regular basis. HAVA delineates how these maintenance activities shall be performed and requires that the state system include "provisions to ensure that voter registration records in the State are accurate and updated regularly," including "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 42 U.S.C. § 15483(a)(2) and (a)(4).

### C.   *U.S. v. State of Missouri, 535 F.3d 844 (98th Cir. 2008)*

The United States filed suit against the State of Missouri and the Missouri Secretary of State, alleging that the state was in violation of its obligations under the NVRA. The District Court granted summary judgment to Missouri, concluding the state had met its NVRA obligations to make a reasonable effort to conduct a general program for list maintenance. The District Court held that, to the extent that any violations had occurred, responsibility for those rested with local elections agencies (LEAs) and not the state.

The U.S. appealed the decision to the U.S. Court of Appeals for the Eighth Circuit. The Eighth Circuit considered whether states can be held accountable for NVRA violations by local elections officials. The Eighth Circuit also asked, "In what manner may states be held accountable for the conduct of the LEAs?" The Federal government argued that the NVRA obligated the state director and, if a state delegates any obligation, the state remained ultimately responsible.

The Eighth Circuit Court of Appeals upheld the District Court's evidentiary rulings and reversed on a narrow issue—whether evidence of any LEA noncompliance rendered Missouri's effort to "conduct a general program" unreasonable such that the State of Missouri was in violation of Section 8 of the NVRA. *See* United States v. Missouri, 535 F.3d 844, 851 (8th Cir. 2008). In partially reversing the district court's order of summary judgment and remanding the matter for reconsideration, the Eighth Circuit instructed that "the district court also consider any lack of LEA compliance and determine whether any such noncompliance renders Missouri's efforts to 'conduct a general program' unreasonable in removing the names of ineligible voters."

The Eighth Circuit's ruling noted the important relevance of the NVRA obligation that the **state** must "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of the voters by reason of death or change of residence." The decision specifically emphasized the word "conduct," noting that "states must take specific actions." The Eighth Circuit further noted that the NVRA requirement "envisions the states will actively oversee a general program...." In short, noncompliance with the NVRA's requirements by LEAs could be attributed to the state and prove noncompliance by the state.

On remand, the district court allowed the parties to file briefs on the issue of "whether any evidence of LEA noncompliance in this case demonstrates by a preponderance of the evidence that the State of Missouri violated its obligation to 'conduct a general program' under Section 8 of the NVRA." The United States dismissed its complaint before the issue was briefed. Therefore, there was never a ruling as to whether the conduct of the LEAs constituted a failure of the state to conduct a general program.

## VII.      Accuracy and Currency of Indiana's 2010 Voter Registration List

In challenging the accuracy and currency of Indiana's voter registration list for the 2010 Federal general election, Judicial Watch relied on (1) data from the 2010 U.S. Census data (specifically Indiana's total VAP in 2010); (2) data contained in the EAC's 2011 report to the United States Congress (specifically the total number of individuals contained in Indiana's voter registration list, as reported by Indiana in response to the EAC 2010 Election Administration and Voting Survey); and (3) the analysis of that data by the demographer hired by Judicial Watch.

In order to form my opinions, I have reviewed the demographer's analysis, as well as the excerpts from the Census on which he relied and the EAC 2011 Report data submitted by Indiana. I must make an important clarification regarding the demographer's report that I reviewed. The report contains a column entitled "County Pop." The data reflected here is the county VAP – not county population – according to Christopher Fedeli of Judicial Watch, and the column was simply mislabeled.

In my experience, there is no other way to ascertain the percentage of voting age population registered to vote other than to compare the VAP to the official list of

registrants. The Census is the only official number for total VAP for this decade, and Indiana's self-reported data is the only official record of Indiana's official list of voters. Therefore, the use of those numbers by the demographer is reasonable and, in fact, required.

The demographer's simple mathematical calculations demonstrate that, in numerous counties, the registration exceeds the number of people old enough to be registered, and for the state as a whole, the registration rate is close to 90%. To a reasonable degree of certainty, based on my experience, those facts mean that Indiana's voter rolls were significantly inaccurate and out of date in 2010.

### A.   EAC 2011 Report

The EAC is required by Federal law to prepare and submit a report to the U.S. Congress every two years. 42 U.S.C. §1973gg-7(a)(3). This report addresses the impact of NVRA on the administration of Federal elections and must be submitted to the U.S. Congress no later than June 30 in the year following the regular Federal general election.

The data referenced by Judicial Watch is part of the EAC's 2010 report entitled "*The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for the Federal Office 2009-2010*," as submitted to the 112th Congress on June 30, 2011 (the "EAC 2011 Report.") The EAC 2011 Report covers elections for Federal office during the period following the November 2008 elections through the November 2010 elections. The EAC 2011 Report is the fourth biennial report to Congress by the EAC.[1]

The Executive Summary of the EAC 2011 Report is based on "the results of a survey to all States...."[2] The survey included two questionnaires: The Statutory Overview Questionnaire, focusing on election laws and procedures, and the Election Administration and Voting Survey (known as "EAVS") that collected data from the states on various NVRA-related issues, including voter registration data. The EAC compiled its 2011 Report based on information compiled and submitted by the states to the EAC in February 2011. Indiana was among the states that submitted data for the EAC 2011 Report.

Voter registration data presented by the EAC 2011 Report relevant to this litigation include:

---

[1] The Federal Election Commission submitted previous reports.
[2] The EAC Survey was distributed to all states, the District of Columbia, and territories. However, note that, according to the DOJ's Questions and Answers on the NVRA: "The requirements of the NVRA apply to 44 States and the District of Columbia. Six states (Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin and Wyoming) are exempt from the NVRA because, on or after August 1, 1994, they either had no voter registration requirements or had election-day voter registration at polling places with respect to the elections for federal office. http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php .

- State-reported voter registration data;
- Registration rates for Voting Age Population (VAP);
- Registration rates for Citizen Voting Age Population (CVAP), based on 2009 American Community Service (ACS) data released by the U.S. Census Bureau;
- State ranking of voter registration rates; and
- State-reported information regarding list maintenance activities, the number of removal notices sent by states, and the number of ineligible voters removed from voter rolls.

The 2011 EAC Report also differentiates between active and inactive voters in presenting voter registration data. Under the NVRA, as discussed in Section VI, states are prohibited from removing a registered voter from the voter rolls solely for failing to vote, but may place a voter on an inactive list under certain circumstances.

In order to ensure the accuracy of the data submitted by the states and presented in the EAC 2011 Report, the EAC based its survey instrument on a Microsoft Excel-based application that contained error-checking algorithms to assist states in checking their data. The EAC also checked the state data, as submitted, for logic and consistency errors.[3]

Further, states were requested to verify and certify in writing the data submitted to the EAC. According to the EAC 2011 Report, Indiana submitted a signed certification with its data.[4]

### B.   Indiana's EAC 2011 Report Data

#### 1.   Voter Registration Data

Indiana reported 4,329,977 registered voters, noting that 4,196,884 were active registrants, and 133,093 were inactive registrants. Active registrants represented 96.9% of its voter rolls, while inactive voters were 3.1 percent.[5]

---

[3] EAC 2011 Report, page 3.
[4] EAC 2011 Report, page 4.
[5] EAC 2011 Report, page 30, 2010 Election Administration and Voting Survey, Table 1b, Registration Summary for 2010.

The chart below presents Indiana's registration rates for its Voting Age Population (VAP):

### 2010 Indiana Registration Rates for Voting Age Population[6]

| VAP | Reported Registration (Active + Inactive) | Reported Registration (Active + Inactive) % of VAP | Ranking | Active Only % of VAP | Ranking |
|---|---|---|---|---|---|
| 4,875,504 | 4,329,977 | 88.8 | 12 | 86.1 | 8 |

Indiana reported that, among those individuals who are of voting age, nearly 90 percent were registered to vote in the state. Indiana's VAP registration rate of 88.8 percent ranked the 12th highest among the states and the District of Columbia. While Indiana's VAP registration rate among only active voters decreased three points to 86 percent, the percentage of active voters was the 8th highest among states and the District of Columbia.

For comparison, the chart below presents the 15 highest voter registration rates as reported by the state to the EAC (considering all voters—active and inactive):

| | | |
|---|---|---|
| 1. | Alaska | 107.1 |
| 2. | District of Columbia | 102.4 |
| 3. | North Dakota[7] | 100.0 |
| 4. | Maine | 97.6 |
| 5. | Michigan | 96.5 |
| 6. | South Dakota | 94.1 |
| 7. | New Hampshire | 91.8 |
| 8. | Iowa | 91.3 |
| 9. | Missouri | 90.7 |
| 10. | Delaware | 90.1 |
| 11. | Mississippi | 89.5 |
| **12.** | **Indiana** | **88.8** |
| 13. | Illinois | 88.1 |
| 14. | Kentucky | 87.0 |
| 15. | Colorado | 86.6 |

Twenty states reported registration rates in excess of 85 percent. The average reported registration rate among the states was 78.7 percent, more than 10 percentage points *lower* than Indiana's rate.

---

[6] EAC 2011 Report, page 32, Election Administration and Voting Survey, Table 1c. Registration Rates for Voting Age Population (VAP).
[7] North Dakota does not have voter registration. For consistency between the various tables presented in the EAC 2011 Report, the registration was assumed to be the Voting Age Population. (See EAC 2011 Report, page 37). North Dakota is an exception in various other areas because it does not have voter registration.

The EAC 2011 Report also presented state registration rates for Citizen Voting Age Population (CVAP). While VAP looks at all individuals who are of voting age, CVAP includes only citizens old enough to vote. The chart below details Indiana's rates:

### 2010 Indiana Registration Rates for Citizen Voting Age Population (CVAP)[8]

| CVAP | Reported Registration (Active + Inactive) | Reported Registration (Active + Inactive) % of CVAP | Ranking | Active Only % of CVAP | Ranking |
|---|---|---|---|---|---|
| 4,723,809 | 4,329,977 | 91.7 | 15 | 88.8 | 7 |

Indiana's reported CVAP registration rate was 91.7 percent, the 15th highest among the states and well above the 85.9 percent average among reporting states. Among active only voters, Indiana's CVAP registration rate was the 7th highest at 88.8 percent and more than ten percentage points higher than the average 78.6 percent.

### 2.      Voter List Maintenance Data

The EAC 2011 Report presented data regarding a variety of voter list maintenance activities and removal actions conducted by the states from 2008 – 2010. As reviewed in Section VI, the NVRA mandates that states conduct a general program of voter list maintenance to keep voter rolls accurate and up to date, and states are granted flexibility in the administration of list maintenance activities beyond the specific NRVA provisions and requirements.

The EAC 2011 Report surveyed activities regarding:

- Removal notices, including the number sent and responses received;
- The number of registrants moved from active to inactive status; and
- The number of individuals removed from the registration list and the reason (death, failure to vote, felony conviction, mental incompetence, felony conviction, voter request)

---

[8] EAC 2011 Report, page 34, 2010 Election Administration and Voting Survey, Table 1d. Registration Rates for Citizen Voting Age Population (CVAP Using Different Registration Bases).

18

### a.  Indiana's Removal Notices

The EAC 2011 Report notes "removal notices are an important tool for maintenance of accurate voter registration rolls."[9] Yet, Indiana reported that this essential list maintenance activity *was not conducted* -- either at the state level or among its counties -- and reported that *no* removal notices were sent during the entire 2008 - 2010 reporting period.[10] Indiana was one of only three states under the NVRA requirements that reported not sending removal notices. New Mexico reported that no NVRA mailing was done in 2008. Indiana and Rhode Island did not provide an explanation.[11]

In total, the states that sent removal notices reported sending over 14.5 million such notices, receiving 1.78 million voter confirmations and 518,277 invalid confirmations. Over 3.6 million of the removal notices were undeliverable while there was no response for the remainder of the notices.

### b.  Other Removal Activities

Indiana reported that 892,460 registrants were removed from the state voter rolls from 2008 - 2010. This represents 20.6 percent of Indiana's 4,329,977 Reported Registrants, the second highest removal rate among all reporting states.

The following is a breakdown of Indiana's reasons for removal[12]:

|                          |         |
|--------------------------|---------|
| Moved out of jurisdiction | 12,851  |
| Death                    | 54,061  |
| Failure to vote          | 276,950 |
| Voter request            | 23,536  |
| Felony conviction        | 11,973  |
| Mental incompetence      | 0       |
| Other                    | 709     |
| Not categorized          | 512,380 |

Of note, Indiana classified over 500,000 removals, or 57.4 percent of all removals, as "not categorized." No other state reported such a high number. Mississippi had the

---

[9] EAC 2011 Report, page 8
[10] EAC 2011 Report, Page 59; 2010 Election Administration and Voting Survey, Table 4b. Voter List Maintenance: Removal Notices.
[11] According to the DOJ's Questions and Answers on the NVRA: "The requirements of the NVRA apply to 44 States and the District of Columbia. Six states (Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin and Wyoming) are exempt from the NVRA because, on or after August 1, 1994, they either had no voter registration requirements or had election-day voter registration at polling places with respect to the elections for federal office. http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php.
[12] EAC 2011 Report, page 63-64; 2010 Election Administration and Voting Survey, Table 4b. Voter List Maintenance: Removal Action.

second highest "non categorized" removal with just over 35,000, and most states reported no "not categorized" removals.  In a note from Indiana provided with its EAC submission, Indiana confirmed that it does not send removal notices and indicated that its submission included the number of voter records cancelled due to being in inactive status for more than two Federal general elections.[13]  It is unclear from the report or Indiana's notation whether these cancelled records are reflected as "non categorized" or as "failure to vote" or a combination.

### C.   Judicial Watch Analysis

The Judicial Watch analysis reviewed the county-by-county data as submitted by Indiana to the EAC and available on the EAC website.   According to the Judicial Watch analysis:

- The VAP voter registration rate exceeded 100% in 12 of the state's 92 counties – Newton, Hancock, Brown, Organ, Union, Warren, Franklin, Tipton, Warrick, Crawford, Spencer and Scott counties;

- The VAP voter registration in three counties exceeded 110% -- Crawford (114%), Spencer (119.7%), and Scott (143.2%);

- The  VAP voter registration rates for 26 other counties was between 90 and 100%; and

- 43 counties had VAP voter registration rates in excess of 88.8%, Indiana's overall VAP registration rate as reported to the EAC.

This data demonstrates that, in 12 Indiana counties, there are more people registered to vote and on the voter rolls than are of voting age.  Likewise, in the other counties, the voter rolls included from 90 percent to 100 percent of those county residents who are old enough to vote.

Further, the voter registration rate among the voting age population in 43 counties exceeded Indiana's overall statewide voter registration rate of 88.8 percent.

### D.   Conclusion:  Indiana's 2010 Voter Rolls Contained Significant Inaccuracies

Indiana reported a 20 percent registrant removal rate for 2008 – 2010, according to the EAC 2011 Report.  However, this does not, on its face, indicate that the state's voter rolls are current and accurate.  Other data provided strong evidence to contrary and indicated significant inaccuracies existed within the voter rolls.

First, Indiana's overall statewide voter registration rate was 88.8 percent for active and inactive voters combined, well above the average of 78.7 percent among all reporting

---

[13] EAC 2011 Report, page 65; 2010 Election Administration and Voting Survey, Table 4b. Voter List Maintenance: Removal Action.

states.  Second, the voter registration rate in 12 specific counties exceeded 100 percent.
Third, in three counties, the registration rate for the voting age population exceeded 110
percent, with Crawford County at 114 percent, Spencer at nearly 120 percent, and Scott
at a staggering 143 percent.  Together, in just these three counties, the number of
registered voters exceeded the number of voting age individuals by more than 12,000.

The number of registrants on the official list of voters, whether on a statewide or county-
by-county, can exceed VAP for various reasons.  Duplicate registrations have not been
identified and removed.  Individuals who have died have not been removed.  Efforts to
identify and remove registrants who have moved out of the jurisdiction have not been
adequately performed.

It is my opinion, based on my experience and expertise as the former Secretary of State
and Chief Elections Officer for the State of Georgia, and based on the data from the EAC
2011 Report and the Judicial Watch analysis, that Indiana's statewide voter rolls in
connection with the 2010 Federal election were significantly inaccurate and out of date,
because the registration rate in 12 counties exceeded 100 percent, with three of those
counties having rates in excess of 110 percent, indicating a considerable number of
duplicate, inaccurate and/or out-of-date registrations.

## VIII.   Defining a "General Program" and "Reasonable Effort" for Voter List Maintenance and Measuring Voter Roll Accuracy

A state has flexibility to develop and implement its voter list maintenance program within
the framework of the legal requirements of NVRA. As noted previously, the program
must be uniform and nondiscriminatory.  The program must make a reasonable effort to
ensure ineligible voters are removed.  The state elections officials and the local elections
officials work together in developing and implementing the program.  State law
designates the state's chief NVRA officer responsible for ensuring that the state meets the
requirements of Federal law.

In July 2005, the EAC issued "Voluntary Guidance on the Implementation of Statewide
Voter Registration Lists."  The report stops short of offering specific criteria for list
maintenance, and today there remains a degree of subjectivity in defining a "general
program" and a "reasonable effort."  However, states can find significant direction from
various resources.  The DOJ provides a Frequently Asked Questions document regarding
the NVRA on its website.[14]  The EAC 2011 Report provides a list of the most frequent
voter list maintenance activities being conducted by the states, and the National
Association of Secretaries of State (NASS) produced a report in 2009 that presents a

---

[14] U.S. Department of Justice NVRA Frequently Asked Questions;
http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php

state-by-state summary of list maintenance activities.[15]  A state can also confer with other state elections officials.

This section reviews commonly employed list maintenance practices among the states and provides my opinions on what constitutes a "reasonable effort" and how the effectiveness of voter list maintenance activities and voter roll accuracy can be measured. In particular, I will discuss the definition of "reasonable," since statute does not specifically define this term.

### A.    Commonly Used List Maintenance Activities

Common voter list maintenance activities conducted among the states include:

- New voter registration information verification programs;
- Timely removal for death, mental incompetency and criminal conviction programs;
- General mailing to all registrants;
- National Change of Address program; and
- Removal Notice program

### 1.    New Voter Registration Verification Program

This program seeks to verify new registrant information to identify invalid registrations and duplicate registrations.  Information on the registration includes either the registrant's driver's license number or the last four digits of the registrant's Social Security number. The information is then matched with information in the motor vehicle and/or Social Security databases, depending on the identifier provided.  Each state determines which database it will utilize for verification purposes and sets specific guidelines for determining what constitutes a successful match.  States are also permitted to access NCOA data (see #4 in this Section) to verify addresses for registrants entered into the statewide voter registration list.

According to the NASS 2009 Report, 41 states reported a matching arrangement of driver's license information with the state motor vehicle database.  Forty states also reported a matching process with the Social Security Administration database.[16]

This verification program is essential to identifying duplicate registrations and verifying other legal eligibility requirements.

---

[15] NASS Report: Maintenance of State Voter Registration Lists: A Review of Relevant Policies and Procedures, September 2009.
[16] NASS 2009 Report, page 12.

### 2.   Timely Removals for Death, Criminal Conviction and Mental Incompetency

The NVRA permits states to remove registrants who have died, been convicted of a crime, or have been declared mentally incompetent. Each state sets the laws and rules for specific procedures to remove the names of these registrants.

For the removal of deceased registrants, elections officials obtain information about deceased voters from a variety of sources, depending on the state, including the state department of health, office of vital statistics or similar entity. In some states, elections officials are authorized to remove deceased registrants based on receipt of a copy of a death certificate, written notification from a close relative, or obituary notices.

Removal of individuals who have died, been criminally convicted (if permitted by state law), and declared mentally incompetent is an essential part of ongoing list maintenance activities.

### 3.   General Mailing to All Registrants

Many states opt to conduct a general mailing to all registrants on their rolls. The mailing asks the voter to verify his/her information and provide updated information if necessary. The frequency of these mailings varies state to state—annually, every two years, every four years or following the U.S. Census every ten years. The mailing may be conducted by the state election office or by a local election office, usually the county voter registration office, on a county-by-county basis.

A voter who returns the general verification notice has provided direct information for use by the state in updating the registration record. The voter registration official may proceed with updating the registrant's record, including cancelling the registration if the voter makes that direct request.

General verification notices that are returned "undeliverable" can provide information that a registrant's address may have changed. This notice of a possible address change triggers the state's ability to take additional steps to verify the voter's information through the confirmation process, which is expressly provided for under NVRA Section 8.

If the returned notice suggests that the individual has moved *within* the same jurisdiction, the record is updated, and a forwardable mail notice of the address change is sent to the registrant with a prepaid pre-addressed return form, so that the registrant can verify the information.

If the returned notice indicates that the registrant has moved *outside* of the same jurisdiction, the confirmation process is activated. The registrant is sent a return card that can be forwarded to a new address. The card must contain the specific language required by NVRA. The information advises the registrant to return the notice by the voter

registration deadline in order to confirm the registrant's address. The notice also informs the registrant that, if the card is not returned, the registrant may have to provide address confirmation before being allowed to vote in a federal election for a certain time period. That time period extends from the date of the notice to the day after the date of the second Federal general election. If the registrant does not vote in an election during that period, the registrant's name will be removed from the eligible voters list. The registrant may be designated "inactive" if the registrant does not return the confirmation notice by the voter registration deadline for the next election after the date of the notice.

In the event that a general mailing provides information that the registrant may be deceased, the elections office seeks to confirm the registrant's death and, upon doing so, cancels the voter record.

In summary, a general mailing, whether conducted on a statewide basis or consistently in each county, is a highly effective list maintenance tool. It allows for every voter record to be verified and updated if necessary. More and more states are conducting general mailings as part of their routine, ongoing list maintenance activities.

### 4.    Utilizing the National Change of Address

The National Change of Address (NCOA) is a database of people whose addresses have changed. The U.S. Postal Service maintains the NCOA database. Election officials may obtain access to this database in order to verify registrant addresses or proactively identify registrants whose addresses may have changed. NVRA Section 8 specifically references the use of the NCOA program for list maintenance efforts, and state law sets the specific requirements for utilizing NCOA. According to the NASS 2009 Report, 34 states authorize the use of NCOA database in identifying address changes to varying degrees, with many states requiring a periodic match of the statewide voter rolls against the NCOA database.[17] The frequency of the NCOA mailings can vary.

Because this change of address information is not received directly from the registrant, the state must follow the confirmation process, described above, to verify address changes outside the jurisdiction.

According to the EAC 2011 Report, nearly 4 million registrants were removed from the rolls due to moving outside of the jurisdiction.

The NCOA program is an effective and widely used list maintenance activity.

---

[17] NASS 2009 Report, page 6.

5.    **Use of Removal Notices**

Removal notices are described in detail in Section VI. The EAC 2011 Report notes that "removal notices are an important tool for the maintenance of accurate voter registration rolls."[18]

In the EAC 2011 Report, 44 states responded that a total of 14.6 million removal notices were sent from 2008 – 2010.  According to the EAC 2011 Report, only 12.2% of voters receiving a removal notice confirmed their registration, while nearly one-fourth of all renewal notices, more than 3.6 million notices, were returned "undeliverable."  States reported receiving confirmation of more than 500,000 invalid registrations.

6.    **Other General List Maintenance Activities**

The U.S. Department of Justice highlights several other possible examples of general list maintenance programs:[19]

- States undertaking a uniform mailing of a voter registration card, sample ballot, or

- Other election mailing to all voters in a jurisdiction, for which the State could use information obtained from returned non-deliverable mail as the basis for correcting voter registration records (for apparent moves within a jurisdiction) or for sending a forwardable confirmation notice and beginning the two federal general election waiting period before removal (for apparent moves outside a jurisdiction or non-deliverable mail with no forwarding address noted).

Another emerging list maintenance activity is "interstate database sharing," designed to identify duplicate voter records.  Since 2005, a number of states have initiated activities to crosscheck their voter registration database with those of other states. [20]

B.    **Defining "Reasonable" / Measuring Effectiveness**

Defining a "reasonable" list maintenance program and measuring the program's effectiveness can be difficult since the specific standards or criteria have not been set forth under the NVRA.  However, in order for a list maintenance program to be a "reasonable effort," it obviously must result in a voter registration list that is as accurate and current as possible and ensure the timely removal of ineligible voters.

---

[18] EAC 2011 Report, page 8.
[19] U.S. Department of Justice, NVRA FAQ document, No. 33.
[20] NASS 2009 Report, page 10.

In evaluating a list maintenance program, the accuracy of the official list of voters must be considered. The EAC 2011 Report provides the most readily available and consistent measure of voter roll accuracy. It presents each state's percentage of registered voters among Voting Age Population and Citizen Voting Age Population. The report further provides a state-by-state ranking in order to benchmark one state's registration percentage against another.

Finally, a degree of common sense must also be used in determining whether a program is effective and, therefore, constitutes a "reasonable effort." Voter rolls that are 100 percent accurate are highly unlikely if not impossible. Voter lists are not static since voters move or die every day. At the same time, a voter list cannot be deemed accurate or up to date if the number of registered voters exceeds the total voting age population, with the exception of voter lists in those states that do not require voter registration. It is also statistically unlikely that 90 percent of the voting age population in any jurisdiction will be registered to vote.

Indiana's Co-Directors of Elections also saw the merit in using the VAP voter registration rate as an indicator of the voter rolls' accuracy or lack thereof. Indiana's Co-Directors told the DOJ that the state:

> will, no later than the last business day of January 2009, **and every four years after that date**, compare information provided by SVRS reports regarding active and inactive voters within each county with other data provided by federal or state agencies, such as the United States Census Bureau's population estimates, to determine if there may be significant problems with the accuracy of voter registration lists.

Indiana Written Plan of Compliance, p. 7 (emphasis added). The Compliance Plan went on to say:

> In cases where the number of registered voters in a county exceeds 90% of the county's estimated voting age population ... the Co-Directors may conduct a voter address confirmation mailing to every voter in the counties in which the problem appears to exist, or to all registered voters....

*Id.*

## C.   Conclusion

While neither federal nor state law specifically defines every element of a voter list maintenance program, states can find ample guidance and information regarding commonly used list maintenance tasks and best practices. The Secretaries of State and elections officials serve as resources for one another, and organizations such as NASS issue periodic reports, like the NASS 2009 Report, regarding the maintenance activities of each state.

States maintain significant flexibility in conducting list maintenance programs in recognition of the state's role in administering elections. However, this flexibility creates some ambiguity. For this reason, when defining a "general program" and a "reasonable effort," benchmarking the practices across the states is the most meaningful and relevant approach.

In my opinion, based on my experience and expertise and to a reasonable degree of confidence, the list maintenance tasks listed here are widely used among the states and are effective tools in maintaining an official voter list that is as accurate as possible. A reasonable list maintenance program would include most, but not all, of these activities.

In defining "reasonable effort," the activities routinely and regularly employed by other states should be taken into consideration. In my opinion, a "reasonable effort" for voter list maintenance is one that includes: (1) a new voter verification program; (2) a program for the timely removal of registrants who have died, moved outside the jurisdiction, or been criminally convicted or declared mentally incompetent (based on state law); (3) a proactive NCOA match and postcard mailing done at least every 2 years; (4) a general mailing to all registered voters, whether conducted by the state or on a county-by-county basis, the frequency of which is determined by the frequency of the NCOA proactive statewide mailing, but not less frequently than every 10 years regardless; and (5) a removal notice program for inactive voters conducted at least every 2 years.

The tools available for assessing the accuracy and quality of a voter list are limited. Currently, to be the best of my knowledge, a state would have two options: 1) identify and hire a professional data research firm to conduct a unique analysis of a state's voter rolls; or 2) utilize U.S. Census Data and existing voter registration data to calculate the voter registration rate. The first option would likely provide more detailed data that specifically identified invalid, inaccurate and/or duplicate registrations, but would likely require significant funding. The second option can be done at little to no cost.

Therefore, it is my opinion that VAP registration rates are the most reasonably obtained, reliable data currently available for evaluating the accuracy of voter rolls. If a jurisdiction's voter registration rate exceeds 100 percent, this is a very strong indication that the list most likely has a high degree of inaccuracy and further action is warranted. If the voter registration rate for a particular jurisdiction exceeds 90%, this is a strong indication that the list most likely has a significant degree of inaccuracy, and further action is warranted.

Further, in my opinion, the "reasonable" test cannot be met by conducting all or even some of these activities just once. In order to be reasonable, and therefore effective, these activities must be conducted on a consistent, ongoing basis across every jurisdiction in the state.

Additionally, compliance to ensure to ensure that the program is actually being performed in a timely, accurate and legal manner is also essential to any reasonable effort. Simply having a list of maintenance tasks, preparing a written plan, and/or issuing

guidelines, guidebooks, or procedural manuals is not sufficient. Compliance can be as simple as a periodic, unannounced check of the statewide database to evaluate whether list maintenance activities are occurring in a timely, effective manner or as robust as annual reports regarding list maintenance activities. In the event that a state has concerns about the quality of a county voter list or believes that list maintenance activities are not being performed appropriately, it is reasonable that the state would take further action. Additional action might include greater scrutiny of county actions, additional training, more robust reporting, and if warranted, filing notice of violations or initiating litigation.

## IX.    Indiana's Voter List Maintenance Activities

This section provides an overview of Indiana's specific voter list maintenance activities, including:

- 2006 Consent Decree
- 2008 Written Plan of Compliance
- Current level of effort

### A.    2006 Consent Decree and Order

As previously noted, in June 2006, Indiana entered into a Consent Decree and Order with DOJ to enforce Indiana's obligations under NVRA Section 8 concerning voter registration list maintenance. The Consent Decree and Order ordered Indiana to conduct various activities to clean up its voter rolls and report on its activities as follows:

- **Deceased Voters and Duplication Registrations**. The Indiana Election Division had previously identified 29,000 registrants that might be deceased and 290,000 registrations that might be duplicates as a result of the state's implementation of its new statewide computerized database. The state was ordered to send notices about these deceased registrants and duplicate records to each county voter registration office for appropriate action. The State was required to ensure that the counties took appropriate action and provide a report to the DOJ. The state's report showed the following:

  - **Deceased Voters.** Indiana reported that it had identified 41,000 potential deceased voters, removed 34,161 deceased voters, and took no action on 6,326 registrants. The overwhelming majority of counties were able to complete this work by the court-imposed deadline.[21]

  - **Duplicate Registrations.** Indiana reported that the counties had identified 170,010 potentially duplicate records. The counties had reviewed 139,952

---

[21] Letter from Bradley King and Kristy Robinson to DOJ Assistant Attorney General Wan Kim, and attached Deceased Voter Processing Results Report, August 16, 2006.

records, cancelling 90,899 records and not cancelling 49,053.  Over 30,000 records had not yet been reviewed.[22]

- **Statewide Mailing.** The Co-Directors of Indiana's Elections office were required to conduct a statewide mailing to all registered voters in order to identify voters who were ineligible to vote.  The state was also directed to follow the NVRA process for any mailing that was returned undeliverable and to ensure that the counties processed the returns and undeliverable addresses in accordance with the law.  The statewide mailing was completed on or before August 10, 2006.

- **Report on Statewide Mailing.** The state was required to provide DOJ a report that identified, on a county-by-county basis, the number of voters who were identified as potentially ineligible, the number of voters actually removed, and the number of voters placed on the inactive list after confirmation mailings.  Further, the state was required to provide a county-by-county list of active and inactive voters post these activities.  According to the state's report on this statewide mailing (which reflected the efforts of 72 percent of the state's counties, per the Defendant's Motion to Extend Consent Decree Deadlines as to a few counties):

  - 609,282 registrants were identified as possibly ineligible;
  - 2,247 registrations were canceled; and
  - 316,756 were moved to inactive status.

- **Written Plan for Compliance.** The Co-Directors were directed to develop a written plan for identifying and removing ineligible voters. The plan required Indiana to have a detailed plan for tracking whether the county voter registration officials were complying with the list maintenance efforts as required under Federal law, including the identification and removal of voters who had died, been convicted of a disqualifying crime or who had moved.  Additionally, the Co-Directors were ordered to ensure compliance among the counties and, if a county voter registration office was out of compliance, the Co-Directors were to take appropriate action against the county, including litigation if the county failed to comply with Federal and state law. The plan was submitted to DOJ in February 2008.

- **Training.** The Co-Directors were required to develop training manuals and conduct regular training regarding list maintenance at least once a year.

- **Annual Reporting Requirements.** The Consent Decree set forth various annual reporting requirements for the state regarding active and inactive voters in each county and the number of registrants removed by each county during the previous

---

[22] Letter from Bradley King and Kristy Robinson to DOJ Assistant Attorney General Wan Kim, and attached Duplicate Voter Processing Results Report, August 18, 2006

year.  According to the annual report, submitted in February 2008, as of December 31, 2007, the state had[23]:

- Cancelled 1,682,346 registrations since the launch of its statewide voter registration system on January 1, 2006; and
- Cancelled 343,589 registrations in calendar year 2007.

It is important to note that the Consent Decree contained a "Termination Date" whereby the agreement remained in effect until June 30, 2009.  However, while the Consent Decree itself may have expired, Indiana's obligations under Federal law did not and have not.

### B.    Indiana's Written Plan of Compliance

As required under the 2006 Consent Decree and Order, Indiana prepared and submitted to DOJ a Written Compliance Plan.[24]  This plan was submitted by the then Co-Directors on February 29, 2008.  While the Consent Decree and Order terminated on June 30, 2009, the Compliance Plan does not reference an expiration or termination date.

The Compliance Plan set forth a detailed process for each of the Consent Decree requirements and established a detailed tracking process for these list maintenance tasks to ensure compliance by the county voter registration offices.

The Compliance Plan went beyond the tasks required in the Consent Decree and Order by establishing additional activities, including the generation of various reports to be created from the State Voter Registration System (SVRS) on certain days of the month.  These reports were to be designed to summarize the activities being conducted by the counties and measure the accuracy of the voter rolls using U.S. Census data to calculate voter registration rates.

In the plan, the Co-Directors referenced several SVRS upgrades that would be completed during 2008 in order to facilitate these reports.

Additionally, the Compliance Plan includes detailed instructions for carrying out other list maintenance activities required under Federal and state law.

Of particular note are the activities referenced on Pages 7 and 8 of the Compliance Plan. Regarding whether the counties were properly canvassing voter rolls to locate registrants who had died or moved:

---

[23] Letter from Bradley King and Pamela Potesta to DOJ Trial Attorney Mi Young Claire Park, and attached report, February 28, 2008.
[24] Letter from Bradley King and Pamela Potesta to DOJ Trial Attorney Mi Young Claire Park, Written Plan for Compliance, February 29, 2008.

- The Co-Directors noted in this document that "conducting the next statewide mailing to all registered voters during 2008 would result in the expenditure of taxpayer funds." [25] The Co-Directors go on to express ongoing concerns regarding list maintenance. In spite of this assurance, no subsequent statewide mailing has ever been conducted.

- The Co-Directors "will, no later than the last business day of January 2009, **and every four years after that date**, compare information provided by SVRS reports regarding active and inactive voters within each county with other data provided by federal or state agencies, such as the United States Census Bureau's population estimates, to determine if there may be significant problems with the accuracy of voter registration lists." [Compliance Plan, p. 7 (emphasis added).] Despite this requirement and specific recognition of the need to monitor the voter rolls for accuracy, Co-Director King said, in his deposition for this matter (Page 79), that he first learned that some county voter rolls exceeded 100 percent of VAP in 2012 from news reports.

Further, on page 11 of the Compliance Plan, the Co-Directors wrote that "For conducting voter list maintenance under the Consent Decree **and** this Plan …." (emphasis added). The use of the word "and" underscores that the activities outlined in Compliance Plan were intended, at least at the time, to be an ongoing effort.

The Compliance Plan also addresses the Co-Directors' obligation to ensure compliance with Federal and state law as well as the Consent Decree and Order. Specifically, the Co-Directors have the authority to take action, including initiate litigation, against a county that fails to comply with Federal and state law.

## C. Indiana's Current Level of Effort

As described by those individuals who have been deposed in this matter, Indiana's current level of effort in regards to list maintenance and compliance activities is significantly less than those under the Consent Decree and set forth in its own Compliance Plan. Further, both Federal and state law provide for other activities that Indiana, unlike most other states, is not currently conducting.

This section reviews and assesses Indiana's current level of effort, including general overview of list maintenance activities, as well as issues that impact the state's ability to conduct a program that satisfies Federal law:

- Indiana's current list maintenance activities and relevant issues
- Compliance and oversight

---

[25] Written Plan of Compliance, Page 7.

To prepare this Section, I reviewed and relied upon the deposition testimony of various elections officials taken in this case, including:

- Trent Deckard, Co-Director, Indiana Election Office ("Co-Director Deckard" and/or "Deckard Deposition")

- J. Bradley King, Co-Director, Indiana Election Office ("Co-Director King" and/or "King Deposition")

- Sarah Redman, Clerk of the Circuit Court, Warrick County ("Ms. Redman" and/or "Redman Deposition")

- Terrence Coleman, Board of Voter Registration, St. Joseph County ("Mr. Coleman" and/or "Coleman Deposition")

- Francisco Fotia, Board of Voter Registration, St. Joseph County ("Mr. Fotia" and/or "Fotia Deposition")

## 1.   Indiana's Current List Maintenance Activities

Indiana's Co-Directors of the Election Division are statutorily responsible under Federal and state law to ensure the state's compliance with NVRA.  Both Co-Director Deckard and Co-Director King acknowledged this role and legal obligation, although they disagreed at times on the specific approach for meeting these obligations.

According to Indiana statute and the testimony of the witnesses referenced above, county voter registration offices, through the Clerk of the Circuit Court or the Board of Voter Registration, and in coordination with the Co-Directors, are responsible for actually performing the majority of Indiana's voter list maintenance activities and conducting the voter record updates due to address changes; canceling registration due to death, criminal conviction, mental incompetence; moving registrants from active to inactive status; and canceling registrations based on inactivity over two Federal election cycles.

Counties are permitted, but not required, to conduct countywide mailings to all registrants as part of their ongoing list maintenance activities.

The state is permitted, but not required, to conduct a statewide mailing to all registrants for the purposes of list maintenance.  The state is also permitted, but not required, to access the NCOA database and compare it to the entire voter registration list to proactively identify registrants who may have moved outside the jurisdiction. A new state law now mandates a general statewide mailing be conducted by the State every two years.

Several issues relevant to whether Indiana is administering a voter list maintenance program that meets Federal and state law emerged in the witness depositions, including: (a) practices regarding voter record review and updates; (b) countywide mailings; (c) statewide mailings; (d) NCOA mailings; and (e) training, procedures, and conflicting state opinions and guidance.

### a.   Practices Regarding Voter Record Reviews and Updates

In reading the Redman, Coleman and Fotia depositions, I observed multiple inconsistencies in the way county officials review voter records to determine appropriate next steps, such as updating or canceling the record or moving the registrant to the inactive list.

In the Redman Deposition, Ms. Redman described what is called the "Confidence Factor." This is a percentage rating generated by the SVRS during the matching process to rate the degree of confidence that two records actually match. For example, the Department of Health interfaces with the SVRS, and a process to match death records and voting records is conducted to identify registrants that may be deceased. The matching process compares available data, including name, address, date of birth, driver's license number and/or last four digits of the Social Security number. The system then calculates a "Confidence Factor" based on the extent to which the data matches. For example, a 100% Confidence Factor indicates a complete match, while a 90% Confidence Factor indicates a slightly less than absolute match.

The relevant issue arises in the interpretation of and confusion surrounding the Confidence Factor and what, if any, actions are taken to verify the voter record if the match is not absolute or 100%.

Ms. Redman, on pages 17 – 20 of her deposition, discusses her interpretation of the Confidence Factor rating and approach to list maintenance based on the Confidence Factor. In her responses, she noted "if we're positive, we cancel them," (p. 18) and on follow-up, responded that positive meant "an absolute match." Absence a perfect match, Ms. Redman indicated that there is no established office policy regarding when and what steps to take to determine if the records match. She went on to point out that counties make their own determinations regarding what actions, if any, the Confidence Factor dictates (Redman Deposition, p. 42).

In his deposition, Mr. Coleman said that "it didn't take him long to discover ... that we had a lot of dead people on our voting rolls" (p. 13). He pointed out limitations to the system, particularly the Confidence Factor rating. Mr. Coleman also said that if the match is "under 50 percent," it will not be sent as a possible match and indicated that, after his own research, he has "canceled hundreds of deceased persons because…they didn't make it through the process." (p. 17)

Mr. Coleman also noted that, for a time, he was conducting his own research on registrants over the age of 100 to determine if they were deceased. The state advised that this was discriminatory and he stopped. (Coleman Deposition, p. 43).

Mr. Fotia indicated in his deposition that he "does not rely" on the Confidence Factor (Fotia Deposition, p. 26). Mr. Fotia acknowledged that, if one county is "very

conservative" in relying on the Confidence Factor, updates could be missed and the other county would not be notified (Fotia Deposition, p. 28).

### b.    Countywide Mailings

General mailings are a common and highly effective tool in conducting list maintenance. Most states conduct some type of general mailing, whether statewide or on a county-by-county basis, on a regular and routine basis, although the frequency varies from every year to every two years to every four years.

In Indiana, counties may conduct countywide mailings. However, such mailings are not required. Between 2009 and 2012, only 5 of Indiana's 92 counties conducted countywide mailings, according to Co-Director King (King Deposition, p. 36).

In July 2012, Warrick County conducted a countywide mailing to its entire voter registration list. Approximately 49,000 registrants received the mailing (Redman Deposition, p. 59). Approximately 13,000 cards, or 26.5 percent, were returned undeliverable (Redman Deposition, p. 61). Since that mailing, 8,500 registrants, or 17.3% of Warrick County's registrant list, were moved to inactive status (Redman Deposition, p. 61).

Of note, Redman indicated that these mailings were a "big way" to determine if a registrant had moved (Redman Deposition, p. 62). She went on to discuss that a mailing to registrants regarding a precinct change is also an option for identifying voters whose residency has changed (Redman Deposition, p. 62).

In contrast, according to Mr. Coleman, St. Joseph County has never conducted a countywide mailing (Coleman Deposition, p. 63). He cited various reasons for this, chief among them funding. Mr. Fotia said he did not know when the last countywide mailing had been conducted in St. Joseph County (Fotia Deposition, p. 32).

### c.    Statewide Mailings

More states are adopting statewide mailings as part of their overall list maintenance efforts. Indiana last conducted a general statewide voter mailing in 2006, as part of the Consent Decree it entered into with the DOJ. As previously referenced, the 2006 statewide mailing identified 609,282 possibly ineligible registrants, resulting in 2,247 cancellations and 316,756 transfers to inactive status. Indiana did not conduct additional statewide mailings despite including a specific reference to do so every four years in its own Written Compliance Plan submitted to the DOJ.

When asked whether statewide mailings would contribute to more accurate voter rolls, Mr. Fotia responded that he believed they would (Fotia Deposition, p. 114).

#### d.    NCOA Mailings

According to its submission for the NASS 2009 Report, the Indiana Secretary of State may conduct an annual residency confirmation mailing to each voter in the state.[26] Counties may utilize the NCOA database to conduct address verification in certain circumstances, according to the depositions of Ms. Redman and Mr. Fotia. However, the state does not utilize nor does it even have the access to utilize the NCOA database for a statewide proactive mailing to its voter list.

Co-Director King noted that, while some NCOA data was obtained, such as checking the validity of an address when it was entered into the SVRS, NCOA data for address forwarding orders was not obtained previously by the state because there had been no agreement with his Co-Director to do so. (King Deposition, p. 42).

The NCOA database is used on a limited basis by the counties to verify address information of registrants being entered into the SVRS. However, there were conflicts with how to proceed even on this limited basis. According to Mr. Fotia, conflicting advice has been given regarding the National Change of Address (NCOA) process and specifically how to handle a letter that is returned undeliverable from the new NCOA address. One Co-Director advised that the registrant be activated for the previous address, while the other Co-Director said the registrant should be canceled. Mr. Fotia indicated that this situation is resolved at the county level. (See pp. 44-45 of Fotia Deposition).

#### e.    Standard Procedures / Training / Conflicting Guidance

Based on the deposition testimony, Indiana lacks standard procedures for several important list maintenance tasks; training is an opportunity for improvement; and the statutory requirement to have co-directors, one from each political party, results in conflicting advice and opinions on key voter list maintenance activities. The following are several examples:

- **Acceptable Mailings / Conflicting Guidance from the State.** Warrick County and St. Joseph County officials have different understandings of the types of voter mailings that are permissible for list maintenance. As referenced above, Ms. Redman listed mailings to all voters in the jurisdiction regarding precinct changes as an appropriate list maintenance option. Mr. Coleman said in his deposition that he was told undeliverable mail from a precinct mailing could not be used for list maintenance (Coleman deposition, p. 40).

---

[26] NASS 2009 Report, page 33.

- **Training.** Mr. Coleman expressed concerns that, during an annual elections conference, it was "clear" to him that there was "not a universal understanding" of voter list maintenance among county elections officials (Coleman Deposition, p. 83). He further stated that "a lot" of the county elections officials had not completed list maintenance activities (Coleman Deposition, p. 85). While this is Mr. Coleman's opinion, he states that he did not get "a lot of training" (p. 11) and his comments are supported by the contradictory practices between Warrick County and St. Joseph County.

- **Significant Conflicting Opinions.** The Co-Directors have disagreed on a number of voter list maintenance issues. Based on Co-Director King's deposition testimony, over his tenure, areas of disagreement regarding list maintenance included: using jury notice declarations (p. 65), relevance of census data for monitoring county compliance (p. 77), encouraging counties to coordinate with colleges (p. 87), and joining the Interstate Cross-Check initiative (p. 92), among others. Co-Director King described the challenges in reaching agreement with his counterpart, and when asked whether this made it more difficult to comply with NVRA, Co-Director King responded "yes" (p. 91).

### D.    Conclusion: Indiana's Current List Maintenance Efforts Lack Consistency and Uniformity

Indiana has had knowledge about the lack of quality in its voter rolls since 2006. The state also has had varying levels of list maintenance effort over that time. Yet, Indiana's current level of effort is substantially less than those required by the Consent Decree and Order and set forth in its own Written Compliance Plan and significantly less than the efforts in other states.

In my opinion, the list maintenance activities required under the Consent Decree and Order more than satisfied the state's Federal obligations under NVRA Section 8. The effort was clearly intensive. The level of effort expended by the counties and the state was naturally much higher because of the lack of ongoing efforts to that date. Further, based on Indiana's own data regarding the significant number of voter records that were updated, cancelled or moved to inactive status, the maintenance program defined in the Consent Decree and Order was effective. The activities were also generally reasonable given the fact that nearly three-quarters of the counties were able to successfully complete the required tasks, and those that did not failed to do so, not because the effort required was too great, but because of extenuating circumstances (such as office flooding). It is my opinion that, if Indiana had continued to perform the maintenance tasks required under this Consent Decree and Order, even with reduced reporting requirements, the state would have a list maintenance effort that satisfied its NVRA requirements.

Indiana also developed a Written Plan of Compliance, which provided a blueprint for an appropriate ongoing program. While the monthly reporting exceeded the reasonable test, once the state, with the counties, had achieved compliance with the Consent Decree and

Order, the Co-Directors could have transitioned to some less frequent reporting, perhaps annual. Indiana would have met its NVRA obligations had the Co-Directors continued to track the activities of the counties, ensured that these activities were being executed appropriately, conducted the voter roll review every four years, and followed through with the verification mailing if a quality issues was identified. (Written Compliance Plan, p. 7-8)

Two areas of inconsistency also raise additional serious concerns and, in my opinion, contribute to the poor quality of Indiana's voters.

First, the Confidence Factor is highly subjective and inconsistent. In the absence of specific standards for how to proceed based on varying degrees of the Confidence Factors, list maintenance activities become overly subjective, leading to counties employing vastly different criteria for updating or canceling a record. For example, one county may conduct certain additional research if the Confidence Factor falls below 90 percent, while another county may not conduct this research unless the Confidence Factor is below 75 percent. The lack of standardization for reviewing and evaluating voter records has led to varying rational for removal of registrants from one county to the next.

Second, countywide mailings have not been conducted in a consistent, uniform manner. Just 5 of Indiana's 92 counties conducted these mailings, according to deposition testimony. While funding may have been an issue, it should not have been an insurmountable one. The cost for the mailings is minimal considering overall county budgets, and the legal obligation to maintain accurate roles should be taken into consideration. For example, St. Joseph County's 2013 total annual budget is set at more than $91.7 million.[27] Further, five counties were able to secure the resources to conduct a general mailing. This lack of uniformity creates a situation in which the records of registrants in one county receive higher scrutiny than those in other counties.

Indiana also does not conduct NCOA mailing to all registrants. It is my opinion that the NCOA mailing is particularly important if a state is not conducting a general countywide or statewide mailing.

In my opinion, more effective training and step-by-step procedures and standards will enhance Indiana's voter list maintenance efforts, so that all election officials are operating under the same or substantially similar procedures. This helps to facilitate uniformity in practices and promotes greater accuracy across the entire registration list.

---

[27] St. Joseph County annual budget;
http://www.stjosephcountyindiana.com/departments/Auditor/2013%20Budget.pdf;
http://articles.southbendtribune.com/2012-10-16/news/34506225_1_county-employees-commissioner-bob-kovach-scale-in-county-government. Note: Two links are provided, because at the time of completion of this document, the direct link to the PDF document on the St. Joseph County auditor's website was not working.

While the conflicting advice is, in part, due to the structure of Indiana elections required under Indiana law, it nevertheless adds to inconsistencies and difficulties in administering voter list maintenance activities. As a result, in my opinion, this leads inconsistent practices from county to county. This issue may well be resolved with the recently passed legislation giving authority to the Secretary of State as the final decision maker in the event of conflicting opinions.

## X.      Compliance and Oversight

In this section, I will review compliance and oversight activities that Elections Co-Directors, as the election officials jointly designated as Indiana's NVRA official, have conducted and continue to conduct in order to ensure that counties, and therefore the state, are conducting a list maintenance program that meets Federal and state law. I also review the implications of the ruling by the U.S. Court of Appeals for the Eighth Circuit in *U.S. v State of Missouri*, 535 F.3d 844 (8th Cir. 2008).

### A.      Indiana's Compliance and Oversight Efforts

Under Indiana law, the Co-Directors of the Election Division have overall responsibility for the state voter registration activities and serve as the state's NVRA official. Ind. Code § 3-7-11-1, -2. The Co-Directors are jointly designated, under 42 U.S.C. § 1973gg-8, as the chief state election official responsible for the coordination of state responsibilities under NVRA. Ind. Code § 3-7-11-1. Among other related duties, the Co-Directors are responsible for coordinating with the State Elections Commission to oversee the implementation and administration of NVRA and protect the fundamental rights of voters. Ind. Code § 3-7-11-2.

Indiana law also permits various voter registration activities, including voter list maintenance activities, to be delegated to county voter registration officials. However, the Co-Directors are still responsible for ensuring that the state meets its obligations under NVRA Section 8.

State law provides the Co-Directors with several tools to ensure compliance. Beyond state law, the Co-Directors can, as part of their authority, require various compliance reports and consider certain data, such as registration rates, as part of a state compliance and oversight effort. Additionally, the 2006 Consent Decree and Order and Indiana's Written Compliance Plan called for significant compliance measures.

The following is a summary of the specific compliance activities available to the Co-Directors:

- **Affidavit re Voter Registration Cancellations.** Indiana law requires county voter registrations officials to file an affidavit under affirmation with the election division verifying that list maintenance tasks had been performed. However, there was no deadline for submitting this affidavit. Mr. King noted that the regularity of counties

38

filing the affidavits was "not frequently" (King Deposition, p. 55).  Co-Director
Deckard indicated that he became aware that most counties were not filing the
required affidavit in 2011 (Deckard Deposition, p. 37).  Despite both Co-Directors
being aware that the affidavits were not being filed as required by state law, no action
was taken to encourage or direct the counties to comply.

In their depositions, Ms. Redman, Mr. Coleman and Mr. Fotia said that they were
unaware of this requirement.

In his deposition, Co-Director King noted that provisions contained in a new state law
(SB 519) require county election officials to file an affidavit no later than 77 days
prior to a Federal general election verifying that list maintenance activities had been
properly conducted and completed prior to 90 days before the election.  Mr. King
acknowledged that the new law, requiring affidavits to be filed by a specific deadline,
would "certainly" be beneficial in monitoring county performance (King Deposition,
pp. 54-56).

- **County NVRA Implementation Plan.**  Under Indiana law, county voter registration
  officials must file an annual report with the election division detailing revisions to the
  county NVRA implementation plan adopted during the preceding year. [28]  Ms.
  Redman indicated that she was unaware of this requirement (Redman Deposition, p.
  68).

- **Compliance Plan.**  To comply with the 2006 Consent Decree, Indiana completed its
  Written Compliance Plan, discussed earlier.  The Compliance Plan set forth detailed
  tracking procedures and monthly county activity reports to ensure that the counties
  were complying not only with the activities requirement under the Consent Decree,
  but also complying with NVRA Section 8 generally.

Co-Director King acknowledged that these tracking procedures and reporting
requirements were discontinued when the Consent Order expired, despite the fact that
the SVRS can still generate these reports.  Both the Consent Decree and the
Compliance Plan contained provisions for violation notices to be sent to the counties.
This process was also discontinued.  When asked if these compliance tools were
helpful, King said that they were (King Deposition, p. 31).

The Compliance Plan also called for the use of U.S. Census data in monitoring voter
registration rates among the Voting Age Population (VAP.)  The state discontinued
use of this valuable tool for voter roll accuracy measurement.

---

[28] Ind. Code 3-7-12-28.1

### B.    Implications of US. v. Missouri

The Eighth Circuit Court of Appeals case regarding U.S. v Missouri was reviewed in Section VI. The Eighth Circuit decision noted that the NVRA obligation for conducting a general list maintenance program rests with the state. The decision emphasized the word "conduct" when discussing this obligation, noting that the NVRA "envisions the states will actively oversee a general program…." On remand, the U.S. dismissed its case prior to a decision by the District Court as to whether the efforts of the counties were legally sufficient. Despite the fact that there is no guidance with respect to that particular question, the Eighth Circuit's decision provides valuable insights regarding the nature of a state's obligations and whether the state's role is assertive or passive in conducting and overseeing the voter list maintenance program.

In his deposition testimony, Co-Director Deckard affirmed that he, jointly with fellow Co-Director King, is the NVRA compliance officer and acknowledged that the co-directors are responsible for conducting the list maintenance program (Deckard Deposition, p. 40 and p. 127). However, Co-Director Deckard further testified that "conducting" means to "provide resource information…" (Deckard deposition, p. 128). On several occasions in his testimony, Co-Director Deckard defined his role as being a "resource" and an "interpretive resource" to the counties on the NVRA requirements (Deckard Deposition, p. 126-128). When asked about his ability or obligation to take corrective action when a county was not conducting appropriate list maintenance tasks, Co-Director Deckard said that the Co-Directors' role was to be a "resource and guide point." (Deckard Deposition, p. 130). When asked if the Co-Directors had the ability to issue "stern" warnings to nonperforming counties or take other corrective action, such as informing a county regarding violations of Indiana law in writing, Co-Director Deckard said "I issue a Guidebook that tells them very specifically about the actions they must taken [sic] under both federal and state law. That's pretty stern." (Deckard Deposition, p. 129).

Co-Director King also acknowledged that the Co-Directors are responsible for the state's NVRA compliance (King Deposition, p. 67). Like Co-Director Deckard, Co-Director King referred to the state's role as "serving as a source for information and training to make sure that the county voter registration officials [follow] the requirements of federal and state law and then carry them out" (King Deposition, p. 67).

As noted above in Section X(A), under Indiana law, counties are required to submit affidavits regarding registrant removals and an annual NVRA plan. Co-Director Deckard and King acknowledged that these tools were a resource for compliance efforts, and further confirmed that the counties were not meeting these requirements nor were they making any effort to require that the counties do so.

### C.   Conclusion: Indiana Did Not Conduct Sufficient Oversight Activities

A reasonable effort by a state in conducting voter list maintenance must include an adequate compliance effort. Indiana had a robust compliance program under the 2006 Consent Decree and Order and even called for significant compliance efforts as part of its own Written Compliance Plan. Further, Indiana state law requires basic reporting by the counties in the form of affidavits regarding registrant removals and annual NVRA plans.

Today, however, Indiana is performing virtually no oversight or compliance and has failed to enforce, or even attempt to enforce, the state law regarding annual voter list maintenance plan updates and affidavits from its counties.

While there was no final ruling in the Missouri case, the court provided relevant insight into the state's obligations.

It is my opinion, based on my experience and expertise and my direct knowledge in interacting with county election officials, that a basic plan for oversight and compliance is necessary in any reasonable effort to maintain accurate voter rolls. A state's responsibility is an active one and serving as little more than a passive information resource is insufficient to meet the state's NVRA obligations. Further, the Co-Directors had—and still have—at their disposal state law that offers a basic tool in determining if the counties are conducting list maintenance tasks in a timely, appropriate manner.

Therefore, it is my opinion, based on my expertise and the review of depositions and other documents, that this lack of oversight and compliance has rendered Indiana's voter list maintenance program ineffective and unreasonable.

### XI.   Overall Opinions and Conclusions

I was retained to provide my opinion on whether Indiana made a "reasonable effort" to maintain and update its voter rolls to ensure currency and accuracy for the 2010 Federal elections. In my opinion, based on my experience and expertise as the former Secretary of State for the State of Georgia, with responsibilities as the chief NVRA official, and to a reasonable degree of confidence, Indiana failed to make a reasonable effort to conduct a general program for voter list maintenance and did not meet its obligations under the NVRA.

My report provides detailed conclusions and opinions, as appropriate in each section. The following is a summary of the key points supporting these opinions and conclusions:

- Indiana had the benefit of strong guidance regarding activities that together generally constituted a "reasonable effort" in the 2006 Consent Decree and Order and its Written Plan of Compliance.

- While Indiana conducts a new voter verification program, it does so based on the highly subjective "Confidence Factor," which led to inconsistent verification practices.

- While Indiana conducts a program for the timely removal of registrants who have died, been criminally convicted or declared mentally incompetent, Indiana does not conduct other generally accepted list maintenance practices:

  - NCOA mailing to all registered voters at least every two years
  - General mailing to all registrants either on a statewide basis or county-by-county at least every 10 years or more frequently in the absence of NCOA mailings
  - Removal notices

- Indiana failed to exercise even minimal oversight and compliance among its counties, including:

  - Failing to ensure that counties were following state and federal law for list maintenance activities; and
  - Failing to ensure that counties followed state law for submitting required reports and plans

- Indiana's minimal activities were not conducted in a uniform, nondiscriminatory manner, including:

  - Countywide mailings were conducted in 5 of the state's 92 counties, subjecting registrants in one county to a higher degree of scrutiny than those in the others;
  - The use of the "Confidence Factor" without adequate standards to determine consistent next steps created inconsistencies in the manner in which voter records were verified and subsequently confirmed or cancelled.
  - Warrick County conducted a mailing regarding a precinct change and utilized the information for list maintenance. The State Election Division advised St. Joseph County that precinct change mailings could not be used for list maintenance.

- Indiana was on notice that its voter rolls were substantially inaccurate and out of date, based on the data the state submitted to the EAC. This data showed that numerous counties had voter registration rates in excess of 100% and three counties had voter registration rates in excess of 115%. Yet, despite the indications of serious quality issues with its voter rolls, the state did not act.

In summary, Indiana has failed to conduct even the most basic list maintenance program to ensure reasonably accurate voter rolls.

First, according to the EAC 2011 Report and data provided by Indiana, Indiana's voter registration rate was nearly 90%, well above the national voter registration rate among states of 78.7%. This data, coupled with the county-by-county data, provides strong evidence that significant inaccuracies exist with Indiana's official list of registrants.

Second, a program that consists of only activities for new voter verification and removals due to death, criminal conviction or mental incompetence is insufficient to meet the "reasonable" test. A general program, based on the commonly used list maintenance task, must include some combination of NCOA mailings, general mailings, and notice mailings

Third, Indiana failed to conduct its list maintenance tasks with consistency and uniformity.

Finally, there is the question of who is ultimately responsible for ensuring that the state meets its NVRA obligations. The Co-Directors are statutorily designated as the state's joint NVRA officials. Certainly, the organizational structure that requires Co-Director, one from each major political party, presents certain challenges. Additionally, the Co-Directors have the authority to delegate certain list maintenance activities to the counties.

In my opinion, none of these factors absolves the Co-Directors from their overall obligations under the NVRA—obligations that they failed to meet in connection with the 2010 Federal election and continue to fail to meet even today.

# # #

# ADDENDUM 1

KAREN C. HANDEL
CURRICULUM VITAE

**President, Handel Strategy Group**
November 2011 – present

- Provide strategic counsel on a variety of business, government, policy and communications issues.
- Serve as expert witness on matters related to elections administration.
- Wrote "Planned Bullyhood," published by Simon and Schuster's subsidiary Howards Books.
- Motivational speaker on leadership, public policy, women in politics, and elections reform.

**Senior Vice President, Public Policy, Susan G. Komen for the Cure**
January 2011 – February 2012

- Led the state and federal public policy program for this $400 million global breast cancer awareness organization and its 129 local affiliates, serving as the organization's primary liaison with elected officials and policy makers. Responsible for proactively identifying legislative and regulatory issues and evaluating the impact on Komen and its mission. Served on the Operating Committee, headed the Washington, DC office, and directly managed a team of 7 and multiple outside consultants.
- Created a comprehensive public policy and advocacy strategy that preserved over 95% of funding for vital federal and state breast cancer screening programs, enhanced Komen's relationships with government officials and regulators, and increased the number of advocates by nearly 40%.

**Candidate for Governor of Georgia**
January 2010 – August 2010

- First Republican woman to advance to primary run-off, earning 231,990 votes in primary and 288,516 votes in run-off, less than 2,500 votes needed to secure the nomination.
- Raised nearly $3 million in a highly competitive, 7-person race.

**Secretary of State, State of Georgia**
January 2007 – January 2010

- Elected with 54% of the vote to lead the 400-person, $40 million Agency with responsibility for elections, fraud investigations, professional business licenses, corporate filings, securities and archives.
- Served as state's chief elections officer, overseeing the implementation of various elections programs, including elections administration, voter list maintenance programs, and photo ID.
- Reduced the budget nearly 20% by reorganizing the Agency, prioritizing programs, renegotiating contracts, and streamlining processes and procedures for long-term savings and better service delivery.
- Improved the application process for professional business licenses shortening the time to license from more than 6 weeks to 10 business days.

**Chairman, Fulton County (GA) Board of Commissioners**
November 2003 – December 2006

- Led Georgia's most populous county, overseeing a $1 Billion annual budget and 3,000 employees.

*Handel – Curriculum Vitae – Page 2*

**Deputy Chief of Staff to Governor Sonny Perdue**
January 2003 – November 2003

- Managed office operations, constituent services, Governor's Mansion, and other special projects, and served on the Governor's leadership team.

**President / CEO, Greater North Fulton Chamber of Commerce**
January 2001 – January 2003

- Led one of Georgia's largest business organizations from near bankruptcy to solvency, developing and implementing a turnaround plan to pay off debt, restore public confidence, and grow the membership.
- Oversaw economic development initiatives that created 100,000 + jobs in North Fulton.

**Global Director, Communications & Public Affairs, CIBA Vision Corporation**
April 1997 – January 2001

- Oversaw the communications, public affairs, and community relations program for this global eye care company with $4 billion in annual revenues and over 6,000 employees in 40 countries, building the infrastructure and establishing related objectives, strategies and programs.

**Southeast Area Director, Public and Community Relations, KPMG**
November 1994 – April 1997

- Managed public and community relations for the 6-state southeast region for this accounting / consulting firm, overseeing communications programs, serving as regional spokesperson, managing the corporate giving program, providing communications consulting on various client projects, and directing the company's global Olympics customer hospitality program.

**Early Career:**  Director, Communications and Media Relations, Fur Information Council of America; Deputy Chief of Staff to Marilyn Quayle, Bush-Quayle Administration; Hallmark Cards, Inc.; Sherman Meehan & Curtain; AARP.

**Other Affiliations:** Board member, The Ritz Group.

**Education:**  Attended Prince George's Community College and University of Maryland – University College.  However, did not obtain a degree.

# # #

**ADDENDUM 2**

### FRCP 26(a)(2)(B) Disclosures

In compliance with Federal Rule of Civil Procedure 26(a)(2)(B)(iv) and (v), Karen Handel has not testified as an expert at trial or by deposition in the previous 4 years, and all publications authored in the previous 10 years are identified in Addendum 1.

**SIGNATURE**

I, Karen C. Handel, hereby affix my signature electronically to the foregoing "Review of State of Indiana Voter List Maintenance Activities."

*s / Karen Handel*

Karen C. Handel
Handel Strategy Group

**ADDENDUM 2**

## FRCP 26(a)(2)(B) Disclosures

In compliance with Federal Rule of Civil Procedure 26(a)(2)(B)(iv) and (v), Karen Handel has not testified as an expert at trial or by deposition in the previous 4 years, and all publications authored in the previous 10 years are identified in Addendum 1.

**SIGNATURE**

I, Karen C. Handel, hereby affix my signature electronically to the foregoing "Review of State of Indiana Voter List Maintenance Activities."

_s / Karen Handel_

Karen C. Handel
Handel Strategy Group