**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., and<br>TRUE THE VOTE, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 1:12-cv-800-WTL-TAB |
| | ) | |
| v. | ) | |
| | ) | |
| J. BRADLEY KING, TRENT DECKARD, | ) | |
| and CONNIE LAWSON, | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

### PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT MOTION

In an attempt to deflect attention from its own law breaking, Indiana's Opposition attempts various mistaken arguments against the Plaintiffs and Plaintiffs' expert, most of which are also irrelevant to the law and facts governing this case. What is relevant to this case is: 1) Plaintiffs' expert is qualified, 2) no genuine dispute exists as to Plaintiffs' facts, which prove Indiana's violations of federal law, and 3) based on that law, Plaintiffs are entitled to judgment on their claims for Indiana's NVRA Section 8 violations.

**I.     Indiana's Arguments Against Plaintiffs' Expert are Inaccurate and Misleading**

Indiana's arguments against former Georgia Secretary of State Karen Handel and her expert opinion all rest on inaccurate arguments. Indiana Opp., ECF 75 at 17-19. First, Indiana's statement that Secretary Handel's background does not give her the necessary knowledge to opine on another state officials' performance of the same role is without merit given the facts of what Secretary Handel accomplished in Georgia and what Defendants Deckard, King, and Lawson have failed to accomplish in Indiana. Next, Indiana mischaracterizes certain legal decisions in Georgia, which are irrelevant to Secretary Handel's qualifications. Indiana also

wrongly characterizes Secretary Handel's opinion as one of law and not of fact.  In truth, the Handel Report evaluates industry standards for state voter list maintenance (a factual matter), while also discussing the relevant election laws which all chief state election officials are required to know, understand, and execute.  Finally, Indiana argues the Handel Report fails to meet the standards for scientific evidence, when in fact it was not offered as scientific evidence.

### A. Plaintiffs' Expert is Qualified

Indiana is mistaken that Plaintiffs' expert is not qualified.  Indiana Opp., ECF 75 at 18-19.  For three years, Plaintiffs' expert Karen Handel held the same responsibilities for voter list maintenance in the State of Georgia that Defendants Trent Deckard, J. Bradley King, and Connie Lawson collectively hold for the State of Indiana.  Georgia is a state of approximately 9.9 million people, a population comparable to Indiana's 6.5 million residents, and the two states are similarly comparable in land mass, mixture of rural and urban populations, and local political structure.[1]  In holding this position, part of Secretary Handel's job was understanding the extent of her obligations to ensure voter list maintenance was conducted reasonably in Georgia.  *Id.*  Secretary Handel relies on the knowledge gained from having performed this job to opine on Indiana's efforts.[2]  As a former chief state election official responsible for NVRA compliance, Karen Handel has the vantage point of having been a "member of the same group" in a similar situation as Defendants, which makes her assessment all the more relevant.  *Alliant Tax Credit Fund 31-A, Ltd. v. Murphy*, 494 Fed. Appx. 561, 573 (6th Cir. 2012).

---

[1] Handel Report, ECF 75-7 at 3 ("Like Indiana, Georgia's county elections officials were largely responsible for the day-to-day administration of elections, including conducting list maintenance tasks.  However, as Secretary of State, I maintained the overall obligation to ensure that federal and state law, as well as any rules or guidelines set by the Secretary of State, the State Elections Director, and/or the State Elections Board were followed.").

[2] Handel Report, ECF 75-7 at 9 ("In formulating my findings and conclusions, I have considered and relied upon my experience and expertise as the former Secretary of State and Chief Elections Officer for the State of Georgia, a position that included responsibility for NVRA compliance.").

Furthermore, Secretary Handel has succeeded where the Defendants have failed. Compared to national averages, Georgia had accurate and well maintained voter lists at the conclusion of Secretary Handel's tenure in 2010.  Plfs.' Motion Appx. Exh. 3, U.S. Election Administration Commission Report (excerpts), ECF 69-1 at 36-39 (showing that, as of 2010, Georgia had a total voting age population ("TVAP") percentage of 69.9 and a CVAP percentage of 75.3, demonstrating accurate voter rolls).[3]  Indiana, as the Court will recall, fared very poorly compared to national averages evaluated on this same 2010 data.  Plfs. Opp., ECF 74 at 23-25.

Indiana also makes misleading claims about two legal decisions in an attempt to cast aspersions on Secretary Handel's tenure.  Indiana Opp., ECF 75 at 19.  With respect to *Morales v. Handel*, Indiana's claim that Georgia "illegally changed its election laws to the detriment of voters" is a gross exaggeration.  *Id.*  Rather, the court found that a change in internal registration reviews without preclearance was a "technical" violation.[4]  Once it was determined that preclearance of this minor change was necessary, the State of Georgia promptly submitted the change to the U.S. Department of Justice ("DOJ").[5]  Indiana is not subject to Section 5 of the

---

[3] These factors also explain why Secretary Handel's fees are reasonable and in line with industry practices for expert witness compensation, contrary to Indiana's assertion.  Indiana Opp., ECF 75 at 17.  There is a very small number of former chief state election officials who can speak from the same position of expertise and firsthand experience as Secretary Handel.  The number of such officials who presided over states of comparable size and geography to Indiana is even smaller, and within that group, the number of officials who did an exemplary job of executing voter list maintenance tasks for their state is still smaller.  These factors make Secretary Handel's expertise extremely unique, justifying her fees.  *Bandy v. Kimsey*, 2010 U.S. Dist. Lexis 119034, at *7 (ND Ind. 2010); *Reit v. Post Props.*, 2010 U.S. Dist. Lexis 119693, at *27 (SDNY 2010).

[4] *Morales v. Handel*, Order Granting Preliminary Injunction, 1:08-cv-3172, p. 22 (N.D. Ga., Oct. 27, 2008) ("Accordingly, since Georgia has failed to preclear either of these changes, we find it to have committed a technical violation of Section 5."), avail. at http://moritzlaw.osu.edu/electionlaw/litigation/documents/Morales-Order-10-27-08.pdf (visited Nov. 19, 2013).

[5] *Id.* ("[T]he State has filed for preclearance of its new procedures in response to an 8 October 2008 letter from the Department of Justice as well as the initiation of this suit. To date, the State appears to be cooperating fully with the Attorney General and DOJ's requests in the preclearance evaluation.").

Voting Rights Act, and, therefore, the complex questions of what changes are subject to preclearance are questions that Defendants have never been required to decide.

Finally, at issue in *Georgia State Conference of NAACP v. Kemp*, 841 F. Supp. 2d 1320 (N.D. Ga. 2012) was a motion to dismiss an NVRA Section 7 lawsuit, not a court finding of any "violation of the NVRA," as Indiana incorrectly claims.  Indiana Opp., ECF 75 at 19.  Like Georgia, Indiana also was sued by the NAACP for alleged violations of Section 7 of the NVRA. *See NAACP v. Michael Gagano, Secretary of the Indiana Family and Social Services Administration*, Order Approving Settlement, Case No: 1:09-cv-0849-TWP-DML (S.D. Ind., Aug. 25, 2011).  In addition to Indiana and Georgia, recent Section 7 lawsuits have been brought against Ohio, Missouri, New Mexico, Pennsylvania, Louisiana, Massachusetts, and Nevada.[6]

**B.    Plaintiffs' Expert Report is Admissible**

Indiana's argument that Plaintiffs' expert report was an inadmissible legal opinion and not an opinion on industry standards is wrong for several reasons.  Indiana Opp., ECF 75 at 17-18.  First, the report extensively details and discusses industry standards for states' performance of their list maintenance obligations.  Secretary Handel identifies four sources of information about industry standards for voter list maintenance: the DOJ; the U.S. Election Assistance Commission's ("EAC") 2011 Report to Congress; the National Association of Secretaries of State ("NASS") 2009 Report on voter list maintenance; and finally, the sitting state election officials of the 50 states.  Handel Report, ECF 75-7 at 20-21.  All of these resources were as readily available to Defendants Deckard, King, and Lawson as they were to Secretary Handel. Secretary Handel devotes seven pages of her report to discussing these industry standards.

---

[6] *See* Lisa Danetz, *Testimony: Increasing Compliance with Section 7 of the NVRA*, Demos (April 19, 2013), avail. at http://www.demos.org/publication/testimony-increasing-compliance-section-7-nvra (visited November 19, 2013).

Handel Report, ECF 75-7 at 21-27.  Specifically, this section of the report contains the following statements (bold font added for emphasis):

- "This section reviews commonly employed **list maintenance practices among the states** and provides my opinions…"  ECF 75-7 at 21.

- "**Many states opt** to conduct a general mailing to all registrants on their rolls."  ECF 75-7 at 22.

- "**More and more states** are conducting general mailings as part of their routine, ongoing list maintenance activities."  ECF 75-7 at 23.

- "The NCOA program is an effective and **widely used** list maintenance activity."  ECF 75-7 at 23.

- "Since 2005, **a number of states** have initiated activities to crosscheck their voter registration database with those of other states."  ECF 75-7 at 24.

- "The EAC 2011 Report... provides a state-by-state ranking in order to **benchmark one state's registration percentage against another**."  ECF 75-7 at 25.

- "While neither federal nor state law specifically defines every element of a voter list maintenance program, **states can find ample guidance** and information regarding commonly used list maintenance tasks and best practices."  ECF 75-7 at 25.

- "In my opinion, based on my experience and expertise and to a reasonable degree of confidence, the list maintenance tasks listed here are **widely used among the states** and are effective tools in maintaining an official voter list that is as accurate as possible."  ECF 75-7 at 26.

Secretary Handel then compared these standards to Indiana's list maintenance efforts and found that Indiana's efforts fell significantly short.  Handel Report, ECF 75-7 at 30, 32-33, 34-42; *See also* Plfs. SOF, ECF 69 at 7-8, 10-13, ¶¶ 4, 10, 25, 28-29, 32, 35.

Furthermore, Indiana's suggestion that knowing and speaking intelligently about the law might disqualify Secretary Handel from evaluating Indiana's voter list maintenance efforts shows just how far removed from standard industry practices Indiana has become.  A significant part of a chief state election official's job is to know and understand the election laws, because

5

the official is responsible for executing those laws and seeing them carried out in his or her

state.  If Defendants Deckard, King, and Lawson collectively knew, understood, and executed

their list maintenance responsibilities as well as Secretary Handel did, then Indiana would not

likely be before this Court.

 An expert witness in an NVRA Section 8 case is obligated to discuss the law because the

law forms the necessary backdrop for a state's list maintenance efforts.  If states were not under a

federal obligation to maintain accurate voter rolls, standards and practices would be quite

different.  Indeed, the very concept of a "standard of care" is a legal one, and yet courts routinely

look to non-lawyer medical doctors to opine on the standard of care in their field and whether a

defendant has met that standard.  *See Musser v. Gentiva Health Servs*., 356 F.3d 751, 760 (7th

Cir. 2004) ("To show medical malpractice… [a] plaintiff must present expert testimony to

establish the applicable standard of care and to show whether the defendant's conduct falls below

the standard of care.").  In this case, the standard of care is imposed by NVRA Section 8, so any

expert report in the field of election administration must demonstrate a knowledge and

understanding of the requirements of this particular law.  The fact that the NVRA also uses the

term "reasonable" does not foreclose an expert's evaluation of what is reasonable in practice

based on a variety of facts presented, as Secretary Handel did in her report.  Handel Report, ECF

75-7 at 30, 32-33, 34-42; Plfs.' SOF, ECF 69 at 7-8, 10-13, ¶¶ 4, 10, 25, 28-29, 32, 35.  And

while only this Court can pass legal judgment on Indiana's efforts under the NVRA, Secretary

Handel's assessment of what is reasonable and unreasonable as a matter of common practice is

sufficiently probative to aid this Court in making that judgment.

 Lastly, Indiana argues that the Handel Report is not "scientific evidence," and so should

be excluded.  Indiana Opp., ECF 75 at 19-20.  Secretary Handel's report has not been offered as

scientific evidence.  Secretary Handel is not a scientist.  Rather, she is a knowledgeable and experienced former state election official who has a record of success in carrying out her duties and responsibilities.  Secretary Handel's testimony must be evaluated under the standard for non-scientific experts used by the Seventh Circuit: it is admissible if it is reasoned, uses the methods of the discipline, and is founded on data.  *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).  The Handel Report satisfies all of these criteria.  First, the report is reasoned.  Its conclusions are based on an analysis of voter roll and census data and of industry practices across the states.  *See* ECF 75-7 at 13 ("In order to form my opinions, I have reviewed the demographer's analysis, as well as the excerpts from the Census on which he relied and the EAC 2011 Report data submitted by Indiana."); ECF 75-7 at 26 ("For this reason... benchmarking the practices across the states is the most meaningful and relevant approach.").  Second, the report relies on methods and practices common in the election administration industry.  ECF 75-7 at 21-27.  Finally, the report is founded on data:  specifically, data from appropriate, standards-making bodies (the DOJ, the EAC, and the NASS) and data relevant to analyzing voter roll accuracy from the U.S. Census Bureau and the EAC.  ECF 75-7 at 14-20, 20-21.

## II.   <u>Indiana has Failed to Create a Genuine Dispute of Fact Over its NVRA Violations</u>

It is undisputed that: (1) Indiana's voter rolls were inaccurate, and (2) given Indiana's inaccurate voter rolls, Indiana's efforts to maintain its rolls were unreasonable by industry standards.  Furthermore, there is no genuine dispute of fact as to Plaintiffs' injuries and standing to bring this action.  Finally, it is undisputed that Indiana violated its obligation to produce records about its voter list maintenance efforts when Plaintiffs requested them.  Accordingly, summary judgment on all of Plaintiffs' claims is appropriate.

**A.    Plaintiffs' Undisputed Evidence Proves Indiana's Voter Rolls Were Inaccurate**

Indiana does not dispute Plaintiffs' empirical evidence about the poor condition of its voter rolls, nor could it.  Voter rolls exceeded 100% of TVAP in 12 counties, and Indiana's registered voter totals statewide exceed the national average.  Plfs.' SOF, ECF No 69 at 7-8, ¶¶ 5-10.  Again, there is no dispute about these facts.  Indiana tries to claim that these undisputed facts do not mean that its rolls are inaccurate.  Indiana Opp., ECF 75 at 25.  But, that claim is not supported by any evidence other than Eitan Hersh's report, which Plaintiffs have demonstrated is unreliable and irrelevant, and therefore inadmissible.  Plfs.' Opp., ECF 74 at 18-21.

As Plaintiffs have demonstrated, the undisputed evidence about the condition of Indiana's voter rolls constitutes a *per se* violation of Section 8 because, if Indiana had undertaken reasonable list maintenance efforts, its registered voter totals would not exceed its TVAP or otherwise be so high relative to its population.  Plaintiffs' undisputed evidence establishes a rebuttable presumption that Indiana's voter rolls are inaccurate.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 229-230 (1988) (courts can create rebuttable presumptions for evidentiary practicality). Indiana has not put forth any facts to explain why its voter rolls are so inaccurate despite any reasonable voter list maintenance efforts, and its opportunity for doing so on summary judgment has now passed.

Having more registered voters than TVAP cannot be explained by Indiana waiting two federal election cycles before removing from the rolls those voters who have moved, but failed to answer inquiries or otherwise confirm their new addresses in writing.  42 U.S.C. § 1973gg-6(b)(2)(A) and (B).  For this to be the case, Indiana would have to demonstrate first that it was conducting regular removal mailings, which it was not (ECF 69 at 12, ¶¶ 30-32), and second that the actual registration rates in counties where the number of registered voters exceeds TVAP was

nearly 100%.  No such evidence has been offered, nor could it be.  National average voter registration rates are between 78% and 85% of population as of 2010 depending on the EAC measurement used, and Indiana's percentages were several points higher on every measure. Plfs.' Opp., ECF 74 at 24-25.  Indiana's voter registration rolls undisputedly are highly inaccurate.

Indiana's counter-argument is that Plaintiffs' evidence does not matter.  Indiana Opp., ECF 75 at 25.  But this counter-argument does not create a genuine dispute of material fact. Since there is no genuine dispute of material fact that the number of voters on Indiana's voter registration rolls exceeds TVAP and that Indiana's rolls are highly inaccurate, Plaintiffs are entitled to summary judgment based on Indiana's *per se* violation of NVRA Section 8.

**B.  Plaintiffs' Undisputed Evidence Proves Indiana Did Not Undertake Reasonable Voter List Maintenance Activities**

The compelling, undisputed evidence of Indiana's highly inaccurate voter rolls is proof that Indiana's list maintenance efforts are unreasonable.  Plfs.' SOF, ECF 69 at 7-8, ¶¶ 5-10; Plfs.' Br., ECF 69 at 19-20; Plfs.' Opp., ECF 74 at 22-25.  As demonstrated above in Section II.A., this undisputed evidence constitutes a *per se* violation of Section 8, or, alternatively, creates a rebuttable presumption of a violation of Section 8 that Indiana has, in fact, failed to rebut.  At a minimum, this same undisputed evidence, when considered in combination with additional undisputed evidence about Indiana's very limited list maintenance efforts, also constitutes a violation of Section 8.

First, Indiana fails to dispute Secretary Handel's description of standard industry practices for maintaining voter lists.  Indeed, Indiana has offered no expert testimony (or evidence of any kind) to identify what other or different standards apply to states' list maintenance efforts.  Instead, Indiana essentially argues that there are no standards.  Indiana

claims that the "reasonable efforts" requirement of NVRA Section 8 is almost entirely meaningless and is a matter of unfettered discretion on the part of state election officers. Indiana Br., ECF 71 at 13-14. Indiana's Opposition is a mere rehash of the argument that this Court must defer to Indiana. Indiana Opp., ECF 75 at 30-32. Indiana even suggests there is no room for judicial interpretation of this federal statute. Indiana Opp., ECF 75 at 32 (Indiana "meets the standard of reasonable efforts, to the extent that such a determination can be made."). Plaintiffs have already rebutted these arguments. Plfs.' Opp., ECF 74 at 13-18.

Plaintiffs' evidence has not been disputed. As discussed in more detail above in Section I.B., Secretary Handel described in extensive detail the industry standards for states' performance of voter list maintenance. She reviewed Indiana's written discovery responses and the testimony of Indiana's witnesses, the evidence concerning the condition of Indiana's voter rolls, and multiple sources of publicly available information on standards for list maintenance and election administration, including information published by the National Association of Secretaries of State, the DOJ, and the EAC. Based on this information and her knowledge and experience as the former Secretary of State of Georgia responsible for Georgia's compliance with NVRA Section 8, Secretary Handel concluded that the State of Indiana's list maintenance efforts were not reasonable. Plfs.' SOF, ECF 69 at 12, ¶ 35.

Faced with a damning report from Secretary Handel, Indiana is reduced to trying to exclude the report in order to create a genuine dispute of material fact. Indiana Opp., ECF 75 at 9-12. Indiana is wrong on the facts and wrong on the law in this regard, as discussed above in Section I. Indiana's remaining arguments about its list maintenance efforts are mere legal quibbles dressed up as facts. It claims that the Indiana Department of Health was only required to *negotiate* with other states for out of state death data, not actually *succeed* in obtaining it.

ECF 75 at 5.  It also argues the Election Division was powerless with respect to county election officials, which is a dubious claim considering that these offices are creations of state law.  ECF 75 at 9-10.  The more salient point is the Co-Directors never really tried.  ECF 69 at 10, ¶ 23. Indiana also cites an inapposite procedure for the routine handling of undeliverable mail, which fails to show NVRA compliance.  ECF 75 at 11; ECF 69 at 12, ¶¶ 30-32.

Finally, the Indiana General Assembly's passage of House Enrolled Act (HEA) 1391 and Senate Enrolled Act (SEA) 591, signed by Governor Pence in May of 2013, does not justify or excuse the failure to comply with NVRA Section 8 or demonstrate that no violation occurred. Indiana Opp., ECF 75 at 24-25.  If anything, it demonstrates that Indiana's political leadership agrees with Plaintiffs that Indiana has been failing in its duty to undertake reasonable voter list maintenance efforts.  The May 2013 legislation is essentially a direction from Indiana's political leadership to its election officials to start improving the state's voter rolls, spelling out in detail the specific, necessary list maintenance steps that Defendants have failed to undertake in the past.  Furthermore, HEA 1391 and SEA 519 do not guarantee that Indiana will avoid future NVRA Section 8 violations, because Indiana has a history of not enforcing its own state laws concerning voter list maintenance.  Plfs. SOF, ECF 69 at 8, 10, ¶¶ 11-12, 23.  A federal injunction ordering Defendants to fully execute the list maintenance provisions of HEA 1391 and SEA 519 and report back to the Court on their progress in cleaning up the voter rolls would likely serve to remedy Indiana's systemic failure to undertake reasonable list maintenance.

### C.  Plaintiffs' Undisputed Evidence Proves Plaintiffs Were Injured

Indiana also fails to demonstrate the existence of a genuine dispute of material fact about Plaintiffs' standing to bring this lawsuit.  Indiana argues that Plaintiff Judicial Watch refused to produce privileged information about its members.  Indiana Opp., ECF 75 at 13-14.  But Plaintiff

11

Judicial Watch properly asserted the privilege, Indiana failed to challenge that privilege, the requested information is unnecessary to demonstrate Plaintiff Judicial Watch's standing to bring this lawsuit, and Indiana has no legitimate need to know the names of Plaintiff Judicial Watch's members.  Plfs.' Opp., ECF 74 at 25-27, n4.

      With respect to Plaintiff True the Vote, Indiana asserts that it is "continuing discovery" of Plaintiff True the Vote's standing and needs additional time to determine facts, asking the Court to defer summary judgment to allow its discovery.  Indiana Opp., ECF 75 at 14.  Indiana's request should be denied.  In November of 2012, the Court set a deadline requiring all discovery necessary for the parties' dispositive motions to be completed no later than September 11, 2013.  ECF 33 at 1; ECF 32 at 5.  Indiana already asked this Court for an extension of that deadline, and its request was denied.  ECF 66.  Indiana's unjustified failure to adhere to Court deadlines is not a sufficient justification for delaying this litigation and causing further prejudice to Plaintiffs. *See* ECF 64 at 4-5, *quoting* Entry on Motion to Intervene, p. 3, March 20, 2013, ECF 50. Finally, Indiana failed to submit a Rule 56(d) affidavit specifying why it cannot present facts essential to justify its opposition to Plaintiff True the Vote's standing.  Fed. R. Civ. P. Rule 56(d).  Thus, not only has Indiana had ample opportunity over the course of a year to pursue whatever discovery of Plaintiff True the Vote that it believed it required, but Indiana also has failed to comply with Rule 56(d).  The Court may therefore conclude that Indiana has no meritorious argument with respect to Plaintiff True the Vote's standing.

    **D.**    **Plaintiffs' Undisputed Evidence Proves Indiana Violated its Obligation to Make Records Available**

      Indiana makes the feeblest of efforts to try to dispute Plaintiffs' demonstration that the state violated Section 8's records disclosure provision, devoting only two sentences of its opposition to the issue.  Indiana Opp., ECF 75 at 34.  Plaintiffs have established that Section 8

requires Indiana to make records of its list maintenance efforts available to the public upon

request, and that there is no genuine dispute of material fact that Indiana failed to do so.  Plfs.'

Br., ECF 69 at 27-28; Plfs.' Opp., ECF 74 at 28-29.  Indiana has submitted no countervailing

evidence on this claim, and its minor objections merely repeat legal arguments that have already

been rejected by this Court.  Indiana Opp., ECF 75 at 14-15.  Plaintiffs are entitled to summary

judgment as a matter of law on this claim.

III.     **Indiana Makes Various Mistakes of Law Concerning NVRA Compliance**

Rather than trying to demonstrate the existence of genuine disputes of material fact,

Indiana makes a number of faulty legal arguments to try to avoid summary judgment.  None of

these arguments have merit.

    A.     **The NVRA's Careful Balancing Requires States to Protect Both**
            **Ballot Access and Election Integrity**

Indiana cannot evade liability by arguing that the NVRA does not adequately balance the

competing interests of ensuring ballot access and protecting election integrity, and its recounting

of the history of the NVRA omits key details.  Indiana Opp., ECF 75 at 21-24.  While Indiana

pleads for "balance," Indiana is the party that has disregarded the careful balance crafted by

Congress, not Plaintiffs.  The NVRA reflects a compromise designed to increase both lawful

voter registrations and the integrity of voter rolls.  The NVRA was enacted in 1993 "to establish

procedures that will increase the number of eligible citizens who register to vote in elections for

Federal office," as well as to "protect the integrity of the electoral process" and "ensure that

accurate and current voter registration rolls are maintained." 42 U.S.C. § 1973gg(b)(1), (3)-(4).

To accomplish these twin goals, Section 7 of the NVRA, 42 U.S.C. § 1973gg-5, was

passed to expand opportunities to register to vote.  Along with these expanded opportunities,

Section 8 of the NVRA, 42 U.S.C. § 1973gg-6, was designed to increase the integrity of

elections by requiring states to perform maintenance of their voter registration rolls to ensure the rolls are accurate.  Section 8 therefore functions as a counterpart to Section 7.  The two provisions represent a carefully crafted compromise by Congress to increase both voter registration *and* the integrity of voter rolls.  As the Senate Report explains:

> An important goal of this bill, to open the registration process, must be balanced with the need to maintain the integrity of the election process by updating the voting rolls on a continual basis. The maintenance of accurate and up-to-date voter registration lists is the hallmark of a national system seeking to prevent voter fraud.[7]

Indiana is obligated to comply with both Section 7 and Section 8, and it may be sued for failing to comply with either of them – as it has been in the past.  *See NAACP v. Michael Gagano, Secretary of the Indiana Family and Social Services Administration*, Order Approving Settlement, Case No: 1:09-cv-0849-TWP-DML (S.D. Ind. Aug. 25, 2011); *see also U.S. v. State of Indiana, et al.*, Consent Decree, Case No. 1:06-cv-01000-RLY-TAB (S. D. Ind. July 5, 2006).

NVRA Section 8 imposed federal standards for states' list maintenance activities.  Before NVRA Section 8 was enacted, the maintenance of voter rolls was a matter of state discretion.[8]  Additional, in enacting Section 8, Congress included the change-of-address confirmation requirement and the two federal election waiting period for unreachable, non-confirming registrants as a safeguard in order to ensure that citizens would never get removed prematurely from the rolls.  42 U.S.C. § 1973gg-6(b)(2)(A) and (B).  With this safeguard, Section 8

---

[7] S. Rep. 103-6 at 17-18, reprinted in *Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples*, Appendix C, Senate Rept. on the Act, p. C-10, Federal Election Commission ("FEC"), January 1, 1994, avail. at http://www.eac.gov/national_voter_registration_act/related_documents.aspx (visited Nov. 18, 2013) ("*1994 FEC Guide*").

[8] H.R. Rep. 103-9 at 35 ("States have used a variety of procedures to guard against fraud and maintain the integrity of the electoral process.... This bill would prevent states from implementing procedures that are responsive to local conditions."), reprinted in *1994 FEC Guide*, Appendix B, House Rept., p. B-18.

prohibited the common practice at the time of simply removing registrations from the rolls automatically every time a voter missed an election.  As explained in the Senate Report:

> One of the purposes of this bill is to ensure that once a citizen is registered to vote, he or she should remain on the voting list so long as he or she remains eligible to vote in that jurisdiction.  The Committee recognizes that while voting is a right, people have an equal right not to vote, for whatever reason. However, many States continue to penalize such non-voters by removing their names from the voter registration rolls merely because they have failed to cast a ballot in a recent election.[9]

As long as a state is obeying the NVRA's address confirmation and two federal election statutory safeguard, there is no reason why a state should not be able to maintain voter rolls that are more accurate than Indiana's *without* removing lawfully registered voters.  Indiana fails to understand this, instead complaining about the costs and expense of performing list maintenance both carefully *and* thoroughly, as Section 8 requires.  Indiana SOF, ECF 71 at 6-7, ¶¶ 15-17.  However, if Indiana had been doing what Congress instructed all along rather than evading its duties, the financial impact on the state would have been neutral over time.[10]

Instead, Indiana now argues it should be allowed to opt out of this Congressionally brokered compromise because it believes NVRA Section 8 is an "arrogant, unfunded mandate."  Indiana Opp., ECF 75 at 21-14.  This particular objection has already been litigated.  *Condon v. Reno*, 913 F. Supp. 946, 965-966 (D.S.C. 1995).  Furthermore, Indiana's repeating it here shows disregard not only for federal law but for the purposes of election integrity, to which Plaintiffs take particular umbrage.  The purpose of election integrity, in addition to preventing voter fraud

---

[9] S. Rep. 103-6 at 17, reprinted in *1994 FEC Guide*, Appendix C, Senate Rept., p. C-9.

[10] S. Rep. 103-6 at 41 ("If enactment of the bill results in more people registered, then the cost of such special mailings will be greater.  On the other hand, the bill's provisions that encourage improved list-cleaning would result in more accurate voter registration lists, and election officials would save money by not having to mail voting materials to or prepare polling places for people who no longer would be on the lists."), reprinted in *1994 FEC Guide*, Appendix C, Senate Rept., p. C-22.

and election fraud, is to protect citizens' *confidence* that elections are being conducted fairly and honestly.  As the U.S. Supreme Court has stated, ensuring that elections are legitimate with verifiable results has an independent value unto itself.  *Crawford, v. Marion County Election Bd.*, 553 U.S. 181, 197 (2008) ("[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process. As the Carter-Baker Report observed, the 'electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.'"); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. . .Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised.").

Finally, Indiana claims it has not maintained accurate voter rolls because it is concerned that, if it did, it might accidentally remove valid registrations and disenfranchise voters.  Indiana Opp., ECF 75 at 33.  This is nonsense.  As discussed above, Congress created the two federal election waiting period safeguard to prevent accidental removals, so that states would not be too fearful to do their job of protecting election integrity.  But this is not all Congress did to ensure voter rolls would be cleaned.  When Congress passed HAVA, it created an *additional* safeguard by requiring states to allow voters accidentally removed from the rolls to cast provisional ballots. 42 U.S.C. §15482; *see also Democratic Party of Virginia v. Virginia State Board of Elections*, 2013 U.S. Dist. Lexis 151713, * 5 (E.D. Va. Oct. 21, 2013) ("If a voter is removed from the voter rolls in error, there are several mechanisms in place to protect that voter's rights, including provisional ballots and registration reinstatement.").  The purpose of HAVA's provisional ballot law was to ensure states followed their NVRA Section 8 list maintenance responsibilities by

eliminating the possibility they might disenfranchise a voter by doing so.[11]  Accordingly, the risk

of disenfranchisement from states cleaning their rolls has been reduced to nearly zero, as long as

states follow federal law and use both the two federal election removal safeguard *and* the

provisional ballot safeguard.  It is Indiana that has gotten the balance of interests wrong, not

Plaintiffs.

###### B.   Removing Convicted Felons and Noncitizens From the Rolls is Not Optional

Indiana is mistaken that it has no federal obligation to remove convicted felons and

noncitizens from its voter rolls.  Indiana Opp., ECF 75 at 26.  First, just last year a federal district

court held that Section 8's broad language does in fact require states to keep noncitizens off of

the voter lists:

> Both sides agree that a state can remove an improperly registered noncitizen. . .
> For noncitizens, the state's duty is to maintain an accurate voting list.  *See, e.g.*,
> 42 U.S.C. § 1973gg-6(b).  A state can and should do that on the front end,
> blocking a noncitizen from registering in the first place.  And if a state finds it has
> made an error--or a number of errors--and wishes to correct the problem, it should
> do so well in advance [of a federal election].

*United States v. Florida*, 870 F. Supp. 2d 1346, 1351 (N.D. Fla. 2012).

Similarly, while the NVRA tells states they are permitted to remove felons and mentally

incapacitated individuals when required by state law, the same broad language cited by the

Florida court demonstrates that states' obligations to maintain accurate voter rolls carries with it

an implicit requirement to ensure that *only* eligible voters are on the rolls.  Indiana convicts may

---

[11] Statement of Senator Bond, 148 Cong. Rec. S10488, at S10489, S10491 (daily ed. October 16, 2002) ("Voters who do not appear on a registration list must be allowed to cast a provisional ballot...  I believe these meaningful reforms will go a long way to helping states clean up voter rolls, and thus clean-up elections… The provisional ballot will be extended to those who arrive at the polls to find that their name does not appear on the register of voters… The intent is to provide protection to those who in fact registered but do not appear on the register because of an administrative mistake or oversight.").

not vote while incarcerated, which makes them ineligible. Ind. Code § 3-7-13-4. Furthermore, as Plaintiffs explained in their initial brief, the list maintenance provisions of Section 303 of HAVA clarify and elaborate on the states' existing list maintenance obligations under Section 8 of the NVRA, and therefore can be used to interpret the latter. Plfs. Br., ECF 69 at 3-4, n2, n3. Section 303 of HAVA tells states in no uncertain terms they must work to remove felons from the rolls if felons cannot vote under state law. 42 U.S.C. § 15483 (a) (2)(A)(ii) and (ii)(I) ("For purposes of removing names of ineligible voters from the official list of eligible voters... the State shall coordinate the computerized list with State agency records on felony status").

### C.   In No Way Has Indiana Satisfied the NVRA's Safe Harbor

Indiana's claim that it satisfies the safe harbor provision of Section 8 rests on mistaken readings of the provision. Indiana Opp., ECF No 75 at 27-30. Section 8's safe harbor requires a state to obtain and use the U.S. Post Office's NCOA database to identify relocating voters *and* to follow the mail confirmation and removal procedures set forth in the statute for those voters. 42 U.S.C. § 1973gg-6(c)(1) and (d)(2). Indiana has not satisfied this safe harbor under any reading of the provision. The FEC guidance[12] following the passage of the NVRA confirms this:

> States or local jurisdictions employing the NCOA program will need their own software to translate the input from the NCOA licensee. This software should provide for the automatic updating of addresses for registrants who have moved within the jurisdiction... Confirmation notices to both those who have changed address within the jurisdiction and those who appear to have moved outside the jurisdiction should be sent soon after the lists have been compared…

*1994 FEC Guide*, pp. 5-20 to 5-21. It is undisputed that Indiana never obtained the NCOA database from the U.S. Post Office, nor did it conduct regular list maintenance mailings. Plfs.' SOF, ECF 69 at 9, 12, ¶¶ 15-16, ¶¶ 30-32. Instead, Indiana argues that it technically "uses" the

---

[12] Prior to the creation of the EAC, Congress directed the FEC to provide required information to the states concerning their responsibilities under the NVRA, which the FEC provided in the *1994 FEC Guide*. *See 1994 FEC Guide*, Preface, p.1; 42 U.S.C. § 1973gg-7(a)(4).

Post Office's NCOA information, because, like anyone using the mail, Indiana occasionally

sends out mail that is returned undeliverable, then uses that data for list maintenance purposes.

Indiana Opp., ECF 75 at 30.  But the safe harbor provision requires states to use "change-of-

address information supplied by the Postal Service *through its licensees*" to update voter

addresses and send removal mailings.  42 U.S.C. § 1973gg-6(c)(1)(A).  Indiana did not do this.

Indiana also argues that it can satisfy all of Section 8 merely by complying with the

NCOA safe harbor procedure, without also having to satisfy a "reasonableness" requirement for

the removal of deceased voters and other ineligible registrations.  Indiana Opp., ECF No 75 at

28.  The FEC's guidance again contradicts Indiana's interpretation:

> Finally, it should be said that the NCOA program is not useful in identifying those
> who have died, those who have moved without filing a change of address, or
> those who may be ineligible because of criminal conviction or mental incapacity.

*1994 FEC Guide*, p. 21.  Accordingly, while a state may claim safe harbor for conducting a

program to remove relocating voters by obtaining and utilizing the NCOA database (which

Indiana has not done), it may not claim safe harbor from the reasonable effort requirement to

remove deceased or other ineligible registrants.  Indiana would therefore not have satisfied

Section 8 even if it had obtained the NCOA database.  Plfs.' Br., ECF 69 at 24.

### D.   Indiana Mischaracterizes the Eighth Circuit's Holding in *U.S. v. Missouri*

Indiana incorrectly argues that *U.S. v. Missouri* only addresses state preemption of local

election officials and does not address the question of what the "plain meaning" of NVRA

Section 8 requires state officials to do.  Indiana Opp., ECF 75 at 32.  To the contrary, the Eighth

Circuit found that NVRA Section 8 requires states to lead and direct voter list maintenance

efforts and conduct active oversight programs that monitor local election officials' list

maintenance activities.  *U.S. v. Missouri*, 535 F.3d 844, 850-851 (8th Cir. 2008); Plfs.' Br., ECF

69 at 20-22.

In discussing local election officials, the Eighth Circuit merely held that a lack of local

official compliance "remains relevant" as indirect evidence of a state's violations, or as support

for a court's injunction ordering a state to "assume direct responsibility" over county list

maintenance tasks.  *U.S. v. Missouri,* 535 F.3d at 851.  Plaintiffs do not opine here on the

necessity of an injunction requiring Indiana to assume control over local election officials' list

maintenance tasks.  *But see* Plfs.' SOF, ECF 69 at 10, 12, ¶¶ 23, 30.  Far more relevant is

Plaintiffs' abundant *direct* evidence of Indiana's lack of state leadership and direction of a

reasonable list maintenance program, and Indiana's lack of any meaningful, active oversight of

local officials.  Plfs.' SOF, ECF 69 at 7-8, 10-13, ¶¶ 4, 10, 25, 28-29, 32, 35.

### Conclusion

WHEREFORE, for all the forgoing reasons, Plaintiffs respectfully request that the Court

grant summary judgment on all Plaintiffs' claims and issue an appropriate injunction.

Dated: November 26, 2013                        Respectfully submitted,

| | |
|---|---|
| J. Christian Adams<br>*Admitted Pro Hac Vice*<br>ELECTION LAW CENTER, PLLC<br>300 N. Washington Street, Ste. 405<br>Alexandria, VA 22314<br>Tel: (703) 963-8611<br>Email: adams@electionlawcenter.com<br><br>David R. Langdon<br>Joshua B. Bolinger<br>LANGDON LAW LLC<br>8913 Cincinnati-Dayton Rd.<br>West Chester, Ohio 45069<br>Tel: (513) 577-7380<br>Email: dlangdon@langdonlaw.com<br>     jbolinger@langdonlaw.com | */s/ Paul J. Orfanedes*<br>Paul J. Orfanedes<br><br>*/s/ Chris Fedeli*<br>Chris Fedeli<br><br>Admitted *Pro Hac Vice*<br>JUDICIAL WATCH, INC.<br>425 Third Street S.W., Ste. 800<br>Washington, DC 20024<br>Tel: (202) 646-5172<br>Fax: (202) 646-5199<br>Email:  porfanedes@judicialwatch.org<br>     cfedeli@judicialwatch.org |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of November, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Chris Fedeli*
Chris Fedeli